# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

SAYER TECHNOLOGIES, S.L.,

     Plaintiff,

   - v -

VISCOFAN COLLAGEN USA INC.,
f/k/a NITTA CASTINGS INC.,

     Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 23-2257 (MAS-TJB)
Hon. Tonianne J. Bongiovanni, U.S.M.J.

Motion Date: To be Determined by Court
Oral Argument Requested

---

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
# MOTION FOR SUMMARY JUDGMENT DISMISSING
# DEFENDANT'S AMENDED COUNTERCLAIMS WITH PREJUDICE

---

THE WEIR LAW FIRM, LLC
1170 U.S. Highway 22
Suite 205
Bridgewater, New Jersey 08807
Attorneys for Plaintiff,
Sayer Technologies, S.L.

Of Counsel and On the Brief:
   Bonnie M. Weir, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY.................................... 2

LEGAL ARGUMENT...................................................................................................... 2

    **POINT I-** PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT
    DISMISSING THE AMENDED COUNTERCLAIMS WITH PREJUDICE ................... 2

    **POINT II-** DEFENDANT'S FIRST COUNTERCLAIM FOR ALLEGED
    BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR
    PURPOSE MUST BE DISMISSED WITH PREJUDICE ................................................. 3

    **POINT III -** DEFENDANT'S SECOND COUNTERCLAIM FOR
    ALLEGED BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
    MUST BE DISMISSED WITH PREJUDICE.................................................................. 10

    **POINT IV -** DEFENDANT'S THIRD COUNTERCLAIM FOR ALLEGED
    VIOLATION OF THE DEFEND TRADE SECRETS ACT MUST BE
    DISMISSED WITH PREJUDICE .................................................................................... 11

    **POINT V -** DEFENDANT'S FOURTH COUNTERCLAIM ALLEGING
    MISAPPROPRIATION OF TRADE SECRETS UNDER NEW JERSEY
    TRADE SECRET ACT MUST BE DISMISSED WITH PREJUDICE .......................... 14

    **POINT VI -** DEFENDANT'S FIFTH COUNTERCLAIM ALLEGING
    UNFAIR COMPETITION UNDER NEW JERSEY LAW MUST BE
    DISMISSED WITH PREJUDICE .................................................................................... 14

    **POINT VII -** DEFENDANT'S SIXTH COUNTERCLAIM (IMPROPERLY
    IDENTIFIED AS A SECOND FIFTH COUNTERCLAIM) ALLEGING
    BREACH OF NDA UNDER NEW JERSEY LAW MUST BE DISMISSED
    WITH PREJUDICE ........................................................................................................... 16

    **POINT VIII –** DEFENDANT LACKS STANDING TO PURSUE ITS'
    COUNTERCLAIMS............................................................................................................ 16

CONCLUSION.................................................................................................................. 23

UNREPORTED DECISIONS
National Auto Division, LLC v. Collector's Alliance, Inc., 2017 WL 410241 (N.J. App. Div. Jan. 31, 2017)

i

# TABLE OF AUTHORITIES

**Cases:**                                                                                         **Page:**

Ackerman v. Levine, 788 F.2d 830 (2d Cir. 1986)..........................................................6

Adam v. Barrone, 41 F.4th 230 (3d Cir. 2022)...................................................... 17-18

Alexander v. Cigna Corporation, 991 F.Supp. 427 (D.N.J. 1998)..............................19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)............................................2, 3

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) .............................................................2

Davis v. Wells Fargo, 824 F.3d 333 (3d Cir. 2016)..............................................17, 19

Hilton v. Guyot, 159 U.S. 113 (1895).........................................................................6

In re Chocolate Confectionary Antitrust Litigation, 801 F.3d 383 (3d Cir. 2015).......17

In re: Cortuk, 633 B.R. 236 (Bankr. D.N.J. Aug. 30, 2021)......................................5, 6

Instrumentation Associates, Inc. v. Madsen Electronics (Canada) Ltd.,
859 F.2d 4 (3d Cir. 1988)..........................................................................................8

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).........2, 3

M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972) ............................................8

National Auto Division, LLC v. Collector's Alliance, Inc.,
2017 WL 410241 (N.J. App. Div. Jan. 31, 2017) .................................................. 14-15

New Jersey Optometric Association v. Hillman-Kohan Eyeglasses, Inc.,
144 N.J.Super. 411 (Ch. Div. 1976), aff'd, 160 N.J.Super. 81 (App. Div. 1978) ........15

Pony Express Records, Inc. v. Springsteen, 163 F.Supp.2d 465 (D.N.J. 2001) ......... 6-7

Spokeo, Inc. v. Robins, 136 S.Ct. 1540 (2016) ..................................................... 17-18


**Rules:**

FRCP 56(c) ...............................................................................................................2

FRCP 56(e) ...............................................................................................................3


**Statutes:**

N.J.S.A. 2A:49A-16.1.................................................................................................9

N.J.S.A. 2A:49-16.3(a) ..............................................................................................9

N.J.S.A. 2A:49-16.4...................................................................................................9

N.J.S.A. 2A:49A-16.7...............................................................................................9

N.J.S.A. 12A:2-315........................................................................................... 3-4, 10

N.J.S.A. 12A:2-725 ...............................................................................................3, 10

N.J.S.A. 12A:2-725(2) ..............................................................................................3

N.J.S.A. §56:15-1...................................................................................................14

## PRELIMINARY STATEMENT

On April 4, 2023, Plaintiff, Sayer Technologies, S.L. ("Sayer"), filed a Complaint seeking payment for outstanding invoices associated with equipment and services provided to Nitta Castings Inc. ("Nitta") between April 25, 2019 and November 26, 2019. The Defendant, Viscofan Collagen USA Inc. ("Viscofan Collagen"), an entity which acquired Nitta in December 2019, filed an Answer with Counterclaims on May 30, 2023 and then amended the Counterclaims on July 11, 2023. In doing so, Viscofan Collagen is rasing issues that have already been determined in Spain in response to legal actions commenced by both Viscofan Collagen and Viscofan, S.A., the parent company of Viscofan Collagen. Those action were filed in accordance with the various contracts which included choice of law and choice of forum provisions confirming the laws of Spain applied and Spain had exclusive jurisdiction of the issues. The Courts in Spain determined that any breakage of the belts provided to Nitta by Sayer did not result from any error by Sayer and Viscofan Collagen failed to produce any evidence to support its claim. Additionally, the Courts in Spain determined that there was also no evidence of unfair competition and further that Viscofan, S.A.'s claims were barred by the statute of limitations. At the time of the alleged unfair competition, Viscofan Collagen did not even exist.

Having lost all of their attempts to obtain a recovery from Sayer through use of the Courts in Spain, as required by each and every Agreement entered into between the parties, Viscofan Collagen now seeks to ignore the decisions rendered in Spain and have a second bite at the apple in response to Sayer's action for payment of outstanding invoices. The Counterclaims address both the issue of the belts as presented by Viscofan Collagen in Spain, as well as Viscofan, S.A.'s claims of unfair competition. As discussed infra, all of Viscofan Collagen's claims are subject to dismissal

-1-

with prejudice as they have already been determined by the Court in Spain which, by contract, had exclusive jurisdiction to address the claims. As such, the doctrines of comity and collateral estoppel prohibit the Counterclaims in this action. Additionally, Viscofan Collagen lacks standing to raise these Counterclaims of Viscofan, S.A. and therefore this Court Lacks jurisdiction to consider the claims which are not even the claims of Viscofan Collagen, but rather claims of the parent company.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Plaintiff, Sayer Technologies, S.L., incorporates herein by reference the accompanying Declaration of Sayer's Managing Director with exhibits as and for a Statement of Facts and Procedural History prior to the commencement of this action.

**LEGAL ARGUMENT**

**POINT I**

**PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT<br>DISMISSING THE AMENDED COUNTERCLAIMS WITH PREJUDICE**

FRCP 56(c)states, in relevant part, that summary "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." See also, Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); and Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). A genuine issue of material fact is "one where a reasonable jury, based on evidence presented, could hold in the movant's favor with regard to that issue." Anderson at 247-248. When evaluating the existence of genuine issues of material fact, "all evidence must be reviewed and all inferences drawn therefrom must be in the light most

favorable to the nonmoving party." <u>Matsushita</u> at 587. Once the movant has met its' burden on a motion for summary judgment, the burden shifts to the nonmoving party to show the existence of a genuine dispute of a material fact. <u>Anderson</u> at 256; FRCP 56(e).

Once this analysis is performed in the instant motion, the Court should grant Plaintiff's motion for summary judgment. As set forth, <u>infra</u>, each of the causes of action have already been resolved by legal action commenced by Viscofan Collagen and Viscofan, S.A. in Spain, in accordance with the various agreements which provided for the use of Spanish law and exclusive jurisdiction in Spain, barring any further attempt to circumvent those determinations and relitigate resolved disputes. Additionally, Viscofan Collagen lacks standing to raise the claims held exclusively by Viscofan, S.A. which have likewise been resolved against Viscofan, S.A. As a matter of law, the Counterclaims cannot proceed.

**POINT II**

**DEFENDANT'S FIRST COUNTERCLAIM FOR
ALLEGED BREACH OF IMPLIED WARRANTY
OF FITNESS FOR A PARTICULAR PURPOSE
<u>MUST BE DISMISSED WITH PREJUDICE</u>**

Defendant's First Counterclaim alleges that the conveyor belts sold by Sayer to Nitta breached the implied warranty of fitness for a particular purpose. These are the same belts for which Sayer seeks payment.

N.J.S.A. 12A:2-315, the implied warranty of fitness for a particular purpose provides as follows: "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied

warranty that the goods shall be fit for such purpose." The issue with respect to fitness of the belts was decided by the Courts in Spain wherein Viscofan Collagen was the plaintiff. After Viscofan Collagen acquired Nitta in 2019, and in accordance with the agreement by and between Sayer and Nitta, it commenced an action in Spain regarding belt breakage. By Judgment No. 000427/2022 entered on December 23, 2022, the Court in Spain considered the expert testimony offered with respect to the belts provided by Sayer to Nitta. See, Exhibit "I". After considering both Viscofan Collagen's expert as well as the Court appointed expert, the Judge determined there was no "design failure, since it has not been proven that they cannot withstand the temperature and humidity conditions in that zone. On the contrary, belt modifications and replacements were carried out by the defendant up to the change of ownership. Finally, the S-line production data do not prove a causal link to the green belts breaking." Exhibit "I" at pg. 58. With respect to the Court appointed expert's report, the Court noted "the technical specifications of the HABASIT belt model T2– S – molded in TPU 10 and chosen by SAYER TECHNOLOGIES S.L. for the Neutralization, Drying and Wetting Zones – fulfill the requirements of the working environment referred by VISCOFAN COLLAGEN USA INC., which are, on the other hand, approximate (~) and incomplete (?), as the Table demonstrates." Id. at pg. 60. The Court continued:

> Having established this, there is no objective proof that links the break of the green belts to the material chosen by Sayer. There is no proof of the defendant's claim that the material does not withstand the high temperature and humidity of the plant working conditions. The video and the three photographs of the supposed rusting are clearly insufficient proof to establish this claim.

Id. at pg. 61. In conclusion on this issue, the Court stated "[b]oth the invoices and the break history prove the existence of a damage but not the defendant's responsibility for the damage or, in short,

-4-

that the cause for the defect or the break of the green belts is their manufacturing from an inadequate material (HABASIT Model T20-S). **The defect has not been proven.**" Id. at pg. 61-62.

When dealing with a foreign judgment, the doctrine of comity must be considered. The Court in In re: Cortuk, 633 B.R. 236, 266-267 (Bankr. D.N.J. Aug. 30, 2021), aptly summarized the doctrine as follows:

> Courts consider the following factors to determine whether to afford comity to a foreign country judgment: (1) whether the judgment was entered by a competent court, having both personal and subject-matter jurisdiction; (2) whether the judgment was brought upon due allegations and proofs, giving the parties the opportunity to defend against the claims; (3) whether the judgment was entered in a clear and formal record; and (4) whether there is any special ground to impeach the judgment. Pony Express Records, Inc. v. Springsteen, 163 F.Supp. 2d 465, 472 (D.N.J. 2001), *citing* Hilton v. Guyot, 159 U.S. 113, . . . (1895). The "polestar" consideration is "whether a reasonable method of notification is employed and reasonable opportunity to be heard is afforded to the person affected." Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 443 (3d Cir. 1971); *see* Hurst v. Socialist People's Libyan Arab Jamahiriya, 474 F.Supp.2d 19, 34 (D.D.C. 2008) (federal courts may grant comity to foreign judgments entered following full and fair trial in foreign court of competent jurisdiction after proper service or voluntary appearance by defendant under judicial system that does not violate U.S. public policy), *citation omitted.* In effect, basic notions of due process must be respected. Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314, . . . (1950) (basic requirement of due process is proper notice that affords interested parties the opportunity to appear and defend).

> Despite these consideration, "comity must yield to domestic policy" so that "no nation will suffer the laws of another to interfere with her own to the injury of her citizens." Republic of Phillipines v. Westinghouse Elec. Corp., 43 F.3d 65,75 (3d Cir. 1994), *quoting* Hilton v. Guyot, 159 U.S. 113, 164, . . . (1895). Therefore, "the obligation of comity expires when the strong public policies of the forum are vitiated by the foreign act." Id., *quoting* Laker Airways Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909, 937 (D.C. Cir. 1984).

-5-

In <u>Hilton v. Guyot</u>, the United States Supreme Court defined comity as:

> . . . neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other.  But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, 141, . . . (1895).  (Citations omitted).

The Court in <u>In re: Cortuk</u>, <u>supra</u> at 267 went on to note that it is the proponent of comity who bears the initial burden to prove that the judgment is entitled to comity and thereafter "the burden shifts to the party opposing comity to show that the order 'violates American policy notions of what is decent and just.'" Finally, the Court noted "[t]his burden is 'high and unfrequently met' and is applicable only in 'clear-cut cases.'", citing to <u>Ackerman v. Levine</u>, 788 F.2d 830, 841 (2d Cir. 1986).

Once the doctrine of comity is found to be applicable, the doctrine of collateral estoppel prevents re-litigation of the action.  In <u>Pony Express Records, Inc. v. Springsteen</u>, 163 F.Supp.2d 465, 473 (D.N.J. 2001), the Court explained:

> Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *See Montana v. United State, 440 U.S. 147, 153, . . . (1979).* So long as a party has been given a "full and fair opportunity to litigate" a matter, he or she is precluded from further litigation of the same matter.  *Id.* This doctrine is invoked by the courts to promote conclusive resolution of disputes, thereby protecting parties from the expense of multiple lawsuits, conserving judicial resources, and increasing the reliability and consistency of judicial decisions. *Id.* at 973-974. . . .

> Of course, in order to apply the doctrine of collateral estoppel, the court must determine that the issue in the pending litigation is identical to the issue in the previous litigation.

In <u>Pony Express, supra</u>, the Court upheld the decision of the United Kingdom under the doctrines of comity and collateral estoppel.

In 2015, Sayer entered into a Technology and Trade Cooperation Agreement with Nitta which included a provision for Sayer to be "free to exploit the results, patentable or not, which arose in certain projects referred to in this contract and owns full proprietary rights on those projects, particularly the Collagen Casing Lines." See, Exhibit "B". The parties further agreed that for any dispute regarding the contract "the courts shall have exclusive jurisdiction Pamplana, both parties expressly waive any other privileges that might correspond." <u>Id.</u> Thereafter, on August 28, 2015, Sayer and Nitta entered into a Contract Agreement for the sale to Nitta of the Sayer Collagen Line Machine. See, Exhibit "C". Once again, the Contact provided that any dispute was to be resolved in the courts in Pamplona, Spain, which had exclusive jurisdiction. <u>Id</u>. Between April 2019 and November 2019, Nitta ordered belts for use with the Sayer Collagen Line Machine which were delivered. See, Exhibit "D". In December 2019, Nitta advised Sayer that it had been acquired by Viscofan Collagen. As noted <u>supra</u>, Viscofan Collagen voluntarily presented the issue of the belts breaking to the Court in Spain as Viscofan Collagen was the Plaintiff.

Having voluntarily submitted the matter to the Court in Spain in accordance with the contracts, Viscofan Collagen recognized that Spain had exclusive jurisdiction to resolve the dispute in accordance with Spanish law. Proofs were submitted by both parties as well as the submission of a Court appointed expert's report. The judgment issued by Spain was entered in a clear and formal record. Finally, there are no special grounds to impeach the judgment. As such, the requirements

under the doctrine of comity have been satisfied. Similarly, the doctrine of collateral estoppel has been met whereby a court of competent jurisdiction rendered a judgment on the issue presented, namely the breakage of the belts was **not** due to anything which was done by Sayer.

When considering the enforcement of a forum selection clause, a federal court must first determine whether a federal statute or rule is involved, and if not then the court "must next determine whether to apply federal judge-made law or state law. . . . In doing so, the district court must evaluate whether application of federal judge-made law would discourage forum shopping and avoid inequitable administration of the law." Instrumentation Associates, Inc. v. Madsen Electronics (Canada) Ltd., 859 F.2d 4, 6-7 (3d Cir. 1988). Courts generally honor the choice of law and forum provisions in a contract in the absence of a compelling reason. Id. at 7. The Court in M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12 (1972), stated that when a choice of forum is "made in an arm's length negotiation by experienced and sophisticated businessmen, and absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."

In this case, sophisticated businessmen negotiated agreements which included provisions for the law of Spain to apply and for Spain to have exclusive jurisdiction. As a result, Viscofan Collagen commenced legal action against Sayer in Spain wherein Viscofan Collagen alleged that the cause of the belt breaks was due to Sayer's failure to manufacture them properly for use in the S-Line machine. Expert reports from Viscofan Collagen, Sayer and a Court-appointed expert were considered by the Court and a determination was made that there was no proof provided by Viscofan Collagen that the breakage of the belts was due to anything done by Sayer. As such the claims were dismissed.

-8-

Now in a clear attempt at forum shopping, and solely in response to Sayer's lawsuit for payment for the belts, Viscofan Collagen filed Counterclaims including one for an alleged breach of the implied warranty of fitness for a particular purpose. While the allegation which Viscofan Collagen made in Spain was not based on the New Jersey statute, the issue of whether Sayer caused the belts to break was determined by the Court in Spain. Viscofan Collagen cannot be entitled to another bite at the apple as the doctrines of comity and collateral estoppel should serve to enforce the decision in Spain resulting in a dismissal of the First Counterclaim with prejudice.

Additionally, New Jersey statutes provide for recognition of foreign country money judgments. N.J.S.A. 2A:49A-16.1 et. seq. The statute applies to a foreign country's judgment which grants or denies a sum of money and when the judgment is final, conclusive and enforceable. N.J.S.A. 2A:49-16.3(a). New Jersey is required to recognize a foreign country's judgment when determined by an impartial tribunal, there was personal and subject matter jurisdiction, the defendant had notice, there was no fraud, the judgment is not repugnant to the public policy of the State or United States, the judgment was not contrary to an agreement between the parties, and due process was met. N.J.S.A. 2A:49-16.4. Once a court finds that the foreign country's judgment is entitled to recognition, same shall be conclusive and enforceable. N.J.S.A. 2A:49A-16.7.

Viscofan Collagen commenced the action in Spain and judgment was entered against its' interests. All of the requirements of comity, collateral estoppel and the Foreign Country Money Judgment Recognition Act have been satisfied. As such, Viscofan Collagen's First Counterclaim must be dismissed with prejudice.

-9-

## POINT III

### DEFENDANT'S SECOND COUNTERCLAIM FOR
### ALLEGED BREACH OF IMPLIED WARRANTY
### OF MERCHANTABILITY MUST BE DISMISSED WITH PREJUDICE

Viscofan Collagen's Second Counterclaim alleges that the conveyor belts sold by Sayer to Nitta breached the implied warranty of merchantability.  Once again, these are the same belts for which Sayer seeks payment.

The implied warranty of fitness for a particular purpose provides "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." N.J.S.A. 12A:2-315.  The factual and legal arguments advanced in Point II, supra, apply here as well.  The issue has already been resolved by the Courts in Spain as the designated court of exclusive jurisdiction.  Under the doctrines of comity and collateral estoppel, as well as New Jersey's Foreign Country Money Judgment Recognition Act, Viscofan Collagen's Second Counterclaim must be dismissed with prejudice.

## POINT IV

### DEFENDANT'S THIRD COUNTERCLAIM FOR
### ALLEGED VIOLATION OF THE DEFEND TRADE SECRETS ACT
### MUST BE DISMISSED WITH PREJUDICE

Viscofan Collagen's Third Counterclaim alleges that Sayer violated the Defend Trade Secrets

Act of 2016 by using Viscofan's (with no distinction as to which Viscofan) trade secrets for their

own benefit.[1]

Initially it bears noting that Viscofan S.A., not the Defendant in this action, filed an action

in Spain as the Plaintiff on or about November 2, 2016, some 3+ years before Viscofan Collagen,

the Defendant/Counterclaim Plaintiff in this action even existed.  In Judgment No. 000040/2019

filed on March 7, 2019, Exhibit "G", the Court addressed Viscofan S.A.'s alleged claim of unfair

competition involving disclosure of trade secrets and related claims.  In reviewing the facts, the

Court in Spain found the following:

> In the case of this procedure, the only conclusion that may be reached
> is that the action being exercised is statute barred since more than one
> year has elapsed since the action could be exercised without it being
> observed that continuing unfair conduct exists.  To this end, it is
> necessary to accurately determine what conduct the defendant is being
> attributed with, which is simply the use of knowledge acquired during
> its commercial relationship with VISCOFAN, S.A. relating to said
> company's plans, machinery, and production process to market
> machines copied from the plaintiff.  In this respect, the fact that an
> order for pulleys was placed in February 2016 with the company
> DINAMICA (exhibit no. 24 of the claim) and in November 2015 an
> order for belts was placed with the company AMMERAAL
> BELTECH, S.A. (Exhibit no. 28 of the claim) is of no relevance in
> order for it to be deemed that we are faced with a continuing act given
> that these are instrumental acts to enable SAYER TECHNOLOGIES,
> S.L. to manufacture a machine (a knotting machine) which it is stated

---

[1] Sayer specifically refutes any suggestion that it improperly used Viscofan's trade secrets.

the defendants copied and sought to sell. Nevertheless, the fact that SAYER TECHNOLOGIES, S.L. sought to sell one or several machines of similar specifications to that developed by VISCOFAN, S.A. is a fact that has been known by the plaintiff since February 23, 2015, as said party states and attests. Indeed, enclosed as exhibit no. 17 to the claim is the email sent by the international sales representative Mr. Horwath in which he reports to Mr. Kamis (of VISCOFAN, S.A.) that both himself and his colleague Mr. Kollross have been contacted by SAYER TECHNOLOGIES, S.L. to place on the market a machine which, in his opinion, bears highly similar features to the knotting machine developed by VISCOFAN, S.A. From this point, the plaintiff is already accepting this circumstance and is fully aware of the alleged activity carried out by SAYER TECHNOLOGIES, S.L., as certified by exhibit no. 18 of the claim, which is a notary record by means of which VISCOFAN, S.A. serves notice on SAYER TECHNOLOGIES, S.L. – through its representative Mr. Legaz – with a letter calling on the company to refrain from marketing the knotting machines and to hand over all documentation and information relating to the designs, the technology, and the know-how pertaining to the plaintiff. Following that, there is only reference to a shipment of containers by SAYER TECHNOLOGIES, S.L. to Nitta group, but under no circumstances has it been certified that what those containers held was technology built by SAYER TECHNOLOGIES, S.L. copied from technology pertaining to VISCOFAN, S.A.

See Exhibit "G" at pages 8-9. Viscofan S.A. appealed that decision. By Judgment No. 000561/2021 decided on May 13, 2021, the Court in Spain reiterated the issue being an allegation of unfair competition involving trade secrets and related relief. See, Exhibit "H" at page 3 (under Legal Grounds, One-Context).

The Court continued at page 9:

Also, the judicial version of events has not proven that Sayer had manufactured and/or marketed knotting machines using Viscofan's secret technology, not even in relation to the one identified in August 2014, which must have been sold to Poland, and which constituted grounds for the requisition dated February 23, 2015. This requisition proves that the events reported by Viscofan were already known by the time the demand was made for confidential data to be handed

-12-

over, but it does not prove that the famed replicated knotting machine existed, nor does it attest to the precise specifications of it.

Viscofan S.A. appealed the May 13, 2021 Judgment with a decision issued on June 23, 2023. See, Exhibit "L". In dismissing Viscofan S.A.'s appeal, the Court stated at page 6:

> Accordingly, following an overall examination of the evidence reviewed, the judgment under appeal established that, beyond the pleadings of the appealing party, none of the instances of the conduct stated had been certified and the lack of evidence thereof was even underlined. It went further and pointed out that if an unlawful act had taken place, it would have been committed in August 2014, meaning that by February 23, 2016 – one month before the action was exercised – the action would have been statute barred.

The statute under which Viscofan Collagen alleges its Third Counterclaim, namely the Defend Trade Secrets Act, addresses claims which do not belong to Viscofan Collagen. Indeed, the alleged trade secrets discussed in the Counterclaim were those of Viscofan S.A. and were considered by the Courts in Spain in accordance with the choice of law and forum provisions of the various contracts. As discussed, infra, Viscofan Collagen lacks standing to bring these claims on behalf of Viscofan S.A. Additionally, Viscofan S.A.'s attempt to circumvent the jurisdiction of Spain to have a second bite at the apple cannot be permitted for the reasons set forth in Point II, supra. The doctrines of comity and collateral estoppel to enforce the Judgments entered in Spain as against Viscofan S.A. are conclusive of the issue.

-13-

### POINT V

### DEFENDANT'S FOURTH COUNTERCLAIM ALLEGING MISAPPROPRIATION OF TRADE SECRETS UNDER NEW JERSEY TRADE SECRET ACT MUST BE DISMISSED WITH PREJUDICE

Viscofan Collagen's Fourth Counterclaim alleges Sayer's alleged misappropriation of trade secrets violates the New Jersey Trade Secrets Act. Relying on the same facts as set forth in the Third Counterclaim which alleged a violation of the Defend Trade Secrets Act, Viscofan Collagen alleges that Sayer violated the New Jersey law, specifically, N.J.S.A. §56:15-1 *et.seq.*

As discussed in Point IV, the decisions rendered by the Courts in Spain determined there was no evidence to support the claim of violation of trade secrets. As such, this Counterclaim is barred by the doctrines of comity and collateral estoppel. Additionally,, and as discussed in Point IV, the alleged claims are those of Viscofan S.A. and not those of the Defendant/Counterclaimant Viscofan Collagen. Indeed, Viscofan Collagen did not exist when these alleged violations occurred. Therefore, Viscofan Collagen lacks standing to bring these claims and this Court lacks jurisdiction to consider same. See, Point VIII, infra.

### POINT VI

### DEFENDANT'S FIFTH COUNTERCLAIM ALLEGING UNFAIR COMPETITION UNDER NEW JERSEY LAW MUST BE DISMISSED WITH PREJUDICE

Viscofan Collagen's Fifth Counterclaim alleges that Sayer engaged in unfair competition under New Jersey Law. As noted by the Court in National Auto Division, LLC v. Collector's Alliance, Inc., 2017 WL 410241 (N.J. App. Div. Jan. 31, 2017) at pg. 4:

> Unfair competition consists, in essence, of the misappropriation of a business's property by another business. . . . Unfair competition,

-14-

> however, has also been described in broader terms: "There is no
> distinct cause of action for unfair competition. It is a general rubric
> which subsumes various other causes of action." . . . The common
> law tort of unfair competition has historically been viewed as an
> umbrella for tortious interference claims . . . Outside of the
> intellectual property context, unfair competition is not an independent
> cause of action. . . (citations omitted).

See also, New Jersey Optometric Association v. Hillman-Kohan Eyeglasses, Inc., 144 N.J.Super.

411, 428 (Ch. Div. 1976), aff'd, 160 N.J.Super. 81 (App. Div. 1978), wherein the Court stated that

"[i]n essence, unfair competition is a business tort."

As noted in the discussion of the decisions rendered in Spain in Point IV, there was no

evidence presented by Viscofan S.A. of unfair competition. Since a court of competent jurisdiction

rendered its decision in the matter commenced by Viscofan S.A., the doctrines of comity and

collateral estoppel prevent Viscofan Collagen from proceeding with a claim for unfair competition

which was previously ruled against Viscofan S.A.

Additionally, Viscofan Collagen lacks standing to bring this claim. All of the allegations

address a time period before Viscofan Collagen even existed. Indeed, Viscofan S.A. is attempting

to relitigate its loss in Spain by having its subsidiary assert allegations which have absolutely nothing

to do with it. As such, Viscofan Collagen lacks standing to bring this claim and, therefore, this Court

lacks jurisdiction to consider same.

## POINT VII

### DEFENDANT'S SIXTH COUNTERCLAIM (IMPROPERLY IDENTIFIED AS A SECOND FIFTH COUNTERCLAIM) ALLEGING BREACH OF NDA UNDER NEW JERSEY LAW MUST BE DISMISSED WITH PREJUDICE

Viscofan Collagen's Sixth Counterclaim (improperly designated as a second Fifth Counterclaim) alleges that Sayer breached the NDA under New Jersey law. It is axiomatic that an NDA is a contract and therefore governed by contract law.

The NDA's referenced in the Counterclaim relate to Viscofan S.A. as all allegations address written agreements prior to Viscofan Collagen's existence in December 2019. As such, Viscofan Collagen lacks standing to bring this claim thereby depriving this Court of jurisdiction to consider it. Additionally, as discussed in Point II, the agreements at issue provided for the law of Spain to be used with exclusive jurisdiction in Spain. Finally, the issue of trade secrets was resolved against Viscofan S.A. in the Courts in Spain and, therefore, the doctrines of comity and collateral estoppel also prevent this claim from proceeded.

## POINT VIII

### DEFENDANT LACKS STANDING TO PURSUE ITS' COUNTERCLAIMS

The Defendant/Counterclaimant in this action is Viscofan Collagen USA Inc. Initially, under "Parties" in the Counterclaim, Defendant states at par. "5" that "Viscofan is a Delaware corporation with its principal place of business located at 141 Southside Avenue, Bridgewater, New Jersey. Viscofan USA is a leading producer and distributor of artificial casings for the meat industry." In par. "6", Defendant states that Viscofan is a successor to Nitta Casings, Inc. following a transaction

-16-

in December 2019 whereby Viscofan, S.A., the parent company of Viscofan, purchased Nitta. Throughout the remainder of the Counterclaims consisting of a total of 102 paragraphs, there is only the use of the name "Viscofan" with no differentiation as to which of the three (3) entities identified in the opening paragraphs, namely, Viscofan Collagen USA Inc., Viscofan USA, and Viscofan, S.A., is involved.

The law is clear that "a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship." In re Chocolate Confectionary Antitrust Litigation, 801 F.3d 383, 404 (3d Cir. 2015), citation omitted. Throughout the Counterclaims, Defendant refers to "Viscofan" when the Defendant is Viscofan Collagen USA Inc. However, the allegations in Counterclaims Three through Six relate to entities other than Viscofan Collagen USA Inc., which entity did not even exist until December 2019.

Federal courts are granted the power to adjudicate cases and controversies by and through Article III of the Constitution. Adam v. Barrone, 41 F.4th 230, 233 (3d Cir. 2022). That power necessarily includes that a party has standing. Id. If its is determined that a party lacks standing, a federal court lacks the authority under the Constitution to consider the case. Id. See also, Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016), wherein the Court noted that "[s]tanding is a jurisdictional matter. 'Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed.'" (citation omitted).

As explained by the Supreme Court in Spokeo, Inc. v. Robins, 136 S.Ct. 1540, 1547 (2016),

> Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood. . . . The doctrine limits that category of

> litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong. . . .
>
> Our cases have established that the "irreducible constitutional minimum" of standing consists of three elements. . . . The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. . . . The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements. . . . Where, as here, a case is at the pleading stage, the plaintiff must "clearly ... allege facts demonstrating" each element. . . . (citations omitted).

The Supreme Court continued its discussion with respect to the first element, injury in fact.

> Injury in fact is a constitutional requirement, and "[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." . . .
>
> To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." . . .

Id. at 1548.

With respect to an injury being "'particularized', it 'must affect the plaintiff in a personal and individual way.'" Id. In addition to "particularization", "[a]n injury in fact must also be 'concrete'" which the Court defined as "de facto" and "it must actually exist". Id.

When considering the second element of the alleged injury is fairly traceable to the challenged conduct, "[t]his is akin to but-for causation, not proximate causation." Adam, supra at 235. This was further explained in footnote "5" as "[b]ut-for causation is established whenever an injury would not have occurred without the alleged action or event." Id. (citation omitted). Any injury traceable to the defendant cannot be "the result of the independent action of some third party

-18-

not before the court." Davis, supra at 346-347. Indeed, "standing is generally an inquiry about the plaintiff: is this the right person to bring this claim." Davis, supra at 348 (citation omitted).

It is also clear that a federal court "may not exercise jurisdiction over a defendant corporation if the only connection with the state is through the defendant's subsidiaries." Alexander v. Cigna Corporation, 991 F.Supp. 427, 443 (D.N.J. 1998). As such, it is important to review the entities identified by Viscofan Collagen in the Counterclaims. According to the corporate search records, Nitta Casings Inc., the entity identified at par. "6" of the Counterclaim, was acquired in a transaction by and between Nitta and Viscofan, S.A. with Viscofan Collagen USA Inc. being the successor-in-interest to Nitta. Nitta was formed on July 9, 1996 under the laws of the State of Delaware. Nitta filed a name change on December 19, 2019 to Viscofan Collagen USA Inc., which entity was not registered to do business in New Jersey until December 20, 2019. That is when Nitta changed its name to Viscofan Collagen USA Inc. At no time is Viscofan USA or Viscofan, S.A. identified as an entity which assumed Nitta.

According to the corporate searches, on June 27, 2022 Viscofan Collagen USA Inc. proceeded to file a Certificate of Withdrawal and ceased doing business in New Jersey as well as in Delaware. There are no recorded documents linking any other Viscofan entity with the prior Nitta (thereafter Viscofan Collagen USA Inc.).

In paragraphs "17" through "33" of the Counterclaims, Defendant uses the name Viscofan but is referring to Viscofan, S.A. with respect to the creation and development of products in the artificial casing industry. Reference is made to NDAs dated January 21, 1992 and June 26, 1995, long before Viscofan Collagen USA ever existed. In paragraphs "34" through "38" of the Counterclaim, Defendant alleges that personnel from Bildu-LAN, with whom it is alleged entered

into the NDAs referenced earlier, formed Sayer Technologies, S.L. in October 2012. Defendant then alleges that it demanded the return of Viscofan Trade Secrets. However, those alleged trade secrets could not have involved Viscofan Collagen USA Inc as it did not even exist. In paragraphs "39" through "43", Defendant alleges Sayer used Viscofan Trade Secrets discussed in the prior paragraphs. Once again, the alleged trade secrets could not have been those of Viscofan Collagen USA Inc which did not exist until December 2019 when it assumed Nitta.

The Third Counterclaim alleges a violation of the Defend Trade Secrets Act. Defendant refers to trade secrets through the Confidentiality Agreement, employment agreements and employee training, as well as the relationship with Bildu-LAN and the NDAs. All of these references predate the very existence and registration to conduct business by Viscofan Collagen USA Inc. The only reference to Nitta is the alleged information regarding use of Viscofan's technology for the machine sold to Nitta by Sayer, which was allegedly discovered after Nitta was acquired. However, the alleged trade secrets were of Viscofan, S.A. and not Viscofan Collagen USA Inc, the Defendant/Counterclaimant in this action. Additionally, as discussed in Point II of this Brief, Viscofan S.A. already submitted this issue to the Court in Spain in accordance with the contractual obligation for such issues to be litigated in Spain pursuant to Spanish law. As discussed in Point IV of the Brief, Viscofan, S.A. was the plaintiff in Spain and the Court's Judgment even referenced Nitta. Viscofan S.A. was unsuccessful in establishing a violation of trade secrets. Viscofan S.A. was also unsuccessful in its appeal of the Judgment and its further appeal of the Judgment. As such, this Court lacks jurisdiction to consider the Counterclaim as Viscofan Collagen USA Inc lacks standing.

Viscofan Collagen USA Inc did not (1) suffer an injury in fact because it did not exist at the time of the alleged trade secrets at issue, (2) it is not fairly traceable to the challenged conduct of Sayer as Viscofan Collagen USA Inc had no trade secrets for Sayer to allegedly take from it, and (3) it is unlikely to be redressed by a favorable judicial decision because of the failure to have any connection to the alleged issues which allegedly occurred years before Viscofan Collagen USA Inc was established and registered to do business.

With respect to Defendant's Fourth Counterclaim, same alleges misappropriation of trade secrets under the New Jersey Trade Secret Act which refers back to the NDAs and Bildu-LAN, all long before Viscofan Collagen USA Inc ever existed as a legal entity. The same arguments set forth for the Third Counterclaim apply to the Fourth Counterclaim. The alleged issue belongs to Viscofan, S.A. and was already resolved in Spain which, according to all of the agreements, has exclusive jurisdiction over the issues. Viscofan, S.A. cannot proceed through Viscofan Collagen USA Inc, a separate legal entity (which no longer exists), and Viscofan Collagen USA Inc. (1) did not suffer an injury in fact, (2) any alleged injury is not traceable to Sayer as Viscofan Collagen USA Inc had no trade secrets for Sayer to allegedly misappropriate, and (3) it is unlikely for the matter to be redressed favorably since Viscofan Collagen USA Inc did not exist during the period it is alleged Sayer misappropriated the trade secrets from Viscofan, S.A.

Defendant's Fifth Counterclaim for alleged unfair competition under New Jersey Law has the same fate as the Third and Fourth Counterclaims as all of the alleged trade secrets were those of Viscofan, S.A., and allegedly taken during a time before Viscofan Collagen USA Inc ever existed. The above arguments apply similarly to this Counterclaim.

Defendant's Sixth Counterclaim (mis-identified as a second fifth counterclaim) alleges breach of NDA under New Jersey Law. However, the allegations refer to the NDAs beginning in 1992 between Viscofan, S.A. and Bildu-LAN. Viscofan Collagen USA Inc did not exist and did not own any of the alleged technology at issue in the Counterclaim. As such, the standing test described in Spokeo., supra, does not permit this Counterclaim to proceed for the same reasons set forth previously.

During a hearing conducted on September 18, 2024, Defendant's counsel made reference to paragraph "D" of an NDA. The document is a Confidentiality Agreement dated December 10, 2012 by and between Sayer and Viscofan, S.A. Paragraph "D" of that Confidentiality Agreement states as follows:

> As a consequence of the foregoing, THE RECIPIENT may have access to information pertaining to and related to the scope of activity of Viscofan and its Affiliated Companies, related to technical, industrial, labor, commercial or any other aspects.

First, Sayer and Viscofan, S.A. ceased working together in 2014/2015 time period. Additionally and more importantly, Viscofan Collagen USA Inc did not exist until 2019. As such there is no possibility by which Sayer could have had access to information of Viscofan Collagen USA Inc as it had none. It also cannot be ignored that this Confidentiality agreement, at par. "10" provided that Spanish law applies and the parties "expressly submit to the jurisdiction of the courts corresponding to the domicile of Viscofan", i.e., Spain.

There can be no doubt that Defendant lacks standing to pursue Counterclaims Three through Six. As such, this Court must dismiss the Counterclaims.

## <u>CONCLUSION</u>

Based upon the foregoing, Plaintiff, Sayer Technologies, S.L., respectfully requests that its motion for summary judgment dismissing the Counterclaims alleged by Defendant, Viscofan Collagen USA, Inc., be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

THE WEIR LAW FIRM, LLC
Attorneys for Plaintiff

Dated: October 21, 2024

By:_____
Bonnie M. Weir

-23-

2017 WL 410241

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of New Jersey, Appellate Division.

NATIONAL AUTO DIVISION, LLC, Plaintiff–Appellant/Cross–Respondent,

v.

COLLECTOR'S ALLIANCE, INC., Defendant–Respondent/Cross–Appellant.

DOCKET NO. A–3178–14T3

Argued November 15, 2016

Decided January 31, 2017

On appeal from the Superior Court of New Jersey, Chancery Division, Monmouth County, Docket No. C–59–14.

## Attorneys and Law Firms

Galit Kierkut argued the cause for appellant/cross-respondent (Sills Cummis & Gross, P.C., attorneys; Ms. Kierkut, of counsel and on the brief; Grace A. Byrd, on the brief).

Eric G. Fikry argued the cause for respondent/cross-appellant (Blank Rome, L.L.P., attorneys; Stephen D. Schrier and Mr. Fikry, of counsel; Mr. Fikry and Michael A. Iannucci, on the brief).

Before Judges Yannotti, Fasciale, and Gilson.

## Opinion

PER CURIAM

**\*1** Plaintiff National Auto Division, LLC (NAD) appeals from an October 3, 2014 order dismissing with prejudice its amended complaint against defendant Collector's Alliance, Inc. (CAI) for failure to state claims on which relief can be granted under *Rule* 4:6–2(e). CAI cross-appeals from a February 3, 2015 order denying its motion for sanctions against NAD.

In its amended complaint, NAD alleged that CAI, a competitor, had improperly raided employees from NAD. Thus, NAD asserted claims for (1) tortious interference with prospective economic advantage; (2) tortious interference with contractual relations; (3) unfair competition; and (4) civil conspiracy. Applying the standard for dismissal under *Rule* 4:6–2(e), we reverse the dismissal of NAD's first three claims, but affirm the dismissal of the civil conspiracy claim. We also reverse the order denying CAI's motion for sanctions. Thus, the matter is remanded for further proceedings.

I.

We accept the facts as pled by NAD. *See Nostrame v. Santiago*, 213 *N.J.* 109, 127 (2013) (reiterating the well-established standard that on a motion to dismiss the facts alleged in the complaint must be accepted and accorded a liberal reading to ascertain if a cause of action is " 'suggested by the facts' " (quoting *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 746 (1989))).

NAD sells extended automobile warranties via telemarketers. CAI sells collectible coins through several methods, including telemarketing. NAD claims that it competes with CAI because they both use telemarketers to sell products and services to customers. NAD further alleges that the methods of telemarketing are transferable.

NAD has approximately 100 employees and ten to fifteen of those employees are highly trained sales "closers." According to NAD, it meticulously trains its closers to fine tune

"proprietary closing techniques" through the use of "proprietary scripts and confidential marketing and development data."

NAD asserts that CAI intentionally set about to raid a large number of employees from NAD and improperly lured those employees away. In that regard, NAD asserts that CAI developed an intentional "plan to harm NAD" and it paid a financial award to employees who successfully recruited NAD closers. Specifically, NAD contends that CAI targeted and raided over thirteen employees from NAD during a two-year period. NAD goes on to assert that CAI used "confidential information" to identify and contact its employees. Moreover, NAD contends that by hiring a large number of its closers, CAI obtained NAD's confidential methodologies for closing sales.

Further, NAD contends that at least six of its former employees who were hired by CAI had restrictive covenants and non-disclosure agreements. Thus, NAD alleges that CAI tortiously interfered with those contractual relationships by hiring those employees. The agreements were between the employees and Metro Marketing, LLC (Metro). NAD, however, claims that it is an affiliate of Metro and, therefore, covered under and protected by the restrictive covenant and non-disclosure agreements.

*2 In addition, NAD alleges that at least one CAI employee denigrated NAD in a Facebook posting. That posting stated:

> To [a]ll my [M]etro friends...good morning... As you are waking up
> dreading the shit hole they call [M]etro in which [you] must endure
> today...there is another way. The [d]ay I [l]eft Metro Marketing is the day
> I stopped feeling like a [l]oser.... Contact me for further instructions[.]

NAD contends that this employee, and potentially others, posted additional public social media messages on behalf of CAI to disparage NAD and improperly solicit NAD employees.

Finally, NAD contends that CAI engaged in a conspiracy with its employees, who were formerly employed by NAD, to intentionally raid more employees away from NAD and to intentionally damage NAD's business.

In April 2014, NAD filed a complaint against CAI seeking relief based on CAI's alleged poaching, and asserting claims for tortious interference with contractual relations and unfair competition. CAI responded by writing to NAD and contending that the complaint's allegations were frivolous and violated *N.J.S.A.* 2A:15–59.1 and *Rule* 1:4–8. CAI also moved to dismiss the complaint.

NAD filed opposition to the motion to dismiss and filed an amended complaint. In its amended complaint, NAD asserted four causes of action: (1) tortious interference with prospective economic advantage; (2) tortious interference with contractual relations; (3) unfair competition; and (4) civil conspiracy. CAI then moved to dismiss the amended complaint and put NAD on notice that it would contend that the amended complaint was also frivolous.

The trial court heard oral arguments on the motion to dismiss and, on October 3, 2014, it entered an order granting CAI's motion and dismissed with prejudice all of NAD's claims. Thereafter, CAI filed a motion for sanctions, the motion was fully briefed, and the trial court heard oral arguments on January 23, 2015. On February 3, 2015, the trial court entered an order denying CAI's motion requesting sanctions.

NAD now appeals the order dismissing with prejudice all of its claims. CAI cross-appeals the order denying its motion for sanctions.

II.

We start with NAD's appeal. On its appeal, NAD argues that the trial court improperly made fact findings on a motion to dismiss, considered information outside the

amended complaint, and failed to recognize that NAD had adequately plead facts supporting all four of its claims against CAI.

We use a de novo standard to review the dismissal of a complaint for failure to state a claim. *Donato v. Moldow*, 374 *N.J. Super.* 475, 483 (App. Div. 2005). In reviewing a dismissal under *Rule* 4:6–2(e), our inquiry is focused on examining the legal sufficiency of the facts alleged on the face of the complaint. *Printing Mart, supra,* 116 *N.J.* at 746. Thus, we must "search[ ] the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, [giving] opportunity ... to amend if necessary." *Ibid.* (quoting *Di Cristofaro v. Laurel Grove Mem'l Park,* 43 *N.J. Super.* 244, 252 (App. Div. 1957)).

"At [the] preliminary stage of the litigation, the [c]ourt is not concerned with the ability of plaintiffs to prove the allegation[s] contained in the complaint. For purposes of analysis plaintiffs are entitled to every reasonable inference of fact. The examination of a complaint's allegations of fact required by the aforestated principles should be one that is at once painstaking and undertaken with a generous and hospitable approach."

*\*3* [*Ibid.* (citations omitted).]

Using this standard, we review each of NAD's claims.

A. Tortious Interference

NAD asserts two claims of tortious interference: (1) tortious interference with contracts; and (2) tortious interference with prospective economic advantage. The contracts NAD identifies are restrictive covenants and non-disclosure agreements that six of the employees signed with Metro. The prospective economic advantage NAD identifies was its interest in the continued employment of the employees who left and went to work for CAI.

The elements of tortious interference with an existing contract are:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

[*Nostrame, supra,* 213 *N.J.* at 122 (quoting *Restatement (Second) of Torts* § 766 (1979)).]

The elements of tortious interference with prospective economic advantage are:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

[*Ibid.* (quoting *Restatement (Second) of Torts* § 766B (1979)).]

*See also Printing Mart, supra,* 116 *N.J.* at 751–60 (explaining that to prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must show (1) the existence of a reasonable expectation of economic advantage; (2) an intentional and malicious interference with that expectation; (3) a causal connection between the interference and the loss of the prospective gain; and (4) damage).

Although these torts are separate causes of action, both have as their focus the means of interference. *Nostrame, supra*, 213 *N.J.* at 121–22. To state a claim for either tort, the plaintiff must show that the interfering acts were intentional and improper. *Ibid.* (citing *Restatement (Second) of Torts* §§ 766 and 766B (1979)).

The mere inducement of an employee to move to a competitor is not, in and of itself, actionable when the employee is terminable at will. *Avtec Indus., Inc. v. Sony Corp. of Am.*, 205 *N.J. Super.* 189, 194 (App. Div. 1985). Because NAD's employees were at-will employees, the alleged interference is governed by the tortious interference with a prospective economic relationship. *Nostrame, supra*, 213 *N.J.* at 121. Nevertheless, the inducement is actionable if the party offering the inducement either has an unlawful or improper purpose or uses unlawful or improper means. *Avtec, supra*, 205 *N.J. Super.* at 194. In *Nostrame*, our Supreme Court identified various types of conduct that has been deemed improper or wrongful. *Nostrame, supra*, 213 *N.J.* at 124. Improper and wrongful means includes conduct that amounts to fraud, defamation, deceit, misrepresentation, violence, intimidation, criminal or civil threats, or other violations of the law. *Ibid.*

### 1. Standing.
**\*4** The trial court found that NAD lacked standing to bring a tortious interference with contracts claim related to the restrictive covenants and non-disclosure agreements. The court reasoned that the employees signed those contracts with Metro and NAD did not have standing to assert that claim on behalf of Metro. In opposition to the motion to dismiss, however, NAD submitted a certification contending that it was a subsidiary of Metro and an affiliated company. NAD also argues that it is a beneficiary to the contracts since the restrictive covenant and non-disclosure agreements expressly stated that the employees would be working for Metro or any of its affiliates.

Applying the standard on a motion for dismissal, NAD has pled sufficient facts to survive a motion to dismiss. Although it may turn out that the employees have contracts only with Metro, on the current record such a ruling cannot be made definitively. CAI argues that interpreting the restrictive covenants and non-disclosure agreements is purely a question of contractual interpretation. However, given NAD's contention that it is a subsidiary and affiliate of Metro, there is a need for at least some discovery on that issue.

### 2. NAD's Allegations of Wrongful Means.
NAD argues that it has identified facts which, if believed, would support a finding that CAI acted intentionally and maliciously in luring away its employees. In support of that contention, NAD alleges that CAI paid its employees bonuses when they attracted NAD "closers." NAD goes on to contend that CAI raided twelve of its closers in a two-year period. NAD also contends that CAI improperly used confidential information to solicit its closers. Finally, NAD alleges that CAI induced one of the former NAD employees to make a Facebook posting to disparage NAD and induce other NAD employees to join CAI.

CAI responds that none of those actions are sufficiently malicious or wrongful so as to constitute tortious interference. On a motion to dismiss, however, NAD's allegations must be accepted. Giving NAD the benefit of all favorable inferences, its allegations are sufficient to survive a motion to dismiss. Whether the claims can survive summary judgment following discovery is a separate matter that can be addressed at the appropriate time.

In short, applying the standard for evaluating a motion to dismiss under Rule 4:6–2(e), NAD has alleged sufficient facts to support both its claim of tortious interference with contracts and tortious interference with prospective economic advantage.

### B. Unfair Competition
Unfair competition consists, in essence, of the misappropriation of a business's property by another business. *N.J. Optometric Ass'n v. Hillman–Kohan Eyeglasses, Inc.*, 144 *N.J. Super.* 411, 427 (Ch. Div. 1976), *aff'd*, 160 *N.J. Super.* 81 (App. Div. 1978).

Unfair competition, however, has also been described in broader terms: "There is no distinct cause of action for unfair competition. It is a general rubric which subsumes various other causes of action." *C.R. Bard, Inc. v. Woodtronics Corp.*, 235 *N.J. Super.* 168, 172 (Law Div. 1989). The common law tort of unfair competition has historically been viewed as an umbrella for tortious interference claims. *See Restatement (Third) of Unfair Competition* § 1 comment g (1995) (explaining that generally, when a competitor tortiously interferes with the business of another, this constitutes an unfair method of competition). Outside of the intellectual property context, unfair competition is not an independent cause of action. *See, e.g. Columbia Broad. Sys. v. Melody Recordings, Inc.*, 134 *N.J. Super.* 368 (App. Div. 1975) (explaining the boundaries of imitating a competitor in the context of unfair competition).

*\*5* Here, NAD has alleged that CAI, by improperly luring NAD's closers, "wrongfully obtained NAD's confidential and proprietary information" in the form of marketing techniques and methodologies. Although this underlies NAD's claims of tortious interference, it also can constitute an independent form of unfair competition. *See Lamorte Burns & Co. v. Walters*, 167 *N.J.* 285, 308–09 (2001) (explaining that the taking of confidential and proprietary property is "contrary to the notion of free competition that is fair"). Further, "information need not constitute a trade secret [to be legally protected], and indeed, may otherwise be publicly available. The key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information." *Id.* at 299 (citing *Platinum Mgmt., Inc. v. Dahms*, 285 *N.J. Super.* 274, 295 (Law Div. 1995)). In *Lamorte* two employees, one of whom had a restrictive covenant, left the plaintiff company to establish a new business and compete directly with their former employer. *Id.* at 291–93. In doing so, the former employees developed a targeted solicitation list based on information from their former employer's client files. *Ibid.* The Court found this to be contrary to the notion of fair competition. *Id.* at 309.

To succeed in its unfair competition claim, NAD must establish that its marketing methodologies constituted confidential and proprietary information based on the relationship of the parties involved and the intended use of the information. NAD is entitled to develop its claim through discovery because it has alleged facts sufficient to survive a motion to dismiss. Whether the claim can survive summary judgment thereafter is, again, a matter that can be addressed at the appropriate time.

C. Civil Conspiracy
A civil conspiracy is defined as

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.

> [*Banco Popular N. Am. v. Gandi*, 184 *N.J.* 161, 177 (2005) (quoting *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 268 *N.J. Super.* 337, 364 (App. Div. 1993), *certif. denied*, 135 *N.J.* 468 (1994)).]

A civil conspiracy requires two or more persons acting in concert. *Ibid.* NAD alleges that CAI acted in concert with its own employees to tortiously interfere with NAD's employment relationships. However, "a corporation which acts through authorized agents and employees ... cannot conspire with itself." *Tynan v. Gen. Motors Corp.*, 248 *N.J. Super.* 654, 668 (App. Div.), *certif. denied*, 127 *N.J.* 548 (1991), *rev'd in part*, 127 *N.J.* 269 (1992). A corporation and its employees are not separate persons for the purpose of civil conspiracy, and a conspiracy cannot exist in the absence of two or more persons acting in concert. Thus, the trial court properly dismissed this count of NAD's complaint.

III.

On its cross-appeal, CAI contends that the trial court erred in not sanctioning NAD under *N.J.S.A.* 2A:15–59.1 and *Rule* 1:4–8. We review a trial court's decision on an

application for fees or sanctions under an abuse of discretion standard. *United Hearts v. Zahabian*, 407 *N.J. Super.* 379, 390 (App. Div.) (citing *Masone v. Levine*, 382 *N.J. Super.* 181, 193 (App. Div. 2005)), *certif. denied*, 200 *N.J.* 367 (2009).

*N.J.S.A.* 2A:15–59.1 provides that a prevailing party in a civil action may be awarded reasonable costs and attorney's fees if the court finds that the complaint or defense of the non-prevailing party was frivolous. To be considered frivolous, the filing must be found to have been made in "bad faith, solely for the purpose of harassment, delay or malicious injury[,]" or made "without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." *N.J.S.A.* 2A:15–59.1(b).

*Rule* 1:4–8(b) provides that a party may make a motion for sanctions against an attorney or pro se party that has filed a paper with a court for a frivolous purpose. The rule goes on to provide certain procedures that must be followed to qualify. The rule also imposes limitations on the amount that can be imposed as a sanction. *R.* 1:4–8(b) and (d). The conduct warranting sanctions under *Rule* 1:4–8 or fees under *N.J.S.A.* 2A:15–59.1 has been strictly construed and narrowly applied. *McKeown–Brand v. Trump Castle Hotel & Casino*, 132 *N.J.* 546, 561 (1993); *Wyche v. Unsatisfied Claims & Judgment Fund of N.J.*, 383 *N.J. Super.* 554, 560 (App. Div. 2006).

**\*6** Here, we discern no abuse of discretion by the trial court given the procedural context in which the court addressed the motion seeking fees and sanctions. Nevertheless, because we are reversing the dismissal of three of NAD's claims and remanding the matter, the prior procedural context no longer exists. Thus, we also reverse, without prejudice to reconsideration, the trial court's order denying CAI's motion for sanctions and fees. If CAI believes it has the grounds to refile its motion for fees and sanctions at a later stage of this litigation, that motion can be re-evaluated at that time.

Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

## All Citations

Not Reported in Atl. Rptr., 2017 WL 410241, 2017 IER Cases 27,997

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.