**EXHIBIT J**

[Spanish Coat of Arms]
JUDICIARY
ADMINISTRATION

Court of First Instance no. 2
Plaza del Juez Elío/Elío Epailearen Plaza, Planta 4
Solairua, 31011
Pamplona/Iruña
Phone no.: +34 848.42.42.41 -FAX +34 848.42.42.84
Email: pinspam2@navarra.es
0N050

Section A

Procedure: **ORDINARY PROCEDURE**
Procedure no.: **0001327/2021**

General ID-No.:        3120142120210012074
Matter: Obligations:
Resolution:        Judgement 000427/2022

Signed by
MARÍA PASTOR CISNEROS
Date: 23/23/2022   15:42

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCCDD_Web/index.html
Verification Code: 3120142002--d1a5053a5e375b0c83ceb3c0cf0988ez72yA4==

# J U D G E M E N T  No. 000427/2022

Pamplona/Iruña, December 23rd 2022,

by **Honorable MARIA PASTOR CISNEROS,** Magistrate Judge at the Court of First Instance No. 2 of Pamplona/Iruña and its district, in light of the records of Ordinary Procedure no. 0001327/2021 presented before this Court on the application of VISCOFAN COLLAGEN USA INC, represented by Attorney JAVIER ARAIZ RODRÍGUEZ and assisted by Lawyer JUAN DE LA FUENTE GUTIERREZ, against SAYER TECHNOLOGIES SL, represented by Attorney CARLOS HERMIDA SANTOS and defended by Lawyer JOSE MARIA AZNAR AUZMENDI, to recover undue payment.

[ *Below is the translation of Point no. 4 "Rusting and Break of Belts", pages 56 to 62 of the Judgement referred to above, belonging to Section B, "Defects related to Sayer's inappropriate use of materials", page 52 of the Legal Ground No. Three "Design Deficiencies. Inappropriate material. Viscofan's responsibility" (page 18 of the Judgement).*]

[Navarre
Coat of Arms]

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380

[Spanish Coat of Arms]
JUDICIARY
ADMINISTRATION

Signed by
MARÍA PASTOR CISNEROS    Date: 12/23/2022    15:42

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCDD_Web/index.html

Verification Code: 3120142002-d1a5053a6e875600c83ceb8c0cf0983e272yAA=

**4. Rusting and break of belts.** The plaintiff's expert concludes that the (green) belts chosen by Sayer for the Wet Zone rusted because of their steel core. The rusting caused the belts to break, forcing a shut-down of the whole collagen extrusion S-Line for the duration of the repair or replacement of the broken belt, thus stopping production.

It also happened at the entrance to the Dryer because of the U-curve between the Wet Zone 2 and the Dryer, where the envelope must turn 180°.

This defect is examined under Point 6.4 Evaporator, Dryer and Post-Wetting. Rusting and break of belts (pages 34 to 38).

The report says in this regard: "Another problem identified by Viscofan Collagen USA Inc. consists in the rusting of the belts due to their steel core, which cannot withstand high temperatures and humidity.

Mr. Diez mentions this aspect in the Video 3, 03:32 - 04:34. However, it is Video 4 where the problem is shown in further detail.

In Video 3, 03:32 - 04:34, Mr. Diez also indicated that the belt soul is made of steel, and therefore susceptible to rusting in the presence of a certain degree of humidity. Sayer's belt choice is therefore wrong or inadequate, since they do not withstand high temperatures and humidity and break.

As way of example, some pictures are included below, showing broken belts due to the aforementioned rusting. Discarded or broken belts due to rusting.

Mr. Diez mentions the breaking of the green belts again, not just in the Wet Zone 2, but also in the next one, the Dryer (Video 4, 02:58 - 04:07).

The breaking of the (green) belts has important economic consequences, independently of the zone, since it forces a shut-down of the whole collagen extrusion S-Line for the duration of the repair or replacement of the broken belt, thus stopping production.

[Navarre Coat of Arms]

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
nº 3390

[Spanish Coat of Arms]
JUDICIARY ADMINISTRATION

Signed by MARÍA PASTOR CISNEROS    Date: 23/23/2022    15:42

Verification Code: 3120142002-d1a5053a5e375600a83cb0c098ef27yAA==

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCDD_Web/Index.html

[Navarre Coat of Arms]

An example of belt breaks between 2018 and 2020 is included in Annex 11, an Excel file with the break history. It shows that the green belts broke in different zones of the S-Line, although the incidence was higher in the Dryer and the Wet Zone (1 and 2).

By way of illustration, the following chart shows the incidence of green belt breaks between 2018-2020. The same chart is detailed for 2018-2019 and 2020 to allow a better visualization.

The chart shows that the number of broken belts per month is much higher in 2018 and 2019 than in 2020, when Viscofan introduced corrections and adjustments to mitigate the existing problem, derived from installing the S-Line."

Point 4.4. of the expert's report ordered by the defendant states the following on the rusting of the green belts installed in the Neutralization, Drying and Wetting Zones:

"One of the defects mentioned in Document 2 of the Claim is the rusting of the belts. Three images are included to illustrate belt rusting. First of all, I would like to discuss some points mentioned by Mr. Prieto and Mr. Diez in their report.

- The green belts are not located in the Wet Zone no. 2, as it is incorrectly mentioned in page 36 of Document 2. Mr. Diez's walkdown by the S-Line, transcribed by Mr. Prieto, indicates that the "green belts" (only identification provided) are only in the Dryer (Video 3, 03:40 to 04:30)

- To claim a design failure, the data sheet of the "green belts" should be compared to the working conditions of the zone in which they are installed. However, although Video 3 (3:40 - 4:30) and Video 4 (02:58 - 04:07) mention the existence of those data sheets, they are not included either in the claim or in the expert's report (Document 2).

More specifically, the image put forward to plead that the "green belts" broke, only shows the effects of rusting —that is, the presence of rust— on the lowest belt in the pile, the one in contact with the pallet, while the upper ones do not show evident signs of rust; it is not possible to know where or why they broke. Besides, the picture is clearly taken in a weather-exposed zone. Therefore, we cannot directly link the rust on the one band to its being installed in the Dryer zone, where humidity is 35% (as indicated in Document 2) and temperature lies between 179.6°F and 188.6°F.

If temperature were the real problem, I think there should be even more breaks than the alleged number. Therefore, I do not consider the design error to be properly justified, since it is not possible to know why or where the failure lies. In fact, attributing breaks to temperature or humidity in the Dryer is not understandable to me. A 35% humidity is a dry environment. In the afternoon of February 19th 2022, a normal winter day, the relative humidity in Bridgewater, New Jersey, is 62%. Needless to say, temperature does not rust. Therefore, we do not understand where the problem lies, if the problem does in fact exist.

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380

[Spanish Coat of Arms]
JUDICIARY ADMINISTRATION

Signed by MARÍA PASTOR CISNEROS    Date: 23/23/2022    15:42

Guaranteed doc. by electr. signature URL verification: https://administracionelectronica.navarra.es/SCCD0_Web/index.html

Verification Code: 3120142002- d1a50S3a5e3756b0d83ea93c0cf0983e72YAA=

I dare doubt the seriousness of the failure due to the following reasons:

Annex 19 shows that the replacement or repair of the green belts (not identified as such any more) between January 2018 –with the S-Line fully operational– and December 2019 –change of ownership of the plant belonging to NITTA CASINGs Inc.– is carried out by the defendant.

In that period, production was down for 4 months due to modifications in the S-Line. If the green belts showed a design failure and it was known, why were they not replaced at that time?

Another point to take into account is the time during which the S-Line was down. According to the claim (page 7, fourth paragraph) "(...) [S-Line modification] works lasted from October 2018 and March 2019, causing a production shutdown (...)". See now the following chart included in Document 2 of the Claim (Annex 11), which compares belt break with production data (page 45, Document 2 of the Claim):

In October 2018 (at the beginning of the shutdown), there were 10 breaks, but production ceased to be effective (see production chart) after November (5 breaks), in December (13 breaks), January (7 breaks), February (3 breaks) and March (2 breaks, end of the shutdown, production data already available). If the S-Line was out of production between November 2018 and February 2019 –as shown in the production data–, the green belts should also have been out of work. Did they break while standing? It does not seem logical that belts break while the line is shut down. In fact, the break chart shows that the third month with the highest number of breaks (13) coincides with the line shutdown.

Besides, after the supposed shutdown, the period between April and November 2019 appears to show the highest number of belt breaks, with a record peak in May (16 breaks).

In my opinion, the modifications introduced in the S-Line worsen the behaviour of the green belts and their break ratio.
Last, but not least, which belts were chosen to replace the supposedly so wrongly selected green belts? Neither Mr. Díez videos, nor their transcript by Mr. Prieto in Document 2 of the Claim indicate which new belts achieved an improvement in the break ratio. Video 4 (3:17) shows a green belt that apparently looks the same as the ones that broke:

Therefore, in my opinion, the use of green belts with steel core in the Dryer Zone is not a design failure, since it has not been proven that they cannot withstand the temperature and humidity conditions in that zone. On the contrary, belt modifications and replacements were carried out by the defendant up to the change of ownership. Finally, the S-Line production data do not prove a causal link to the green belts breaking.

The court expert approaches this subject under Point 9.6. on Use of Unsuitable Materials in the S-Line.

[Navarre Coat of Arms]

[Stamp]
Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3300

[Spanish Coat of Arms]
JUDICIARY ADMINISTRATION

Signed by
MARÍA PASTOR CISNEROS    Date: 23/23/2022  15:42

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCDD_Web/index.html

Verification Code: 3120147002- d1a5053a5e3756b0c83ceb2c0cf0393e72yAA==

Point 9.6.1. analyzes the alleged defect in the green belts (pages 65 to 68) and says:

"(...) According to the expert opinion, the cause for the alleged high number of T20-S breaks would be their unsuitability for the working conditions in the zones where they were implemented, particularly their insufficient protection against temperature and humidity. This would have caused the metal components inside the belts (which are molded in thermoplastic polyurethane or TPU) to rust early and to favor their mechanical failure.

The previous accusation is backed up by three photographs showing some parts apparently affected by corrosion and by an analysis of the break evolution of those elements in time, based on the information recorded in the excel sheet attached to the expert's report as Annex 11 with the title "Excel File with the History of (Green) Belts Breaks in the Wet Zone 2" --despite the Wet Zone 2 being the only one that does not use those elements-- and in which the company HABASIT is mentioned in all cases, and not BRECO.

The expert who writes this report considers that he cannot take any of these references for his analysis, because they do not allow to establish a cause-effect link with sufficient guarantee. He decides to use a comparison strategy between the available data on the working conditions in the neutralization, drying and wetting zones and the technical specifications of model T20-S.

WORKING CONDITIONS /... it is important to recall that the ultimate responsibility for the definition, management and supervision of the working conditions of the collagen gel casing extrusion line rests with NITTA CASINGS INC. after the S-Line passes the test phase.

Therefore, according to VISCOFAN COLLAGEN USA INC, the usual working conditions for the collagen gel casing extrusion line would be: uninterrupted operation (24/7) and constant velocity at a permanent speed below 150 feet per minute.

In respect of the use of the HABASIT model T20-S in the Neutralization, Drying and Wetting Zones, it is important to recall that there is no direct contact with the food product (which rests on fingers), so that it is not subjected to the conformity requirements of the food industry like the model FAB-12E, which is used in the Washing and Plasticizing Zones.

From the environmental point of view, we can see the following references in each of the zones equipped with the model T20-S. These references are included in the expert's report that VISCOFAN COLLAGEN USA INC. presents in their CLAIM:

In the Neutralization Zone, the temperature remains around 77 °F. No estimated values are given either for relative humidity or for the acidity or alkalinity of the environment, despite the ammonia fumes emitted by the process being potentially corrosive.

[Navarre Coat of Arms]

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380

59

P00133

[Spanish Coat of Arms]
JUDICIARY
ADMINISTRATION

Signed by
MARÍA PASTOR CISNEROS    15:42    Date: 23/23/2022

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCCD_Web/index.html

Verification code: 3120142002-d1a5053a5e375680c83ceb3c0cf098ee72yAA==

In the Drying Zone, the temperature remains between 179.6 and 188.6 °F. There are no estimated values either for relative humidity or for the acidity or alkalinity of the environment, since the product has previously been washed and plasticized.

In the Wetting Zone, temperature remains around 122 °F and relative humidity around 35%. The acidity or alkalinity of the environment is not relevant, since the product has previously been washed, plasticized and dried.

TECHNICAL SPECIFICATION / From the strict point of view of the contract, the technical specifications that are established in the offer suppose the temperature of the working environment in the Drying Zone to be around 176 and 248 °F. These temperature values should only be taken into account to select the structural elements of such Zone. Besides, the considerations related to the relative humidity of the product (ranges from 9 to 11% and from 19 to 20%), also established in the offer, cannot be translated to the working environment of Model T20-S, since there is no physical contact between the belt and the product, which is transported on fingers that are fixed to the element.

Therefore, after reading the technical specifications provided by SAVER TECHNOLOGIES S.L. for the HABASIT model T20-S, molded in TPU 10, it is concluded that the manufacturer prescribes its use for working environments with temperatures between 32 and 230 °F.

On the other hand, there is no recommended relative humidity range, although a criterion is mentioned at the end of the document that might be understood as standard climate conditions. This criterion mentions a parameter of 50% (way above the 35% referred by VISCOFAN COLLAGEN USA INC.).

Finally, there is no reference either to the environmental pH values that this Model can be continuously exposed to or to its average life span, both depending on the set of working conditions it might be exposed to. In any case, HABASIT offers a web-based app to run certain checks and simulations, which can be accessed at https://rims.habasit.com/.

In short, the technical specifications of the HABASIT belt model T20- S –molded in TPU 10 and chosen by SAVER TECHNOLOGIES S.L. for the Neutralization, Drying and Wetting Zones– fulfil the requirements of the working environment referred by VISCOFAN COLLAGEN USA INC., which are, on the other hand, approximate (~) and incomplete (?), as the Table demonstrates.

These previous factors could be verified explicitly in the case of temperature (which would also be valid for the technical specifications of the BRECO belt model T20 provided by VISCOFAN COLLAGEN USA INC, as long as the molding material was TPUWB1), and implicitly in the case of relative humidity, since the reference to the standard environmental conditions is 50%."

[Navarre Coat of Arms]

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380

[Spanish Coat of Arms]
JUDICIARY
ADMINISTRATION

Signed by
MARÍA PASTOR CISNEROS

Verification code: 312014Z002-d1a505da5e37560cd83ceb3c0c0983e272yAA== Date: 23/23/2022 15:42

Guaranteed doc. by electr. signature URL verification:
https://administracionelectronica.navarra.es/SCDDD_Web/Index.html

Having established this, there is no objective proof that links the break of the green belts to the material chosen by Sayer. There is no proof of the defendant's claim that this material does not withstand the high temperature and humidity of the plant working conditions. The video and the three photographs of the supposed rusting are clearly insufficient proof to establish this claim.

The defendant's expert explains in his report that the breaking of the green belts is due to their rusting, because they do not withstand temperature and humidity. But he also recognizes that he did not know the characteristics of the product at the time of his report.

On the other hand, it is said that the situation improves with the adjustments and corrections introduced by Viscofan in 2020. Errors excepted, the adjustments in the line design are carried out in the Wet Zone and neither their existence nor Sayer's responsibility for them have been proven.

Before Court, the defendant's expert points at the belts being subjected to excessive tension as another reason for their breaking. In this regard, Viscofan's Innovation Manager points at excessive tension and oscillation movements as break causes to be added to the material used –stainless steel now–, which he believes to be the main factor. He saw one or two broken belts when he travelled to the US. Therefore, another possible cause for the belt breaks would lie in the untested design of the S-Line.

Same as in the Drying Zone, the break problem improved when Sayer was replaced as a belt supplier. Nevertheless, it has already been pointed out that there is no conclusive objective proof that the problem is caused by the belt material.

Mr. Goldfarb does not add new information about the defect to what he already manifested. He explains that the problem is solved by the measures taken by Viscofan after acquiring Nitta; in his opinion, by Viscofan's decision to change material.

On the other hand, he explained that, every time a belt broke, the S-Line had to be shut down to repair it. The amount of gel lost because of the lack of movement is to be added to this loss. He refers a loss of 12,000 liters of gel due to the shutdown. I believe it is relevant that the shutdown did not prevent the (other?) belts from moving. This would explain why green belts still broke when the S-Line was shut down.

The defendant claims the amount of 300,364.53 Euro and 1,772.56 USD for the replacement of the broken (green) belts and attaches the corresponding invoices paid by Viscofan Collagen USA Inc. in Annex 19. Both the invoices and the break history prove the existence of a damage but not the defendant's

[Navarre Coat of Arms]

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3308

[Spanish Coat of Arms]
JUDICIARY ADMINISTRATION

responsibility for the damage or, in short, that the cause for the defect or the break of the green belts is their being manufactured from an inadequate material (HABASIT Model T20-S).

**The defect has not been proven**

Doña Cristina Fuentes Sánchez, Traductora Jurada de Inglés en virtud del título otorgado por el Ministerio de Asuntos Exteriores, Unión Europea y Cooperación, certifica que la que antecede es traducción fiel y exacta al INGLÉS de un documento redactado en lengua ESPAÑOLA. En SANTANDER, a 16 de junio de 2023.

Ms. Cristina Fuentes Sánchez, Sworn Translator of English, appointed by the Ministry of Foreign Affairs, European Union and Cooperation, certifies that the above is an accurate and exact translation into ENGLISH of a document originally drafted in SPANISH. In SANTANDER, 16 June 2023.

FUENTES SANCHEZ CRISTINA - 20217773Z

Firmado digitalmente por FUENTES SANCHEZ CRISTINA - 20217773Z
Nombre de reconocimiento (DN): c=ES, serialNumber=IDCES-20217773Z, givenName=CRISTINA, sn=FUENTES SANCHEZ, cn=FUENTES SANCHEZ CRISTINA - 20217773Z
Fecha: 2023.06.16 01:20:18 +02'00'

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380

62

P00136

**CARLOS HERMIDA SANTOS**
Procurador de los Tribunales
C/ SANGÜESA 4 4º C 31003 PAMPLONA
‗‗‗‗‗‗‗‗
Tels. 948.23.81.12  Fax. 948.23.76.82
E-mail chermidasantos@gmail.com

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

D. José Mari Aznar Auzmendi
Abogado

Su Ref.     : -
Mi Ref.     : A-15930
Cliente     : SAYER TECHNOLOGIES, S.L.
Contrario   : VISCOFAN, S.A.
Procedim.   : PROCEDIMIENTO ORDINARIO 1327/2021
Juzgado     : PRIMERA INSTANCIA Nº 2 DE PAMPLONA
Fecha notif : 10/01/2023

Pamplona, 9 de enero de 2023

Estimado Compañero:

Adjunto te remito copia literal de la Sentencia dictada, estimando parcialmente la demanda interpuesta de contrario.

**FINA PLAZO RECURSO DE APELACIÓN  DIA 7 DE FEBRERO DE 2.023.**

Un cordial saludo,

Carlos Hermida Santos

Procurador

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



**ADMINISTRACIÓN DE JUSTICIA**

Juzgado de Primera Instancia Nº 2
Plaza del Juez Elío/Elío Epailearen Plaza, Planta 4
Solairua, 31011
Pamplona/Iruña
Teléfono:   848.42.42.41 - FAX 848.42.42.84
Email:   pinspam2@navarra.es
CR650

Puede relacionarse de forma telemática con esta Administración o a través de la
Sede Judicial Electrónica de Navarra https://sedejudicial.navarra.es/

Sección: A

Procedimiento: PROCEDIMIENTO
ORDINARIO
Nº Procedimiento:  0001327/2021

NIG:   3120142120210012074
Materia: Obligaciones
Resolución:   Sentencia 000427/2022

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator*
*#: 3380*
*16 junio 2023 / June 6 2023*

S E N T E N C I A   Nº 000427/2022

En Pamplona/Iruña, a 23 de diciembre del 2022.

Vistos por el Ilmo./a D./Dña MARIA  PASTOR  CISNEROS, Magistrado-Juez del Juzgado de Primera Instancia Nº 2 de Pamplona/Iruña y su Partido, los presentes autos de Procedimiento Ordinario nº 0001327/2021, seguidos ante este Juzgado a instancia de VISCOFAN COLLAGEN USA INC, representada por el Procurador D. JAVIER ARAIZ RODRÍGUEZ  y asistida por el Letrado D. JUAN DE LA FUENTE GUTIERREZ, contra. SAYER TECHNOLOGIES SL representada por el Procurador D. CARLOS HERMIDA SANTOS y defendida por el Letrado D. JOSE MARIA AZNAR AUZMENDI, sobre reclamación de cantidad.

**ANTECEDENTES DE HECHO**

PRIMERO.- En fecha de 13 de diciembre de 2021 tuvo entrada en este Juzgado demanda de D. Javier Araiz Rodríguez        en representación VISCOFAN COLLAGEN USA INC        frente a SAYER TECHNOLOGIES SL solicitando se dicte sentencia  por la que condene a SAYER TECHNOLOGIES, S.L. al pago a la parte demandante de la cantidad de 1.796.823,74 euros y 773.061,56 dólares, más intereses desde la demanda y las costas procesales.

SEGUNDO.- Admitida la demanda por Decreto de 23 de diciembre de 2021  . En fecha de 8 de febrero de 2022   se presenta escrito de contestación a la demanda de D. ª Carlos Hermida Santos        en representación de SAYER TECHNOLOGIES SL  y solicita que se dicte sentencia por la que con integra desestimación de la promovida de contrario, se absuelva a mi representada de todos los pedimentos  frente a ella dirigidos  condenándose igualmente a la mercantil demandante  al pago de las costas y gastos del presente procedimiento ; citándose a las partes  para la celebración de la comparecencia previa para el 1 de marzo de 2022 a las 09:00 horas, con el resultado de ver en autos

TERCERO.- El día y hora señalados se celebró el juicio, practicándose la prueba propuesta y admitida, con el resultado que es de ver en autos, tras lo cual, las partes formularon sus conclusiones, quedando el acto visto para sentencia.



1



ADMINISTRACIÓN
DE JUSTICIA





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #:*
*3380*

**FUNDAMENTOS DE DERECHO** *16 junio 2023 / June 6 2023*

**PRIMERO.-** La parte actora, ejercita una acción reclamación de cantidad consecuencia del incumplimiento de las obligaciones asumidas en el contrato de arrendamiento de obra con suministro de materiales suscrito entre NITTA CASINGS INC ( ahora VISCOFAN COLLAGEN USA Demandante, y en adelante Viscofan ) y la mercantil demandada SAYER TECHNOLOGIES SL ( en adelante Sayer (ex arts. 1124, 1100,1101, 1108, 1124, 1544 y ss. del CCciv),

La actividad de VISCOFAN COLLAGEN USA (antes denominada, NITTA CASINGS INC) se centra en la producción de envolturas de colágeno, y se lleva a cabo en sus instalaciones en el Estado de New Jersey, en los Estados Unidos de América.

En dichas instalaciones se decidió, en el año 2015, sustituir una línea concreta de producción de envolturas de colágeno por la más moderna línea que se encargó a SAYER. A la línea diseñada, fabricada, instalada y puesta en marcha por SAYER se le conoce como S-Line, y la misma forma parte en la actualidad de la planta de extrusión de colágeno de VISCOFAN COLLAGEN USA en la localidad de Bridgewater, en el Estado de New Jersey (Estados Unidos de América).

Para lo cual Nitta y el 28 de agosto de 2015 suscribe contrato con Sayer en cuya virtud SAYER procedería a fabricar para la primera una máquina de extrusión de colágeno para la fabricación a su vez de envolturas, por precio de 3.235.249 euros, la cual debía instalarse y ponerse en marcha en el domicilio de NITTA CASINGS INC (hoy VISCOFAN COLLAGEN USA INC) en los Estados Unidos de América.

La S-Line se compone de diferentes partes, que se reflejan en la siguiente imagen y que son las siguientes:
1.- Zona de extrusión o extrusoras. Partiendo de un gel de colágeno, se conforma el tubo continuo de envoltura de colágeno con el calibre o diámetro querido.
2.- Evaporador. Se trata de una etapa de evaporación del amoniaco del tubo de colágeno.
3.- Zona húmeda 1. Se procede al lavado de la envoltura de colágeno con agua.
4.- Zona húmeda 2. A la envoltura se le aplica agua o glicerina, según el caso.
5.- Secadero. Se produce el secado de la envoltura de colágeno.
6.- Post-humectación. Se sopla con aire caliente y húmedo con el objetivo de llegar al porcentaje de humedad preciso.
7.- Enrollado en bobinas.

SAYER incumplió sus compromisos contractuales. Si bien en el contrato se previó el envío de la máquina de extrusión de colágeno el día 18 de abril de 2016, para su inmediata instalación, lo cierto es que existió un retraso considerable en todo el proceso de fabricación, transporte y completa instalación. La máquina no empezó a operar en régimen de

2



pruebas hasta mediados del año 2017 y no quedó definitivamente en marcha hasta principios de 2018.

Sin embargo, no sólo se produjo un considerable retraso ( que no reclaman), sino que las condiciones en las cuales se instaló la máquina de extrusión por parte de SAYER fueron muy deficientes.

Por otra parte, la S-Line no se entregó, instaló y puso en marcha en perfectas condiciones, sino que presentó desde un principio un considerable número de defectos de notable importancia, los cuales tuvieron que ser corregidos en buena parte por la actora

De hecho, puede afirmarse que la S-Line diseñada, fabricada, instalada y puesta en marcha por SAYER resultó inicialmente inhábil para la función que debía desempeñar y esta situación no se solventó hasta que se completaron las correspondientes reparaciones por la actora , meses después de la entrega.

En cuanto a los defectos en la S Line, según esta parte han existido defectos de diseño y de ejecución asi como defectos en material de seguridad De los primeros se aporta informe pericial de, elaborado por D. Fernando Prieto Morán como documento 2 de la demanda.

Resumidamente, los defectos de diseño y ejecución serían los siguientes:
- La velocidad máxima de la S-Line es de 32 metros por minuto frente a los 40 metros por minuto ofrecidos por SAYER. A una mayor velocidad, el secadero es insuficiente, no pudiéndose realizar la tarea de secado satisfactoriamente.
El perjuicio derivado de esta menor velocidad se ha calculado en 647.049,80 euros.
- La zona húmeda era innecesariamente larga, habiendo tenido que ser en parte inutilizada. Además, estaba mal diseñada, produciendo un estiramiento excesivo de la envoltura.
El coste de la parte inutilizada se ha cifrado en 539.000 euros.
Los trabajos de corrección en la zona húmeda han supuesto 77.379,50 euros y 13.000 dólares.
- El incorrecto diseño de la S-Line produjo innumerables roturas de correas, con un coste de 300.364,53 euros y 1.772,56 dólares.
Las correas son la pieza que se ocupa de transportar las envolturas por las distintas secciones de la máquina, por lo que se trata de una pieza fundamental de la misma cuya rotura exige parar por completo el proceso productivo para proceder a su sustitución.
- En la zona de secadero determinadas puertas se instalaron con un material inadecuado, incapaz de soportar las altas temperaturas. Ello trajo consigo que se tuvieran que sustituir, lo que supuso el desembolso de 153.029,91 euros.
- Los trabajos de subsanación en los suelos de rejilla o trámex, completamente inadecuados en el ámbito alimentario, supusieron otros 3.313,50 dólares.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

3

P00141



Firmado por:
MARIA PASTOR CISNEROS

Fecha: 22/12/2022 15:42

Doc garantizado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/SCOD_Web/index.html

CSV: 3120142002-41a5053a5a37560c0d3ceb5c0c0d983ec72yA+==

- Los graves defectos que tenía el producto fabricado por la S-Line ocasionaron cuantiosas devoluciones por parte de los clientes, por un importe de 161.581,50 dólares.
    - Además todos los trabajos se prolongaron entre octubre de 2018 y marzo de 2019, lo que trajo consigo una parada de producción con un perjuicio económico de 593.394 dólares.

Y de los defectos en material de seguridad. Según la parte actora desde el punto de vista de seguridad de maquinaria no se cumple con la normativa establecida en la cláusula 1.7 del contrato de 28 de agosto de 2015, y existen notables defectos que se recogen los informes periciales de PILZ que se aportan como documentos núms. 3 y 4, junto a sus traducciones juradas

Los daños y perjuicios se han cifrado, en un importe total    de 1.716.823,74 euros y 773.061,56 dólares, que reclaman

Por otra parte y en cuanto a las reclamaciones extrajudiciales formuladas por dichos defectos. El 29 de enero de 2020, tras la integración de NITTA CASINGS INC en el grupo VISCOFAN, se envió una reclamación formal a SAYER, ya bajo la nueva denominación VISCOFAN COLLAGEN USA INC, la ( documento núm. 6.)

En dicha comunicación se exponía también el lamentable resultado de otros proyectos de SAYER con el grupo NITTA, referidos a otras máquinas distintas de la S-Line, las cuales no son objeto de la presente demanda judicial.

El día 23 de marzo de 2020 SAYER contestó basándose fundamentalmente en que, a su parecer, antes de que NITTA CASINGS INC se integrara en el grupo VISCOFAN, no habría existido ninguna queja u objeción, sino todo lo contrario. En dicha cara también reclamaba el pago de una determinada cantidad por pedidos muy posteriores al contrato de 28 de agosto de 2015. Se aporta la comunicación de SAYER, de 23 de marzo de 2020, como documento núm. 7.

El día 2 de abril de 2020 la actora  contestó a SAYER distinguiendo entre el carácter ilícito de la tecnología empleada por SAYER y el incumplimiento por su parte de los contratos suscritos respecto de las diferentes máquinas, las cuales han presentado infinidad de deficiencias de suma gravedad. Acompañamos esta carta de respuesta como documento núm. 8.

Y finalmente se refiere a los antecedentes contenciosos entre ambas empresa. Denuncia de Viscofan contra Sayer por un posible delito del art 279 del CP por esta última por  utilizar información secreta. Diligencias Previas de las que  conoció el Juzgado de Instrucción nº 3 de Pamplona, sobreseídas en Auto de 4 de abril de 2016 por no entender que no existían indicios racionales de la existencia del  delito. Auto que recurrido en apelación fue confirmado por la Audiencia Provincial de Navarra  en Auto de 20 de mayo de 2016 dictado por la Sección  1ª ( documento 9)

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*
Administración de Justicia en Navarra | Justizia Administrazioa Nafarroan

4



P00142



Demanda de Viscofan contra Sayer por competencia desleal presentada en el Juzgado de lo Mercantil nº 1 de Pamplona origen del PO 444/2016 que terminó en Sentencia de 7 de marzo de 2019 desestimándola y que recurrida en apelación fue confirmada por la Audiencia Provincial de Navarra en Sentencia de 13 de mayo de 2021 dictada por la Secc ª. Sentencia que dice ha recurrido ante el Tribunal Supremo ( documento 10 y 11 de la demanda)

Y finalmente Sayer presentó demanda frente a Viscofan en reclamación de determinados suministros facturados entre abril y noviembre de 2019 origen del PO 959/2020 seguido en el Juzgado de Instancia nº 9 de Pamplona donde Viscofan interpuso declinatoria de falta de jurisdicción de los tribunales españoles, que fue estimada en Auto de 9 de junio de 2021 ( documento 12) , y confirmado recurrido en apelación por la Audiencia Provincial de Navarra en Auto de 23 de noviembre de 2021 dictada por la Sección 3ª ( documento 13)

La demandada SAYER TECHNOLOGIES SL ( en adelante Sayer) por su parte opone

1.- Discrepa de la identificación que da al objeto del contrato Debe corregirse la identificación del objeto del contrato que efectúa la actora como una máquina de extrusión de colágeno. La fabricada y vendida por SAYER TECHNOLOGIES, S.L. (en adelante, SAYER) no es una máquina de extrusión de colágeno sino una línea de transporte de tripa artificial. La extrusión no es una función que ejecute esta máquina, que en el mismo documento nº1 de la demanda se denomina "máquina de tripas de colágeno".

2.- Discrepa de retrasos imputables a Sayer de fabricación, transporte y completa instalación de la máquina, Buena parte de ese retraso se debió a la propia actora, y no a la demandada Ni la fabricación ni el transporte a Estados Unidos registraron retrasos importantes.

Sin embargo, conforme acredita el que acompaña como documento nº2 con esta contestación (relación de emails intercambiados entre el personal de la demandada y los Sres. Gary Wysocki y Francisco Sousa, Director del departamento de I+D y Director Gerente de la actora respectivamente, entre los
meses de septiembre de 2016 y julio de 2017), entregada de la máquina en el
domicilio de la demandante a mediados de 2016, su instalación no se pudo completar hasta varios meses más tarde debido a que la actora tenía que realizar primero diversas tareas propias para completarla, como dotar instalaciones eléctricas, ejecutar obra civil en su nave, levantar plataformas, ocuparse de la instalación de los sistemas de aire y agua que aplica a la máquina Son trabajos que le competían a la demandante y no a SAYER, quien dependía de que se ejecutaran para poder completar su instalación. De modo que este retraso a que alude la demanda fue, en realidad, causado por la tardanza de la propia actora en acometer los trabajos necesarios

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

5



3.- Cuando en la demanda se dice que se decidió sustituir una línea completa de producción de envolturas de colágeno por la más moderna línea que se encargó a Sayer, se incurre en un error: la máquina vendida por SAYER no es una línea completa de producción, sino una máquina transportadora que, como tal, solo desempeña una parte limitada de esa producción. La línea completa de producción comprende, además del tratamiento químico previo del producto, desde la extrusión hasta su empaquetado, siendo así que esta -por más que se le llame línea- solamente realiza el transporte de la tripa artificial durante unas determinadas fases.

De manera que la actora sustituyó, dentro de una de sus líneas de producción, una máquina de transporte antigua por la adquirida, sumándose a las más de 20 líneas ya activas en su planta, que continuaron su funcionamiento.

4.- Enumera todas las fases como integrantes de la máquina cuando no son, tal

La extrusión, no es una función que ejecute esta máquina. Se trata de un moldeado del producto (gel de colágeno) que se proyecta a través de una herramienta que le da forma, las llamadas cabezas extrusoras que, no son obra de SAYER. Lo que allí se llama zona de extrusión es solamente la recepción por la máquina del material ya extruido, sobre cuyas características no tiene control.

Tampoco las fases posteriores están correctamente explicadas; lo que la máquina hace es transportar el material extruido hasta su enrollado. Ese material es un compuesto químico que responde a una fórmula particular de cada productor, con características singulares en cada caso. Para que el material extruido llegue en condiciones de ser finalmente enrollado y pasar a las siguientes fases de producción va sufriendo una serie de intervenciones (el evaporado, el lavado, el plastificado, el secado...) que son las que le confieren

sus propiedades, y que consisten en la eliminación de amoníaco por evaporación, en su lavado en agua con aditivos (una vez más, particulares según la fórmula de cada empresa), su rociado de nuevo con agua y glicerina y el secado mediante aire caliente. Lo que la máquina hace es llevar el material a lo largo de estas fases, exponiéndolo a los agentes que se le aplican.

Pero la máquina no gestiona ni la fórmula química del material de partida ni su extrusión ni la aplicación de amoníaco, ni la temperatura o distribución del aire caliente usado para la evaporación, ni la presión, conductividad o caudal de agua con que se lava, ni los aditivos que incorpora o su ph ni, de nuevo, la temperatura del aire utilizado para el secado o la humedad del empleado en la llamada posthumectación; las unidades de tratamiento de aire o de aplicación de líquidos deben ser instaladas por la actora (una de las causas que dice del retraso).

La máquina tampoco plastifica el producto; la zona de plastificado -zona húmeda 2- es similar a la de lavado -zona húmeda 1-, y la aplicación de las aguas de plastificado es responsabilidad de la actora tanto en caudal como en temperatura, conductividad, contenido de sólidos, agente



ADMINISTRACIÓN
DE JUSTICIA

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 28/10/2022 15:42

Doc. garantizado con firma electr. URL verificación:
https://administraciondeelectronica.navarra.es/SCID_Weal/index.html

CSV: 3121142002-d1a50d53a6e87980cd3cab3c0d988azZgAAv=

plastificante, suavizante, endurecedor, etc. Todos estos factores son críticos para el resultado del producto y ajenos a Sayer Todas estas cuestiones pueden apreciarse directamente, además, en el que la demandante presenta como anexo 1 al Informe pericial del Sr. Prieto Morán (dossier técnico de SAYER), en el que se indica de forma expresa - páginas 2 y 3- que ni las condiciones físicas y químicas del producto, ni la entrada de ese gel -a través de la extrusión- en el proceso de transporte, ni los sistemas de aplicación de líquidos o de aire son partes de la máquina. Se dice con claridad que es el cliente quien debe saber si las características de su producto pueden soportar las condiciones de velocidad o temperatura de la máquina.

En definitiva, la línea S no controla ningún parámetro de calidad que no sea el tamaño del tubo de colágeno.

5.- Niega los defectos o vicios de diseño, ejecución opuestos por la demandante. Discrepa de los daños y perjuicios consecuencia de ellos reclamados: Pérdidas sufridas por devoluciones de producto rechazado por clientes de la actora a causa los defectos de calidad y por la parada de producción por trabajos ejecutados entre octubre de 2018 y marzo de 2019

Señala igualmente que, la entregada por SAYER es una máquina capacitada para trabajar a las velocidades propuestas en la oferta comercial aceptada y procesar el colágeno de conformidad con las necesidades de la actora desde la fase previa de extrusión hasta la de enrollado, y de hacerlo facultando su tratamiento adecuado con todos los elementos (tales como agua, químicos o aire) que la actora incorpora en su proceso. La máquina ejecuta todas las funciones esperables en las condiciones adecuadas. Está diseñada, construida e instalada de acuerdo con todas las normas o exigencias técnicas aplicables y en particular con las específicamente convenidas entre las partes para su mejor integración en la fabricación de la actora

Igualmente discrepa de los defectos de seguridad y daños y perjuicios reclamados

Por otra parte y en cuanto a la exigencia de que se le abonen las reparaciones de los daños por los defectos que dice existen en la maquina. Sayer señala que la garantía concedía a la hoy actora el derecho a requerir a esta parte para que, sin coste alguno, ejecutara las reparaciones o sustituciones que exigieren posibles defectos en la máquina, pudiendo reclamar el reembolso del precio pagado. Tal derecho pudo haber sido ejercitado por la demandante, durante dos años, desde el momento en que la máquina fue puesta en marcha para su evaluación y pruebas. Tal cosa se llevó a cabo, de acuerdo con la propia demanda (página 2), a mediados del año 2017, siendo este el momento a partir del que la actora pudo haber advertido cualquiera de los defectos que -afirma- existen.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*





Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma electr. URL verificación:
https://administracionelectronica.navarra.es/SCDD_Web/index.html

CSV: 51201142022-41a50532a5a3758b0a85ca3ada58f53ae72yAA===

Anunciando informe pericial de D Jesús Sahuquillo Huerta sobre los defectos e informe del economista de D Fermín Elizalde Fernández con objeto cuantificación de los perjuicios y daños que la actora reclama .

Informes periciales aportados al presente procedimiento el pasado 21 de febrero de 2022

En definitiva discrepa que Sayer haya incurrido en mora, los defectos opuestos de contrario, y en definitiva, que haya incumplido sus obligaciones contractuales

Respecto a los antecedentes contenciosos planteados por la actora ( hecho séptima de la demanda), dicha parte opone la falta de relación con este procedimiento, y la relación jurídica que una a las partes en el presente procedimiento

### SEGUNDO.- ANTECEDENTES.

El 28 de agosto de 2015 en Orkoien NITTA CASSINGS INC ahora VISCOFAN COLLAGEN USA INC y en su representación D Ernesto Garrido Zúñiga como Director General y SAYER TECHENOLOGIES SL y en su representación D Francisco Conde Sousa Director de Operaciones , suscriben contrato en el que la primera compra a la segunda Máquina de línea de producción de tripas de colágeno de Sayer, en lo sucesivo Línea S

Siguiendo el informe pericial judicial del Sr Oscar Prieto. En la primera página del "acuerdo contractual" se establecen las especificaciones técnicas generales de la Línea S y se muestra un esquema en planta en el que se puede observar la configuración de 4 tramos que adopta el diseño de la Línea S para encajar en el espacio habilitado por NITTA CASINGS INC.

En la segunda página se muestran dos imágenes más en perspectiva de la Línea S.

A partir de la página 3 del Presupuesto se incluyen los 11 puntos en los que se desarrollan las especificaciones técnicas de las áreas de tratamiento (las zonas a las que se refiere el Dosier Técnico), el instrumental láser para el control del calibre y las bobinadoras, se indican los elementos excluidos, el precio, las condiciones de pago, el plazo de entrega, el período de garantía y otras referencias que se citan en las cláusulas del Contrato.

En el punto 6 las exclusiones del Presupuesto que según dicho perito básicamente se hace referencia a todos aquellos que no guardan relación directa con el mero transporte de la envoltura de gel de colágeno extruido a lo largo de las distintas zonas de tratamiento.

Acuerdo contractual que rezaba así
"1 CONDICIONES

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

8





- El Vendedor entregará al Comprador el 18 de abril de 2016 los siguientes productos:

Artículo: Máquina de línea de producción de tripas de colágeno de Sayer, en lo sucesivo «Line S»

Cantidad: 1

Precio 3.235.249,00 EUR (Euros)

1.2 - El objeto del presente contrato es la venta de «Máquina de línea de producción de tripas de colágeno de Sayer / Line S» , de conformidad con la entrega 059-2015,

1.3 . Sayer actúa como coordinador y es responsable de la realización de los proyectos encargados por NITTA, bajo el compromiso de que se desarrollen de acuerdo con las especificaciones técnicas del producto de NITTA.

1.4 - La entrega será EX-Works Orcoyen (Navarra) España, según acuerdan ambas partes.

1.5 - La puesta en marcha será realizada junto con los ingenieros de Nitta, que contribuirán con su conocimiento en relación con el producto

1 .6 - Nitta dotará las estructuras, las plataformas y los pasillos entre las líneas

1.7 - Seguridad: La máquina tiene el diseño y la estructura que contempla la Directiva de Maquinaria del CE.

**2. NOTIFICACIÓN.** El Comprador proporcionará al Vendedor notificación con 60 días de antelación en relación cualquier cambio sobre el Artículo que se haya solicitado entregar. El Vendedor reembolsará cualquier pago adicional en consecuencia.

**3. RIESGO DE PÉRDIDA.** El riesgo de pérdidas derivado de cualquier perjuicio causado a Line S, independientemente de la causa, será sufragado por el Vendedor hasta la entrega de Line S al Comprador.

**4. ACEPTACIÓN.** El Comprador tendrá el derecho de inspeccionar Line S en el momento en que lo reciba y, antes del transcurso de 30 días desde la entrega el Comprador notificará al Vendedor cualquier reclamación por daños en relación con su estado, calidad o grado de los materiales. El Comprador especificará detalladamente el argumento en que se basa la reclamación.

El incumplimiento de las presentes condiciones por parte del Comprador constituirá la aceptación irrevocable de los materiales por parte de este. Todas las notificaciones entre las partes deberán producirse por escrito y se entregarán por correo electrónico o correo certificado, con solicitud de acuse de recibo.

**5. GASTOS.** Condiciones de pago acordadas:

J. 35 % a la confirmación del pedido

2. 15 % a la aceptación del diseño

3. 15 % fabricación

4. 10% ensamblaje en Sayer

5. 15 % aceptación en Sayer

6. 10 % aceptación en las instalaciones de Nirta (EE. UU.)

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

9



P00147



ADMINISTRACIÓN DE JUSTICIA

Firmado por: MARIA PASTOR CISNEROS

Fecha: 22/12/2022 15:42

Doc. garantizado con firma electr. URL. verificación: https://administraciondejusticia.navarra.es/SCDD_Web/index.html

CSV: 9120142022-d1a5053fa5d87f6b0c85ac3acdaf088aef72yAA==

6. GARANTÍA. El Vendedor garantiza Line S durante 24 meses a partir de la realización de los test y la puesta en marcha en las instalaciones de NITTA (EE. UU.), y libre de defectos sustancial es en la mano de obra y los materiales. La responsabilidad del Vendedor en relación con la anterior garantía se limita a la sustitución o reparación de los defectos o al reembolso del precio de compra, según su criterio.(..)

A continuación

**PRESUPUESTO MÁQUINA DE COLÁGENO SAYER / LINE "S"**

La máquina de Colágeno Sayer se compone de:
2 líneas de producción (1 en lado derecho + 1 en lado izquierdo)
Cada línea produce 4 canales de productos.
Velocidad máxima 46 metros por minuto ☐ 150 pies/minuto
Dimensiones: 2,80 metros de ancho (0.80 metros de pasillo) x 110 metros de largo x 5 metros de altura
.La línea puede trabajar tanto a la derecha como a la izquierda con calibres de 13 a 24 con 8 productos (a definir), sin aumentar el precio o también puede trabajar a la derecha con calibres de 13 a 24 con 4 productos y a la izquierda con calibres de 25 a 42 con 3 productos (a definir), sin aumentar el precio
Humedad del producto a la salida del humificador ☐ 19-20%
Humedad del producto después del secado ☐ 9-11%
En la zona de secado, estructuralmente, la máquina está lista para trabajar entre 80º C y 120º C.

La línea se compone de 5 áreas diferentes:
1.- Zona húmeda (Zona 1 y Zona 2).
1.1.- Zona húmeda zona 1:
38 metros de longitud
5 metros de altura
2,80 metros de ancho (0.80 metros de pasillo)
Accionamientos, retorno, bandejas, transportadores y correas
Zona de extrusoras: estructura, paneles de control. (Extrusoras no incluidas en el precio)
8 motores Siemens Servo (*)
Placas de control de amoníaco
Evaporador ☐ 3 pases de 28 metros, tiempo 1.82 minutos
Agua ☐ 6 pases de 34 metros, tiempo 4.43 minutos
Estructura y accionamientos para la curva
9 motores reductores y sus paneles de control (*)
8 dispositivos de control Keyence con sus mandos y cables. (*)
(*) Serán suministrados por Nitta en sus instalaciones
1.2.- Zona húmeda zona 2:
24 metros de longitud
5 metros de altura
2,80 metros de ancho (0.80 metros de pasillo)
Accionamientos, retorno, bandejas, transportadores y correas
9 motores reductores y sus paneles de control (*)
Estructura y accionamientos para la curva
Agua - 3 pases de 20 metros, tiempo 1.30 minutos

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

10




Glicerina □ 6 pases de 20 metros, tiempo 2,6 minutos
Estructura y accionamientos para la curva
8 dispositivos de control Keyence con sus mandos y cables. (*)
(*) Serán suministrados por Nitta en sus instalaciones

**2.- Zona de aditivos:**
6 metros de longitud
5 metros de altura
2,80 metros de ancho (0.80 metros de pasillo)
Baño de glicerina
Transmisiones y correas de entrada/salida
Estructura y accionamientos para la curva

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #:*
*3380*
*16 junio 2023 / June 6 2023*

**3.- Zona de secado:**
36 metros de longitud
5 metros de altura
2,80 metros de ancho (0.80 metros de pasillo)
Accionamientos, retorno, bandejas, transportadores y correas
Secado □ 6 pases de 29 metros, tiempo 3,78 minutos
Humificador - 3 pases de 29 metros, tiempo 1.90 minutos
Ajustes de velocidad
9 motores reductores y sus paneles de control (*)
Conductos de aire preparados para la conexión del equipo
(*) Serán suministrados por Nitta en sus instalaciones

**4.- Láser (control del diámetro del producto a la salida de la secadora)**
4 equipos de Keyence para el control del calibre (*)
4 marcos
Paneles de control
Programación
Instalación eléctrica
Instalación mecánica
(*) Serán suministrados por Nitta en sus instalaciones

**5.- Enrollador**
8 enrolladoras dobles completas
8 controles de tensión del enrollado
Sistema de movimiento transversal
Marcos
Programación
Paneles de control

**6.- No incluido en el presupuesto**
El equipo de suministro de aire a la secadora y su control controles de
tensión del enrollado   Suministro de agua y líquidos, tratamientos de
recuperación (sólo entrada de agua / glicerina)
Suministro de glicerina y su tratamiento
Instalación de aspiración y tratamiento de amoniaco
Cabezas extrusoras
Alimentación de gel a la extrusora.
Equipamientos Keyence

11



P00149

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #:*
*3380*
*16 junio 2023 / June 6 2023*

Motores reductores y su control de velocidad
**7.- Precio**
Precio: 3.235.249 € ex-works Orcoyen (Navarra) España.
**8.- Plazos de pago**
Plazos de pago: 35% en la confirmación del pedido, 15% en la aceptación del diseño, 15% en la fabricación, 10% en el montaje en Sayer, 15% en la aceptación en Sayer y 10% en las instalaciones de Nitta (EE.UU.)
**9.- Entrega**
38 semanas desde el pedido, incluyendo 8 semanas de montaje en las instalaciones del cliente.
**10.- Garantía**
Garantía: 24 meses a partir de la prueba realizada y puesta en marcha en las instalaciones de la NITTA (EEUU)
**11.- Varios**
Coste de embalaje incluido en el presupuesto.
Marcos, plataformas, pasillos entre las líneas... incluidas en el presupuesto.
Seguridad: La máquina está diseñada y construida de acuerdo con las instrucciones de la CE – Directiva de Máquinas. (documento 1 de la demanda)

En cuanto al envío de materiales siguiendo el mismo informe del Sr Oscar Prieto ( páginas 31 a 33), se sucede de la forma siguiente:

"El envío de los materiales a las instalaciones de NITTA CASINGS INC. se efectúa a través de la empresa SCHENKER LOGISTICS S.A.U., que emite 7 Documentos Únicos Administrativos (D.U.A.) para los días:
15 de abril de 2016, envío por barco de 20.645 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
22 de abril de 2016, envío por barco de 21.630 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
29 de abril de 2016, envío por barco de 13.382 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
6 de mayo de 2016, envío por barco de 14.630 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
27 de mayo de 2016, envío por barco de 16.623 kg de "PIEZAS ETÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
12 de agosto de 2016, envío por barco de 13.922 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".
10 de enero de 2017, envío por avión de 241 kg de "PARTES DE PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO". SAYER TECHNOLOGIES S.L. asume los costes de envío desde sus instalaciones (EXW), tal como establece el Contrato, lanzando la primera remesa pocos



Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 16:42

Doc. garantizado con firma elect. URL verificación:
https://administraciondeelectronica.navarra.es/SCOD_Web/index.html

CSV: 512014202-d1a5053a5c575fsb0a83ce85c0a09a86ae27qAA==

12

días antes del 18 de abril de 2016, fecha tope establecida en el Contrato para el envío/entrega de la máquina.

No constan reclamaciones por parte de NITTA CASINGS INC. en relación con las fechas de envío, y sí una comunicación por correo electrónico, fechada el 29 de agosto de 2016, en la que Francisco Sousa (Chief Operating Officer - COO) le indica a Ernesto Garrido (Gerente) que han recibido el sexto contenedor (enviado el 12 de agosto de 2016) y que Gary Wysocki (Engineering Manager) "tiene todo bajo control".

Por otra parte, para la facturación de los trabajos establecidos en el Contrato, SAYER TECHNOLOGIES S.L. procede de acuerdo con el siguiente esquema de 7 facturas:

El 13 de abril de 2016 emite la factura 160030 en concepto de 01 - S LINE/PARTS H - ZONE 1, por un importe de 540.000 €.

El 21 de abril de 2016 emite la factura 160040 en concepto de 02 - S LINE/PARTS H - ZONE 2, por un importe de 930.000 €.

El 27 de abril de 2016 emite la factura 160043 en concepto de 03 - S LINE/PARTS D - ZONE1, por un importe de 400.000 €.

El 4 de mayo de 2016 emite la factura 160049 en concepto de 04 - S LINE/PARTS D - ZONE2, por un importe de 300.000 €.

El 24 de mayo de 2016 emite la factura 160058 en concepto de 01 - S LINE/PARTS C - ZONE 1, por un importe de 500.000 €.

El 8 de agosto de 2016 emite la factura 160088 en concepto de 01 - S LINE PARTS C - ZONE 2, por un importe de 530.000 €.

El 30 de diciembre de 2016 emite la factura 160139 en concepto de 01 - S LINE PARTS C - ZONE 3, por un importe de 35.249 €.

. Los importes y los conceptos de las facturas no estarían relacionados con los hitos previstos en el Contrato, sino con el envío de los materiales a las instalaciones de NITTA CASINGS INC. en New Jersey.

Por otra parte NITTA ha pagado el precio de la máquina y aunque como dice el perito judicial no se sigue el orden cronológico estipulado, no constan reclamaciones al respecto. Se culmina el pago el 24 de abril de 2017. Pagos que según las partes no se documentaron

Sobre los pagos en dicho informe pericial judicial se dice, y no se ha desdicho de contrario que:

"En el Contrato para la adquisición de la Línea S se establece una hoja de ruta en la que se identifican claramente una serie de 6 hitos que se deben producir de forma sucesiva, y " "Confirmación del Pedido" (35%), la "Aceptación del Diseño" (15%), la "Fabricación" (15%), el "Ensamblaje" (10%), la "Aceptación en las instalaciones de SAYER" (15%) y la "Aceptación en las instalaciones de NITTA" (10%); eventos relevantes en el desarrollo del proyecto vinculados al abono de un porcentaje concreto del precio total establecido en el documento (de 3.235.249,00 €), y que NITTA CASINGS INC. resuelve de acuerdo con el siguiente esquema:

El 1 de septiembre de 2015 se produce el abono correspondiente a la Confirmación del Pedido mediante una transferencia bancaria en cuyo concepto aparece la expresión "35% at order confirmation".

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

13



Firmado por
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma elctr. URL. verificación:
https://administraciondelectronica.navarra.es/SCOD_Web/index.html

CSV: 3121142202-41a5063a5a375850od3ba8cedd08d88ad7zyAA==

Según refieren las partes, este hito se formaliza documentalmente mediante la firma del Contrato.

El 15 de enero de 2016 se produce el abono correspondiente a la Aceptación del Diseño mediante una transferencia bancaria en cuyo concepto aparece la expresión "15. DESIGN ACCEPTANCE".

Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente que incluya toda la información asociada al proyecto, algo particularmente llamativo a la vista de su envergadura.

SAYER TECHNOLOGIES S.L. refiere que varios representantes de la empresa (Ernesto Garrido, Alejandro Gutiérrez, Óscar García, Carlos Múgica, Alfonso Rey y José Miguel Idoate) se desplazaron a las instalaciones de NITTA CASINGS INC. en Bridgewater (New Jersey) entre los días 6 y 11 de diciembre de 2015 para hacer la presentación del diseño definitivo; y que fue durante esos días cuando se produjo su aprobación formal.

Esta versión es consistente con la información expuesta en los justificantes de los pasajes de avión presentados por SAYER TECHNOLOGIES S.L., y con el contenido de un correo enviado el 16 de noviembre de 2015 por el entonces Gerente de Ingeniería (Engineering Manager) de NITTA CASINGS INC., Mr. Gary Wysocki (no aparece en el organigrama facilitado por VISCOFAN COLLAGEN USA INC.), en el que hace referencia a este viaje y solicita que lleven consigo todos los planos fin de obra ("as-built") de la Línea S para su revisión, recalcando la importancia que tiene para ellos conocer las dimensiones exactas de la Línea S, de cara a las actuaciones que deban ejecutar en la planta para su acondicionamiento.

El 20 de junio de 2016 se produce el abono correspondiente a la Fabricación mediante una transferencia bancaria en cuyo concepto aparece la expresión "15. AT MANUFACTURING".

Según refieren las partes, este hito tampoco se formaliza documentalmente por medio de un acta o algún documento equivalente.

El 27 de abril de 2016 se produce el abono correspondiente al Ensamblaje (se rompe la "lógica cronológica") mediante una transferencia bancaria en cuyo concepto aparece la expresión "10. ASSEMBLAGE".

Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

El 11 de agosto de 2016 se produce el abono correspondiente a la Aceptación en SAYER (se recupera la "lógica cronológica") mediante una transferencia bancaria en cuyo concepto aparece la expresión "12.5.ACCEPTANCE AT SAYER".

Según refiere SAYER TECHNOLOGIES S.L., en ese momento no se produce el abono del 15% pactado por "conveniencia financiera" de NITTA CASINGS INC. Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

Los días 1 de febrero, 2 de marzo y 24 de abril de 2017 se produce el abono correspondiente a la Aceptación en NITTA de forma fraccionada (completando también el abono pendiente correspondiente al hito anterior) mediante sendas transferencias bancarias, incluyendo las dos primeras en su concepto la expresión "PARTIAL OF 12.5 AT ACCEPTANCE AT NCI





*Cristina Puentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

(USA)", mientras que la última se refiere a la factura 160139, emitida por SAYER TECHNOLOGIES S.L. el 30 de diciembre de 2016 (el importe de la transferencia no coincide con el de factura).

Según refieren ambas partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

· Aunque el esquema expuesto no se ajusta por completo a los criterios establecidos en el Contrato, no constan reclamaciones por parte de SAYER TECHNOLOGIES S.L. en relación con esta cuestión." ( paginas 31 a 33 del Informe)."

Se aporta como documento 5 de la contestación a la demanda los justificantes de pago de la Línea S

Según la demanda la máquina no empieza a operar en régimen de pruebas hasta mediados de 2017 y no quedó definitivamente en marcha hasta principios de 2018

Igualmente señala el perito judicial y no se ha desdicho por las partes, no hubo un test de prueba ni de un proceso de puesta en marcha documentado.

En este sentido el perito judicial recoge en su informe que: "Según refieren las partes, no consta que se formalizaran documentalmente por medio de un acta, o algún documento equivalente, ni la realización de un Test de Prueba ni de un proceso de Puesta en Marcha, de manera que no es posible recurrir a ellos para rescatar los detalles que pudieran rodear su ejecución (fechas de inicio y de finalización, objetivos planteados, pruebas efectuadas, resultados obtenidos, mecanismos de validación empleados, registro de la evolución del proceso, registro de incidencias, etc.)."

Como se dice igualmente en este informe La cláusula 6 del Contrato aborda ... las cuestiones que regulan la garantía que ofrece SAYER TECHNOLOGIES S.L. con la venta de su producto, de 24 meses en los que la empresa puede optar por la reposición de los materiales defectuosos, su reparación o la devolución del precio de compra.

Hasta el momento de la adquisición de NITTA CASINGS INC. por parte del GRUPO VISCOFAN no se activó la cláusula 6 del Contrato, en la que se establecen las coberturas previstas en caso de reclamación del cliente (página 35). Si bien como aclara la demandante en el trámite de conclusiones, la reclamación que hace en este procedimiento no se hace al amparo de dicha garantía. Sino del art 1101 del Código Civil.

El 19 de diciembre de 2019, VISCOFAN S.A. hace público el acuerdo alcanzado con NITTA GELATIN INC. para adquirir su división de envolturas de colágeno, compuesta por NITTA CASINGS INC. en New Jersey y NITTA CASINGS (CANADA) INC. en Ontario, que pasan a denominarse VISCOFAN COLLAGEN USA INC. y VISCOFAN COLLAGEN CANADA INC., respectivamente.

Y data de 29 de enero de 2020 la primera reclamación formal de los defectos que Viscofan imputa a Sayer . Según dicha reclamación la Línea

15

P00153



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

S no cumple con las especificaciones técnicas ni alcanza las prestaciones y ritmos de producción prometidos por parte de la vendedora Los responsables de Sayer no habrían podido durante los dos años anteriores la puesta en marcha de la línea solventar los " tan críticos problemas de la maquina y su instalación desde un punto de vista técnico" que según dice no le ha quedado otro remedio que pedir la indemnización directa de los daños y perjuicios que su negligencia le ha causado . (documento 6 de la demanda) . Sin embargo, no consta como se ha indicado ninguna reclamación por ninguno de los defectos que ahora se reclaman hasta la adquisición de    Viscofan de la planta de extrusión de colágeno en Bridwater (New Jersey/ EEUU)   a finales de diciembre de 2019. Los correos que se aportan con la contestación a la demanda  relacionados con las modificaciones en la Linea S  y a los que se hará posteriormente nuevamente referencia ( documento 4 de la contetsación a la demanda) . No se deriva ningún requerimiento como dice Viscofan a Sayer para que reparase, o solucionase ningún problema en la Línea S. No hay constancia documental de ello, a pesar de que según  la cláusula cuarta del  contrato " todas las notificaciones entre las partes deberán producirse  por escrito, y se entregarán por correo electrónico o correo certificado,  con solicitud de acuse de recibo". Tampoco lo han hecho los  dos testigos y trabajadores de Nitta que han depuesto en el acto plenario y que  formaron parte del grupo de trabajo de la fabricación de la  máquina por parte de esta empresa, y de las modificaciones que se sucedieron durante el ultimo trimestre de .2018, y primero del año 2019. Modificaciones que haría necesaria parar  la Línea S, reclamando la demandante igualmente los daños y perjuicios derivados de ella .

Según la demanda como se ha señalado las primeras pruebas  datan de mediados del año 2017 quedando  definitivamente en marcha hasta principios de 2018. Sin embargo, no existe ninguna reclamación formal anterior  la precitada carta de 29 de enero de 2020, adquirida   la división de envolturas de colágeno,  en New Jersey en diciembre de 2019 de Nitta por parte de Viscofan, .
"

De fecha anterior al contrato de 28 de agosto de 2015 que integra el presupuesto   y haciendo referencia nuevamente a la fabricación de la  máquina , y primeras  negociaciones que se dieron entre las  partes. Sayer elabora   un  dosier técnico. Documento que se sitúa temporalmente alrededor del mes de febrero de 2015. Documento  resultado de los primeros contactos de las partes para determinar las especificaciones técnicas  de la máquina,   algunos de sus puntos modificados posteriormente y recogidos en el acuerdo contractual de 28 de agosto de 2015 ( anexo 1º del informe pericial de la demandante)

En este sentido el perito judicial recoge en su informe que:

"Este documento se incorpora a la DEMANDA presentada por VISCOFAN COLLAGEN USA INC. como el primero de los anexos de su informe pericial. En sus páginas no aparece ninguna referencia que permita ubicarlo temporalmente, pero SAYER TECHNOLOGIES S.L. indica que se le facilitó a NITTA CASINGS INC. en febrero de 2015, con ocasión de sus primeros encuentros en Estados Unidos, y que se les envió por

16





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

correo electrónico el 28 de abril de ese mismo año, acusando su recibo por la misma vía dos días después.

El Dosier Técnico (Technical Dossier) es un documento de 25 páginas, elaborado por SAYER TECHNOLOGIES S.L., en el que se exponen de forma sinóptica las características y especificaciones técnicas generales de un modelo de una línea de colágeno a la que se denominada LSC-60-4C (según indica SAYER, se trata de una codificación con la que se refieren a una Línea SAYER de Colágeno de 4 Canales que puede alcanzar velocidades de hasta 60 metros por minuto).

Las páginas 2 y 3 del Dosier Técnico (Introducción y Observaciones) se dedican a realizar una serie de:

Consideraciones generales sobre las características técnicas de la máquina, entre las que cabe citar la longitud total de la línea, de 115 metros, y el rango de velocidades disponible (de 40 a 60 metros por minuto).

Advertencias sobre el ámbito de especialización técnica del fabricante (excluyendo expresamente el gel de colágeno) y la posibilidad de adaptar las dimensiones de la línea a los requerimientos concretos del cliente, que deberá especificar los tiempos de procesamiento que requiere su producto (gel de colágeno).

Indicaciones sobre los elementos que quedan excluidos de la propuesta y sobre aquellos sobre los que sería preciso hacer un estudio específico (como en el caso del amoniaco, por ejemplo).

A partir de la página 4 comienza la descripción técnica de la LSC-60-4C, que se divide en 6 apartados:

1. Sección de Gel (apartado sin contenido, por quedar excluida de la propuesta).

2. Sección Húmeda, en la que se realizan de forma consecutiva los tratamientos de Neutralización, Lavado y Plastificado (descritos en las patentes a las que se hizo referencia en el apartado 5.1), mediante la aplicación de las correspondientes dosis de amoniaco, agua y glicerina.

En este apartado se definen principalmente las características de la estructura portante y de la zona de extrusión del gel de colágeno, los dispositivos de control de calibre, el sistema de transporte de la envoltura de gel de colágeno y el sistema de recogida de líquidos de tratamiento (agua y glicerina).

3. Sección de Secado, en la que se realiza el tratamiento de Secado (descrito en las patentes a las que se hizo referencia en el apartado 5.1) mediante la aplicación de aire caliente y seco.

En este apartado se definen las características de la estructura portante y de aislamiento térmico del proceso, así como del sistema de transporte de la envoltura de gel de colágeno.

4. Láser, para el control del calibre (diámetro) de la envoltura de gel de colágeno.

En este apartado se proponen dos zonas de control: la primera, al principio del proceso, e inmediatamente después de la extrusión del gel de colágeno; la segunda, al final del proceso, e inmediatamente antes del enrollado de la envoltura. También se propone la incorporación de sensores de infrarrojos para el control de la temperatura del gel de colágeno a la salida de los cabezales de extrusión.

17



P00155



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

5. Humectador, en el que se proporciona a la envoltura el grado de humedad adecuado antes de su enrollado (bobinado).

En este apartado se describe un sistema de humectación distinto del que se contrata posteriormente.

6. Bobinadora doble, en la que se enrolla la envoltura de gel de colágeno antes de su entrada en la Fase de Acabado (descrita en las patentes a las que se hizo referencia en el apartado 5.1).

Al final de este apartado, probablemente por error, se incluyen los componentes de la instalación eléctrica de la línea de colágeno."

De 23 de junio de 2015 es la firma  a lo que las partes  llaman " Acuerdo Tecnológica y Cooperación comercial" suscrito  entre D Ernesto Garrido Zúñiga  en representación de Sayer como Director General y D Francisco Sousa Director de operaciones  en representación de Nitta , donde se reconoce que :

"I Que Sayer es una empresa dedicada a la fabricación de maquinaria  especial y a  medida, así como a la automación de procesos industriales Sayer está comprometida al desarrollo tecnológico de diversos sector ( automovilístico, alimentario, electrofónico, y dispositivos) y debe colaborar  con Nitta  para ayudarle a modernizar su sistema productivo

II Que Nitta es una empresa dedicada a la producción de colágeno para el sector alimentario  y está interesada en llevar a cabo un proyecto técnico / de colaboración comercial con Sayer

III Ambas empresas  han acordado establecer una asociación comercial para la implementación  y aplicación de soluciones tecnológicas industriales de Sayer para la  manufactura de Nitta proporcionando tecnología ingeniera

Con este fin, las partes  acuerdan la ejecución de este acuerdo marco con los siguientes

Descargos de responsabilidad:

Uno  Sayer actuará como coordinador y responsable de llevar a cabo los proyectos encomendados por Nitta, garantizando  que se desarrollen de acuerdo  con las especificaciones técnicas del producto. Sayer desarrollará los proyectos  que se encarguen en el futuro, los proyectos en los que Sayer intervendrá  de conformidad  con este acuerdo, son los siguientes: máquina  de etiquetado automático, extrusora, máquina de colágeno, máquina de corrugado, y otros

Dos: Como consideración para implementación de proyectos, Nitta se compromete a· pagar el precio acordado a Sayer en las condiciones negociadas entre las partes

Tres Sayer acepta no revelar, en ningún sentido, la información técnica que reciba de Nitta a la que pueda tener acceso durante el proyecto. Todos los datos e información obtenidos durante el proyecto permanecerán confidenciales (...)"

**TERCERO. DEFICIENCIAS DE DISEÑO. MATERIAL INAPROPIADO. RESPONSABILIDAD VALORACION –**

18





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Llegados a este punto conviene recordar que el contrato de obra celebrado y vinculante para las partes litigantes, regulado como se ha indicado en los artículos 1.544 y 1.588 y ss. CC se caracteriza por de ser de carácter consensual, oneroso, conmutativo y bilateral con obligaciones recíprocas, del que se deriva para el contratista el derecho de obtener el cobro del precio, pero a título de contraprestación, esto es, a cambio de su prestación de entregar la obra encomendada, a satisfacción del comitente, una vez ejecutada; y, por ello, el comitente puede rehusar el pago del precio que se reclama si -y sólo si- el contratista no le ha hecho entrega o no pone la obra a su disposición -«exceptio non adimpleti contractus»-, pues si solamente ha cumplido en parte o de modo defectuoso su obligación de entrega en relación a las circunstancias de cantidad, calidad, manera o tiempo -«exceptio non rite adimpleti contractus»-(STS, Sala Primera, de 1 de junio de 1980 ), en la medida en que constituyen hipótesis de mero cumplimiento irregular, no goza el comitente de la misma facultad sino únicamente de abonar el justo valor de lo realmente bien ejecutado. Los principios de respeto a la palabra dada y a la buena fe(Art. 1258 CC ) dieron lugar al nacimiento de dos excepciones, una de contrato no cumplido - «exceptio non adimpleti contractus»- y otra de contrato no cumplido adecuadamente, en cantidad, calidad, manera o tiempo -«exceptio non rite adimpleti contractus»-, excepciones no reguladas explícitamente en el ordenamiento jurídico patrio pero cuya existencia está implícitamente admitida en varios preceptos (arts. 1.124 y 1.100 , apdo último, CC), y viene siendo sancionada por la jurisprudencia(S.S.T.S. de 17 de enero de 1975, 3 de octubre de 1979 y 13 de mayo de 1985 ex pluribus).

La excepción de contrato no cumplido adecuadamente sólo puede triunfar cuando el defecto o defecto en la prestación realizada por el actor es de cierta importancia en relación con la finalidad perseguida por las partes al perfeccionar el contrato y con la facilidad o dificultad de su subsanación, haciéndola impropia para satisfacer el interés del demandado por lo que no puede prosperar cuando lo mal realizado u omitido carezca de suficiente entidad en relación a lo bien ejecutado y el interés de aquel que opone la excepción quede satisfecho con la obra entregada u ofrecida, de forma que las exigencias de la buena fe y el principio de conservación del contrato sólo permitan la vía reparatoria, bien mediante la realización de las operaciones correctoras precisas, bien a través de la consiguiente reducción del precio(STS de 27 de marzo de 1991 ).

Por ello, no se trata de que el comitente deba el precio a todo trance, ni de que cualquier irregularidad le exonere de realizar su prestación sino que sólo y únicamente el incumplimiento pleno le faculta, en principio, para no cumplir su prestación. No sucede lo mismo cuando lo mal realizado u omitido carezca de suficiente entidad en relación con lo ejecutado, ya que entonces, resultaría contrario a la equidad y a la buena fe el facultar al comitente para retener su total contraprestación, o el resto de ella que tuviere pendiente de cumplir cuando con sólo una reducida parte puede resarcirse de las imperfecciones de la obra mandada ejecutar, en cuyo caso, debe, pues, efectuar el pago de lo que dentro de mismo juicio acredite menor valor de lo recibido o bien satisfacer el precio y por vía de reconvención o en juicio ulterior con ese objeto, pedir la integridad de la obra o la reposición de la parte mal hecha(STS de 24 de octubre de 1986 y SAP de Lleida de 27 de abril de 1985).



P00157



ADMINISTRACIÓN
DE JUSTICIA

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

La non rite adimpleti contractus supone que la prestación se ha realizado, pero inexactamente, de manera parcial o defectuosa. Debiendo añadirse otra diferencia por lo que respecta al orden probatorio, pues mientras el demandante, en los casos de inejecución o ejecución incompleta, le incumbe la carga de probar el cumplimiento íntegro que se le cuestiona, es al demandado, en los supuestos de realización defectuosa de la prestación, a quien le incumbe la prueba de las deficiencias o irregularidades que la prestación del actor presenta, en cuanto en ellos no se limita a negar el cumplimiento de la obligación contraída por el demandante, sino que introduce en el debate procesal nuevos hechos obstativos del regular y exacto cumplimiento debido por éste.

La doctrina jurisprudencial, en base a la reciprocidad que ha de presidir el desarrollo funcional de las obligaciones bilaterales y la equidad que debe inspirar la aplicación de las normas, ha adoptado soluciones correctoras encaminadas a restablecer el equilibrio de las prestaciones, que, en términos generales, pasan por la reducción parcial de la prestación reclamada en medida equivalente o proporcional a la parte que al demandante resta por cumplir de la suya y a la importancia económica de las deficiencias constatadas en ella. Más en concreto, la sentencia de 17 de abril de 1976, estima justificada la reducción del precio de la obra reclamado por el contratista en la cantidad suficiente para resarcir al comitente demandado de las imperfecciones que aquélla presentaba (En este sentido SAP de Tarragona de 3 de noviembre de 2010; SAP de Girona de 26 de febrero de 2009; SAP de 12 de noviembre de 2007 entre otras

Sentado lo anterior. En primer lugar Nitta ahora Viscofan es una empresa de producción de colágeno. En dicha producción se distinguen distintas fases:
1.- La fase de procesamiento del material
2.- La fase de preparación para la extrusión
3.- La fase de línea continua
4 la fase acabado

La Línea S fabricada por la empresa de ingeniería mecánica Sayer se sitúa en la fase 3, la fase de línea continua. Siguiendo la exposición del informe pericial judicial la fase de Línea Continua se inicia con el bombeo y filtrado del gel de colágeno almacenado en la Etapa 25, de Almacenamiento, y continúa con la dosificación previa a la Etapa 28, de Extruido o Extrusión, que se resuelve por medio de una máquina extrusora, cuyo cabezal está diseñado para darle al gel de colágeno forma tubular, con un calibre (diámetro) y un espesor (grosor) determinados; es decir, la forma de envoltura característica con la que se recubren y comercializan los productos cárnicos embutidos.

En el cabezal de extrusión se practican una serie de orificios cuya función sería inyectar en el interior de la envoltura un agente gaseoso a una presión ligeramente superior a la del ambiente, para evitar que colapse, ayudando a que conserve su forma tubular a lo largo de las Etapas siguientes, y al mismo tiempo, activando el proceso de coagulación del gel de colágeno.

20



P00158



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En la patente ES 2 396 807 B1, publicada por la Oficina Española de Patentes y Marcas a solicitud de VISCOFAN S.A., se muestran cuatro representaciones distintas de un cabezal de extrusión (3) que tiene la particularidad de presentar una ranura de salida (1) no circular.(...)

Siguiendo con el proceso descrito en las patentes, la envoltura de gel de colágeno extruido atraviesa una serie de Etapas sucesivas en las que se la somete a diferentes tratamientos físicos y químicos que tienen por objeto dotarle de las propiedades que el fabricante considera adecuadas.

Los tratamientos en cuestión se denominan Neutralización (Etapa 29), Lavado (Etapa 30), Plastificado (Etapa 31) y Secado (Etapa 32), y consisten básicamente en la aplicación de las dosis adecuadas de amoniaco, agua, glicerina, aire caliente y seco, y aire húmedo, respectivamente, sobre la envoltura de gel de colágeno extruido. Por último, la envoltura se colapsa y se enrolla lisa en forma de bobina o carrete en la Etapa 33, de Enrollado.

La demandante defiende que la Línea S fabricada por Sayer adolece de defectos de diseño y ejecución de la maquina( utilización de materiales inapropiados). Así como importantes defectos de seguridad, que se analizan en el fundamento de derecho siguiente  Defectos que según se dice en la demanda hacían  inhábil la máquina para la función que debía de desempeñar y según dice esta situación  no  se solventó hasta que se completaron  las correspondientes reformas por la parte actora, meses después , Reclamando los daños y perjuicios que ha tenido la demandante consecuencia de ellos  al amparo del art 1101 del Cciv

En cuanto a los defectos de diseño y ejecución. A  instancias de la demandante en su determinación contamos con el  informe del Ingeniero Técnico Industrial, especialidad Electrónica Industrial D.  Fernando Prieto Moral  de 11 de noviembre de 2021 sobre los problemas y desperfectos existentes en la línea de extrusión de colágeno Identificada como S Line en Instalaciones de Viscofan Collagen USA Inc. Visita la planta de extrusión de colágeno de forma virtual el 16 de junio de 2021  siendo la persona encargada de atender al perito D Guillermo Diez García actual jefe de operaciones de Viscofan ( documento 2 de la demanda) ·

Por  Sayer informe técnico sobre los supuestos defectos en la línea S implementada por Sayer Technologies SL en las instalaciones de Viscofan Colagen USA Inc antes Nitta Casings Inc del Ingeniero de electrónica y automática industrial D Jesús Sahuquillo Huerta fechado el  21 de febrero de 2022. E informe pericial de 21 de febrero de 2021 del economista D Fermín Elizalde con tres objetivos: a) determinarse la pertinencia y racionalidad  del perjuicio del perito de la demandante por la pérdida de valor de la línea S, b) si las facturas de los Anexos 18 a 21 del informe pericial de la demandante deben de ser tenidas en cuenta para determinar el posible perjuicio, y c) corresponde a los gastos imputables a problemas acecidos en la Línea S

Y el  Informe pericial judicial  de D Óscar Prieto Merchán - Ingeniero Técnico Industrial - Ingeniero Industrial, quien no vista la planta, y dispuso



21





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

de los videos de la anterior visita y otros complementarios que dice solicita por entender insuficientes los que se aportan a la demanda

Por otra parte a instancias de la demandante han depuesto como testigos D Pedro Erdociain Bravo ingeniero industrial de Viscofan , D Jaime Soroa Zubiría economista de Viscofan, y D Eugene Goldfarb químico

Por parte de la demandada han declarado como perito testigo D Oscar Prieto Matito responsable de producción de Sayer, y como testigo de D Fernando Conde de Sousa Director de Operaciones entre 2013 y 2019 de Nitta ( ahora Viscofan)

Por otra parte, y en el examen de dichos defectos se seguirá el orden del informe pericial de D Fernando Prieto Moral . Defectos que los describe y analiza en el punto 6 de su informe, quedando desglosados en dos grandes grupos: A. Defectos de diseño de la Línea S,. B En la utilización de materiales "inapropiados"

Informes periciales, que fueron ratificados en el acto plenario

Comenzando por los primeros defectos de la Línea S

A.DEFECTOS DE DISEÑO DE LA S LINE

1.-Velocidad de la línea S-Line. El perito de la demandante concluye que frente a una velocidad de la línea Nitta existente de 30 m por minuto , la nueva línea, la línea S Line debía de contar con una velocidad de al menos 40 m/min ( también se menciona una velocidad objetivo de 40/60 m/min) Sin embargo, la velocidad máxima actual de la S Line es de aproximadamente 32m/min, muy lejos del objetivo de 40 m/min y un 46,6% inferior frente al valor objetivo de 60m/min.

De forma más detallada (páginas 26 a 29) del informe del Ingeniero Técnico Industrial, especialidad Electrónica Industrial Fernando Prieto Moral se señala que:
".., uno de los principales parámetros a mejorar en la nueva línea S-Line era el de la velocidad de la línea.
Así, frente a una velocidad de la línea Nitta (Vídeo 2, 00:15 – 00:33) existente de unos 30 metros por minuto (m/min), la nueva línea, la línea S-Line contaría con una velocidad de "al menos" 40 m/min.
Se hace referencia a "al menos" 40 m/min porque en los documentos facilitados por Sayer a Nitta se pueden encontrar dos valores de velocidad de la línea S-Line:
- (Anexo 01) "Technical dossier Colagen Line LSC-60-4c"; En este documento, correspondiente a un dossier técnico de la nueva línea se ofrece una velocidad de 40/60 m/min
- (Anexo 02) "Quotation": este documento corresponde a la oferta económica por la línea S-Line, y se hacía referencia (página 1/10) a una velocidad máxima de 46 m/min (150 ft/min).

Firmado por:
MARIA PASTOR CISNEROS
Fecha: 22/12/2022 15:42
Doc. garantizado con firma electr. URL verificación:
https://administraciondeelectronica.navarra.es/SCDD_Web/index.html
CSV: 5122Y142002-d1a50f53a5c0758b0c83ce53dcb0589ae27aylV==





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Así, tras la visita virtual realizada por este perito a la S-Line, se pudo comprobar en 2 ocasiones que la velocidad de la línea era de 105 pies/min, es decir, aproximadamente 32 m/min.

La S-Line dispone de 2 paneles con displays (visualizadores) en los que puede apreciarse la velocidad de la línea. El primero de ellos al comienzo de la línea y un segundo display en la parte final de la línea, en la zona de las enrolladoras.

Se muestra a continuación una imagen del video tomado por este perito (Video 2, 01:24 – 01:40) donde se aprecia la velocidad de 105 ft/min en el primero de los paneles mencionados.

En la siguiente imagen (Video 5, 03:56 – 04:49, fotograma 04:41) se aprecia la velocidad medida en el segundo display ubicado en la zona final de la S- Line, en la zona de las enrolladoras. Se puede apreciar que la velocidad es la misma

Dicha velocidad, que es la máxima velocidad a la que discurre en la actualidad la S-Line (Video 2, 01:00 – 01:40) supone que en el supuesto menos ambicioso, es decir, a la velocidad de 40 m/min del documento "Technical dossier Colagen Line LSC-60-4c" (Anexo 01), no sólo no se llega al valor prometido sino que dicha velocidad es aproximadamente un 20 % inferior al valor mínimo prometido por Sayer.

Asimismo es de destacar que la velocidad a la que discurre la S-Line es prácticamente la misma a la que discurría la denominada Línea Nitta (30 m/min), es decir, la línea que se tomaba como referencia en cuanto a velocidad se refiere y como parámetro principal a mejorar.

En cuanto a las razones por las no se incrementa la velocidad de la S-Line o los problemas que ésta presenta si se intenta, el Sr. Diez indicaba que sólo a la velocidad de 30 m/min la envoltura se seca adecuadamente en el secadero (etapa posterior), que lógicamente no es la velocidad deseada dado que el objetivo prometido por Sayer era el de 46 m/min. Sin embargo, si se sube la velocidad, el secadero no es capaz de secar la envoltura (no llega al 9-11% indicado en la Quotation) y el producto no adquiere las propiedades o incluso puede romper (Video 2, 02:45 – 04:11).

De todo lo anterior se puede concluir que la S-Line no alcanza, ni puede alcanzar, la mínima velocidad prometida de 40 m/min (alcanza un máximo de 32 m/min).

La conclusión anterior cobra especial relevancia si se tiene en consideración que el proyecto de la S-Line se presupuestó en una cantidad nada despreciable de 3.235.249 €.

El Sr. Diez se manifestaba en este sentido en la visita virtual (Video 2, 04:12 – 04:33) señalando que en su opinión la inversión no había merecido la pena dado que en el mejor de los supuestos se estaba obteniendo una velocidad en la S-Line igual a la de la denominada Línea Nitta, la cual era la referencia de velocidad a mejorar, y los datos actuales de la S-Line quedan muy lejos de cualquiera de los datos de velocidad prometidos en la documentación de Sayer(:..)"

23

P00161



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Por otra parte, este perito cuantifica dichos perjuicios en un total de 647.049, 80 euros que sería el menor valor de la máquina que fue de 3.235.249 euros a resultas de la menor velocidad a la asegurada por Sayer ( 40 m/min ), que calcula en un 20% menos ( de 32 m/min)

.El Ingeniero de Electrónica y Automática Industrial ( páginas 17 a 22 del informe) Sr. Sahuquillo Huerta por su parte recoge en su informe que

En el punto 3.3 sobre el contrato firmado y compromisos asumidos por Sayer señala que::

"…Respecto a esto último, veamos las características esenciales que debe cumplir la línea S según el contrato:



-Máxima velocidad 46 metros por minuto 150 pies/min

-Humedad del producto a la salida del humidificador 19-20.%
-Humedad del producto tras secado 9-11.%
- En la zona de secado, estructuralmente, la máquina está preparada para trabajar entre 80°C y 120°C

En la línea S, es un hecho pacífico que se cumplen las características que están en color verde

. Ahora, la línea deberá cumplir las condiciones de temperatura y humedad en los rangos especificados Es decir, la línea S debe cumplir estas características, estar dentro de estos rangos sí o sí. En ese caso ¿qué ocurre con la velocidad? La velocidad de la línea está definida como un máximo, pero no está acotada en un rango (como podría haberse hecho a propuesta de la actora, por ejemplo, desconozco por qué no se hizo) ni hay una condición estricta de velocidad (por ejemplo, definir un mínimo de velocidad y no un máximo) o una condición aún más estricta: la velocidad de trabajo debe ser de 40 m/min.

Sin embargo, nada de eso se dice en el contrato, ni en la oferta, ni siquiera en el dosier: se establece una velocidad máxima de trabajo, por lo que se presume que cualquier velocidad inferior que cumpla con el resto de las características está dentro del ámbito del contrato, por la sencilla razón de que son condiciones de cumplimiento más estrictas.

Dicho de manera sencilla, la velocidad de 40 m/min no se contrató. Se contrató una línea que cumpliese con unos determinados rangos de trabajo de humedad y temperatura para una velocidad máxima, pero no para una velocidad mínima o una velocidad de trabajo «única», como parece desprenderse del documento 2 de la demanda.

Sobre este y el resto de los defectos de la línea S se explicarán y desarrollarán en el siguiente apartado del informe. No obstante, ni en la demanda, ni en los documentos que acompañan a la demanda se

24

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

menciona problemas o defectos anteriores a la adquisición de Nitta por Viscofan.

Como colofón a este apartado, y como ingeniero formado en automatización industrial, me resulta difícil de comprender que fallos de diseño tan graves y evidentes (la falta de velocidad, la longitud de las líneas húmedas, cintas transportadoras que se oxidan, además de todos los fallos de seguridad de los documentos 3 y 4 de la demanda) no fuesen percibidos por ingenieros expertos como los que, sin duda, trabajaban para Nitta y que no fuese hasta la adquisición de la planta por parte de Viscofan, que se dieran cuenta de estos fallos, de un cariz tan evidente que difícilmente cabría calificar como "vicios ocultos"."

Por otra parte en el punto 4 " sobre los supuestos defectos alegados en la Línea S " En el apartado primero: " la velocidad de la línea S", dispone que::

"En el documento 2 de la demanda, página 26, apartado 6.1, se analiza el problema con la velocidad de la línea S. En este apartado se justifica que la velocidad contratada es de "al menos 40 m/min" (sic) mezclando la información del dosier técnico previo a la oferta vinculante (anexo 1 del documento 2) y el propio contrato. Pero obvia lo demás. Por ejemplo, se obvia que en el dosier técnico no hay ninguna restricción respecto a la humedad y la temperatura de trabajo. Como he indicado previamente, cuando se ejecuta un proyecto se deben establecer unas condiciones de obligado cumplimiento que, en mi opinión, son estas:
Humedad del producto a la salida del humidificador □19-20 %
Humedad del producto tras secado 9-11 %
En la zona de secado, estructuralmente, la máquina está preparada para trabajar entre 80ºC y 120ºC
Si se cumplen estas condiciones, la velocidad no es relevante para el contrato. En el dosier técnico nada se dice de estas condiciones, ni la máquina es una línea S como la que se contrató posteriormente, sino una línea tipo LSC-60-4C. Simplemente, en la demanda, se están mezclando conceptos que nunca se pusieron en duda, ni en el presupuesto, ni en el contrato, lo cual es sorprendente, dado que la motivación de la contratación de la línea S era su mayor velocidad frente a las anteriores líneas de la actora.
No se pusieron en duda porque, incluso con el razonamiento de la demanda, la línea S es más rápida que la línea anterior de la actora. Efectivamente, en el anexo 13 del documento 2 de la demanda se hace una comparativa entre la producción a 40 m/min, a 32 m/min2 y a la velocidad de trabajo de la línea anterior de la actora, que era de 27,4 m/min. Es decir, aunque nos acojamos a la tesis de la actora de que la premisa fundamental era mejorar la velocidad de lo que tenían, la velocidad se ha mejorado en casi un 17%.
Ahora bien, la velocidad en la línea S es regulable. Dicho de otro modo, se puede aumentar o disminuir. No hay ningún vídeo anexo al documento 2 en el que se haga una prueba donde se especifique que la velocidad de la línea debe ser 40 m/min y que no pueda llegar a esa velocidad.

P00163



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

No es el caso: en el propio video 2 del documento 2 de la demanda (anexo 07), lo explica claramente ya que no se puede incrementar la velocidad por que se deben cumplir las otras condiciones de humedad en el secado que sí que estaban en el contrato. Esto es consecuente con lo que he explicado anteriormente, la línea S, en primer lugar, debe cumplir con las condiciones de secado (humedad del producto tras secado 9-11%) y esto lo cumple, a una velocidad inferior a la velocidad máxima establecida en el contrato, pero también a una velocidad superior en aproximadamente un 17% (16,79% para ser exactos) a la que tenían anteriormente. Dicho lo cual:

- No hay una velocidad "prometida" como se indica en el citado video. Lo que hay es un rango de trabajo (humedad del producto tras el secado del 9%-11%) que, aparentemente, se cumple a una velocidad de 32 m/min, que está dentro del rango de velocidad contratado.
- Que el incremento de la velocidad respecto a la línea anterior sea solo del 17% y si eso hace rentable o no la sustitución, con todos mis respetos al Sr. Prieto y al Sr. Díaz, carece de fundamento técnico alguno. Para sostener su apreciación, en el video hacen mención de que la velocidad de la línea anterior de la actora es de unos 30 m/min y que la línea S funciona a unos 30 m/min para resaltar que no se ganó nada con el cambio, si se me permite la expresión. Pero sus propios documentos los desmienten: ni la velocidad de la línea anterior son 30 m/min (son 27,4 m/min, anexo 13 del documento 2 de la demanda) ni la velocidad de trabajo mostrada (105 pies/min) son 30 m/min, sino 32 m/min. Existe, por tanto, una mejora importante en la velocidad (un 17% no es una cantidad despreciable).

En mi opinión, si los 40 m/min eran esenciales para el retorno de la inversión debería haberse establecido dicha velocidad como requerimiento en el contrato, al mismo nivel que la humedad del producto tras el secado. Sin embargo, se aceptaron libremente las condiciones técnicas del contrato por ambas partes, y en el contrato no hay ninguna "promesa" de velocidad "viable", que es lo que parece desprenderse del documento 2 de la demanda.

Con el presente documento se aporta como anexo 01 un video (video facilitado por la demandada) de la línea S en pruebas a una velocidad de producción de 150 pies/min (45,72 m/min), lo que me permite establecer que, efectivamente, la línea S puede trabajar a la velocidad máxima.

Finalmente, en la demanda tampoco se aporta prueba alguna de que el producto fabricado a 40 m/min no cumpla con las condiciones de humedad a la salida del humidificador (19% - 20%) y/o humedad tras el secado (9% - 11%). Solamente se afirma que "el secadero no es capaz de secar la envoltura". En el contrato, el secadero debe ser proporcionado por la actora y una de las razones que puede darse para que esto ocurra (si ocurre, no hay ninguna prueba irrefutable al respecto) es que el secadero de la actora no esté bien dimensionado para esa velocidad y ese tipo de gel, como se advertía en el dosier técnico por parte de la demandada

Por tanto, la línea S, en mi opinión, cumple perfectamente con las indicaciones del contrato y que, si existiere algún problema con la relación velocidad / secado, puede deberse a una selección errónea del gel o un

Doc. garantizado con firma elect. URL verificación:
https://administraciondejusticia.navarra.es/SCDD_Web/index.html

CSV: 5120142002-01a80583a5e87550c083aa3bc0f0383ae72yAA==

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 28/12/2022 16:42

26



P00164

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

mal dimensionamiento de la máquina de secado, que son responsabilidad de la actora.

Como se indica en el vídeo 2, anexo 07 del documento 2 de la demanda, la actora reconoce que se puede incrementar la velocidad, esto es, que puede trabajar a esa velocidad, aunque tiene problemas con el secado. También en el vídeo que aportamos junto con este informe (anexo 01 citado ut supra) se observa la línea S trabajando a 150 pies/min (45,72 m/min).(...)

Si a esa velocidad existen problemas con el secado, hecho que no se demuestra documentalmente en la demanda, no es un problema de la velocidad de la línea, sino de un mal dimensionamiento de la secadora y/o un gel que no es adecuado para esas velocidades.

En el vídeo del anexo 01 se muestra un vídeo grabado en las instalaciones de Sayer durante la fase de programación y pruebas de la línea S. En este vídeo se observa una bobina en simulación de desbobinado y la siguiente en modo de bobinado, lo que permite el ajuste de velocidad y par."

Por otra parte y respecto a la fórmula utilizada para cuantificar este perjuicio. El Sr Elizalde en su informe considera que la conclusión que hace el perito de la demandante para determinar el menor valor de la máquina por la supuesta reducción del valor de la máquina debe indicarse de manera rotunda es un procedimiento absolutamente carente de sustento técnico y profesional, ya que pueden verse afectados por esa supuesta reducción de la velocidad

Y en el informe pericial judicial del ingeniero D Oscar Prieto

Páginas 50 y ss.

En cuanto a los compromisos contractuales que Sayer asume con Viscofan el perito señala que:

"..Mediante la firma del Contrato, SAYER TECHNOLOGIES S.L. se comprometió al diseño, fabricación y montaje, en las instalaciones del cliente, de una máquina cuyas prestaciones, grosso modo, consistían en:
a) Recibir la envoltura de gel de colágeno producida en los cabezales de extrusión.
El Contrato no contemplaba el compromiso de incluir estos dispositivos (los cabezales de extrusión), de manera que su adquisición, montaje, puesta a punto y operación no eran responsabilidad de SAYER TECHNOLOGIES S.L.
b) Facilitar la circulación de la envoltura de gel de colágeno extruido a una velocidad constante, de hasta 46 metros (150 pies) por minuto, a lo largo de un circuito que recorre distintas etapas que tienen por objeto proporcionar al producto una serie de tratamientos de forma secuencial (neutralización, lavado,
plastificado, secado y humectación).
El Contrato no contemplaba el compromiso de incluir los sistemas de aportación y/o extracción de fluidos para dichos tratamientos (amoniaco, agua, glicerina, aditivos, aire caliente y seco, y aire húmedo,

27

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



respectivamente), de manera que su adquisición, montaje, puesta a punto y operación no eran responsabilidad de SAYER TECHNOLOGIES.S.L.

c) Adecuar el diseño y los materiales empleados en la máquina al espacio disponible y a las condiciones de trabajo previstas en cada una de las etapas de tratamiento (corrosión, humedad, temperatura, aislamiento térmico, etc.).

d) Recibir la envoltura de gel de colágeno a la salida de la última etapa de tratamiento (humectación) y darle formato de rollo o bobina (envoltura lisa), teniendo presente que el formato en el que se entrega el producto al cliente final requiere someter a la envoltura a un proceso adicional, de plisado, que tiene lugar en la planta que la empresa tiene en Ontario (Canadá).

e) Proporcionar un sistema para el control del calibre de la envoltura, con 4 puntos de control distribuidos a lo largo del recorrido de la Línea S. Aunque el Contrato no contemplaba el compromiso de incluir estos dispositivos, SAYER TECHNOLOGIES S.L. se hizo cargo de su montaje y puesta a punto.

En definitiva, el Contrato suscrito entre ambas empresas tenía por objeto la adquisición de una máquina destinada a integrarse en un proceso de producción de envoltura de gel de colágeno extruido, capaz de: transportar la envoltura de gel de colágeno extruido a lo largo de las distintas etapas que componían el proceso de producción de forma adecuada, garantizar los tiempos de tratamiento del producto especificados para cada una de esas etapas, adaptarse al espacio disponible en la planta de Bridgewater (New Jersey), equipar un sistema de control de calibre, y subsidiariamente, prever la integración de aquellos sistemas esenciales para el proceso no previstos en el Contrato.

Además de las consideraciones anteriores, eminentemente técnicas, el Contrato tenía por objeto otros propósitos, destinados a proporcionar los mecanismos legales adecuados para proteger y garantizar los intereses de las partes firmantes.

En el siguiente epígrafe examina las especificaciones Técnicas de la Línea S

En este sentido el perito judicial señala que: "Poco más de un mes antes de la firma del Contrato, SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. habían firmado un Acuerdo de Cooperación Tecnológica y Comercial con el objeto de abordar una serie de proyectos que incluían, entre otros, una línea de procesamiento de envoltura de gel de colágeno.

Con anterioridad a la firma de este acuerdo, SAYER TECHNOLOGIES S.L. ya había facilitado a NITTA CASINGS INC. diversos documentos en los que se describían las características técnicas de algunos de sus productos; y en el caso concreto del Dosier Técnico, se anticipaban las referencias que se emplearon posteriormente para definir las especificaciones técnicas de la Línea S.

El Dosier Técnico presentaba una solución para el proceso de producción de envoltura de gel de colágeno extruido que difería sustancialmente del proceso productivo que NITTA CASINGS INC. venía operando hasta la fecha en sus líneas (Unit 1, 2, 3 y 4), y que afectaba de forma radical a la aplicación de los tratamientos de neutralización, lavado y plastificado; de manera que, aceptando estas premisas, NITTA CASINGS

28

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



INC. asumía de forma implícita el carácter experimental del proyecto, y en consecuencia, el riesgo asociado.

Por otra parte, el Dosier Técnico incluía una serie de advertencias ("remarks") en sus primeras páginas para aclarar que SAYER TECHNOLOGIES S.L. estaba especializada en fabricación y automatización de líneas, pero no en gel (de colágeno, se entiende), descargando así en el cliente la responsabilidad de anticipar la idoneidad de su producto (el gel de colágeno) a las prestaciones contratadas. Estas advertencias se referían también a la definición de los tiempos de procesamiento que requería el producto del cliente (gel de colágeno), que servirían para definir las dimensiones de la máquina, así como otras cuestiones relativas a los elementos o sistemas que no se incluían en la propuesta (cabezales de extrusión, sistemas de aportación de aire, etc.).

El documento que recogía las especificaciones técnicas definidas para la Línea S era el Presupuesto (Quotation) que se adjuntó al Contrato, y el responsable último de la definición y aceptación de dichas especificaciones era NITTA CASINGS INC., en calidad de cliente y como empresa especializada en la producción de gel de colágeno y en su procesamiento para la producción de envoltura.

Por su parte, SAYER TECHNOLOGIES S.L., en calidad de vendedor y como empresa especializada en maquinaria industrial y automatización de procesos, estaba en condiciones de asesorar a NITTA CASINGS INC. en la definición de aquellas especificaciones técnicas propias de su ámbito de competencias.

La configuración propuesta (en forma de "L" invertida) obedecía en exclusiva a la necesidad del cliente de acondicionar la máquina al espacio disponible en la planta de Bridgewater (New Jersey), y obligaba a la fragmentación del recorrido, una circunstancia que imponía serias restricciones al diseño de la Línea S, motivando, entre otras cosas, la implementación del sistema de poleas en las curvas.

De la misma manera, el dimensionamiento de la longitud de cada uno de los tramos de la Línea S, así como el número de pases previstos para cada uno de ellos, obedecía en exclusiva a la previsión del cliente sobre los tiempos de tratamiento que requería su producto (que es donde residía en última instancia la clave del proceso productivo). En este sentido, conviene subrayar que los tratamientos de neutralización, lavado y plastificado aceptados por NITTA CASINGS INC. en este proyecto difieren sustancialmente de los que venía operando hasta la fecha en sus líneas de procesamiento de envoltura mediante extrusión de gel de colágeno y que, por tanto, no disponía de referencias previas propias para su definición (de nuevo se incide en el carácter experimental asociado a esta circunstancia).

Por otra parte, dotar a la máquina de una velocidad máxima de transporte alrededor de un 50% superior a la velocidad a la que estaban funcionando hasta el momento sus líneas de procesamiento de envoltura de gel de colágeno, que operaban en el entorno de los 30 metros (100 pies) por minuto, obedecía en exclusiva al interés del cliente por incrementar de forma sensible su capacidad de producción.

En relación con los contenidos que se incluyen finalmente en el Presupuesto, cabe afirmar que SAYER TECHNOLOGIES S.L. estaba en condiciones de asumir y satisfacer el cumplimiento de todas las especificaciones técnicas que se definieron porque formaban parte de su

29



P00167



Cristina Fuentes Sánchez
Nº T/I Jurada/Sworn translator #: 3380
16 junio 2023 / June 6 2023

ámbito de especialización industrial y porque dependían en exclusiva de su capacidad técnica, con la excepción de aquellas que hacían referencia a los objetivos de humedad del producto a la salida de las etapas de secado y humectación, cuya inclusión resulta inexplicable para el perito autor de este informe, ya que su consecución dependía también de factores ajenos a su solvencia técnica, entre los que estaría la gestión que hiciera NITTA CASINGS INC. de sus sistemas de aportación de aire caliente y seco (para el secado del producto), y de aire húmedo (para su humectación) en el Área de Secado, amén de la gestión que hiciera de los sistemas que afectaban a los tratamientos previos, que son los que determinan las propiedades del producto a su entrada (..) "

En el punto 9.4   analiza los defectos relacionados con las capacidades motrices de la Línea S. En el apartado primero  sobre la velocidad máxima, y en el segundo  sobre la adecuación para el transporte.

En la página 58  y 59( punto 9.4.1 de su informe)    la " velocidad máxima de la Línea S", dice que:

"...El proceso de diseño de las cintas transportadoras de la Línea S se detalla en un documento que se adjunta al informe. El esquema general empleado para el diseño de sus componentes sería el siguiente:
a) Estimación de cargas y esfuerzos en base a las especificaciones técnicas y a la experiencia (que incrementa la previsión de cargas y esfuerzos previstos inicialmente).
b) Dimensionamiento y determinación de bandas (cintas) y poleas, en base a los criterios técnicos del fabricante (la selección conservadora de las opciones ofrecidas por el fabricante revierte en el incremento de las prestaciones mecánicas del diseño).
c) Dimensionamiento y determinación de motores eléctricos y variadores de frecuencia, en base a las especificaciones de velocidad máxima, al cálculo de cargas y esfuerzos, a la previsión de ampliación de las capacidades del sistema y a la gama de equipos disponibles.

A la vista de la documentación facilitada por SAYER TECHNOLOGIES S.L., revisada y analizada por el perito autor de este informe, se concluye que:
Los cálculos  facilitados  por  la  empresa  para  el dimensionamiento de los componentes mecánicos y eléctricos de las cintas de transporte de la Línea S prevén su funcionamiento en el entorno de los 200 pies (60 metros) por minuto (un 33% superior a la especificación técnica recogida en el Contrato, aunque en primera instancia se limita (vía software) a 150 pies (46 metros) por minuto, tal como se había establecido en el Contrato.
Las prestaciones de los equipos y sistemas empleados en la Línea S, cuyo objeto sería proporcionarle la capacidad de transporte prevista en el Contrato, se adaptan a los parámetros obtenidos durante el proceso de cálculo citado en el párrafo anterior, de manera que acaban dimensionándose para ofrecer mayores prestaciones de las contratadas (sobredimensionados).







*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En definitiva, la reclamación que se presenta en la DEMANDA cuestionando el cumplimiento de la especificación técnica sobre la velocidad máxima de la Línea S no tiene fundamento técnico ni lógica contractual. En primer lugar, porque la máquina se diseñó y dimensionó para desarrollar todo el rango de velocidades contratadas, incluida la máxima, que podría superar suprimiendo la limitación que se implementó en su sistema de regulación y control. En segundo lugar, porque la demanda no cuestiona en realidad este hecho, sino la incapacidad de producir envoltura de gel de colágeno comercializable más allá de los 105 pies (32 metros) por minuto (una cuestión que no depende únicamente de las prestaciones del sistema motriz de la Línea S, como ya se ha aclarado en diversas ocasiones), recurriendo para ello al uso reiterado de un concepto artificioso ("velocidad prometida") que induce a interpretar de forma equívoca los verdaderos compromisos adquiridos por SAYER TECHNOLOGIES S.L. en relación con las capacidades de la Línea S.."

De lo expuesto se desprende que los compromisos asumidos por Sayer se encuentran recogidos en el contrato suscrito en el 28 de agosto de 2015 y en concreto en el presupuesto integrado de la misma fecha ( anexo 2 y 3 del informe de la demandante y documento 1 de la demanda).

Pero sin olvidar como hace el perito judicial Sayer que este acuerdo tenía por objeto la adquisición de una máquina destinada a integrarse en un proceso de producción de envoltura de gel de colágeno extruido, capaz de: transportar la envoltura de gel de colágeno extruido a lo largo de las distintas etapas que componían el proceso de producción de forma adecuada, garantizar los tiempos de tratamiento del producto especificados para cada una de esas etapas, adaptarse al espacio disponible en la planta de Bridgewater (New Jersey), equipar un sistema de control de calibre, y subsidiariamente, prever la integración de aquellos sistemas esenciales para el proceso no previstos en el Contrato.

No comparto con la demandada que la Línea S encargada a Sayer se reduzca a fabricar una línea de *transporte* de tripas de colágeno. No responde al precio de la máquina, y a la empresa de Ingeniería Mecánica elegida para fabricar la Línea S

En segundo lugar Según la actora a pesar de los cambios en la máquina, la velocidad máxima no supera los 32 por minuto. La Línea anterior ( fabricada por Jhonson) alcanzaba los 30 m por minuto. La velocidad contratada lo fue de 46 m/min. De al menos 40 m por minuto

De dichos documentos Sayer como dice el petito de la demandada, y el perito judicial no se compromete a una velocidad mínima, si a determinados rangos de temperatura y humedad. Es más ni siquiera se establece en el documento anterior al contrato y presupuesto de 28 de agosto ( dosier técnico ) donde se prevé que la velocidad de la línea debía ser al menos de una velocidad de 40 m por minuto. Dosier que ni siquiera contemplaba la fabricación de una línea S como la que se contrató posteriormente, sino una línea tipo LSC-60-4C. Es más no





31

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



recogía los parámetros de humedad y temperatura que alcanzaba la maquina

En tercer lugar, tanto este perito de la demandada  como  el perito judicial coinciden en que  la maquina estaba pensada para funcionar en todo rango de velocidades. El video realizado por el perito de la demandada  demostraría  que puede alcanzarse la velocidad máxima de 46 m por minuto.  Manifestación que como dice dicho perito judicial no discrepa la demandante. Según se  ha indicado y se recoge en el informe de Viscofan si se sube la velocidad, el secadero no es capaz de secar la envoltura (no llega al 9-11% indicado en la Quotation) y el producto no adquiere las propiedades o incluso puede romper (Vídeo 2, 02:45 – 04:11).

Problemas  que Viscofan no ha  probado traigan causa de la velocidad y no del  dimensionamiento de la secadora y/o un gel que no es adecuado para esas velocidades. Esto último responsabilidad de Nitta. O como dice el perito judicial no depende únicamente de las prestaciones del sistema motriz de Línea S, como  se  dirá nuevamente al analizar los defectos  siguientes relacionados con el diseño de la Línea S, que complementaria lo hasta este momento dicho

No probado dicho defecto  y la relación de la reducción de la velocidad y perdida de rendimiento de la línea, no es necesario entrar a examinar la fórmula de cálculo de la pérdida del valor de la línea S del perito Sr Prieto. No obstante,  a criterio de esta Juzgadora son razonables las críticas que el economista Sr Elizalde hace de  "la fórmula  utilizada".  Es cuestionable determinar los perjuicios económicos por el menor rendimiento de la máquina sin tener  en cuenta los gastos fijos que la maquina hubiera tenido  aun en el caso de que la maquina funcionase en los rangos de velocidad  que dice Viscofan se comprometió Sayer

**2.-Zonas Húmedas 1 y 2 innecesariamente largas.** El perito de la demandante concluye que  las zonas son  innecesariamente largas, previsiblemente bien diseñadas para velocidades objetivo  de al menos 40 m/min pero al no poderse alcanzar esa velocidad ( la velocidad actual máxima es de 32 m/min), la zona húmeda  resulta innecesariamente larga. Viscofan tuvo que optar por inutilizar  por completo  el nivel inferior de dicha zona húmeda, cuyo diseño  también producía un estiramiento excesivo de las envolturas

De forma más detallada en las paginas 29 a 31 del informe de la demandante, punto 6.2 de su informe  se dice que:
"Tanto la Zona Húmeda 1 como la Zona Húmeda 2 presentan errores de diseño, dado que resultan innecesariamente largas.
En el Vídeo 3, 00:00 – 01:57 podemos encontrar la explicación del Sr. Diez de las zonas por las que se ha de pasar y fueron visitadas hasta llegar a la Zona Húmeda, en la cual tiene lugar otro de los problemas identificados en la S-Line, la longitud excesiva de la denominada Zona Húmeda.
El Sr. Diez indicaba a este perito durante la visita virtual (Vídeo 3, 01:58 – 02:49) que esa zona es  innecesariamente larga y que

32



P00170



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

previsiblemente estaría bien diseñada para las velocidades pretendidas en la documentación de Sayer de al menos 40 m/min, pero al no poderse alcanzar esa velocidad (recordemos que se queda en 32 m/min, es decir, un 20 % por debajo), la zona húmeda resulta innecesariamente larga.

El Sr. Díez manifestaba que la solución a ese problema consistió en inutilizar por completo el nivel inferior de dicha zona húmeda (Vídeo 3, 02:50 -- 03:30). Con la implantación de dicha medida se evitan las excesivas bajadas y subidas de la envoltura en su recorrido, y las excesivas zonas donde se tracciona la envoltura por medio de las bandas, lo cual además generaba estiramientos en la envoltura. En la sección posterior 6.5 se ahonda también sobre este problema del estiramiento de la envoltura.

En la actualidad, para poder producir envoltura dentro de los parámetros de calidad requeridos, la zona húmeda de la S-Line está funcionando en una pequeña parte de la capacidad inicial instalada.

De forma más concreta, en la actualidad hay un total de 12 tránsitos menos de los 15 que tenía originariamente sumados los correspondientes a la zona húmeda 1 y zona húmeda 2 (incluidos los pases de glicerina), dado que se está funcionando con 3 pasos de la zona húmeda 2.

En la Oferta de Sayer (Anexo 02, páginas 3 y 4) se preveían 6 pases de 34 m cada uno en la Zona Húmeda 1, 3 pases de 20 m en la Zona Húmeda 2, y 6 pases de glicerina también en la Zona Húmeda 2, totalizando la cantidad antes referida de 15 pases iniciales instalados por Sayer.

Se muestran a continuación algunos fotogramas de las zonas del piso inferior de la Zona Húmeda que han sido inutilizadas (vídeo 3, 01:10 -- 02:25).

Fotograma del piso inferior de la Zona Húmeda 1 inutilizado (Vídeo 3, 01:45). Fotograma del piso inferior de la Zona Húmeda 2 desmantelada (Vídeo 3, 01:45).

En la primera fotografía se aprecia el piso inferior de la Zona Húmeda 1 inutilizada, pero todavía con las bandejas instaladas.

En la siguiente fotografía se aprecia el piso inferior de la Zona Húmeda 2 no solo inutilizada sino incluso desmantelada, donde se han eliminado las bandejas y todo el resto de elementos (motores, rodamientos, etc.) como medida de higiene. …"

En el punto 6.5 se refiere otros problemas de diseño de la Zona Húmeda. El estiramiento no deseado de las envolturas y en el punto siguiente 6.6 capacidad insuficiente del secadero Consecuencia de lo cual Nitta inhabilita parte de la zona húmeda, que desmantela posteriormente Viscofan

**En cuanto al estiramiento no deseado de las envolturas de colágeno** El perito de la demandante, concluyendo que el diseño original de Sayer de la zona húmeda así como la zona de giro existente en la zona húmeda 2 y el secadero, producía un estiramiento excesivo de las envolturas . En concreto el ultimo giro mencionado es una zona en U donde la envoltura debe realizar un giro de 180°, el cual era demasiado brusco y provocaba que hubiera estiramientos y variación de calibre de la envoltura ( parámetro clave de la misma)

33



P00171

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*







Este defecto lo examina de forma más detallada en las páginas 38 a 40 ( punto 6.5 de su informe) y señala que: " Otro problema identificado en la línea de extrusión de colágeno S-Line es el del estiramiento no deseado en las envolturas, el cual originaba problemas de firmeza y estabilidad de calibre de la envoltura.

El estiramiento longitudinal de la envoltura de colágeno provocaba una variación del diámetro o calibre de la envoltura y por consiguiente de firmeza, por debilitarse la pared de la envoltura fruto del estiramiento, y de estabilidad como consecuencia de dicha variación del calibre.

Según los datos históricos de Viscofan Collagen USA Inc el calibre se reducía aproximadamente en un 10%.

La explicación de este problema de estiramiento de la envoltura de colágeno la encontramos en el Vídeo 2, 05:06 – 08:18.

Para ilustrar este problema de la S-Line, que tuvo lugar tras la puesta en marcha de la línea, se muestra a continuación un diagrama de flujo de un producto de calibre 13 con las mediciones de calibre en cada paso del proceso.

La configuración inicial de la S-Line daba muchos problemas de control de calibre debido a los fuertes estiramientos que sufría la envoltura en el proceso.

Este diagrama de flujo muestra las distintas medidas de calibre para el referido producto de calibre 13, concretamente, a modo de ejemplo, los siguientes:

    a. Al salir de la extrusora el calibre es 12,7.

    b. Se infla hasta llegar a 16,9 (etapa de aplicación de glicerina).

    c. En el secadero se encoje hasta un mínimo de 12,4, y

    d. Finaliza en la enrolladora con un calibre de 13,3.

Dicha variabilidad demuestra que la envoltura sufría fuertes estiramientos durante el proceso de producción, lo que hacía muy complicado el control de calibre.

Viscofan Collagen USA Inc llevó a cabo las siguientes acciones para solucionar el problema y conseguir un mayor control de calibre:
    Se introdujo amoniaco externo en la extrusión, y
    Se eliminó el paso de la envoltura por el piso inferior en la Zona Húmeda, reduciendo el proceso de Zona Húmeda únicamente al piso superior.

Con esas modificaciones, que persisten hoy en día, se consiguió un mayor control del calibre.

Asimismo, otro factor (problema) que afecta a la S-Line, en este caso justo a la entrada del Secadero, es el diseño de la zona de giro existente entre la Zona Húmeda 2 y el Secadero, una zona en U donde la envoltura debe realizar un giro de 180 º.

Tal y como explica el Sr. Diez en el Vídeo 4, 02:25 – 02:58 el diseño original de Sayer era demasiado brusco y provocaba:

34



Firmado por:
MARÍA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/GCID_Web/index.html

CSV:3122142002-d1a055ba5a57550c83ce8bd03883a272yA=

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

- que hubiera estiramientos y variación de calibre de la envoltura,

- que hubiera roturas de las denominadas correas verdes (Ver nuevamente Anexo 11 con histórico de roturas de las correas vedes), o

- que para evitarlas hubiera que reducir en exceso la velocidad de la línea, lo que nuevamente repercutía en uno de los principales problemas o desperfectos de la S-Line, la velocidad.

Hoy en día, como indica el Sr. Diez, esa zona fue adaptada por Viscofan Collagen USA Inc y como consecuencia de ello la línea S-Line al menos es capaz de mantener la velocidad de 32 m/min".

Este perito cuantifica los perjuicios por los defectos de diseño S Line en 539.000 euros, que corresponden al coste de la zona húmeda inutilizada a resultas de su excesiva longitud ( apartado 6.2).

Adjunta como Anexos 15 y 16 dos presupuestos relativos al diseño e instalación de una zona húmeda como la realizada por Sayer para la S-Line. El primero contempla el diseño e instalación de una zona húmeda de dos pisos o niveles y el segundo valora el diseño e instalación de una zona húmeda de un único piso o nivel. El daño lo determina por la diferencia de coste entre uno y otro presupuesto, de 1.027.000 euros y de 488.000 euros.

Asimismo, acompaña como Anexo 17 un desglose del presupuesto de la S-Line realizado en febrero de 2015, en el que se expresa el coste relativo a cada una de las zonas que la componen, y en concreto se valora toda la zona húmeda en 794.000 dólares.

**Respecto a la capacidad insuficiente del secadero** . El perito de la demandante concluye que la capacidad del secadero es insuficiente para la velocidad prometida por Sayer de 40/46/60 A la velocidad máxima actual que puede conseguir la S-Line de 32 m/min el secadero tiene capacidad, pero evidentemente ese no es el objetivo de velocidad deseado y establecido en la documentación de Sayer (Anexos 01 y 02). Si se incrementa la velocidad en la línea, el secadero no es capaz de secar adecuadamente.

En las páginas 40 y 41 ( punto 6.6) punto 6.6 de forma más concreta examina dicho defecto. Señala que:
"Otro problema o desperfecto relevante es el relativo a la capacidad "insuficiente" del Secadero, aspecto directamente relacionado también con el referido problema de la velocidad de la línea S-Line.
Se trata de un cuello de botella dado que su capacidad es insuficiente para la velocidad prometida por Sayer de 40/46/60 m/min.
A la velocidad máxima actual que puede conseguir la S-Line de 32 m/min el secadero sí tiene capacidad, pero evidentemente ese no es el objetivo de velocidad deseado y establecido en la documentación de Sayer (Anexos 01 y 02). Así las cosas, si se incrementa la velocidad, el secadero, aguas abajo, no es capaz de secar adecuadamente (no llega al 9-11%

35





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

indicado en la "Quotation") y por tanto la envoltura de colágeno no adquiere las propiedades de humedad necesarias e incluso, como Viscofan Collagen USA Inc pudo comprobar en diversas ocasiones, la envoltura puede romper. Alternativamente, si se aumentara la temperatura en el secadero como medida para compensar la falta de capacidad ante un aumento de velocidad, en tal caso aunque se pudiera llegar a conseguir un secado adecuado, la envoltura sufriría en mayor medida los estiramientos mencionados anteriormente y los problemas de roturas de correas verdes del secadero serían más frecuentes, ya que estos problemas se agravan con mayores velocidades.

Como ya se indicará otro de los problemas de la S-Line (rotura de las correas (verdes)), este tipo de roturas, de la envoltura per se en este caso, entraña importantes repercusiones económicas, dado que origina que en ese momento toda la línea de extrusión de colágeno S-Line debe pararse durante el tiempo necesario para restituir la línea, con la consiguiente falta de producción".

El perito de la demandada Sr Sahuquillo, En el punto 4.2 analiza el defecto opuesto de la longitud de las zonas húmedas 1 y 2. Páginas 22 a 24 donde por el contrario se dice que:
"Los argumentos del documento 2 de la demanda que indican el Sr. Prieto y el Sr. Díez se pueden resumir en los siguientes puntos:
i. La zona húmeda es innecesariamente larga (vídeo 3, anexo 08 del documento 2 de la demanda) y que previsiblemente estaría bien diseñada para las velocidades pretendidas en la documentación de Sayer de al menos 40 m/min (sic), pero que, al no poderse alcanzar esa velocidad, la zona húmeda resulta innecesariamente larga.
ii. La solución resultó en la reducción de las dimensiones de la zona húmeda 1 y en la eliminación de la zona húmeda 2. Esa decisión fue tomada por la actora.
No se explica en el vídeo la problemática asociada a esa innecesaria longitud de las zonas húmedas, más allá de los estiramientos en las vueltas del colágeno extruido y que, siguiendo la línea argumental del documento 2 de la demanda, valoraremos posteriormente en este informe.
Sobre el punto (i) el análisis que se hace en el documento 2 es un análisis ex post facto muy claro: dado que no llego a la velocidad que yo quiero, la línea es muy larga. No obstante, ese no es realmente el proceso de un diseño de una línea automatizada. Por tanto, pongámonos en el lugar del ingeniero o ingenieros que desarrollaron la línea S específicamente para la planta de la actora en Nueva Jersey. Recordemos que la demandada no vende productos estandarizados, sino que hace proyectos llave en mano. La primera consideración de diseño siempre es el espacio disponible, que no era precisamente ni grande, ni fácil.
Así pues, en el diseño de la instalación, la longitud de la línea se determina en relación con el tiempo necesario para procesar el gel que debe aportar la actora. Sin embargo, en el documento 2, o de las palabras del Sr. Prieto o del Sr. Díaz, no se hace ninguna referencia a este hecho fundamental.
Desde esta perspectiva (que la longitud se determina en relación con el tiempo necesario para procesar el gel junto con las restricciones de espacio, se puede entender perfectamente qué pasó y porqué se tomó la

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/SCDD_Web/IndexC.html

CSV: 3120142002-41e605.3a5e375f6b0c82ceb3dcd9393ce77cpAA==



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

decisión de «recortar» la zona húmeda: el problema, al contrario de lo que se afirma por parte de la actora, no está en la velocidad, sino en el tiempo necesario para procesar el gel, que es una característica que debía definir la actora.

Efectivamente, en el diseño mecánico de la línea S, la demandada tenía dos limitaciones impuestas -precisamente- por la actora: el tiempo necesario para procesar el gel y el espacio habilitado para montar la línea.

En mi opinión, la supuesta limitación de velocidad a 32 m/min (limitación que, como he indicado, no está provocada por el diseño de la línea S, sino que es voluntad de la actora), los problemas alegados en el secado del colágeno, así como la supuesta longitud excesiva de la zona húmeda tiene un mismo denominador común: el tiempo de procesado del gel de la parte actora. Es el procesado del gel el que, como advertía la demandada en su dosier técnico, el que marca los tiempos de procesamiento, la longitud de la línea y finalmente, la velocidad máxima de trabajo estipulada en el contrato (46 m/min) que es una consecuencia de los tiempos de procesado del gel proporcionado por la actora.

Por tanto, los problemas en el procesado del colágeno que aduce la actora, en mi opinión, no están relacionados con un mal diseño de la línea S, ya que está línea cumple con las condiciones del contrato firmado libremente entre las partes, sino que están relacionadas con el tiempo de procesamiento del gel, cuya selección y conocimiento son exclusivos de la parte actora."

En el punto 4.5 examina relacionado con el anterior, el estiramiento indeseado de las envolturas , y dice que :

"De acuerdo con el Sr. Diez en el video 3 (5:06 – 08:18) y video 4 (02:25 – 02:58) tal y como transcribe el Sr. Prieto en el documento 2 de la demanda se ha identificado un estiramiento indeseado en las envolturas, lo cual originaba problemas de reducción del calibre de, aproximadamente, un 10%. En el propio documento 2 hay un ejemplo del comportamiento y una solución que se aporta, que es muy ilustrativa del problema técnico que se plantea en la demanda.

Para un producto de calibre 13 (diámetro de la tripa de 13 mm) se tienen las siguientes mediciones:

a. Al salir de la extrusora el calibre es de 12,7. Pero es que la extrusión no es, ni nunca ha sido, responsabilidad de la demandada. Efectivamente, entre las exclusiones del contrato están los cabezales extrusores y la alimentación de gel a la extrusora. El error respecto del calibre es únicamente del 2,30%.

b. Se infla hasta llegar a 16,9 (etapa de aplicación de glicerina). El suministro de glicerina y su tratamiento tampoco están incluidos en el contrato y no son responsabilidad de la demandada.

c. En el secadero se encoje hasta un mínimo de 12,4. El equipo de suministro de aire al secadero y su control están excluidos del contrato y no son responsabilidad de la demandada

d. Finaliza en la enrolladora con un calibre de 13,3. El calibre con el que se comercializa el producto es de 13,3 que representa un +2,30% del

Doc. garantizado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/SCDD_Web/index.html

CSV: 3121142002-c1a5053a5e5765b0c8ba0d3c5f583ac72yyAA==

Fecha: 22/12/2022 15:42

Firmado por:
MARIA PASTOR CISNEROS

P00175



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

calibre (no un 10% como se indica en el documento 2). Entiendo que un error de ±2,30% o dicho de otro modo ±0,3 mm es un error aceptable.

Es de hacer notar que el calibre 13 es, junto con el de 12,5, el calibre más pequeño de tripa de colágeno que comercializa la actora. Cuanto más pequeño es el calibre, más se perciben los cambios de diámetro durante el proceso (que no al final del mismo, ya que ±0,3 mm considero que es un error aceptable). Habría que comprobar si con calibres más grandes, el error se multiplique o, al

contrario, se mantenga en ±0,3 mm con lo que sería prácticamente despreciable en calibres de, por ejemplo, 50 mm.

Independientemente de lo anterior, los cambios en el diámetro de la tripa no se deben tanto al diseño de la línea S, como al propio comportamiento del gel (responsabilidad de la actora), como claramente se desprende de la solución adoptada:

- Se introdujo amoniaco externo en la extrusión, y
- Se eliminó el paso de la envoltura por el piso inferior en la zona húmeda, reduciendo el proceso de zona húmeda únicamente al piso superior.

Obsérvese que en el propio vídeo 3 a partir del minuto 5:05, el Sr. Diez y el Sr. Prieto comentan que los estiramientos se producen en la curva a la entrada del secadero, donde hay un giro de 180°. Sin embargo, esa zona no ha participado de la solución. En mi opinión, no se ha modificado, porque el giro debe ser como es, dado el espacio en la planta y porque el problema no es mecánico, sino químico, debido al gel empleado y que, en mi opinión, es el problema principal que tiene la «línea S», de ahí que las soluciones pasen por tratamientos químicos (amoniaco) o reducción de tiempo de procesado del gel en la zona húmeda (reducción de la exposición a la glicerina y al lavado) que es lo que verdaderamente afecta a la tripa de colágeno.

Del primer punto, sólo podemos insistir en que el tratamiento con amoniaco y la extrusión están fuera del ámbito contratado y no son responsabilidad de la demandada.

En cuanto al segundo punto, me remito al apartado 4.2. de este informe: la longitud de las zonas húmedas estaba definida en el contrato por las condiciones del espacio disponible en la fábrica, así como por los tiempos de procesado del gel que facilitó la actora para el diseño de la línea S.

Por tanto, en mi opinión, no existen estiramientos en las envolturas que provocan errores en el calibre de la envoltura en su etapa final (en el bobinado). El error en el calibre está dentro de unos márgenes aceptables. Además, los errores que se alegan en el documento 2 en los cambios de calibre están provocados por actuaciones que están excluidas del ámbito contratado libremente entre las partes en litigio."

Y finalmente en el punto 4.6. trata las supuestas deficiencias en la zona del secadero. Señalando que:

"En la zona del secadero se menciona varios problemas: una capacidad insuficiente y el uso de materiales inapropiados. En cuanto al primero 4.6.1. Sobre la supuesta capacidad insuficiente en el secadero

En este apartado se insiste en el hecho de que la capacidad insuficiente del secadero es en relación con la velocidad prometida de 40-46-60 (m/min).

Doc. generado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/SCDD_Web/index.html

CSV: 81201142D02-d1a5083a5e37a8bcb82eab3c0cf093az72yAvvvv

Fecha: 22/12/2022 15:42

Firmado por:
MARIA, PASTOR CISNEROS

ADMINISTRACIÓN
DE JUSTICIA

38



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En el video 4, hasta el minuto 1:50 aproximadamente se reconoce que la capacidad insuficiente es para una velocidad prometida inexistente. No voy a extenderme, ya que este punto está suficientemente explicado en el apartado 4.1 de este informe. Pero es que tampoco es cierto, con los datos de producción aportados que la velocidad máxima a la que puede trabajar la línea S es de 30 m/min. En primer lugar, porque en los videos aportados con el documento 2 se observa que la velocidad de trabajo es 32 m/min (105 ft/min).

En segundo lugar, por que la gráfica de producción (documento 2, anexo 12) también desmiente este hecho:

Observemos diciembre de 2020, con una eficiencia (anexo 12, documento 2) del 77% y una velocidad de 33 m/min. La eficiencia es la misma que en noviembre de 2020 con una velocidad de sólo 30 m/min. Es más, en enero de 2021, la eficiencia baja al 71% con una velocidad de 32 m/min ¿porqué no se emplea la velocidad de 33 m/min?¿por qué no se hacen pruebas a mayores velocidades?

La velocidad y la eficiencia en la producción no están directamente correlacionadas. No hay una relación a menor velocidad más eficiencia y viceversa. Observemos el periodo entre enero y junio de 2020. La velocidad fue siempre 29 m/min, pero la eficiencia osciló entre el 70% en enero de 2020 y el 87% en febrero de 2020. Luego hubo eficiencias de 83%, 85%, 71% y 74%, insisto, siempre a la misma velocidad.

Además de lo anterior, no se tiene en cuenta que el aire en el secadero y su control son responsabilidad de la actora. Como indica el Sr. Prieto en la página 41 del documento 2, transcribiendo las palabras del Sr. Diez, el objetivo del secadero es una humedad entre el 9%-11% que es lo que está contratado, lo que no está contratado es que ese objetivo se deba cumplir a una determinada velocidad de trabajo. El contrato indica claramente que la velocidad es una velocidad máxima de 46 m/min, por debajo de la cual, estaríamos dentro del contrato.

Pero es que, aumentar la velocidad no significa disminuir dramáticamente la eficiencia de la línea, como hemos señalado en la gráfica del anexo 12 del documento 2. No hay una correlación entre producción (entendida como % de eficiencia) y velocidad. A mayores velocidades se puede obtener mayores o iguales eficiencias que a velocidades inferiores. Es más, a la misma velocidad, se obtienen diferencias en la eficiencia de hasta el 17%.

Al argumento de si se aumentara la temperatura del secadero como medida para compensar la falta de capacidad ante un aumento de velocidad, hemos de incidir en el hecho de que el control del secadero (del aire de entrada) es responsabilidad de la actora y que estas temperaturas son, sobre todo, dependientes del tipo de colágeno (el gel) que compone la tripa. Los parámetros de trabajo con el gel (tiempos y temperaturas) son responsabilidad del experto en el gel, esto es, la actora.

Pero es que, además, en el video 5, minuto 1, en la parte inferior del secadero se observa como la hay líneas del secadero paradas en ese momento ¿si falta capacidad, porqué están paradas? Esta imagen también se repite en el documento 3, fotografía 15.

En el círculo rojo se indican las dos líneas que se mantienen paradas (sin tripa).



39



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En mi opinión, por tanto, la capacidad del secadero es suficiente y está conforme al contrato firmado libremente entre las partes, sin que pueda establecer ningún fallo o falta de diseño en el mismo. La capacidad es suficiente para la producción de tripas de colágeno y la supuesta falta de velocidad en la línea no es tal, ya que puede trabajar a velocidades mayores a 32 m/min, como además se ha hecho, sin menoscabo aparente de la eficiencia en la producción"

En el informe pericial judicial del Ingeniero Sr Oscar Prieto  En el apartado segundo del punto 9.4  al examinar las deficiencias relacionadas con las capacidades motrices: Bajo el epígrafe 9.4.2  "  sobre la adecuación del transporte "( páginas 59 a 64)dice que :

"Con la firma del Contrato, SAYER TECHNOLOGIES S.L. asume de forma explícita el compromiso de satisfacer el cumplimiento de las especificaciones técnicas previstas para la Línea S, incluidas aquellas relacionadas con sus capacidades motrices; pero al mismo tiempo, y de forma implícita, asume también el compromiso de diseñar una máquina adecuada para el transporte de la envoltura de gel de colágeno extruido dentro de los rangos de velocidad de trabajo establecidos.

La falta de consistencia (o estabilidad mecánica) de la envoltura de gel de colágeno extruido y su variabilidad a lo largo de las distintas etapas de procesamiento son aspectos que hay que considerar especialmente a la hora

de diseñar el sistema motriz, que podrá considerarse adecuado en la medida en que permita el tránsito del producto sin afectar significativamente a su estabilidad mecánica, que podría verse comprometida por la combinación de los siguientes efectos:
    Rozamiento del producto con elementos mecánicos.
    Transiciones del producto entre cintas de transporte consecutivas.
    Efectos gravitatorios (peso propio).
    Presión de la mezcla de gases que se inyecta en su interior.
    Alteración de las propiedades del producto debidas a los tratamientos aplicados.

SAYER TECHNOLOGIES S.L. estaba en disposición de intervenir en el diseño de la máquina para amortiguar los efectos debidos al rozamiento recurriendo al empleo de materiales, componentes y estrategias de diseño orientados a minimizar los coeficientes de fricción (recubrimientos, revestimientos, rodamientos, lubricantes, secciones de apoyo, radios de giro, etc.).

SAYER TECHNOLOGIES S.L. también estaba en disposición de intervenir en el diseño de la máquina para amortiguar los posibles estiramientos (o colapsos) de la envoltura durante las transiciones que se producen entre una cinta de transporte y la siguiente; desde un punto de vista pasivo, mediante el diseño de recorridos poco traumáticos entre cintas de transporte (empleando materiales de baja fricción); y desde un punto de vista activo, mediante la implementación de un sistema de regulación de la velocidad de la Línea S que permitiera un ajuste suficientemente preciso de las velocidades de cada una de las cintas de transporte instaladas en la máquina de manera pudieran controlarse los estiramientos asociados a la diferencia de velocidad entre cintas de

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 22/12/2022 16:42

Doc. garantizado con firma electr. URL verificación:
https://siunitraladaelectronica.navarra.es/SCDD_Web/index.html

CSV: 3120142002-d1a5053a5c375500c53ca52c0c0983ac72yA===



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #:*
*3380*
*16 junio 2023 ( June 6 2023*



a) NITTA CASINGS INC. debió proporcionar a SAYER TECHNOLOGIES S.L. información suficiente y necesaria sobre las características mecánicas de su producto para facilitar la validación de las soluciones mecánicas propuestas en el diseño de la Línea S; pero no lo hizo.

b) SAYER TECHNOLOGIES S.L. debió emplear la información sobre las características mecánicas del producto de NITTA CASINGS INC. para validar la adecuación de las soluciones mecánicas propuestas en el diseño de la Línea S; pero no dispuso de ella.

c) NITTA CASINGS INC. debió proporcionar a SAYER TECHNOLOGIES S.L. muestras de producto que le sirvieran para ensayar las soluciones mecánicas que se estaba planteando en la fase de diseño; y si lo hizo, no pudo garantizar que sus propiedades fueran similares a las que se observarían una vez comenzase el proceso de Puesta en Marcha de la Línea S, ya que los tratamientos de neutralización, lavado y plastificado previstos para esta máquina cambiaban sustancialmente con respecto a los que NITTA CASINGS INC. venía operando en otras líneas de procesamiento de su planta de New Jersey.

d) Al no disponer de los mecanismos de validación referidos en los puntos anteriores, SAYER TECHNOLOGIES S.L. pudo recurrir a la realización de ensayos para evaluar la adecuación del diseño del sistema de poleas que se implementarían posteriormente en las curvas de la máquina, pero empleando para ello producto procesado en una línea de envoltura mediante extrusión de gel de colágeno de NITTA CASINGS INC. que aplicaba los tratamientos de neutralización, lavado y plastificado con técnicas distintas a las previstas para la Línea S.

e) Incluso en el supuesto de que el diseño del sistema motriz de la Línea S pueda ser adecuado a las características del producto de NITTA CASINGS INC., no sería garantía suficiente de que no se viera sometido a esfuerzos mecánicos excesivos, ya que éstos dependían también de la gestión que hiciera NITTA CASINGS INC. de los sistemas de regulación de la velocidad de la Línea S y de los sistemas de dosificación de los tratamientos de neutralización, lavado, plastificado, secado y humectación.

f) En cualquier caso, y a tenor de los cambios radicales a los que se ha sometido el diseño original de la Línea S, resulta inviable obtener conclusiones válidas sobre el desempeño de la máquina original a partir del funcionamiento de la que opera actualmente.

En definitiva, no hay indicios ni pruebas concluyentes de que los supuestos estiramientos que sufría la envoltura de gel de colágeno extruido que denuncia VISCOFAN COLLAGEN USA INC. en la demanda pudieran deberse a la mejor o peor adecuación del sistema de tracción diseñado para la Línea S por SAYER TECHNOLOGIES S.L."

Del problema de la estabilidad del calibre , defecto descrito por el perito de la actora y la demandada al tratar el " estiramiento no deseado de las envolturas. Lo trata en el epígrafe 9.7 " sobre el proceso de producción de envoltura".

En este sentido se dice que : "En el dictamen pericial que se adjunta a la demanda se incluye una reclamación sobre el comportamiento de la envoltura a su paso por la línea, argumentando que dificultaría el control de

42



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

su calibre durante el proceso de producción. En principio, y como viene de exponerse anteriormente, el comportamiento de la envoltura de gel de colágeno, una vez extruido y puesto en circulación sobre la línea, es una cuestión sobre la que SAYER TECHNOLOGIES S.L. poco tiene que decir una vez satisfechos sus compromisos contractuales.

En cualquier caso, VISCOFAN COLLAGEN USA INC. presenta un esquema de proceso sobre el que se muestran una serie de valores que se corresponderían con registros del valor del calibre de la envoltura medidos en distintos puntos de la línea para, a continuación, establecer una relación de causa-efecto entre la variación del calibre y el estiramiento de la envoltura manifestando que "dicha variabilidad demuestra que la envoltura sufría fuertes estiramientos durante el proceso de producción, lo que hacía muy complicado el control de calibre".

En primer lugar, el esquema de proceso que se presenta NO se corresponde con la configuración original de la Línea S (aparecen 4 pases de lavado y 2 de plastificado), y por lo tanto, los resultados que puedan haber sido obtenidos mediante pruebas en esas condiciones no pueden extrapolarse al planteamiento original.

En segun lugar, los registros que se muestran no tienen validez probatoria (no se aporta ningún documento que acredite en qué condiciones se obtienen estas lecturas), además de que representan una cantidad de elementos de control enorme (21) en comparación con las que se dispusieron inicialmente en la Línea S para controlar el calibre del producto.

En tercer lugar, incluso en el caso de que se pudieran tomar en consideración estos datos, lo único que demostrarían es que se produce una variabilidad en el calibre de la envoltura a lo largo del proceso, pero no que esta implique necesariamente la existencia de estiramientos excesivos. De hecho, la diferencia de lecturas sólo en el primer tramo, antes de que se produzca ningún giro, ya supondría una variación del calibre del 24% (de 12,7 a 15,8 mm).

En cuarto lugar, hay varias causas que permiten explicar la variación del calibre de la envoltura distintas de los estiramientos (variaciones de presión del gas inyectado en el interior, cambios de composición durante la coagulación y la plastificación, cambios de temperatura y humedad, etc.).

A continuación, VISCOFAN COLLAGEN USA INC. enumera un par de medidas que se habrían adoptado con el objetivo supuesto de mejorar el control del calibre en la línea. La primera consistiría en la introducción de "amoniaco externo en la extrusión", una decisión que encajaría dentro de la lógica del esquema de responsabilidades que le corresponde adoptar como productor del gel de colágeno y de la envoltura que se produce tras su extrusión; y la segunda en la supresión de los niveles inferiores del Área Húmeda, una decisión que se atribuía en otra parte del dictamen pericial a la falta de capacidad del Área de Secado (asunto que se ha tratado anteriormente en el apartado 9.5, Sobre el Dimensionamiento de la Línea S).

Por último, la atención del autor del dictamen pericial que se incorpora a la demanda se centra en diseño de la Curva 3 (parece ser la única que no se había desmantelado en el momento de la adquisición de NITTA CASINGS INC. por parte de VISCOFAN COLLAGEN USA INC.), a la que

43

P00181



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

hace responsable también de supuestos estiramientos excesivos o roturas de bandas del modelo T20-S, aunque no argumenta su tesis, ni la justifica."

Y en el epígrafe 9.5, Sobre el Dimensionamiento de la Línea S en la zona de secado, el problema de la falta de capacidad de la zona de secado donde dice que:

"Las reclamaciones que hace VISCOFAN COLLAGEN USA INC. a este respecto se refieren a la falta de capacidad de la Zona de Secado (se entiende excluida la Zona de Humectación), que identifica como la causa principal que limita el aumento de la velocidad de procesamiento de la línea por encima de los 105 pies (32 metros) por minuto, y al tamaño excesivo del Área Húmeda (tanto de la Zona 1 como de la Zona 2).

Por su parte, SAYER TECHNOLOGIES S.L. refiere que se limitó a dimensionar la Línea S atendiendo a las especificaciones técnicas recogidas en el Presupuesto, que establecían la longitud de los pases y su número, en cada una de las zonas de la máquina, de acuerdo con los tiempos de tratamiento que NITTA CASINGS INC. consideró adecuados.

Centrados en primera instancia en el dimensionamiento de la Zona de Secado, y recurriendo a la información que proporciona VISCOFAN COLLAGEN USA INC. en su DEMANDA, parece que NITTA CASINGS INC. no conseguía los valores de humedad que había especificado en el Presupuesto para su producto a la salida de esta etapa (entre el 9 y el 11%) cuando la línea superaba valores de velocidad de 30 metros (100 pies) o 32 metros (105 pies) por minuto; aun siendo notablemente inferiores a la máxima contratada (en casi un 50%).

Las razones por las que no se alcanzaron estos objetivos de humedad pudieron ser varias, e incluso pudieron confluir, siendo las más verosímiles las siguientes:

Falta de capacidad del sistema de aportación de aire caliente y seco.

Problemas de aislamiento térmico del cerramiento instalado en la Zona de Secado.

Condiciones de la envoltura de gel de colágeno a la entrada de la Zona de Secado.

Dimensionamiento insuficiente de la Zona de Secado como consecuencia de una definición equivocada del tiempo de tratamiento mínimo necesario.

Con respecto a la primera causa, hay que hacer notar que el proceso de secado no puede alcanzar sus objetivos si las características del aire (temperatura y humedad relativa) no son las adecuadas. O dicho de otro modo, de nada sirve prolongar los tiempos de permanencia de la envoltura de gel de colágeno en la Zona de Secado si el ambiente en el que lo hace no es propicio para alcanzar los objetivos de humedad establecidos. A este respecto, VISCOFAN COLLAGEN USA INC. no considera en ningún momento la posibilidad de que ésta pudiera ser la causa que impedía que se alcanzaran los objetivos de humedad propuestos para la envoltura a la salida de la Zona de Secado, de hecho, no hace mención alguna de las características técnicas del sistema de aportación de aire en el dictamen pericial que incorpora a la DEMANDA, y sin embargo, refiere temperaturas de trabajo en la Zona de Secado de 82 a 87 ºC, y una humedad relativa promedio del 35%, muy superior a la que debía alcanzar el producto al final de esta etapa (de entre el 9 y el 11%).



44



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



En relación con la posibilidad de que pudiera haber problemas de aislamiento térmico con el cerramiento empleado en la Zona de Secado, desde luego no habrían impedido la regulación de las condiciones de temperatura y humedad relativa requeridas, o al menos no hay referencias en la DEMANDA a este respecto.

Por último, en referencia a las dos últimas causas que se plantean, hay que advertir de nuevo que las especificaciones proporcionadas por NITTA CASINGS INC. se basaban en su experiencia operando líneas de procesamiento cuyos tratamientos de neutralización, lavado y plastificado diferían notablemente de los que se proponían en el diseño de la Línea S, pudiendo ocurrir que se anticiparan condiciones del producto a la entrada de la Zona de Secado que no se ajustaran a las que finalmente se obtuvieron (carácter experimental del Contrato). Resulta llamativo que los valores de humedad del producto empiecen a ser conformes cuando los tiempos de tratamiento en la Zona de Secado superan en casi un 50% los valores definidos inicialmente en el Presupuesto (la relación entre la velocidad de procesamiento y la duración de los tratamientos en la línea es de proporcionalidad inversa).

Si abordamos el análisis de las consideraciones que hace VISCOFAN COLLAGEN USA INC. en su DEMANDA con respecto al dimensionamiento excesivo de las Zonas Húmedas (1 y 2), comprobaremos que siguen el mismo

patrón argumental empleado para cuestionar el dimensionamiento de la Zona de Secado, justificando en este caso que se deben al anterior; es decir: VISCOFAN COLLAGEN USA INC. considera que el dimensionamiento de las Zonas Húmedas 1 y 2 es excesivo porque asume una limitación en la velocidad de procesamiento de la línea cuya causa principal es la supuesta falta de capacidad de la Zona de Secado para alcanzar los objetivos de humedad previstos inicialmente; aunque también cabría hacer la lectura contraria, interpretando que, tras su paso por un Área Húmeda excesivamente larga (o mal gestionada desde el punto de vista de la dosificación), el producto llegase a la Zona de Secado en unas condiciones de humedad inasumibles para ella.

Sea como fuere, todas estas cuestiones, con la excepción del aislamiento térmico, dependían en exclusiva del criterio técnico de NITTA CASINGS INC., cliente y especialista en la producción, extrusión y procesamiento de gel de colágeno.

En definitiva, SAYER TECHNOLOGIES S.L. diseña, fabrica, monta, pone a punto y ensaya ( Test de prueba) una máquina dimensionada de acuerdo con las especificaciones técnicas establecidas en el Presupuesto que se adjunta al Contrato, basadas principalmente en la definición de unos tiempos de tratamiento que sólo NITTA CASINGS INC. estaba en condiciones de proporcionar, dada su condición de cliente y especialista en la producción, extrusión y procesamiento su producto (gel de colágeno). NITTA CASINGS INC. no se limita a firmar el Contrato dando por buenas sus especificaciones técnicas, sino que acepta formalmente el diseño final de la máquina, procediendo al abono correspondiente al 15% de su valor total (Design Acceptance).

Por otra parte, las causas que pueden explicar en mayor medida la incapacidad de la línea para alcanzar los objetivos de humedad establecidos a la salida de la Zona de Secado dependían exclusivamente del criterio técnico de NITTA CASINGS INC., ya fuera con la definición de

45



P00183

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



ADMINISTRACION
DE JUSTICIA

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. depositado con firma electr. URL verificación:
https://administraciondejusticia.navarra.es/SCDD_Web/index.html

CSV: 3120140202-41a5058a5c375680c83c6a32c6cd0983ad72cAA==

los tiempos de tratamiento, con la implementación y gestión del sistema de aportación de aire caliente y seco, o con la gestión de los tratamientos previos al secado de la envoltura (neutralización, lavado y plastificado).

La reclamación relativa a las Zonas Húmedas 1 y 2 se apoya en las mismas tesis que la reclamación sobre la Zona de Secado, siendo de aplicación las mismas conclusiones."

De lo expuesto. Mientras el perito de Viscofan considera que las zonas húmedas 1 y 2  eran innecesariamente larga y que previsiblemente estaría bien diseñada para las velocidades pretendidas. Respecto al estiramiento no deseado de las envolturas  que relaciona con el diseño inadecuado de la Línea S de la zona húmeda. Para este perito  la configuración inicial de la S-Line, lo que a su vez daba muchos problemas de control de calibre debido a los fuertes estiramientos que sufría la envoltura en el proceso. Errores del calibre también debidos  otro factor (problema) que afecta a la S-Line, en este caso justo a la entrada del Secadero, es el diseño de la zona de giro existente entre la Zona Húmeda 2 y el Secadero, una zona en U donde la envoltura debe realizar un giro de 180 º.

El perito de la demandada niega  que las zonas húmedas 1 y 2 inicialmente diseñadas por Sayer fueran innecesariamente largas así como las consecuencias en la envoltura de colágeno. Defienden que es un problema del procesado no relacionado  con un mal diseño de la línea S, ya que está línea cumple con las condiciones del contrato firmado libremente entre las partes, sino que están relacionadas con el tiempo de procesamiento del gel, cuya selección y conocimiento son exclusivos de la parte actora. No existen estiramientos en las envolturas que provoquen errores en el calibre de la envoltura en su etapa final (en el bobinado). El error en el calibre está dentro de unos márgenes aceptables. Además, los errores que se alegan en los cambios de calibre están provocados por actuaciones que están excluidas del ámbito contratado libremente entre las partes en litigio. Las medidas adoptadas, y no relacionadas con las obligaciones contractuales de Sayer avalarían lo anterior

Sentado lo anterior, la  clausula 1.3  del acuerdo contractual dispone que . Sayer actuaba como coordinador y es responsable de la realización de los proyectos encargados por NITTA, bajo el compromiso de que se desarrollasen de acuerdo con las especificaciones técnicas del producto de NITTA.  Según el perito de Viscofan el Sr Fernando  Prieto son los tiempos  o pases marcados  en cada una de las zonas y  que aparecen en el presupuesto, las que junto a las dimensiones de la zona donde se iba a instalar la línea S . Son los parámetros  que el perito entiende Sayer debió tener  en cuenta  fundamentalmente para diseñar la línea S. Tiempos que forman parte del acuerdo  contractual firmado por las partes , y que entiendo ciertamente  Sayer se comprometió a cumplir. Lo que sucede es que  esta cuestión no puede desvincularse del tratamiento físico y químico sometido al producto durante el proceso, ajeno no ya de las obligaciones contractuales de Sayer, sino a su conocimiento. , Como dice el que fue Director Investigación I +D, de Nitta  el químico D Eugene Goldfarb , ahora trabajador de Viscofan El producto  , es un producto específico de Nitta. Sin contar por tanto  con una información completa de



46

P00184

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*





este , y de su comportamiento. No es posible determinar estos tiempos, y en consecuencia diseñar una maquina que cumpla con estos tiempos. Aquí no existe o es escasa la prueba practicada sobre la información que Nitta facilita a Sayer, posiblemente relacionado con el tema de la confidencialidad de la información que Nitta facilitó a Sayer, y por la que Viscofan habría también demandado a Sayer ante el Juzgado de lo Mercantil, cuya sentencia desestimando la demanda fue confirmada por la Secc 3º de la Audiencia Provincial, y recurrida en casación a su vez ante el Tribunal Supremo

Según el Director de Operaciones de Nitta ( 2013 - 2019) el Sr Sousa que firmó en representación de Nitta el acuerdo marco de cooperación entre las dos empresas, y el acuerdo contractual de 28 de agosto de 2015 y presupuesto que fijaría las obligaciones de Sayer en la fabricación de la Línea S en concreto. Todos los parámetros, para el diseño de la Línea S , se facilitaron por Nitta. En el mismo sentido el Sr Oscar García Matitto responsable de producción de Sayer

Según el Sr Eugene Goldfarb Di, sin embargo, los tiempos los dio Nitta. Sea como sea lo claro que Nitta como fabricante del producto, es la única que puede facilitar información sobre el mismo, y es la que conocía las dimensiones para instalar la Línea S. Por tanto, no es tan relevante quien facilita estos tiempos. Sino que información se contó para calcular estos tiempos además de las dimensiones de la zona donde iba a ser instalada.

En definitiva como se ha indicado la demandada debió de contar de toda la información que entendió necesaria y sino toda la que entendía necesaria. No se puede escudar en que no es un experto en la fabricación del gel. Pero aun dicho esto, hasta que la maquina no se encontró en pleno rendimiento, no se puedo asegurar siquiera que fuera suficiente. Y lo que es más relevante no se pudo predecir el comportamiento que tuvo el producto durante este proceso cuando ni siquiera pudo Nitta hacerlo como dice el Sr Sousa en el acto plenario..

Es un hecho indiscutido, y han coincidido todos los intervinientes en el pleito La tecnología de la línea que utilizaba hasta entonces Nitta ( fabricadas por Johnson) era muy distinta a la de la Línea S. Entre las cuales que la envoltura de colágeno permanece hinchada durante todo el recorrido de la Línea S.o que aquí no se adicionaba producto químico

Era la primera vez que se empleaba la Línea S. Desde este punto de vista, se puede decir como hace el perito judicial , nos encontrábamos ante un proyecto experimental, que no es contradictorio con decir que Sayer se presentó ante Nitta como una empresa que reunía los conocimientos y medios para fabricar la Línea S. que demandaba Nitta.

Que esta línea ya se estuvieran utilizando por otras empresas, algunas de ellas del Grupo Viscofan. No significa que si en este caso no funcionó, no respondiese la Línea S a las expectativas que dice ahora Viscofan tenía. No entiendo que de ello se pueda concluir que el problema necesariamente es del fabricante de la Línea S, de Sayer. El

47



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*





producto que fabrica Nitta ahora Viscofan no es el mismo que el fabricado en estas otras empresas.

A mayor abundamiento hay elementos que se excluyeron del presupuesto ( punto 6), que según el Sr Sousa Nitta ordena fabricar a otras empresas ( cabezas extrusoras, equipamiento Keyence, motores reductores y su control de velocidad ...)

Y como se ha indicado no consta que se formalizaran documentalmente por medio de un acta, o algún documento equivalente, ni la realización de un Test de Prueba ni de un proceso de Puesta en Marcha, de manera que no es posible recurrir como dice el Sr Oscar Prieto a ellos para rescatar los detalles que pudieron rodear su ejecución (fechas de inicio y de finalización, objetivos planteados, pruebas efectuadas, resultados obtenidos, mecanismos de validación empleados, registro de la evolución del proceso, registro de incidencias, etc.). Pero tanto el Sr Sousa, como el Sr García Matito y no se ha desmentido por el Sr Goldfarb, han coincidido en que no hubo quejas o reclamaciones ni en el momento del montaje de la Línea S, ni el momento de la puerta en marcha de la misma

Relacionado con el sobredimensionamiento de la zona húmeda, el estiramiento longitudinal de la envoltura de colágeno y variación del diámetro o calibre de la envoltura y por consiguiente de firmeza. Ni el perito de la demandada ni el perito judicial consideran probado la existencia de una relación entre los estiramientos en las envolturas y los cambios de calibre Coincidiendo igualmente que el supuesto error en el diseño de la curva 3 no se justifica ni se prueba.

Las medidas que se habrían adoptado La primera consistiría en la introducción de "amoniaco externo en la extrusión", una decisión que se encontraría dentro de las medidas que según el contrato correspondería adoptar a Nitta como productor del gel de colágeno y de la envoltura que se produce tras su extrusión. Y la segunda la en la supresión de los niveles inferiores del Área Húmeda, una decisión que la actora atribuye a la falta de capacidad del Área de Secado.

Según el perito judicial incluso en el supuesto de que el diseño del sistema motriz de la Línea S pueda ser adecuado a las características del producto de NITTA CASINGS INC., no sería garantía suficiente de que no se viera sometido a esfuerzos mecánicos excesivos, ya que éstos dependían también de la gestión que hiciera NITTA CASINGS INC. de los sistemas de regulación de la velocidad de la Línea S y de los sistemas de dosificación de los tratamientos de neutralización, lavado, plastificado, secado y humectación.

Se apuntan a otras causas que permiten explicar la variación del calibre de la envoltura distintas de los estiramientos (variaciones de presión del gas inyectado en el interior, cambios de composición durante la coagulación y la plastificación, cambios de temperatura y humedad, etc.





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Respecto a los videos aportados por la demandada sobre las variaciones del diámetro o calibre de la envoltura. Según el perito judicial además de que no se conocen las condiciones en que se hacen , demostrarían que se produce una variabilidad en el calibre de la envoltura a lo largo del proceso, pero no que esta implique necesariamente la existencia de estiramientos excesivos. Pero es más como se recoge también el esquema de proceso que se presenta no se corresponde con la configuración original de la Línea S (aparecen 4 pases de lavado y 2 de plastificado), y por lo tanto, los resultados que puedan haber sido obtenidos mediante pruebas en esas condiciones no pueden extrapolarse necesariamente al planteamiento original de la línea S fabricada por Sayer

Otro problema o desperfecto relevante según la actora es el relativo a la capacidad "insuficiente" del Secadero, aspecto directamente relacionado también con el referido problema de la velocidad de la línea S-Line. Según el perito de Viscofan se trataría de un cuello de botella dado que su capacidad es insuficiente para la velocidad prometida por Sayer de 40/46/60 m/min. Se resolvería con la inutilización de parte de la zona húmeda que entiende sobredimensionada. Desmantelada posteriormente por parte de Viscofan. Así como el diseño la curva en U

Ni el perito de la demandada ni el perito judicial consideran que este probado que esta deficiencia en la zona de secado traigan causa del diseño de la línea de Sayer

En el caso del perito de la demandada se defiende que no existe ningún fallo de diseño en la S Line. La capacidad es suficiente para la producción de tripas de colágeno y la supuesta falta de velocidad en la línea no es tal, ya que puede trabajar a velocidades mayores a 32 m/min, como además se ha hecho, sin menoscabo aparente de la eficiencia en la producción"

Se señalan otras posibles causas. En el caso del perito judicial las causas que pueden explicar en mayor medida la incapacidad de la línea para alcanzar los objetivos de humedad establecidos a la salida de la Zona de Secado dependían exclusivamente del criterio técnico de Nitta

En este caso es extrapolable lo ya dicho en el caso de la velocidad y el sobredimensionamiento de la zona húmeda.

El perito judicial no descarta siquiera que el problema se encuentre en las fases de producción del gel

Es más, como dice el perito judicial la línea ha sido sometida a cambios importantes, y ninguno de los peritos que, no han visto la línea en su situación anterior cuentan con pruebas concluyentes del origen del problema.

En el informe de dicho perito, y en relación con las modificaciones que se hace en la Línea S ( página 79) señala que cuando, adquiere Nitta , ya se había anulado el funcionamiento de las plantas inferiores de las Zonas Húmedas, de manera que se habían suprimido



49



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



también los mecanismos de giro de la envoltura de gel de colágeno previstos para las curvas y se habían modificado los tiempos de tratamiento originales de los procesos de neutralización, lavado y/o plastificado. Tras la adquisición de la línea por parte de Viscofan Collagen Usa Inc. se procedió a la sustitución del sistema de Enrollado y de Humectación de la envoltura de gel de colágeno, y se efectúan otras modificaciones de menor calado que tienen por objeto, según refieren, mejorar su rendimiento. Y así lo pudo comprobar el mismo perito al ver la videoconferencia que el 16 de junio de 2021 hizo el perito de la actora guiada por el Director de Operaciones de Viscofan desde febrero de 2020 D Guillermo Diez García, al que se hace referencia constante en dicho informe

Discrepancias sobre el origen de estos defectos que se da en los únicos testigos que han depuesto en el acto del juicio, trabajadores de Nitta, y que conocieron la Linea S antes de que se modificase, el Sr Sousa y el Sr Goldfarb. Este último en este momento trabajando para Viscofan

El Sr Sousa Director de Operaciones de Nitta en contra de lo que sostiene el Sr Eugene que atribuye los problemas surgidos a defectos de diseño En el acto del juicio ha declarado que los cambios que se hacen en el año 2018 no respondería a fallos del diseño de la Linea S sino de ajustes o mejoras conocido el comportamiento que estaba teniendo el producto

D Pedro Erdociain Prieto Bravo Ingeniero Técnico Agrícola , y desde enero de 2020 Ingeniero de Innovación de Viscofan , así como el Sr Jaime Soroa Zubiría Director General de Viscofan. Ambos conocen la línea, una vez adquirida Nitta por Viscofan, y por tanto habiéndose hecho las modificaciones de mayor calado en la Línea S. En el caso del primero, en el acto plenario ha señalado que la vio por primera vez en enero de 2020. Respecto a los problemas que dio la Línea Según el testigo, los conoció por los comentarios que le hicieron cuando viajó a EEUU durante la planta de extrusión de colágeno . Ninguno de los cuales salvo los dos anteriores, han podido ser oídos en el acto del juicio. Ni siquiera consta que los peritos en la elaboración de su informe hayan contado con su opinión.

Y finalmente en relación con las modificaciones de Nitta de la Línea S. Como documento 4 la demandada, Sayer aporta correos cruzados entre las partes sobre las modificaciones en la Línea S de 16, 18 de noviembre, y 22 de noviembre de 2018. Correos no impugnados de contrario de los que como dice dicha parte no se derivaría que dichas modificaciones respondan a los defectos y de la entidad que dice Viscofan. Sino más bien de su literalidad responde a mejoras, ajustes o correcciones. Pero no a defectos responsabilidad de Sayer. No se atribuye responsabilidad alguna de estas modificaciones a Sayer En este mismos sentido, como se ha indicado se pronuncia el Sr Sousa quien además dijo que para dichos " ajustes" se contó con la colaboración de Sayer porque había que alterar algunos parámetros



50

P00188

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En correo de 18 de noviembre de 2018 de Francisco de Sousa Director de operaciones y Ernesto Garrido

*Buenas tardes, D. Ernesto,*
*Te llamaré mañana por la mañana y te explicaré lo que estamos haciendo entre la (zona) húmeda 1 y (zona) húmeda 2, nuestros tests muestran que podríamos no necesitar la (zona) húmeda 2, solo 1 o 2 pases de glicerina en la parte inferior de la (zona) húmeda 2 serán suficientes, además, el consumo de agua disminuirá mucho.*
*Estamos usando la (zona) húmeda 1 solo con tres pases. · Las envolturas están mostrando mayor consistencia a medida que reducimos los pases de agua.*
*Saludos.*
*Gracias.*

De 16 de septiembre de 2018 de Oscar Garrido Matito responsable de producción de Sayer y Eugene Goldfard

*Otra pregunta, Eugene,*
*Si el objetivo es eliminar el desperdicio de agua en la (zona) húmeda 2, ya que no es necesario lavar más que en la (zona) húmeda 1,*
*¿Habéis pensado en evitar el área de lavado y proceder directamente a la zona de plastificado?*

De 16 de septiembre de 2018 de Oscar Garrido Matito responsable de producción de Sayer y Eugene Goldfard
*Buenos días, Eugene, algunas preguntas para escoger la mejor solución para tu propuesta de ayer:*
*¿Qué área queréis trabajar sin agua, solo el lavado en la (zona) húmeda 2 o también la zona de plastificado? Imagino que es solo la zona de lavado.*
*Será necesario calcular dónde y cuántos soportes deberían ser reemplazados.*
*¿Es el objetivo eliminar el desperdicio de agua del área de lavado en la (zona) húmeda 2?*
*¿Esto es algo provisional o definitivo?*

De 22 de septiembre de 2022 de Ernesto Conde Sousa a Oscar Garrido Matito

*Hola, Óscar.*
*Feliz acción de gracias para ti y tu familia de Sayer.*
*Los chicos descargaron ayer más información sobre las últimas 48 horas, y aún podemos ver muchas variaciones entre S2 y S3.*
*Gene está de descanso, es el fin de semana de acción de gracias, así que estaremos todos de vuelta el lunes.*
*Añado algunas imágenes: este es el aspecto que tiene la línea S ahora, solo hay pases superiores en la parte alta de la (zona) húmeda 1, dos en la parte inferior de la (zona) húmeda 1 y de ahí directamente a la parte inferior de la (zona) húmeda 2, solo 2 pases en el baño de glicerina, no se usa agua en la parte superior de la (zona) húmeda 2. Con estos*

51

P00189



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



*cambios la envoltura está mostrando mayor consistencia y mejor control de calibre, y ahorrando mucha agua y glicerina.*

*Nos movemos en esta dirección porque tenemos 184 millones de metros de material circulando por las restantes líneas; ¡e inmediatamente la línea S estará cargada con sus ocho extrusores!*

*La próxima semana inyectaremos el tinte, y a partir de ahí solo emplearemos tonos caoba, rojo oscuro, para calibres de 13 a 23 milímetros, el mayor desafío es el 13 milímetros porque ya sabemos que podemos alcanzar todos lo demás, aunque por supuesto tenemos que probar todos los tonos con la inyección de tinte y eso suele afectar al control del calibre añadiendo algo de "ruido", pero no debería ser un problema.*

*Gracias.*

*Saludos.*

**No se prueba por tanto la existencia de un defecto de diseño de la Línea: S**

En cuanto al montante de los perjuicios económicos reclamados por este defecto. Reclama por un lado 539.000 euros que sería el sobrecoste que ha supuesto a Viscofan consecuencia de la inutilización de parte de las zonas húmedas. Cantidad que resulta de la diferencia de lo que pagó y lo que le habría costado en el caso una zona húmeda con las nuevas dimensiones .

Y por otra parte, 77.379,50 euros y 13.000 dólares correspondientes según dicha parte a trabajos de corrección en la zona húmeda (vid. apartados 6.2 y 6.5). Se adjunta como Anexo 18 las facturas abonadas por Viscofan Collagen USA Inc por este motivo.

Facturas que según el Ingeniero Sr Sahuquillo y el economista el Sr Fermín Elizalde comprenden a partidas que no guardan relación con trabajos en la zona húmeda. En este sentido señala que la primera factura ( 2020) emitida por Ezma por importe de 77379,50 euros , corresponde a trabajos que nada tienen que ver con la S Line ya que se trata de materiales, depósitos etc, y las dos facturas ( 2018) emitidas por Sebastiano Nini, empresa constructora , no deben tenerse en cuenta, ya que se trata de trabajos relacionados con la instalación de anclajes, depósitos, etc. que nada tienen que ver con lo que es la propia S Line. Contamos en este sentido certificado de Ezma que informa que los trabajos descritos en nuestra factura nº 20200229, con presupuesto ref 200253 según nº de pedido Viscofan nº 4500535473 se realizaron en la máquina denominada " Estación Húmeda S Line" que estaba montada en las instalaciones de VISCOFAN COLLAGEN USA Inc. New Jersey- USA. Trabajos que se realizaron según nuestro presupuesto ref 200253 ( anexo 22 del escrito presentado por Viscofan el 28 de noviembre de 2022.

**B.DEFECTOS RELACIONADOS CON LA UTILIZACION DE MATERIALES INAPROPIADOS POR SAYER**

**3. Diversas zonas de la S-Line disponen de un suelo inapropiado**, concretamente un suelo de rejilla o "tramex" que constituye

52



P00190

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



el suelo por el que pueden caminar los operarios de la línea S-Line, con el consiguiente paso por gravedad de suciedad del piso superior al piso inferior.

El perito de la demandante lo trata en el punto -6,3 Zona Húmeda 1, Materiales inapropiados. Pagina 31 a 34 de su informe pericial de la demandada donde dice que:

"Otro aspecto correspondiente a este capítulo de problemas o desperfectos corresponde a la utilización en diversas zonas de la S-Line de un suelo inapropiado, concretamente un suelo de rejilla o "tramex" que constituye el suelo por el que pueden caminar los operarios de la línea, con el consiguiente paso por gravedad de suciedad del piso superior al piso inferior.

El Sr. Diez explica este problema de materiales o elementos inapropiados en el Vídeo 5, 02.25.– 03.55

Este aspecto afectaría lógicamente a la higiene de las envolturas producidas, que recordemos, se trata de un producto alimenticio.

En el caso de las zonas inutilizadas o desmanteladas esta deficiencia ahora mismo no supone un problema por razones obvias (la envoltura no pasa por el piso inferior). Sin embargo, en otras zonas, Viscofan Collagen USA Inc ha debido recurrir a "cerrar" el paso que suponen esos suelos de rejilla.

Se muestran a continuación un par de fotogramas donde se puede apreciar este tipo de suelos de rejilla o Tramex, la primera en la Zona Húmeda 1 y la segunda en la zona del secadero.

Fotograma del suelo de rejilla visto desde el piso inferior de la Zona Húmeda 1 inutilizada (Video 3, 02:50).

Fotograma del suelo de rejilla visto desde el piso superior de la entrada a la Zona del Secadero (Video 4, 01:47).

Se trata de una solución, la del suelo en rejilla, que fue prevista en la documentación de Sayer, concretamente en la página 7/25 del Dossier técnico de la "S-Line" (Anexo 01) al hacer referencia a las denominadas "Tramex Sections".

Asimismo, en la página siguiente 8/25 del mismo documento del Dossier técnico de la "S-Line" (Anexo 01) también se representaba la misma solución de suelo de rejilla o Tramex.

En la imagen anterior también se puede apreciar que debajo del suelo en rejilla o Tramex se habían previsto unas bandejas recolectoras que finalmente no se instalaron, como muestran los fotogramas antes reproducidos de la Zona Húmeda 1 y del Secadero."

Paginas 24 y 25 del informe de la demandada. Punto 4.3. Sobre el suelo de rejilla en la zona húmeda:

"En primer lugar, las rejillas de tramex son elementos conocidos y muy empleados en la industria.

Estos suelos tienen que cumplir con dos condiciones: ser de acero inoxidable, dado el ambiente húmedo en el que trabajan, y que su entramado no deje pasar objetos superiores a 8 mm (Anexo 1, Real Decreto 486/1997, punto siete, apartado segundo, que establece: «En las escaleras o plataformas con pavimentos perforados la abertura máxima de los intersticios será de 8 milímetros»). Estas dos condiciones se cumplen.





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

El suelo de tramex estaba en el dosier técnico, en la oferta final y en el contrato aceptado libremente por las partes. No obstante, el Sr. Díez, en el video 5 que acompaña al documento 2 de la demanda incide en el hecho de que deja pasar suciedad que acaba en la envoltura que se está produciendo.

En la imagen anterior se observa un corte de la sección húmeda. El tramex separa la zona superior de la inferior. En las zonas amarillas circula el producto, en la zona roja, el personal. Entre ambas alturas está el tramex. En mi opinión, la suciedad que se pueda desprender del operario del piso superior es prácticamente imposible que caiga sobre el producto tratado en la planta inferior.

Por tanto, en mi opinión profesional, no hay un problema de diseño de la planta desde un punto de vista técnico, ni contractual, ni legal, ni de ningún otro tipo por el uso de suelos de tramex en para separar el nivel superior del inferior"

Y en las páginas 70 y 71 del informe del perito judicial

" Punto 9.6.3. Sobre los Suelos de Acero en Rejilla (TRAMEX)

El acero en rejilla, conocido popularmente como TRAMEX, es un producto industrial cuya solución estructural consiste en el entramado rectangular de pletinas metálicas electro-soldadas (en la imagen). Su uso está muy extendido en el montaje de suelos, falsos techos, peldaños, pasarelas, etc. debido a múltiples factores (manejabilidad, ligereza, resistencia y modularidad, entre otros) que no procede analizar en este informe, salvo para indicar que ninguno de ellos lo hace incompatible a priori con la industria alimentaria.

La reclamación que hace VISCOFAN COLLAGEN USA INC. en este caso tiene que ver con el empleo de esta solución en el pasillo del nivel superior de la máquina, destinado principalmente al tránsito del personal que opera y mantiene la línea de procesamiento, entendiendo que existe el riesgo de caída de partículas provenientes de ese nivel sobre el producto que circula por debajo del nivel del pasillo o sobre las bandejas por las que circulan los fluidos de tratamiento.

A este respecto, el análisis propuesto consiste en determinar, en primer lugar, si el riesgo al que se alude existe para, a continuación, identificar al responsable de su gestión.

- En relación con la primera cuestión, se recurre a la sección transversal de la Zona 1 del Área Húmeda de la Línea S, obtenida a partir del modelo que ha facilitado SAYER TECHNOLOGIES S.L. al perito autor de este informe (distinta de la que se muestra en el Dosier Técnico), para confirmar la existencia del riesgo(..).

SAYER TECHNOLOGIES S.L. apunta que NITTA CASINGS INC. descartó incluir en el Contrato una propuesta que se ofrecía en el Dosier Técnico (detallada en las páginas 8 y 9), que incluía la colocación de una bandeja corrida a lo largo del pasillo, colocada justo debajo del suelo de TRAMEX y ligeramente inclinada con respecto a él, cuya función consistiría precisamente en impedir el tránsito de partículas del nivel superior al nivel inferior, y facilitar la recogida de estos residuos, canalizándolos al exterior de la máquina como vertidos durante las labores de limpieza.

Sea como fuera, el hecho es que NITTA CASINGS INC. era la responsable de establecer las condiciones en las que estaba dispuesta a



54

P00192

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #:*
*3380*
*16 junio 2023 / June 6 2023*



iniciar la Puesta en Marcha de su línea de procesamiento de envoltura de gel de colágeno extruido, incluidas aquellas relacionadas con su seguridad e higiene; y que, consciente de no haber contratado la solución propuesta por SAYER TECHNOLOGIES S.L., dio por bueno su diseño definitivo y no implementó ninguna solución alternativa para corregir esta deficiencia.

En definitiva, el perito coincide con el criterio de la demanda al considerar que la colocación de un suelo de TRAMEX en los pasillos de los distintos tramos de la Línea S, en las circunstancias en las que se hace, y particularmente en el Área Húmeda, no es aceptable desde el punto de vista de la higiene en el ámbito industrial en el que se produce este hecho (sector alimentario).

Sin embargo, la consideración anterior no puede servir de ninguna manera para trasladar a SAYER TECHNOLOGIES S.L. la responsabilidad sobre las condiciones en materia de seguridad e higiene en las que se decidió iniciar el proceso de Puesta en Marcha de la línea de procesamiento de envoltura de gel de colágeno extruido, máxime cuando ella misma estaba en disposición de procurar una solución adecuada."

Sentado lo anterior, aquí la colocación de la rejilla como dice la demandante y reconoce el perito judicial supuso un riesgo para los operarios que circulaban sobre ella lo que llevó a Viscofan a recurrir a "cerrar" el paso que suponen esos suelos de rejilla.

Por otra parte ambos peritos coinciden en el problema de la introducción de suciedad, y el posible paso por gravedad de suciedad del piso superior al inferior. En el dosier técnico de Sayer se solucionaba colocando una bandeja por debajo que en el proyecto final se optó por no colocar. Según se dice una decisión impuesta por Nitta  lo que debería de haberse documentado, y no consta. El mismo perito de la demandada no descarta el problema. En este sentido como se ha indicado recoge en su informe que la suciedad que se pueda desprender del piso superior es prácticamente imposible- pero no por tanto imposible- que caiga sobre el producto tratado en la planta inferior.  Responsabilidad de Sayer que no decae a criterio de esta Juzgadora por el hecho  como recuerda el perito judicial, que era  responsabilidad de Viscofan  garantizar las condiciones en materia de seguridad e higiene en las que se decidió iniciar el proceso de puesta en marcha de la línea de procesamiento de envoltura de gel de colágeno extruido. O como dice la demandada decae este problema  por la decisión adoptada por la demandante de cerrar dichos pasillos  En escrito de contestación a la demanda se dice que "  fue la propia actora  como sabemos la que unilateralmente desmontó  el paso inferior en el 2018, con lo que el supuesto inconveniente  que habría desaparecido hace cuatro años". Viscofan ( en ese momento Nitta) pago dichos suelos una suma de dinero. Suelos que  no han resultado aptos desde el punto no solo de la seguridad sino también de  higiene alimentaria. Obligando al cubrimiento del mismo al menos en determinadas zonas de la Línea S ( zona húmeda) Por lo que tuvo un perjuicio económico por el que entiendo debe ser indemnizada

En el punto 8 del informe pericial " daños y perjuicios" el Sr Prieto Moran cuantifica estos en 3.313,50 dólares  que es lo  que según la

55







*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

demandante obedece a la modificación de los tramos de suelo de rejilla o "tramex". Se adjunta como Anexo 21 la factura nº 180122 de 20/1/2028. ( página 48). El Sr Fermín Elizalde las facturas no guardan relación con la sustitución del tramex, sino al reembolso del precio pagado por este suelo

A pesar de la falta de claridad de la factura de la misma videoconferencia que el perito de la demandante hace guiada por el Sr Díez se observa por un lado el suelo de Tramex colocado por Sayer y por otro la colocación de determinadas placas que respondería el cubrimiento del suelo de rejilla en algunas de estas zonas.

**Sayer deberá de indemnizar a Viscofan en 3.313,50 dólares**

4. <u>Oxidación de correas y rotura</u>. Este perito de la demandante concluye que , las correas (verdes) seleccionadas por Sayer para la Zona Húmeda se oxidaban debido a que las correas tenían alma de acero. Como consecuencia de la oxidación de las correas, tenían lugar roturas que originaban que en ese momento toda la línea de extrusión de colágeno S-Line debiera pararse durante el tiempo necesario para la reparación o sustitución de la correa rota, con la consiguiente falta de producción.

Esta situación se daba también a la entrada del Secadero, como consecuencia del giro existente entre la Zona Húmeda 2 y el Secadero, una zona en U donde la envoltura debe realizar un giro de 180º.

Examina dicho defecto en el Punto 6.4 Evaporador, Secadero y Post-Humectación. Oxidación de correas y rotura. ( páginas 34 a 38)
En el Informe al respecto se dice que: "Otro de los problemas identificados por Viscofan Collagen USA Inc. es el de que las correas se oxidaban debido a que las correas tenían alma de acero y no soportan las altas temperaturas y humedad.
El Sr Díez lo avanza en el Vídeo 3, 03:32 – 04:34 haciendo mención a ese aspecto. Sin embargo, es en el vídeo 4 dónde se ve con mayor detalle dicho problema.
Del mismo modo, el Sr. Díez indicaba en el mismo momento antes identificado (Vídeo 3, 03:32 – 04:34) que el alma de las correas es de acero, y por consiguiente susceptible de oxidarse en presencia de cierta humedad. Se trata por tanto de una incorrecta o inapropiada elección por parte de Sayer de las correas, las cuales no soportan las altas temperaturas y humedad y se rompen.
A modo de ejemplo se muestran a continuación fotografías de algunas de las correas rotas como consecuencia de la referida oxidación. Correas desechadas por roturas debidas a oxidación.

El Sr. Díez, se refiere nuevamente a la rotura de las correas verdes, no sólo en la Zona Húmeda 2, sino también en la siguiente zona, el Secadero (Vídeo 4, 02:58 – 04:07).
La rotura de estas correas (verdes), con independencia de dónde tenga lugar la rotura, entraña importantes repercusiones económicas, dado que origina que en ese momento toda la línea de extrusión de colágeno S-Line debe pararse durante el tiempo necesario para la reparación o sustitución de la correa rota, con la consiguiente falta de producción.

Firmada por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma electr. URL. verificación:
https://administraciondeelectronica.navarra.es/#SCDD_Web/index.html

CSV: 5112014200241e80053a6fa3765b0c83eabfa0c0983ea272yAA==





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Un ejemplo de las roturas ocurridas en los años 2018 a 2020 puede verse en el Anexo 11. En dicho Anexo (fichero Excel conteniendo el histórico de las roturas) se puede apreciar que las roturas de las correas verdes tuvo lugar en distintas zonas de la S-Line, aunque quizás con mayor incidencia en el Secadero y la Zona Húmeda (1 y 2).

A modo ilustrativo se muestra en la siguiente gráfica la incidencia relativa a la rotura de las correas verdes en el período 2018-2020. Para una mejor visualización, se muestran a continuación la misma gráfica desdoblada en el período 2018-2019 y 2020.

En esta gráfica se puede apreciar que en los años 2018 y 2019 la cantidad de correas rotas por mes es mucho mayor que en 2020, cuando Viscofan hizo las correcciones y ajustes para mitigar el problema existente, consecuencia de la instalación de la S-Line."

En el informe pericial de la demandada Punto 4.4. Sobre la oxidación de las correas verdes montadas en las Zonas de Neutralización, Secado y Humectación se dispone que

"Uno de los defectos que se mencionan en el documento 2 de la demanda es la oxidación de las correas. Se acompañan tres imágenes explicativas de la oxidación de las correas. En primer lugar, me gustaría discutir algunos puntos mencionados por el Sr. Prieto y el Sr. Diez en su informe.

- Las cintas verdes no están en la zona húmeda 2 como incorrectamente se indica en la página 36 del documento 2. Como indica el Sr. Diez en su recorrido por la línea S transcrito por el Sr. Prieto, las "correas verdes" (no se identifican de otra manera) sólo están en el secadero (video 3, entre el 3:40 y el 4:30)

- Para atribuir un error de diseño habría que comparar las hojas de características de las "correas verdes" con las condiciones de trabajo en las que están instaladas. Sin embargo, pese a que en el video 3 (3:40 - 4:30) y en el video 4 (02:58 - 04:07) se menciona que esas hojas de características (datasheet en inglés) efectivamente existen, no se aportan con la demanda ni con el informe pericial (documento 2).

Concretamente, en esta imagen, en la que se alega que son "cintas verdes" rotas por oxidación, solamente son visibles los efectos de la oxidación -es decir, la presencia de óxido- en la cinta que está en la base de la pila, en contacto con el agua, mientras que las superiores no tienen signos evidentes de óxido, ni se sabe dónde han roto ni porqué. Además, la fotografía está tomada claramente en una zona a la intemperie, por lo que ese óxido que aparece en una de las bandas tampoco podemos hacer una atribución directa de oxidación debido a su presencia en una zona del secadero cuyas condiciones de humedad son del 35% (como se indica posteriormente en el documento 2) y una temperatura entre 82ºC y 87ºC.

Si la temperatura fuese el problema real, considero que habría incluso más roturas de las que alega la actora. Así pues, no considero que esté apropiadamente justificado el error de diseño, porque no es posible saber o conocer en qué o dónde está el fallo. Efectivamente, atribuir la rotura a la temperatura o a la humedad en el secadero no me resulta comprensible. Una humedad del 35% es un ambiente seco. En un día normal de invierno, con fecha 19 de febrero de 2022, a media tarde en Bridgewater, Nueva Jersey, la humedad relativa es del 62%. Huelga decir que la temperatura



57



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

no oxida, por lo que no entendemos cuál puede ser el problema, si efectivamente dicho problema existe.

Me permito poner en duda la gravedad del fallo por los siguientes motivos:

En el anexo 19, se puede observar que en el período entre enero de 2018 (con la «línea S» plenamente operativa) y diciembre de 2019 (cambio de propiedad de la fábrica de NITTA CASINGS, Inc.) la sustitución o arreglo de las correas verdes (ya que no se identifican como tales) las realiza la demandada.

Pero es que en ese período hubo un parón de 4 meses con modificaciones de la «línea S», si las correas verdes presentaban un error de diseño que ya se conocía ¿por qué no se cambiaron en ese momento?

Otro punto para tener en cuenta es el período donde la «línea S» estuvo fuera de producción. De acuerdo con la demanda (p.7, cuarto párrafo) «(...) los trabajos [de modificación de la línea S] se prolongaron entre octubre de 2018 y marzo de 2019, lo que trajo consigo una parada de producción (...)». Ahora véase la siguiente gráfica de rotura de cintas aportada con el documento 2 de la demanda (anexo 11), comparada con los datos de producción (p.45, documento 2 de la demanda):

En octubre de 2018 (inicio de la parada) hubo 10 roturas, pero la producción dejó de ser efectiva (ver gráfica de producción) a partir de noviembre (5 roturas), en diciembre (13 roturas), enero (7 roturas), febrero (3 roturas) y marzo (2 roturas, fin de la parada, ya con datos de producción). Si efectivamente -como indican los datos de producción- la línea S no produjo entre noviembre de 2018 y febrero de 2019, las cintas verdes debían también estar paradas ¿se rompieron estando paradas? Porque no parece muy lógico que, si la línea está parada, las cintas se rompan. De hecho, si observamos la gráfica de roturas, el tercer mes con mayor incidencia de roturas (13) se produce con la línea parada.

Es más, tras el supuesto parón, el período de mayor incidencia de rotura de las cintas parece ser entre abril y noviembre de 2019 donde se alcanza la cifra récord de rotura en mayo de 2019 (16).

En mi opinión, las modificaciones en la «línea S» empeoraron el comportamiento de las cintas verdes y su ratio de roturas.

Finalmente, pero no por ello menos importante ¿con qué cintas se sustituyeron las correas verdes supuestamente mal seleccionadas? Ni en los vídeos del Sr. Díez, ni en la transcripción que de ellos hace el Sr. Prieto en el documento 2 de la demanda se indica qué nuevas correas han conseguido mejorar la ratio de roturas. En el vídeo 4 (3:17) se observa que se trata de una correa verde aparentemente igual que las que se han roto:

Por tanto, en mi opinión, no existe un error de diseño en el empleo de las correas verdes con núcleo de acero en la zona del secadero, ya que no se ha demostrado que no son correas capaces de aguantar bien las condiciones de temperatura y humedad en esa zona. Al contrario, las modificaciones y sustituciones en las correas, hasta el cambio de la propiedad, los realizaba la propia demandada. Por último, los datos de producción de la «línea S» no permiten establecer una relación causal con las roturas de las correas verdes.

Y el perito judicial, lo trata en el punto 9.6. Sobre el Empleo de Materiales Inadecuados en la Línea S





Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma electr. URL verificación:
https://administraciondelectronica.navarra.es/SCID_/WebIndex.html

CSV: 31201420002-41a0053a6a37850c0d3eab5c0cf9d58a270yAA==

En el aparatado 9.6.1. analizada los supuestos defectos en las Bandas (o Correas) Verdes (páginas 65 a 68) y dice que: "...

(...)Según refiere el dictamen pericial, la causa que explicaría el supuestamente elevado número de roturas del modelo T20-S sería su falta de adecuación a las condiciones de trabajo de las zonas en las que se implementó, y en particular, la falta de protección suficiente frente a la temperatura y la humedad, lo que habría provocado la corrosión temprana de los elementos metálicos embutidos en las bandas (moldeadas con poliuretano termoplástico, o TPU), favoreciendo su fallo mecánico.

La acusación anterior se sostiene aportando tres fotografías realizadas sobre algunos ejemplares aparentemente afectados por la corrosión, y mediante un análisis de la evolución temporal de las roturas de estos elementos basado en la información registrada en una hoja de cálculo que se adjunta como Anexo 11 al dictamen pericial bajo la denominación "Fichero Excel del Histórico de roturas de correas (verdes) en Zona Húmeda 2" (cuando la Zona Húmeda 2 es la única que no dispone de estos elementos), y en la que se cita a la empresa HABASIT en todos los casos, y no a BRECO.

El perito autor de este informe considera que no puede asumir ninguna de estas referencias para su propio análisis, entre otras razones porque no permiten establecer una relación de causa-efecto con suficientes garantías, y opta por la estrategia del contraste entre las datos disponibles relativos a las condiciones de trabajo en las zonas de neutralización, secado y humectación, y las especificaciones técnicas del modelo T20-S.

CONDICIONES de TRABAJO / ... conviene recordar de nuevo en este punto que la responsabilidad última sobre la definición, gestión y supervisión de las condiciones de trabajo en las que opera la línea de procesamiento de envoltura mediante extrusión de gel de colágeno le corresponde a NITTA CASINGS INC. a partir del momento en el que la Línea S supera el Test de Prueba.

Así pues, y según refiere VISCOFAN COLLAGEN USA INC. las condiciones de trabajo habituales para la línea de procesamiento de envoltura mediante extrusión de gel de colágeno serían: funcionamiento ininterrumpido (24/7) y velocidad constante en régimen permanente no superior a los 46 metros (150 pies) por minuto.

En lo relativo al empleo del modelo T20-S de HABASIT en las Zonas de Neutralización, Secado y Humectación, conviene recordar que no se produce contacto directo con el producto alimentario (que se apoya en unos peines o cunas), de forma que no está sujeto al cumplimiento de los requisitos de conformidad alimentaria a los que sí está sometido el modelo FAB-12E, empleado en las Zonas de Lavado y Plastificado.

Desde un punto de vista ambiental, en cada una de las zonas en las que opera el modelo T20-S tendríamos las siguientes referencias, proporcionadas también por VISCOFAN COLLAGEN USA INC. en el dictamen pericial que incorpora a su DEMANDA:

En la Zona de Neutralización: la temperatura se mantendría de forma aproximada alrededor de los 25 ºC, no constan valores estimados para la humedad relativa, y tampoco para la acidez o alcalinidad del ambiente, aunque en el proceso se emiten vapores de amoniaco potencialmente corrosivos.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

En la Zona de Secado: la temperatura se mantendría en el rango de los 82 a los 87 ºC, no constan valores estimados para la humedad relativa y tampoco para la acidez o alcalinidad del ambiente, dado que el producto ha sido sometido previamente a los tratamientos de lavado y plastificado.

En la Zona de Humectación: la temperatura se mantendría alrededor de los 50 ºC, la humedad relativa se mantendría alrededor del 35% y no se contempla considerar la acidez o alcalinidad del ambiente como un aspecto relevante, dado que el producto ha sido sometido previamente a los tratamientos de lavado, plastificado y secado.

ESPECIFICACIONES TÉCNICAS / Desde un punto de vista meramente contractual, las especificaciones técnicas que se establecen en el Presupuesto en este ámbito se limitarían a plantear la hipótesis de un ambiente de trabajo en el Área de Secado cuyo rango de temperaturas se movería entre los 80 y los 120 ºC, a los únicos efectos de tomarla en consideración en la selección de sus elementos estructurales. Además de lo anterior, las consideraciones que se refieren a la humedad relativa del producto (rangos de 9 al 11% y del 19 al 20%), también recogidas en el Presupuesto, no pueden extrapolarse al ambiente de trabajo del modelo T20-S, ya que no hay contacto físico entre la banda y el producto, que es transportado mediante unas cunas (o peines) sujetas a dicho elemento.

Así pues, de la consulta de las especificaciones técnicas que ha facilitado SAYER TECHNOLOGIES S.L. sobre el modelo T20-S de HABASIT, moldeado en TPU 10, se concluye que el fabricante prescribe su uso para trabajar en ambientes cuyas temperaturas se muevan en el rango de los 0 a los 110 ºC.

Por contra, no se indican los rangos de humedad relativa para los que estaría recomendado su uso, pero sí consta una mención al final del documento que sirve para establecer un criterio sobre lo que podrían considerarse condiciones climáticas estándar, fijando la referencia para este parámetro en el 50% (muy por encima del valor del 35% referido por VISCOFAN COLLAGEN USA INC.).

Por último, tampoco aparecen referencias sobre los valores de pH ambiental que puede tolerar este modelo de forma continuada, ni a los tiempos de vida promedio, que dependerán del conjunto de las condiciones de trabajo a las que se vean expuestas. En cualquier caso, HABASIT dispone de una aplicación web que permite hacer ciertas comprobaciones y simulaciones en el siguiente enlace: https://rims.habasit.com/.

En definitiva, las especificaciones técnicas del modelo de banda T20-S de HABASIT moldeado en TPU 10, elegido por SAYER TECHNOLOGIES S.L. para las Zonas de Neutralización, Secado y Humectación, satisfacen los requerimientos de las condiciones ambientales de trabajo referidas por VISCOFAN COLLAGEN USA INC., que, por otra parte, son aproximadas (~) e incompletas (?), tal como se puede observar en la tabla.

La verificación de lo anterior sería explícita en el caso de la temperatura (esta afirmación también es válida en el caso de considerar las especificaciones técnicas del modelo de banda T20 de BRECO que ha facilitado VISCOFAN COLLAGEN USA INC, siempre y cuando el material empleado para su moldeo fuera el TPUWB1), e implícita en el caso de la humedad relativa, al establecerse la referencia de las condiciones ambientales estándar en el entorno del 50%."

Doc. garantizado con firma electr. URL verificación:
https://administracionelectronica.navarra.es/SGDJ_Web/Index.html

CSV: SJ2014z02t2-41e8508a34d376b0a85ca3a0cf0983ae272yAA=

Fecha: 23/122/2022 15:42

Firmado por:
MARIA PASTOR CISNEROS





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Sentado lo anterior no hay ninguna prueba objetiva de la relación de la rotura de estas correas verdes o bandas con el material elegido por Sayer . No hay ninguna prueba de que como dice la demandante , este material no soporte las altas temperaturas y humedad a las que se trabajaba en la planta. El video y tres fotografías de la supuesta oxidación es una prueba claramente insuficiente para acreditar este extremo.

El perito de la demandada como recoge en su informe entiende que la rotura de las correas verdes es consecuencia de la oxidación de las mismas al no soportar la temperatura y humedad. Pero al mismo tiempo reconoce que no conoció las características del producto en el momento que elabora su informe.

Por otra parte se dice que esta situación mejora con los ajustes y correcciones que hace Viscofan en 2020. . Ajustes que salvo error se hacen en el diseño de la línea en la zona húmeda y que no se ha probado existiese y sea responsabilidad de Sayer .

El perito de la demandada en el acto del juicio apunta como otro motivo de la rotura de las correas que estuvieran sometidas a una tensión excesiva. En este sentido el Director de Innovación de Viscofan, que señala como causa de la rotura además del material empleado ahora de acero inoxidable que entiende es la principal. La tensión excesiva y movimientos de oscilación. Viendo en el momento que viajó a EEUU uno o dos cintas rotas Por tanto, otras posibles causas de la rotura de correas se encontraría en el diseño de la Línea S, no probado

E Igualmente que el problema de rotura de correas que se daba en la zona de secado, mejoró cuando se cambió de fabricante de correas. Hasta ese momento Sayer. Pero como se ha indicado no existe ninguna prueba objetiva concluyente que este problema se deba al material de la correa.

El Sr Goldfarb no ha añadido sobre dicho defecto más de lo ya ha manifestado. Señala que este problema se soluciona con las medidas tomadas por Viscofan adquirida Nitta. A su criterio por la decisión que toma Viscofan cambiando de material

Por otra parte, ha explicado que cada vez que se rompía una correa , había que parar la Línea S para repararla, lo que implica un perjuicio a lo que hay que añadir la cantidad de gel que se pierde por no estar en movimiento. Refiere que se pierde por esta parada unos 12.000 litros de gel. Parada, y entiendo relevante, no implicaba que las correas ( ¿ las demás?) no sigan en movimiento. Lo que explicaría que aun parada la Línea S siguiera habiendo roturas de correas verdes

Reclama la demandada por ello 300.364,53 euros y 1.772,56 dólares que corresponderían a la sustitución de las correas (verdes) rotas. Adjuntándose como Anexo 19 las facturas abonadas por Viscofan Collagen USA Inc por este motivo . Facturas al igual que el histórico de roturas que

61



P00199



Cristina Fuentes Sánchez
Nº T/I Jurada/Sworn translator #: 3380
16 junio 2023 / June 6 2023

acreditan la existencia de un daño pero no la responsabilidad de la demandada en este daño. En definitiva que el defecto o rotura de las correas verdes se deba a que el material en el que estaban fabricadas era inapropiado (modelo T20-S de la empresa HABASIT).

**No se ha probado el defecto**

**5.-Puertas de la zona de secadero.** El perito de la demandante lo trata en el punto 6.7 de su informe : Secadero. Materiales Inapropiados. El secadero es una zona sometida a altas temperaturas (aprox. 82 – 87 °C) y humedad (35%), y las puertas seleccionadas e instaladas por Sayer se deterioran al no soportar ese ambiente, es decir, no resisten adecuadamente la temperatura y humedad de esa zona.

En concreto en la página 41 y también relacionado con la temperatura y humedad con el anterior En el informe de la demandante se señala que:

"Otro de los problemas identificados es el del inapropiado material empleado en ciertos elementos del secadero, concretamente en el material empleado para la construcción de las puertas de esta parte de la S-Line.

El secadero es una zona sometida a altas temperaturas (aprox. 82 – 87 °C) y humedad (35%), y las puertas instaladas por Sayer acaban deteriorándose al no soportar ese ambiente extremo.

Según indica el Sr. Diez en el Vídeo 3, 04:35 – 05:05, las puertas del secadero, debido al material utilizado para su construcción, no resisten adecuadamente la temperatura y humedad de esa zona.

Posteriormente, en el Vídeo 4, 01:55 – 02:24 y 04:30 – 05:47, el Sr. Diez explica nuevamente este problema y muestra alguna de las puertas que todavía presenta estos problemas, concretamente de desperfectos en la superficie interior de dichas puertas, las superficies que se encuentran más cerca del interior de los canales del secadero donde hay mayor temperatura y humedad. Muchas de las puertas, como también indica el Sr. Diez, ya fueron cambiadas."

Se cuantifica en 300.364,53 euros y 1.772,56 dólares que se corresponden a la sustitución de las correas (verdes) rotas (v apartado 6.4). Adjunta como Anexo 19 las facturas abonadas por Viscofan Collagen USA Inc por este motivo. Facturas que según el perito el Ingeniero Sr Sahuquillo , y economista Sr Elizalde al igual que ocurre con las del anexo 20 que se harán a continuación referencia. El perito entiende que no todos los conceptos se relacionarían con dicho defecto. Cuestionando igualmente el precio/unidad de correa o la falta de detalle de las horas de trabajo en otras

En el informe de la demanda 4.6.2. Sobre el supuesto empleo de materiales inapropiados en el secadero (páginas 34 a 36) se indica que:

"Además de las correas verdes, suficientemente analizadas en el apartado 4.4 de este informe, se menciona el deterioro de unas puertas en la zona del secadero. Estos defectos se atribuyen a la humedad (35%) y a la temperatura (aprox. 82ºC – 87ºC). No se explica ni qué material tienen las puertas antes, ni que material tienen las puertas después de repararlas. Máxime cuando en el anexo 20 del documento 2, donde supuestamente

62



P00200

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



están anotados los problemas con el secadero, no aparece ni una sola vez el concepto "puertas del secadero". En mi opinión, no hay prueba documental alguna sobre la supuesta sustitución de las puertas del secadero. Si analizamos las condiciones de trabajo de las puertas, una humedad del 35% es inferior a la humedad ambiente de un día cualquiera en Bridgewater, NJ (62%):

Por tanto, una humedad del 35% es un ambiente seco, que no afecta a las puertas. En cuanto a la temperatura, tampoco podemos estar seguros de que sea la razón de esos deterioros (obsérvese que sólo se muestra una puerta, y que aparentemente, todas las demás son iguales):

Otro punto que me ha llamado la atención es que no haya vapor de condensación cuando se abre la puerta en el video. La temperatura de 82°C-87°C no es la que está en el pasillo, lógicamente. La temperatura ambiente, el 16 de junio de 2021 (cuando se grabó el video) en Bridgewater, NJ estaba entre los 26°C de máxima y los 11°C de mínima4. Asumiendo que la temperatura eran 26°C, cuando se abre la puerta del secadero a 87°C, lo normal es que salga vapor de condensación (de la misma forma que sale al abrir la puerta de un horno) e incluso que se empañase el objetivo de la cámara con la que se estaba grabando. Pero esto no sucedió, por lo que también dudo que la temperatura sea la responsable de los desperfectos en las puertas.

Por lo que se aprecia en la imagen, además, las puertas parecen ser de HPL (tableros fenólicos laminados a alta presión). Como definición de HPL (del inglés High Pressure Laminate) o laminado de alta presión, podemos decir que es un material compuesto por varias capas o láminas de celulosa impregnadas en resinas fenólicas, las cuales son sometidas a grandes presiones y altas temperaturas durante el proceso de fabricación. También se lo denomina tablero estratificado o compacto. Son paneles con una buena resistencia a altas temperaturas. Mayor que la de cualquier producto derivado de la madera, llegando a soportar sin deteriorarse de manera puntual los 180°C. También soportan correctamente el vapor de agua (humedad del 100%). Por lo tanto, a falta de pruebas sobre las puertas originales y las supuestamente cambiadas (recordemos que en el anexo 20 no hay prueba documental de ningún cambio de puerta) no podemos atribuir las supuestas roturas de las puertas a un defecto en el diseño de las mismas.

En definitiva, las puertas instaladas en el secadero son de un material resistente a humedades del 100% y temperaturas de hasta 180ºC sin deteriorarse, por lo que, sin prueba documental alguna del cambio en las puertas del secadero, no puedo concluir que haya un error de algún tipo en el diseño de la línea S."

Y en el informe pericial judicial (páginas 68 a 70)

"9.6.2. Sobre los Cerramientos del Área de Secado
En la Zona de Secado de la Línea S se produce un aporte constante de aire caliente y seco que tiene por objeto reducir los niveles de humedad del producto proveniente del Área Húmeda (y de Aditivos) a valores de entre el 9 y el 11% antes de su procesamiento en la Zona de Humectación.

Según refiere VISCOFAN COLLAGEN USA INC., responsable de la gestión del sistema de aportación de aire, las temperaturas en la Zona de Secado se mantienen entre los 82 y los 87 ºC y la humedad relativa en



63



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

torno al 35% (este último dato, orientativo, se empleó en otro apartado del dictamen pericial que se incorpora a la DEMANDA para referirse a la humedad relativa de la Zona de Humectación).

El aislamiento térmico que se dispuso en la Zona de Secado de la Línea S tenía el doble objetivo de reducir las pérdidas de calor (eficiencia energética) y facilitar la regulación de la temperatura en el interior (limitando variaciones bruscas). A tal efecto, SAYER TECHNOLOGIES S.L. refiere el empleo de un cerramiento de tablero de partículas para uso de interiores en ambiente seco, revestido de un laminado de 8 mm de la marca Fundermax (aporta una factura fechada el 30 de abril de 2016).

La reclamación que hace VISCOFAN COLLAGEN USA INC. en este caso no se refiere a las consecuencias de un mal aislamiento térmico (exceso de consumo energético y/o dificultades en la regulación de la temperatura), sino al deterioro que parecen haber sufrido los revestimientos interiores de las compuertas del cerramiento que se encuentran en la zona del pasillo, que se debe, según su criterio, a su falta de adecuación para resistir temperaturas y humedades relativas elevadas ("ambiente extremo"); una cuestión que afectaría a su vez al deterioro progresivo del aislante térmico revestido, por exposición directa a las condiciones ambientales de la zona de secado. Se recuerda de nuevo que una humedad relativa del 35% se asocia generalmente con un ambiente seco.

Los elementos probatorios que presenta VISCOFAN COLLAGEN USA INC. se limitan a la exhibición de una compuerta (de las muchas que hay montadas en esa zona de la línea) cuyo revestimiento interior aparece parcialmente rasgado y despegado, así como a la inclusión de una serie de facturas, fechadas en febrero de 2021, en las que aparecen conceptos que podrían estar relacionados con la reciente reposición de estos elementos; de manera que el perito autor de este informe opta, de nuevo, por el contraste entre las condiciones de trabajo del revestimiento, facilitadas por VISCOFAN COLLAGEN USA INC., y sus especificaciones técnicas, proporcionadas por SAYER TECHNOLOGIES S.L., resultando en este caso que la documentación facilitada se corresponde con el producto MAX COMPACT Estándar FH de Fundermax, cuyo empleo se justifica también con la presentación de una factura fechada en abril de 2016, y cuyas propiedades térmicas serían las siguientes:

- Especificaciones técnicas de las propiedades térmicas del producto MAX COMPACT Estándar FH de Fundermax -

La norma UNE-EN 438-2:2016+A1:2019 (que se cita en la tabla) especifica los métodos de ensayo para la determinación de las propiedades de los laminados decorativos de alta presión. El perito autor de este informe no ha encontrado correspondencia entre las referencias que aparecen en la tabla (quemadura de cigarro o sartén caliente) y las que recoge la norma para las condiciones de trabajo que más se asimilan a las de la Zona de Secado (resistencia al calor seco o al calor húmedo); y aunque los valores obtenidos en esos ensayos resultan óptimos, no procede apoyarse en ellos para justificar su comportamiento en condiciones de ensayo diferentes, incluso cuando se trata de evaluar sus propiedades térmicas (esta misma consideración es aplicable a las propiedades del material en su comportamiento frente al fuego).

Firmado por:
MARIA PASTOR CISNEROS

Fecha: 23/12/2022 15:42

Doc. garantizado con firma efecto URL verificación:
https://administracionelectronica.navarra.es/SCDD_Web/index.html

CSV: 5120142002-d1a50a53a6e57950c628ca3a0cf9c6f8aac7?pAA==



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



Por otra parte, la indicación que hace el fabricante en el apartado general de propiedades, refiriendo de forma muy vaga que el producto es "resistente a la humedad y al vapor", tampoco puede servir para validar su aptitud para emplearse en la Zona de Secado.

La reclamación sobre el revestimiento de las compuertas de la Zona de Secado se refiere a un aspecto poco relevante desde el punto de vista del funcionamiento de la máquina y de su rendimiento.

Los elementos probatorios (facturas) que presentan ambas partes para justificar la instalación y posterior sustitución de estos elementos quedan fuera del ámbito de análisis de este informe; y la exhibición de la compuerta que aparece deteriorada tampoco tiene la entidad probatoria suficiente y necesaria.

Tampoco hay garantías plenas con respecto a las condiciones de humedad relativa y temperatura a la que hayan podido verse sometidas las compuertas desde el momento de su instalación, y sólo se conoce con certeza que su régimen de funcionamiento previsto es continuo (24/7).

Las especificaciones técnicas facilitadas por SAYER TECHNOLOGIES S.L. tampoco permite pronunciarse con rotundidad sobre la aptitud del material para resistir las condiciones ambientales de la Zona de Secado, aunque los valores de las propiedades térmicas que aparecen referenciadas resultan muy favorables.

En definitiva, el perito autor de este informe no dispone de elementos de juicio suficientes para determinar que la causa de los desperfectos que presenta la compuerta que se exhibe en el dictamen pericial que se adjunta a la DEMANDA sea su falta de adecuación para soportar las condiciones ambientales que refiere VISCOFAN COLLAGEN USA INC."

Se reclama la suma de 153.029,91 euros corresponden a la sustitución de los elementos deteriorados en la zona del secadero Se adjunta como Anexo 20 del informe las facturas abonadas por Viscofan Collagen USA Inc por este motivo.

En definitiva nuevamente la actora defiende que Sayer ha empleado un material inapropiado en los cerramientos en la zona de secado que dice no está preparado para las altas temperaturas y humedad que soportan, y se terminan deteriorándose. No se refiere a las consecuencias de un mal aislamiento térmico Como prueba de este problema como dice el perito judicial se aporta la imagen de una de ellas, y las facturas de reposición por un total de 153.029,91 ( de abril de 2020, junio de 2020 y febrero de 2020), que en el caso de emitidas por Master Automatismos, SL fechadas en febrero 2021 según el Sr Prieto ni siquiera se puede afirmar de su contenido respondan estas partidas facturadas a reposiciones de elementos deteriorados en la zona de secadero ( anexo 20 del informe pericial de la demandante). En el mismo sentido el economista D Fermín Elizalde, y el Ingeniero Sr Sahuquillo

Respecto a la fechada en febrero de 2021. El Economista Sr Elizalde señala además que en ella se refiere a adquisiciones que se harían a Mecanizar Ruedas Naturin que dice es una filial del Grupo Viscofan. Lo que a criterio de esta Juzgadora no tendría relevancia, el pago se habría hecho a Master Automatismos, SL y no a la filial perteneciente al Grupo Viscofán, que además tiene personalidad jurídica propia.

65



P00203



Firmado por:
MARIA PASTOR DISNERGS

Fecha: 23/12/2022 15:42

CSV: 3120142002-d4a5003a5a5736b0c50ce8a0c50f888a27a/AA==

Doc. garantizado con firma elect. URL verificación:
https://administracionelectronica.navarra.es/SCDI_Web/index.html

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

La mercantil Master Automatismos, SL aclara los conceptos de estas facturas. La factura nº 20065 correspondería a Mecanizado de correas de secadero y suministro de accesorios para apoyo de tripa según listado en albarán. La -factura nº 20085 al Suministro de piezas para modificaciones en línea de extrusión de colágeno según desglose adjunto. Y la -factura nº 21023 con el el suministro de 156 cajones de soplado para secadero S-Line Nitta con distribución de salidas de aire optimizada. Por tanto, el proveedor de Viscofan desdice a la demandada, y al perito judicial cuando afirman que esta última no hace referencia o no se puede relacionar con el problema del deterioro de compuertas del secadero

No obstante lo relevante es que nuevamente no existe prueba concluyente de que las compuertas instalados en la zona de secadero no estuvieran fabricados con un material adecuado para soportar la temperatura y humedad. Insuficiencia probatoria que alcanza a datos de tan fácil prueba como, relación , y fechas de contrapuertas instaladas por Sayer, deterioradas y repuestas por Viscofan. El Sr Diez en la videoconferencia informa al perito, que en ese momento hay otras pendientes de instalar. Pero solo exhibe una de las contrapuertas "descascarillada y levantada" según dice . Ni siquiera el perito de Viscofan conoce las características del producto instalado por Sayer, Señalando al respecto que parece que se encuentran hechas de conglomerado.

El perito judicial señala además que no hay garantías plenas con respecto a las condiciones de humedad relativa y temperatura a la que hayan podido verse sometidas las compuertas desde el momento de su instalación, y sólo se conoce con certeza que su régimen de funcionamiento previsto es continuo (24/7). Las especificaciones técnicas facilitadas por Sayer , aunque según el perito judicial ( al igual que con el anterior defecto) no permite pronunciarse con rotundidad sobre la aptitud del material para resistir las condiciones ambientales de la Zona de Secado los valores de las propiedades térmicas que aparecen de dicho producto ( max compact estándar FH de Fundermax -) , resultarían muy favorables.

**En definitiva no se puede dar por probado que los daños que dice tuvieron las contrapuertas de la zona del secadero sean consecuencia del material utilizado por Sayer para su fabricación.**

**Por lo expuesto , solo se ha probado la utilización del material inapropiado en la colocación de los suelos de rejilla o tramex. Por los que la demandada deberá de reembolsar el precio abonado para el cubrimiento del mismo**

La no acreditación del resto de deficiencias en el diseño de la línea S Line y en los materiales empleados por Sayer conduce a desestimar las sumas reclamadas por los perjuicios de la demandante consecuencia de las devoluciones de producto fabricado en la línea S que Viscofan cuantifica en de 161,581,50 dólares y otros 593.394 dólares por el coste que dice Viscofan le supuso la parada de producción realizada entre octubre de 2018 y marzo de 2019 para efectuar modificaciones en la S-



66

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Line que permitieran producir. Facturas que se aportan como anexos 22 y 23 del informe del perito de la demandante.

En relación con lo anterior el Director General de Viscofan, el Sr Soroa Zubiría ha justificado la reducción del importe de reclamación por la parada de la maquina respecto a la que hacía en su reclamación de enero de 2020. En que entiende más ajustado reclamar por este concreto periodo y no los sucedidos durante toda la vida de la misma.

A mayor abundamiento en cuanto a la devolución del producto como señala el perito judicial, ( páginas 74 y 75 de su informe) Si la devolución de producto terminado al que se refiere el dictamen pericial se debiera a su falta de conformidad, lo primero que debería quedar en evidencia como indica el perito judicial y comparte esta Juzgadora sería el sistema de control de calidad implantado por Nitta., responsable de la gestión del proceso de producción.

El Sr Eugene ha sido sea con todos los respetos bastante ambiguo cuando ha explicado o intentado explicar cómo se pudo comercializar un producto que no reunía las condiciones de calidad.. En este sentido, reconoce que el producto está sometido a un control de calidad. Explicando lo que pudo suceder con uno de sus clientes. Señalando que para el cliente este producto no cumplía la envoltura de colágeno sus funciones y se cambió el tipo tripa de colágeno para que se adaptase a este cliente.

Y finalmente como documento 2 de la contestación a la demanda. Sayer aportan correos cruzados entre las partes de19, 26, 28 y 29 de septiembre de 2016, 21 de octubre de 2016, 9 de noviembre de 2016, y 14 de julio de 2017. De los que se desprende que al menos parte del retraso en la terminación de la línea no se debió a la fabricante de la Linea S sino al retraso de otros trabajos responsabilidad de Nitta necesarios para la continuación del encomendado a Sayer. No obstante la demandante no reclama ninguna cantidad por este concepto que además no ha probado.

Finalmente. Viscofan en su demanda dice que la Línea S resultó inhábil . Sin embargo, solo consta que estuviese parada en la produccion durante las modificaciones en la Línea entre octubre de 2018 y marzo de 2019 que hizo Nitta. Parara además que no se prueba sea consecuencia de defectos de diseño en la Línea S responsabilidad de la demandda

Si tenemos en cuenta la totalidad de la inversión que ha tenido que hacer Nitta y posteriormente Viscofan por los supuestos de defectos de diseño y ejecución de la Línea S teniendo en cuenta la documentación aportada con la demanda. Toda ella asciende a 530.773,94 euros y 18.086,06 euros. Mientras que el precio de la Línea S fue de 3.235.249 euros. La máquina se pone definitivamente en marcha reiniciándose en definitiva la producción a primeros de 2018. No existe desde entones ningún requerimiento a Sayer, y anterior a la adquisición de la planta de extrusión de colágeno de New Jersey por Viscofan, sobre supuestos defectos en la máquina. No es hasta el 29 de enero de 2020 y lo fue para

67





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



reclamar directamente los daños y perjuicios tenidos. No consta como dice hubo, requerimientos previos a Sayer para reparar, modificar la Línea S por problemas en su diseño. O en su caso para reponer los elementos de la Línea S dañados. Reclamación del Director General de Viscofan D Jaime Soroa Zubiría por incumplimiento del contrato y daños y perjuicios que Sayer responde en burofax de 23 de marzo de 2020 rehusando la reclamación ( documento 7 de la demanda). Posteriormente el 2 de abril de 2020 nueva reclamación de Viscofan ( documento 8 de la demanda) previa a formular la presente demanda turnada a este Juzgado el pasado 13 de diciembre de 2021

**CUARTO.- DEFECTOS DE SEGURIDAD** A instancias de la demandante informes de D Abraham Hueyleitl ( Pllz de Mejico) aportados junto a sus traducciones como documento 3 y 4 de septiembre de 2021 de evaluación de riesgos. . En el primero se evalúan los riesgos Adjunta fotografías de los riesgos o peligros identificados en la máquina. La visita para evaluar los riesgos se produce en agosto de 2021

En el segundo de los informes se examinan los conceptos de seguridad que se deben de tener en cuenta para que la maquina S Line cumpla con la legislación y los estándares aplicables ( documento 5 de la demanda)

A instancias de la demandada, se cuenta con el Informe pericial de D Jesús Sahuquillo Huerta de 21 de febrero de 2022,

E Informe pericial judicial elaborado por Tesicnor ( D Santiago Pangua Cerrillo), quien también adjunta fotografías de los riesgos examinados en su informe

En cuanto a la cuantificación del perjuicio. La demandante reclama 80.000 euros desglosando el presupuesto (página 80 de su informe) en las siguientes partidas: Concepto de seguridad: 10.000 euros, diseño de seguridad 12.000 euros, integración de sistemas 50.000 euros, y validación de seguridad y expediente técnico 8000 euros

El perito judicial desglosa cada uno de ellos y estima la valoración económica de los riesgos. Haciendo un total de 64.008,00 euros ( páginas 46 y 47 de su informe)

El perito de la demandada salvo error no cuantifica económicamente los posibles o supuestos defectos de seguridad

D Jesús Sahuquillo Huerta de 21 de febrero de 2022, y D Santiago Pangua Cerrillo de Tesicnor se han ratificado en sus respectivos informes . Pero en el caso de D Jesús Sahuquillo Huerta la partes no le han formulado ninguna pregunta sobre los defectos de seguridad que trata en el punto 6 " Sobre los defectos de seguridad de la Línea S" de su informe ( páginas 44 a 50 de su informe)

Siguiendo el orden de los defectos de seguridad tal y como expone el informe pericial de la actor

68





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

**ADMINISTRACIÓN DE JUSTICIA**

**1.-PELIGROS MECANICOS:**

**1.- Exposición a movimientos del eje. Ubicación: área de extrusión.** El perito de la demandante describe este riesgo. Dice que en el área de extrusión existe un motor azul a cada lado de la línea con el eje expuesto al contacto del operador. El contacto con el elemento móvil puede provocar la fractura de los dedos o rasguños en las manos. Propone para reducir el riesgo colocar un resguardo fijo alrededor del eje motor expuesto para evitar el acceso a la zona de peligro durante cualquier accionamiento eléctrico(..) Riesgo significativo. (página 11 )

El perito D Jesus Sahuquillo Huerta entiende que el área de extrusión ( zona húmeda 1) es responsabilidad de Viscofan. Por lo que excluye cualquier responsabilidad de Sayer. El perito atiende a la división de responsabilidades se ha establecido en función de las exclusiones del contrato: En este se excluye del presupuesto:

1. El equipo para el suministro de aire al secador y su control
2. El suministro de agua y líquidos, tratamientos de recuperación (sólo entrada de agua / glicerina)
3. Suministro de glicerina y su tratamiento
4. Instalación de succión y tratamiento con amoníaco
5. Cabezales extrusores
6. Alimentación del gel a las extrusoras
7. Equipos KEYENCE5
8. Motores reductores y su control de velocidad

El perito judicial por su parte comparte las conclusiones del perito de la actora Lo valora en 1.500 euros. Según dice aunque el perito de la demandada hace una división de responsabilidades en el manual de instrucciones que se le facilita aparece consta que la totalidad de la línea es de Sayer. El único que consta evalua los posibles riesgos y medida de seguridad adoptadas

Entre la documentación examinada por el perito de la actora y judicial se encuentra el manual de instrucciones S Line nº 150013 de Sayer Technologies SL que comprende seis secciones : Sección 1º - Declaración de conformidad de la CE. Sección 2º: Instrucciones de seguridad en el mantenimiento. Sección 3º Manual de instrucciones de la máquina. Sección 4º Dibujos y listas. Sección 5º Esquemas y programas. Sección 6º Repuestos recomendados Próxima revisión mayo de 2008. Por tanto, como dice el perito judicial comprende la totalidad de la línea. No existe documento distinto a este que haga referencia al uso e instrucciones de seguridad de la máquina. Por lo que, la demandada debió de contar o contó con la información de todos los elementos de la misma, también los que están excluidos en el presupuesto, para la elaboración de dicho manual y las instrucciones de seguridad . Sin ánimo de insistir único documento que se refiere a las medidas de seguridad de la máquina, único manual de seguridad de la máquina que contamos. Unico documento en definitiva que evalua los riesgos de la maquina . Con la

69

P00207



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

salvedad de la referencia en la condición 1.7 del acuerdo contractual de 28 de agosto de 2015 siguiente: ~ "Seguridad: La máquina tiene el diseño y la estructura que contempla la Directiva de Maquinaria del CE."

La dirección letrada y salvo error no hace en su contestación. En el trámite de conclusiones ha señalado que esta máquina ni requiere manual de instrucciones, ni declaración de conformidad, y que las condiciones de seguridad las imponen la legislación estadounidense y no la CE. Afirmación de la que discrepo, y no hay más que remitirse al documento contractual, y manual de instrucciones que hace Sayer sobre la máquina para poder concluir que es Sayer la que se compromete a que la maquina cumpla la Directiva de maquinaria de la CE. Es Sayer quien elabora un manual de instrucciones que comprende la declaración de conformidad de la CE.

**Por tanto, se da por probado el defecto de seguridad que la demandada no niega pero que atribuye su responsabilidad a Viscofan. Se valora en 1.500 euros.** El perito judicial como se ha indicado a diferencia de la actora desglosa los defectos y su valoración. Por los que a falta de propuesta distinta se acoge en este y demás que se prueben, la valoración que hace el perito judicial. Me anticipo con ello a que , no se van a dar por probados la totalidad de los defectos y soluciones propuestas por el perito de la demandante

**2.- Punto de atrapamiento en los cilindros neumáticos. Ubicación: área de extrusión** En el área de extrusión existen cilindros neumáticos que se usan para ajustar la distancia de la herramienta de extrusión del colágeno. El cilindro posee un punto de atrapamiento expuesto, que en caso de que el personal introduzca los dedos podría provocarle fracturas en los dedos .Propone colocar un resguardo fijo alrededor de la zona de movimiento del cilindro neumático (..) Riesgo muy bajo

D Jesús Sahuquillo Huerta en el mismo sentido que el anterior considera que forma parte del área de extrusión y por tanto la responsabilidad es de Viscofan

El perito judicial se encuentra conforme con el perito judicial identificando el riesgo y la solución propuesta valora en 575 euros

**Por tanto, se da por probado el defecto de seguridad que la demandada no niega pero que atribuye su responsabilidad a Viscofan. Se valora en 575 euros**

**3.-Abertura en los resguardos del motor . Ubicación: área de extrusión.** En el área de extrusión hay motores que cuentan con un resguardo fijo para evitar el contacto con los elementos móviles de motor, sin embargo, las aberturas en los resguardas son de 10 mm lo que permite que los dedos puedan acceder y sufrir posibles amputaciones. Riesgo significativo Propone cerrar el hueco existente en el resguardo del motor para evitar el acceso a la zona de peligro(..),

70



P00208

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



El perito de la demandada  en el mismo sentido que los anteriores. Se ubica en el área de extrusión, por tanto  responsabilidad de Viscofan

El perito judicial  por su parte entiende que el riesgo es aceptable, y señala que en el informe de Pilz no se observa la distancia de la guarda hasta el punto de riesgo. En todo caso hay que tener en cuenta UNE 138572020  Lo valora en 1.750 euros

**Por tanto,   se da por probado el defecto  de seguridad que la demandada no niega pero que atribuye su responsabilidad a  Sayer. Se valora en 1.750 euros**

### 4.- Movimientos  en las cintas transportadoras. Ubicación S Line.
La envoltura se transporta a lo largo de toda la línea por medio de una cinta transportadora. Esta cinta está protegida  en diferentes fases  del proceso con resguardos móviles no supervisados, En las transiciones de una era a otra, la cinta transportadora y los elementos de transmisión están completamente  expuestos al contacto del personal. Se propone colocar resguardos fijos para evitar el acceso a la zona  de peligro . En las zonas que sea necesario un acceso continuo a través de resguardos móviles se recomienda implementar un sistema de supervisión de los bloqueos para detener inmediatamente     cualquier movimiento  peligros en la zona correspondientes(..) . Riesgo alto

El perito de la demandada no considera  que sean riesgos altos que puedan suponer la fractura  de los miembros superiores del personal. Las cintas transportadoras  que se aprecian no sobresalen de la estructura. Un operario tendría que efectivamente introducir sus miembros superiores para que haya un atrapamiento , pero es que además, ni la velocidad  ni la correa son tan fuertes  como para provocar  la rotura de la extremidad superior de una persona adulta

El perito judicial  comparte la identificación del riesgo. Nivel  de riesgo significativo. En cuanto  a la solución señala que sería necesario colocar resguardos fijos únicamente en los rodillos . Lo valora en 8.975 euros

Existe este defecto de seguridad que se sitúa en el área de la Línea S, responsabilidad de Sayer .El perito judicial y de la  actora lo clasifican en un riesgo significativo. Pero se discrepa en la solución

**Por tanto todos los peritos reconocen la existencia de dicho defecto, la responsabilidad de Sayer, aunque en el caso de la demandada minimiza el riesgo o las posibles consecuencias de dicho defecto  que no significa que no exista. En cuanto a la solución se acoge la del perito judicial  cuya imparcialidad  y neutralidad se presume . No dándose razón alguna por la que no se pueda considerar dicha medida adecuada para  reducir el riesgo. Por tanto se valora dicho perjuicio en los términos que dice el perito judicial, esto es en 8.975 euros**

Firmado por: MARIA PASTOR CISNEROS
Fecha: 23/12/2022 16:42
Doc. garantizado con firma electr. URL verificación: https://administraciondejusticia.navarra.es/SCGD_Web/index.html
CSV: 51f2014202d-1fa5053ea5d9755b0cd53ceb3cdfd853ea72yAfvam



71

P00209



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

### 5.-Atrapamiento y pellizco de los dedos en las aberturas de la cinta transportadora, S line

El perito de la actora señala que en las interfaces de la línea, las bandas azules tienen una abertura en sus extremos con un hueco de 15 mm que permite el acceso de los dedos a los elementos de transmisión del motor. El contacto con estos elementos puede resultar en la fractura de los dedos. Se propone colocar resguardos fijos para evitar el acceso a la zona de peligro durante cualquier movimiento de la cinta transportadora azul. Riesgo alto

El perito de la demandada hace las mismas valoraciones que en el anterior. No discrepa de la responsabilidad en su caso de Sayer

El perito judicial comparte las conclusiones sobre la descripción del riesgos, nivel y solución propuesta por el perito de la demandada. Lo valora en 2.785 euros

**Por tanto se da por probado la existencia del riesgo, no discutido por ninguno de los técnicos era responsabilidad de Sayer. Se valora el perjuicio en 2.785 euros. Como se ha indicado el perito de la demandante no hace una individualización de los riesgos**

### 6.- Bordes afilados. Zona húmeda 1

El perito de la demandante señala que en la transmisión de la extracción de amonio al área húmeda 1 hay instalado un resguardo fijo que tiene bordes afilados. Dado que la estructura excede de las dimensiones de la cinta transportadora, es habitual que el operador se tope con el resguardo y se produzcan rasguños en los brazos. Riesgo muy bajo. Se propone minimizar los bordes afilados de la zona en los lugares donde tenga mayor tránsito (..)

El perito de la demandada señala que es responsabilidad de Viscofan. Tratamiento del amoniaco es responsabilidad de Viscofan

El perito judicial comparte la solución del perito de la actora. Riesgo que entiende en un nivel aceptable. Lo valora en 1450 euros

**Por tanto, se da por probado el defecto de seguridad que la demandada no niega pero del que responsabiliza a Sayer. Se valora en 1.450 euros**

### 7.- Aplastamiento en cilindro neumático en el área de secado y enrollado Según el perito de Viscofan, en las zonas de transferencia entre el área húmeda húmedas 1 y 2 dentro y fuera del área de secado hay una serie de cilindros neumáticos que ejercen la tensión de la cinta transportadora. Estos cilindros se activan únicamente en los momentos de ajuste o cuando se detecta una pérdida de tensión en la banda. Sin embargo, si en algún momento de su activación, una persona se introduce su mano durante la contracción del cilindro, podría sufrir una fractura de los dedos o las manos. Propone colocar un resguardo fijo

72

P00210



*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



alrededor de la zona en movimiento del cilindro neumático para evitar el acceso a la zona de peligro. Riesgo muy bajo

El perito de la demandada responsabilidad de Viscofan, de acuerdo la división de responsabilidades

El perito judicial entiende que es un riesgo aceptable. Esta de acuerdo con la solución que propone el perito de la actora . Lo valora en 320 euros

**Por tanto, se da por probado el defecto de seguridad que la demandada no niega pero que atribuye su responsabilidad a Viscofan . Se valora el perjuicio en 320 euros**

**8.-Aplastamiento en los rodillos alimentadores en la enrolladora. Área de enrollado.**

El perito de la demandante señala que cada enrolladora dispone de un sistema de rodillo alimentador que alisa la envoltura para su siguiente enrollado. Los rodillos alimentadores son impulsados por un motor, no obstante, existe la posibilidad de separarlos mediante la activación de un cilindro neumático que, a su vez, se activa manualmente por un selector . Esta situación provoca un riesgo de pellizcarse . Además, existe el riesgo de que un objeto lleve aflojado el operador se enrede en los rodillo rotatorios. Riesgo muy bajo. Propone colocar un resguardo fijo para evitar el acceso a la zona de peligro durante cualquier movimiento de los rodillos alimentadores.

El perito judicial se encuentra conforme con las valoraciones y solución que hace el perito de la demandante . Lo valora en 850 euros

El perito de la demandada señala que estas no son las instaladas por Sayer. Aportando una fotografía de la instalada por Sayer y la posterior instalada por Viscofan que es la que aparece en la fotografía del perito de la demandante. Remite a las facturas de bobinadoras en el anexo 20 del informe pericial de los defectos de diseño y ejecución ( página 45 y 46 del informe)

**El perito judicial reconoce en el acto del juicio que estas se cambiaron por Viscofan. Por tanto nueva maquinaria que no cuenta con la autorización y supervisión de Sayer. Por lo que difícilmente se le puede exigir que cumpla con las medidas de seguridad exigibles**

**9.- Aplastamiento de los dedos en la enrolladora. Área de enrollado.**

El perito de la demandante manifiesta que cada carrete dispone de un mecanismo de apertura y cierre para el enrollado de la envoltura. El operador cierra la enrolladora para colocar el anillo de cartón dentro de lo que envolverá la envoltura, posteriormente abre la enrolladora y presiona el pulsador de giro de esta para conectar con el enrollado de la envoltura. Cuando la enrolladora se expande, la abertura tiene una longitud de 15

73



P00211

*Cristina Fuentes Sánchez*
*Nº TI/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



mm que permita la entrada de los dedos. Si el mecanismo está cerrado y el personal tiene los dedos en el interior, este podrá sufrir fracturas de los mismos. Riesgo alto. Se propone colocar resguardos móviles para evitar el acceso a la zona de peligro durante cualquier movimiento de la enrolladora.

El perito de la demandada atribuye su responsabilidad a Viscofan

El perito judicial . Riesgo significativo y solución N/A ( no aplicable) Lo valora en 850 euros

En el acto de la juicio señala que es un riesgo no aplicable para esta maquina .Por tanto , no es posible adoptar medidas de seguridad complementarias. Es posible pensar en otras medidas como la colocación de señales de advertencia. Pero el perito judicial no las indica. El perito de la actora no ha comparecido en el acto del juicio para ratificarse, aclarar y exponer su criterio técnico

**No se considera por tanto dicho riesgo como indemnizable**

**10- Peligro de atrapamiento por contacto con la transmisión de la enrolladora. Área de enrollado**

En la parte posterior de las ochos enrolladoras se encuentra el mecanismo de transmisión. La transmisión está `protegida por el resguardo fijo y una ventana de policarbonato que permita visualizar el mecanismo en caso de atasco. El contacto directo con los elementos móviles puede provocar la rotura de dedos y manos. Riesgo insignificante. Se propone que el resguardo actual se instale con unas sujeciones que requieran el uso de herramientas para su eliminación y evite el contacto con los elementos móviles.

El perito de la demandada atribuye a Viscofan
El perito judicial . Riesgo aceptable y solución N/A ( no aplicable )Lo valora en 475 euros

**En el mismo sentido que el anterior**

**No se considera por tanto dicho riesgo indemnizable**

**11.-Aplastamiento en cilindro neumático en el área de enrollado Área de enrollado**

El perito de la demandante señala que la activación de la apertura y cierre de los rodillos alimentadores se activa mediante un cilindro neumático situado en la parte posterior de la enrolladora. El cilindro está expuesto al contacto directo del operador, introducir los dedos en la zona en movimiento del cilindro puede provocar la fractura de los mismos. Riesgo significativo. Se propone colocar un resguardo fijo de manera que evite el acceso a la zona de peligro(..)

El perito de la demandada responsabiliza a Viscofan





*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*

Para el perito judicial es un riesgo aceptable. Solución N/A. Lo valora en 975 euros

**En el mismo sentido que el anterior**

**No se considera por tanto dicho riesgo indemnizable**

**12.-Aberturas en la zona interior de uso de la máquina. Área húmeda**

En el informe pericial de la demandante señala que el área húmeda tiene una abertura en el suelo que puede provocar una caída o tropiezo del operador que este supervisando el área. Además, hay una rampa para los materiales de desecho, que no obstante, es lo suficientemente grande para provocar un tropiezo del operador o que este introduzca accidentalmente un miembro inferior. Esta situación puede provocar la fractura de miembros inferiores. Riesgo significativo. Las aberturas deberán están cubiertas de tal manera que se evite cualquier tropiezo. La rampa deberá de disponer de un cartel en el que se indique la existencia de la rampa y deberá de señalarse el riesgo negro y amarillo

Perito de la demandada dice que es un elemento de Viscofan y por tanto es responsable

El perito judicial riesgo aceptable. Se acoge a la solución de la demandante. Lo valora en 875 euros

**Por tanto, se da por probado el defecto de seguridad que la demandada no niega pero que atribuye su responsabilidad a Viscofan. Se valora el perjuicio en 875 euros**

**13.- Eje de motor expuesto en el aérea de enrollado . Área de enrollado.**

El perito de la demandante señala que en las ocho enrolladoras están expuestos los ejes de los motores, esto puede causar el atrapamiento de la ropa o cualquier accesorio del operador. Riesgo insignificante. Se propone colocar un resguardo fijo alrededor del eje para evitar el acceso a la zona de peligro durante cualquier accionamiento eléctrico.

El perito judicial. Riesgo aceptable. Solución N/A. Lo valora en 875 euros

El perito de la demandada entiende que es un elemento de Viscofan, es por tanto su responsabilidad

**No se considera por tanto dicho riesgo indemnizable**

**14.-Estabilidad de la maquina. Perímetro de la maquina.**

P00213

*Cristina Fuentes Sánchez*
*Nº T/I Jurada/Sworn translator #: 3380*
*16 junio 2023 / June 6 2023*



El perito de la demandante señala que la maquina está fijada adecuadamente en la superficie. Las pendientes cumplen la normativa. No se propone medidas adicionales

El perito judicial está conforme.

El perito de la demandada no niega sea responsabilidad de Sayer. Pero esta conforme con que no hay ningún riesgo que requiera medidas de seguridad adicionales

No existe por tanto dicho defecto de seguridad

Lo que hace un total de 18.230 euros en que deberá Sayer indemnizar a Viscofan

## 2.PELIGROS ELECTRICOS

### 1.- Interruptor de aislamiento eléctrico. Panel eléctrico

Según el petito de la demandante la maquina S Line esta provista de 11 armarios eléctricos en el lado A y el lado B de la línea. No observa problemas o incumplimiento de la norma IEC 60204 I. Riesgo aceptable. Señala que las instrucciones de bloqueo / etiquetado y mantenimiento deberán de incluirse en el manual del usuario, así como la información para el uso correcto y los riesgos residuales

El perito de la demandada se muestra conforme con que forma parte de la Línea S Pero no observa la necesidad de adoptar medidas de seguridad adicionales

El perito judicial considera riesgo aceptable. Está conforme con la solución de la demandante. Lo valora en 600 euros

Por tanto todos los peritos reconocen la existencia de dicho defecto, la responsabilidad de Sayer, aunque en el caso de la demandada considera que no es necesario adoptar medidas de seguridad adicionales, que no significa no exista dicho peligro. Se valora dicho perjuicio en los términos que dice el perito judicial, esto es en 600 euros

### 2.-Conexión a tierra en el armario eléctrico. Panel eléctrico
El perito de la demandante señala que la omisión de la conexión a tierra en los armarios eléctricos correspondientes al sistema de secado y de agua puede provocar el contacto indirecto con el persona, pudiendo provocar la muerte Riesgo alto. Las medidas eléctricas deberán de adoptarse para demostrar que el sistema de protección funciona. El sistema de protección de la instalación eléctrica deberá de realizarse de acuerdo con IEC 602004 1 (...)

El perito de la demandada señala que ( pagina 46) la línea S se instalaron 4 armarios y 10 cajas, con los elementos indicados en el esquema, interiores y e exteriores Resumen de los elementos eléctricos de la línea:



76

P00214

# EXHIBIT K

Court expert's report JPI2-PAM-PO-2021-1327
[*The following is the translation of points 9.6.1 and 9.6.2 of the full report attached*]

One the

# DESIGN of the S-LINE
## (SAYER COLLAGEN LINE MACHINE – "S-LINE")

# Effect of AGREEMENT dated August 28th 2015
## between NITTA CASINGS INC.
## and SAYER TECHNOLOGIES S.L.

Requested by
Court of First Instance no. 2 in Pamplona - Ordinary Procedure 1327/2021

Written by
Óscar Prieto Merchán - Degree in Industrial Engineering

Prepared for
Court of First Instance no. 2 in Pamplona

Claimant
VISCOFAN COLLAGEN USA INC. (VAT: 223455324)
141 Southside Avenue, 08807 Bridgewater, New Jersey (United States of America)
Attorney - Mr. Javier Aráiz Rodríguez
Lawyer - Mr. Juan de la Fuente Gutiérrez

Defendant
SAYER TECHNOLOGIES S.L. (Spanish Tax Id-No.: B71070676)
Polígono Ipertegui II, nave 33-35, Orkoien, Navarre (Spain)
Attorney - Mr. Carlos Hermida Santos
Lawyer - Mr. José María Aznar Auzmendi

Signed by Mr. OSCAR PRIETO MERCHAN – ***4672** on the 11/11/2022 and certified

Ofelina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380


## 9.6. On the Use of Unsuitable Materials in the S-Line

Besides the complaints that were explained in the previous Sections, VISCOFAN COLLAGEN USA INC. adds to their CLAIM several complaints related to the use of a series of elements or materials in the assembly of the S-Line that they consider not to be suitable for a proper functioning.

### 9.6.1. On the Green Belts

Section 8.5 describes the conveyor mechanism foreseen in the S-Line design and mentions the use of two different belt models according to the treatment zone where they are installed and refers to them by color (white and green) to facilitate their recognition, since this is the way they are described in the expert's report presented with the CLAIM.

Nevertheless, in the specific study detailed in this Section, they will be referred to according to their description in the technical data sheets presented by SAYER TECHNOLOGIES S.L. (attached to the report):

    ☐White belts correspond to the model FAB-12E manufactured by <u>HABASIT</u>.

    ☐Green belts correspond to the model T20-S manufactured by <u>HABASIT</u>.

Since there is no complaint about the function or suitability of the model FAB-12E, the analysis in this Section is limited to model T20-S, which is installed in the Neutralization, Drying and Wetting Zones. At the request of the expert author of this report, VISCOFAN COLLAGEN USA INC. provided the technical data sheets that are mentioned at some point in the video-conference attached to the expert's report (see Annex 09, fourth fragment of the interview), but they were in fact from a different manufacturer (<u>BRECO</u>), who uses a very similar reference for their product (T20).

According to the expert's opinion, the cause for the alleged high number of breaks in model T20-S would be their unsuitability for the working conditions in the zones where they were implemented[14], particularly their insufficient protection against temperature and humidity. This would have caused the metal components inside the belts (which are molded in thermoplastic polyurethane or TPU) to rust early and to favor their mechanical failure.

The previous accusation is backed up by three photographs showing some parts apparently affected by corrosion and by an analysis of the break evolution of those elements in time, based on the information recorded in the excel sheet attached to the expert's report as Annex 11 with the title "Excel File with the

---

[14] No reference is made to possible failures in the mechanical size of the belts.

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3300

P00039



History of (Green) Belts Breaks in the Wet Zone 2" –although the Wet Zone 2 is the only one which does not use those elements– where the company HABASIT –and not BRECO- is mentioned in all cases.

The expert who writes this report considers that he cannot take any of these references for his analysis, because they do not allow to establish a cause-effect link with sufficient guarantee. He decides to use a comparison strategy between the available data on the working conditions in the neutralization, drying and wetting zones and the technical specifications of model T20-S.


WORKING CONDITIONS

Although this question has been approached above, it is important to recall that the ultimate responsibility for the definition, management and supervision of the working conditions of the collagen gel casing extrusion line rests with NITTA CASINGS INC. after the S-Line passes the test phase.

Therefore, according to VISCOFAN COLLAGEN USA INC, the usual working conditions for the collagen gel casing extrusion line would be: uninterrupted operation (24/7) and constant velocity at a permanent speed below 150 feet per minute.

In respect of the use of the HABASIT model T20-S in the Neutralization, Drying and Wetting Zones, it is important to recall that there is no direct contact with the food product (which rests on fingers), so that it is not subject to the conformity requirements of the food industry like the model FAB-12E, which is used in the Washing and Plasticizing Zones.

From the environmental point of view, we can see the following references in each of the zones equipped with the model T20-S. These references are included in the expert's report that VISCOFAN COLLAGEN USA INC. presents in their CLAIM:

- In the Neutralization Zone, the temperature remains around 77 °F [25°C]. No estimated values are given either for relative humidity or for the acidity or alkalinity of the environment, despite the ammonia fumes emitted by the process being potentially corrosive.

- In the Drying Zone, the temperature remains between 179.6 and 188.6 °F [82 and 87°C]. There are no estimated values either for relative humidity or for the acidity or alkalinity of the environment, since the product has previously been washed and plasticized.

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3300



Expert's report JPi2-PAM-PO-2021-                                    Analysis and Conclusions

On the Use of Unsuitable Materials in the S-Line.

[I]n the Wetting Zone, temperature remains around 122 °F [50°C] and relative humidity around
35%. The acidity or alkalinity of the environment is not relevant, since the product has
previously been washed, plasticized and dried.

| | T (°C) | HR (%) | (pH) |
|---|---|---|---|
| Neutralization | ~25 | - | ? |
| Drying | 82- 87 | ? | - |
| Wetting | ~50 | ~35 | - |

## TECHNICAL SPECIFICATIONS /

From the strict point of view of the contract, the technical specifications that are established in the offer
suppose the temperature of the working environment in the Drying Zone to be around 176 and 248 °F
[80 and 120°C]. These temperature values should only be taken into account to select the structural
elements of such Zone. Besides, the considerations related to the relative humidity of the product
(ranges from 9 to 11% and from 19 to 20%), also established in the offer, cannot be translated to the
working environment of Model T20-S, since there is no physical contact between the belt and the
product, which is transported on fingers that are fixed to the element.

Therefore, after reading the technical specifications provided by SAYER TECHNOLOGIES S.L. for the
HABASIT model T20-S, molded in TPU 10, it is concluded that the manufacturer prescribes its use for
working environments with temperatures between 32 and 230 °F [0°C and 120°C].

On the other hand, there is no recommended relative humidity range, although a criterion is
mentioned at the end of the document that might be understood as standard climate conditions. This
criterion mentions a parameter of 50% (way above the 35% referred by VISCOFAN COLLAGEN USA
INC.).

Finally, there is no reference either to the environmental pH values that this Model can be continuously
exposed to or to its average life span, both depending on the set of working conditions it might be
exposed to. In any case, HABASIT offers a web-based app to run certain checks and simulations, which
can be accessed at https://rims.habasit.com/.

Catalina Fuentes Sánchez
Traductora-Intérprete Jurado de INGLÉS
Nº 3380

Page 67

P00041

 Expert's report JPI2-PAM-PO-2021-                                    Analysis and Conclusions

On the Use of Unsuitable Materials in the S-Line.

In short, the technical specifications of the HABASIT belt model T20-S –moulded in TPU 10 and chosen by SAYER TECHNOLOGIES S.L. for the Neutralization, Drying and Wetting Zones– fulfil the requirements of the working environment referred by VISCOFAN COLLAGEN USA INC., which are, on the other hand, approximate (~) and incomplete (?), as the Table demonstrates.

These previous factors could be verified explicitly in the case of temperature (which would also be valid for the technical specifications of the BRECO belt model T20 provided by VISCOFAN COLLAGEN USA INC, as long as the moulding material was TPUWB1), and implicitly in the case of relative humidity, since the reference to the standard environmental conditions is 50%.

### 9.6.2.    On the Enclosures of the Drying Zone

In the Drying Zone of the S-Line, there is a constant supply of warm and dry air to reduce the humidity level of the product that arrives from the Wet (and Additives) Zone to values between 9 and 11% before it is processed in the Wetting Zone.

According to VISCOFAN COLLAGEN USA INC., who is responsible for managing the air supply system, temperatures in the Drying Zone are kept between 179,6 and 188,6 °F [82 and 87°C] and the relative humidity around 35%. (This last informative value was used in another Section of the expert's report attached to the CLAIM to refer to the relative humidity of the Wetting Zone).

The thermal insulation installed in the Drying Zone of the S-Line had a double function: reducing heat losses (energy efficiency) and helping to regulate inside temperature (by limiting sudden changes). To this end, SAYER TECHNOLOGIES S.L. reports using an enclosure of particle boards for interiors in dry environments with 8-mm laminate coating manufactured by Fundermax (an invoice dated April 30th 2016 is presented).

In this case, the complaint of VISCOFAN COLLAGEN USA INC. does not refer to the consequences of a bad thermal insulation (excessive energy consumption and/or difficulty to regulate temperature), but to the wear that the inner coating of the enclosure doors in the corridor zone seem to have suffered. According to their criteria, it is caused by their unsuitability to withstand high temperatures and relative humidity[2] ("external environment"); this would affect in turn the progressive deterioration of the coated thermal insulation due to its direct exposure to the environmental conditions of the Drying Zone.

Doña Cristina Fuentes Sánchez, Traductora Jurada de inglés en virtud del título otorgado por el Ministerio de Asuntos Exteriores, Unión Europea y Cooperación, certifica que la que antecede es traducción fiel y exacta al INGLÉS de un documento redactado en lengua ESPAÑOLA. En SANTANDER, a 19 de junio de 2023.

---

[2] It is again noted that a relative humidity of 35% is usually associated with a dry environment.

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3300

Ms. Cristina Fuentes Sánchez, Sworn Translator of English, appointed by the Ministry of Foreign Affairs, European Union and Cooperation, certifies that the above is an accurate and exact translation into ENGLISH of a document originally drafted in SPANISH. In SANTANDER, 19 June 2023.

FUENTES
SANCHEZ
CRISTINA -
20217773Z

Firmado digitalmente por FUENTES SANCHEZ CRISTINA - 20217773Z
Nombre de reconocimiento (DN): c=ES,
serialNumber=IDCES-20217773Z,
givenName=CRISTINA, sn=FUENTES SANCHEZ, cn=FUENTES SANCHEZ CRISTINA - 20217773Z
Fecha: 2023.06.19 23:34:51 +02'00'

Cristina Fuentes Sánchez
Traductora-Intérprete Jurada de INGLÉS
Nº 3380



Informe Pericial Judicial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Sobre

# el DISEÑO de la LÍNEA S (SAYER COLLAGEN LINE MACHINE - "LINE S") objeto del CONTRATO de 28 de agosto de 2015 entre NITTA CASINGS INC. y SAYER TECHNOLOGIES S.L.

Solicitado por
Juzgado de Primera Instancia N.º 2 de Pamplona - Procedimiento Ordinario 1327/2021

Emitido por
Óscar Prieto Merchán - Ingeniero Técnico Industrial - Ingeniero Industrial

Dirigido a
Juzgado de Primera Instancia N.º 2 de Pamplona

Demandante
VISCOFAN COLLAGEN USA INC. (VAT: 223455324)
141 Southside Avenue, 08807 Bridgewater, New Jersey (United States of America)
Procurador - D. Javier Aráiz Rodríguez
Letrado - D. Juan de la Fuente Gutiérrez

Demandado
SAYER TECHNOLOGIES S.L. (CIF: B71070676)
Polígono Ipertegui II, nave 33-35, Orkoien, Navarra (España)
Procurador - D. Carlos Hermida Santos
Letrado - D. José María Aznar Auzmendi

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

P00045



Informe Pericial Judicial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*    Índice de Contenidos
*19 de junio de 2023*

1. Objeto, Alcance y Ámbito de Aplicación..................................................................1
2. Antecedentes..............................................................................................................2
3. Metodología................................................................................................................4
4. Contexto Empresarial.................................................................................................6
    4.1. VISCOFAN COLLAGEN USA INC......................................................................6
        4.1.1. Objeto Social..........................................................................................8
        4.1.2. Instalaciones, Organigrama y Plantilla..................................................9
        4.1.3. Sistemas de Gestión de Calidad, Patentes y Otros.............................11
    4.2. SAYER TECHNOLOGIES S.L.............................................................................11
        4.2.1. Objeto Social........................................................................................13
        4.2.2. Instalaciones, Organigrama y Plantilla................................................13
        4.2.3. Sistemas de Gestión de Calidad, Patentes y Otros.............................13
5. Fundamentos Técnicos.............................................................................................15
    5.1. Producción de Envoltura mediante Extrusión de Gel de Colágeno.................15
    5.2. Fases de Procesamiento del Material y Preparación para la Extrusión.........18
    5.3. Fase de Línea Continua....................................................................................18
    5.4. Fase de Acabado..............................................................................................20
6. Contratación de la Línea S.......................................................................................21
    6.1. Dosier Técnico..................................................................................................22
    6.2. Acuerdo de Cooperación Tecnológica y Comercial.........................................24
    6.3. Contrato y Presupuesto...................................................................................25
    6.4. Especificaciones Técnicas................................................................................27
        6.4.1. Generalidades.......................................................................................28
        6.4.2. Área Húmeda........................................................................................29
        6.4.3. Área de Aditivos y Área de Secado......................................................30
        6.4.4. Control de Calibre, Enrollado y Elementos No Incluidos.....................30
7. Ejecución del Contrato.............................................................................................31
    7.1. Proceso de Diseño...........................................................................................31
    7.2. Abono de Importes...........................................................................................31
    7.3. Envío de Materiales y Facturación...................................................................33
    7.4. Test de Prueba y Puesta en Marcha................................................................35
    7.5. Garantía............................................................................................................35
    7.6. Cronograma de Eventos...................................................................................35



Informe Pericial Judicial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Índice de Contenidos

8. Diseño de la Línea S..............................................................................39
    8.1.   Descripción General.......................................................................39
    8.2.   Área Húmeda...................................................................................43
    8.3.   Área de Aditivos..............................................................................43
    8.4.   Área de Secado................................................................................44
    8.5.   Sistema de Transporte....................................................................44
    8.6.   Curvas...............................................................................................46
    8.7.   Control de Calibre...........................................................................47
    8.8.   Enrollado..........................................................................................48
9. Análisis y Conclusiones.........................................................................50
    9.1.   Sobre el Objeto del Contrato........................................................50
    9.2.   Sobre las Especificaciones Técnicas de la Línea S...................51
    9.3.   Sobre el Proceso de Ejecución del Contrato..............................53
            9.3.1.   Sobre el Test de Prueba y el Proceso de Puesta en Marcha.......54
            9.3.2.   Sobre la Garantía..............................................................56
    9.4.   Sobre las Capacidades Motrices de la Línea S...........................57
            9.4.1.   Sobre la Velocidad Máxima de la Línea S...................58
            9.4.2.   Sobre la Adecuación para el Transporte de la Línea S.......59
    9.5.   Sobre el Dimensionamiento de la Línea S...................................62
    9.6.   Sobre el Empleo de Materiales Inadecuados en la Línea S......65
            9.6.1.   Sobre las Bandas (o Correas) Verdes............................65
            9.6.2.   Sobre los Cerramientos del Área de Secado.................68
            9.6.3.   Sobre los Suelos de Acero en Rejilla (TRAMEX).......70
    9.7.   Sobre el Proceso de Producción de Envoltura............................72
            9.7.1.   Sobre la Estabilidad del Calibre.....................................73
            9.7.2.   Sobre la Devolución de Producto Terminado.................74
    9.8.   Sobre el Estado Actual de la Línea S............................................75
    9.9.   Sobre el Contenido de la Videoconferencia................................75

*Se puede acceder al Índice del documento desde cualquiera de sus páginas a través del enlace incrustado en esta imagen* 



Informe Pericial Judicial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*                    Referencias
Nº T/I Jurada: 3380
19 de junio de 2023

Este informe incluye referencias a los contenidos de los documentos que se relacionan a continuación, que no

constaban en el expediente del Procedimiento Ordinario 1327/2021 en el momento de producirse la firma del

Acta de Aceptación del Cargo de Perito, y que se le han facilitado al juzgado en archivos aparte (disponibles

también a través de este enlace hasta el momento de la resolución del Procedimiento Ordinario 1327/2021):

⇨  Consulta Base de Datos USPTO Patent Public Search (11 de abril de 2022).

⇨  Patente US 10,485,241 B2.

⇨  Patente ES 2 803 249 T3.

⇨  Patente ES 2 396 807 B1.

⇨  Patente ES 2 751 460 T3.

⇨  Acuerdo de Cooperación Tecnológica y Comercial (23 de junio de 2015).

⇨  Información Relevante CNMV sobre VISCOFAN S.A. (19 de diciembre de 2019).

⇨  Extracto del Due Diligence encargado a Baker & Mckenzie.

⇨  Criterios de Diseño del Sistema de Tracción de la Línea S.

⇨  Sección 3 del Manual de Instrucciones de la Línea S.

⇨  Hoja de Especificaciones Técnicas del modelo de banda T20-S de HABASIT.

⇨  Hoja de Especificaciones Técnicas del modelo de banda T20 de BRECO.

⇨  Hoja de Especificaciones Técnicas del laminado MAX COMPACT Estándar FH de FUNDERMAX.

⇨  Extracto Norma UNE-EN 438-2 2016.

Asimismo, se le han facilitado al juzgado los contenidos relacionados con el proceso de diseño de la Línea S que

SAYER TECHNOLOGIES S.L. ha proporcionado al perito autor de este informe, que no se adjuntan al documento

debido a su extenso volumen y diversidad de formatos.

 Informe Pericial JPI2-PAM-PO-2021-1327          Objeto, Alcance y Ámbito de Aplicación

Objeto, Alcance y Ámbito de Aplicación

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 1. OBJETO, ALCANCE Y ÁMBITO DE APLICACIÓN

El objeto de este informe pericial consiste en dar cumplimiento a las obligaciones contraídas por su autor el 15 de marzo de 2022, mediante la firma del Acta de Aceptación del Cargo de Perito para el Procedimiento Ordinario 1327/2021, ante Dña. Maite Arenaza Sarasola, Letrado de la Administración de Justicia perteneciente al Juzgado de Primera Instancia N.º 2 de Pamplona; y en consecuencia, determinar si la Línea S[1] presentaba los errores de diseño reseñados en el dictamen pericial elaborado por D. Fernando Prieto Morán, y ha ocasionado a NITTA CASINGS INC. (ahora denominada VISCOFAN COLLAGEN USA INC.) los daños y perjuicios relacionados en el mismo, tal como se solicita en el SEGUNDO OTROSÍ de la DEMANDA interpuesta por VISCOFAN COLLAGEN USA INC. ante el Juzgado de Primera Instancia N.º 2 de Pamplona en diciembre de 2021.

Queda excluida del objeto de este informe pericial la determinación del cumplimiento de los requisitos de seguridad y salud establecidos en la Directiva 2006/42/CE del Parlamento Europeo y del Consejo, de 17 de mayo de 2006, relativa a las máquinas; solicitada también por VISCOFAN COLLAGEN USA INC. en el TERCER OTROSÍ de la misma DEMANDA.

El alcance de este informe pericial se limita el estudio de los aspectos técnicos relacionados con el Contrato[2] firmado por NITTA CASINGS INC. y SAYER TECHNOLOGIES S.L. el 28 de agosto de 2015, SAYER TECHNOLOGIES S.L. para la adquisición de la Línea S.

El ámbito de aplicación de este informe pericial se circunscribe a las actuaciones judiciales propias del desarrollo del Procedimiento Ordinario 1327/2021 activado por el Juzgado de Primera Instancia N.º 2 de Pamplona, y a cualesquiera otras que pudieran derivarse de éste.

Cualquier otro uso de los contenidos de este informe, distinto de los previstos en su ámbito de aplicación, deberá ser autorizado previamente por su autor, que manifiesta bajo juramento de decir verdad que ha emitido su dictamen actuando con veracidad y con la mayor objetividad posible, que ha tomado en consideración todo aquello susceptible de favorecer o causar perjuicio a cualquiera de las partes, y que conoce las sanciones penales en las que puede incurrir en el caso de incumplir con su deber.

---

1    Ésta será la denominación empleada en este informe para referirse al objeto del Contrato.

2    Ésta será la denominación empleada para referirse al documento firmado el 28 de agosto de 2015 por SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. para la adquisición de la Línea S.

P00049

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 2. ANTECEDENTES

La DEMANDA que se presenta ante el Juzgado de Primera Instancia N.º 2 de Pamplona en diciembre de 2021 hace referencia a los supuestos errores de diseño de una máquina (la Línea S) cuya adquisición se formaliza en agosto de 2015 mediante la firma de un contrato entre SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC., empresas localizadas en Navarra y New Jersey (U.S.A.), respectivamente.

Las relaciones técnicas y comerciales que mantienen ambas empresas se producen de forma habitual en inglés, aunque acuerdan someterse a la jurisdicción de los Juzgados de Pamplona para la resolución de los conflictos que pudieran derivarse de la interpretación o aplicación de los términos del Contrato, que se establece, entre otras cuestiones, que el diseño de la Línea S se adaptaría a las especificaciones técnicas facilitadas por el cliente, poniendo especial énfasis en la definición de los tiempos de tratamiento que requería su producto (el gel de colágeno) y en la geometría del emplazamiento previsto para su instalación.

El diseño, fabricación y ensamblaje parcial de la Línea S se llevó a cabo en las instalaciones que SAYER TECHNOLOGIES S.L. ocupa en Orkoien (Navarra), y se instaló finalmente en la planta de NITTA CASINGS INC. en Bridgewater (New Jersey), a más de 5.000 km de distancia, donde opera desde su puesta en marcha, integrada en un proceso de producción de envolturas de gel de colágeno extruido que se completa definitivamente en otra planta de NITTA CASINGS INC. ubicada en Ontario (Canadá), a 1.000 km de distancia de la anterior.

A la vista de los resultados obtenidos durante las primeras pruebas que efectúan con su producto (gel de colágeno), NITTA CASINGS INC. decide transformar la máquina tratando de optimizar el proceso productivo, de manera que se anula su funcionamiento en ciertos espacios y se reordena en otros, lo que condiciona de forma sustancial la posibilidad de extraer conclusiones categóricas sobre el rendimiento de la máquina diseñada y montada en origen, a partir del estudio del comportamiento de la máquina actual.

En diciembre de 2019, el GRUPO VISCOFAN, con domicilio social en Aranguren (Navarra), llega a un acuerdo para la adquisición de la empresa NITTA CASINGS INC., delegando en VISCOFAN COLLAGEN CANADA INC. la gestión de la planta de Ontario y en VISCOFAN COLLAGEN USA INC. (empresa que presenta la DEMANDA) la de la planta de New Jersey.

Según refiere la propia VISCOFAN COLLAGEN USA INC., ellos mismos han efectuado una serie de modificaciones en la máquina tras el cambio de titularidad, persiguiendo igualmente un mejor rendimiento, aunque han manifestado al autor de este informe su deseo de preservar la exposición de ciertos detalles. A este respecto, conviene tener presente que los procesos de producción de gel de colágeno, y los procesos posteriores de

P00050

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Antecedentes

Antecedentes

extrusión y tratamiento para transformarlo finalmente en envoltura para la industria alimentaria, están sometidos de forma habitual al sistema de patentes, o al secreto industrial, y buena prueba de ello es que SAYER TECHNOLOGIES S.L y el GRUPO VISCOFAN ya mantuvieron en el pasado relaciones comerciales sometidas a los acuerdos de confidencialidad que esta última acostumbra plantear con todas las empresas que intervienen de alguna manera en su proceso productivo, y por las que mantienen actualmente otros litigios cuyo trasfondo es, precisamente, la protección del secreto industrial.

Así pues, y a modo de síntesis, los elementos que caracterizan y condicionan en mayor medida el estudio del objeto de este informe serían:

⇨ La propia naturaleza del ámbito tecnológico en el que se desarrolla.

⇨ El tiempo transcurrido desde el momento en el que se contrató la adquisición de la Línea S.

⇨ La distancia que media entre el lugar donde opera la Línea S y el lugar donde se juzgan los hechos.

⇨ El empleo de un idioma extranjero (el inglés) en las relaciones técnicas y comerciales.

⇨ El cambio de titularidad de la propiedad de la Línea S.

⇨ Las modificaciones a las que se ha sometido a la Línea S con respecto al diseño original.

⇨ El celo con el que se comparte la información sometida a secreto industrial.

⇨ La existencia de conflictos previos, judicializados y pendientes de sentencia firme.

*página 3*

P00051

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 3. METODOLOGÍA

El desarrollo de los trabajos efectuados para la elaboración de este informe puede estructurarse en tres fases.

La primera fase ha consistido en contrastar y complementar la documentación técnica disponible en el Procedimiento Ordinario 1327/2021 facilitado por el Juzgado de Primera Instancia N.º 2 de Pamplona en el momento de recibir el encargo, priorizando la obtención de información adicional relativa al diseño original de la Línea S sobre el que se dirigen todas las reclamaciones que recoge la DEMANDA, y del que apenas constaban referencias. También en esta primera fase se ha procedido al estudio del contexto tecnológico y empresarial en el que se producen los hechos que motivan la DEMANDA, así como al análisis de los detalles que rodearon el proceso de contratación de la Línea S y su ejecución posterior.

La segunda fase del proceso de elaboración del informe se ha centrado en el estudio de la documentación facilitada por SAYER TECHNOLOGIES S.L. sobre el diseño original de la Línea S, que ha servido para confirmar e identificar las modificaciones, sustanciales, a las que se ha visto sometida la máquina desde el momento de su concepción inicial, y en consecuencia, acentuar la conveniencia de emplear una terminología específica para referirse a ella.

La tercera y última fase del proceso ha consistido en la redacción del informe como tal, organizando sus contenidos en 9 apartados; los 3 primeros tienen un propósito fundamentalmente introductorio, los 5 siguientes tienen un carácter eminentemente expositivo, y se orientan a la contextualización del caso, mientras que el noveno y último se apoya en los contenidos previos para acometer el análisis de las cuestiones concretas que se plantean en la DEMANDA, así como a la emisión de las conclusiones pertinentes (en este último apartado se incluye el análisis de cuestiones complementarias sobre las que se ha considerado oportuno pronunciarse).

La metodología de análisis de las cuestiones planteadas en la DEMANDA se ha basado principalmente en el contraste de la documentación obtenida por el perito a través de distintas fuentes, intentando no depender en exclusiva de los contenidos de los informes o dictámenes periciales presentados por las partes, que resultan opuestos en la mayoría de sus premisas, planteamientos y conclusiones.

Por último, y en relación con la posibilidad de haber efectuado una visita física a las instalaciones en las que se encuentra la línea de procesamiento en la que se integró en su momento la Línea S, el perito autor de este informe expone que:

1. En el momento de recibir el encargo, VISCOFAN COLLAGEN USA INC. le trasladó su ofrecimiento para realizar dicha visita, indicando que sería la empresa quien correría con los gastos del desplazamiento.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Metodología

                                                                          Metodología

2.  Tras ser conocedor de esta propuesta, SAYER TECHNOLOGIES S.L. reclamó su derecho a estar presente durante la visita.

3.  Como consecuencia de lo anterior, VISCOFAN COLLAGEN USA INC. trasladó al perito su inquietud por el hecho de que la presencia de técnicos de SAYER TECHNOLOGIES S.L. en sus instalaciones pudiera comprometer la confidencialidad de cierta información relacionada con sus procesos productivos.

4.  Tratando de buscar un equilibrio de intereses, el perito autor de este informe propuso a VISCOFAN COLLAGEN USA INC. que le facilitase material audiovisual complementario al que se presentó en la DEMANDA, por considerarlo incompleto y de calidad insuficiente para apreciar determinados detalles. A este respecto, el perito detalló y concretó los contenidos que consideraba oportunos, pero VISCOFAN COLLAGEN USA INC. hizo una entrega parcial de los mismos alegando de nuevo que la exposición de ciertos detalles podría comprometer la confidencialidad de sus procesos productivos, añadiendo en esta ocasión que la trascendencia económica derivada de esta exhibición podría suponer un perjuicio económico mucho mayor que el que se reclama en la DEMANDA.

5.  A la vista de lo anterior, y después de tener acceso a la documentación facilitada por SAYER TECHNOLOGIES S.L. sobre el diseño original de la Línea S, el perito acaba concluyendo que está en disposición de acometer su labor prescindiendo de la visita física a las instalaciones de VISCOFAN COLLAGEN USA INC. en Bridgewater (New Jersey), entendiendo que:

    ✓ La máquina que opera actualmente ha sido transformada y modificada en diversas ocasiones, resultando en estos momentos sustancialmente distinta de la que se instaló en origen.

    ✓ La máquina está siendo operada por la empresa que presenta la DEMANDA desde 2020.

    ✓ Las cuestiones fundamentales que se plantean en la DEMANDA pueden analizarse con suficiente nivel de detalle a partir de la documentación disponible.

página 5

P00053

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 4. CONTEXTO EMPRESARIAL

Este apartado tiene por objeto contribuir a la comprensión de las circunstancias que rodearon el proceso de contratación de la Línea S, y su ejecución posterior, desde un punto de vista empresarial. A este respecto, se hace una revisión de los antecedentes históricos de las empresas implicadas, se indican sus objetos sociales y se exponen algunos de sus principales activos, renunciando a la posibilidad de emitir juicios vinculantes sobre sus respectivas solvencias técnicas porque, entre otras cosas, y en el caso concreto de NITTA CASINGS INC., la mayor parte de la información obtenida no alcanza el nivel de detalle que el perito autor de este Informe hubiera deseado, entendiendo, por otra parte, las dificultades que alega VISCOFAN COLLAGEN USA INC. para recuperar información correspondiente a un período temporal en el que la empresa no dependía de ellos.

### 4.1.  VISCOFAN COLLAGEN USA INC.[3]

En agosto de 1996, la empresa <u>DEVRO</u> vende su negocio de envolturas de colágeno en América del Norte a la empresa japonesa <u>NITTA GELATIN INC.</u> por valor de 26 millones de dólares, constituyendo para ello la empresa NITTA CASINGS INC., que asume el control de las instalaciones de Bridgewater (New Jersey) y Ontario (Canada), donde se encuentran las plantas de producción y acabado, respectivamente. Los antecedentes de esta transacción son los siguientes:

⇨  En 1950, los investigadores de JOHNSON & JOHNSON (empresa establecida originalmente en New Jersey en torno a 1885) comenzaron una serie de ensayos con colágeno enfocados principalmente en sus aplicaciones quirúrgicas, aunque pronto advirtieron su potencial aplicación en otros campos de la industria, incluyendo la producción de envolturas para el sector alimentario, que se mostraría, a la postre, la más rentable.

⇨  En 1960, JOHNSON & JOHNSON creó una línea de negocio específica para el colágeno a la que denominó DEVRO, en referencia al proyecto investigador que lo desarrolló (Development and Research Organization), dando comienzo a la producción industrial de envolturas de gel de colágeno en 1963 en las instalaciones de Bridgewater (New Jersey), al tiempo que lo hacía en otras partes del mundo.

⇨  En marzo de 1995, DEVRO alcanza un acuerdo para hacerse con la empresa <u>TEEPAK</u>, dedicada también a la producción de envoltura de gel de colágeno; y en aplicación de las leyes antimonopolio, la Federal Trade Commission (FTC) condiciona la formalización del acuerdo a una venta previa de su

---

3    Las consideraciones de este apartado se atribuyen a VISCOFAN COLLAGEN USA INC. como parte demandante, pero se corresponden en realidad con NITTA CASINGS INC., que fue la empresa que firmó el Contrato en agosto de 2015.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                    Contexto Empresarial

VISCOFAN COLLAGEN USA INC.

negocio de colágeno en América del Norte, que se resuelve en agosto de 1996, con su venta a la empresa japonesa NITTA GELATIN INC., tal como se anticipa al comienzo del relato.

⇨ El 19 de diciembre de 2019, VISCOFAN S.A. hace público el acuerdo alcanzado con NITTA GELATIN INC. para adquirir su división de envolturas de colágeno, compuesta por NITTA CASINGS INC. en New Jersey y NITTA CASINGS (CANADA) INC. en Ontario, que pasan a denominarse VISCOFAN COLLAGEN USA INC. y VISCOFAN COLLAGEN CANADA INC., respectivamente.





**Bridgewater (Viscofan Collagen USA)**

The latest acquisition of Viscofan, the factory of Bridgewater built in 1957 by Johnson & Johnson, extends all the variety of collagen casings, co-extrusion gel and biomaterials providing solutions for our customers worldwide.

*Address:*
341 Southside Avenue
Bridgewater, NJ 08807 USA

– Vista aérea de la planta de VISCOFAN COLLAGEN USA INC. en Bridgewater (New Jersey) –

*página 7*

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Contexto Empresarial

VISCOFAN COLLAGEN USA INC.



**Ontario**

Located in the Greater Toronto Area, this location serves as a converting center and a distribution center for Ontario and Western Canada regions.

Address:
57 Steelcase Rd W.
Markham, Ontario
L3R 2M4



- Vista aérea de la planta de VISCOFAN COLLAGEN CANADA INC. en Ontario (Canada) -

Los contenidos de los apartados siguientes, y muchas de las referencias que se hagan posteriormente, se refieren a NITTA CASINGS INC. por ser ésta la empresa que formalizó el Contrato con SAYER TECHNOLOGIES S.L. y supervisó su ejecución, cuando todavía no había sido adquirida por el GRUPO VISCOFAN.

### 4.1.1. Objeto Social

Tal como se indica en el apartado anterior, la empresa NITTA CASINGS INC. se constituye en agosto de 1996, tras la venta por parte de DEVRO del negocio de envolturas de colágeno a la empresa NITTA GELATIN INC., asumiendo a partir de ese momento el control de las instalaciones de Bridgewater (New Jersey) y Ontario (Canada), donde se encuentran las plantas de producción y acabado, respectivamente.

*página 8*



*Cristina Fuentes Sánchez*
*Nº T/J Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                              Contexto Empresarial

VISCOFAN COLLAGEN USA INC.

Tal como reza en su página web, NITTA GELATIN INC. es una empresa especializada en la producción de geles de origen animal (bovino, porcino y pez), destinados a usos muy diversos, que ofrece un amplio abanico de opciones para adecuar la formulación de sus productos a las necesidades de sus clientes. En 2018 celebró el centenario de su fundación siendo uno de los mayores suministradores de productos derivados del colágeno a nivel mundial. Originaria de Osaka (Japón), la empresa se establece en Norte América en 1979.



– Layout del edificio principal de la planta de VISCOFAN COLLAGEN USA INC. en New Jersey –

### 4.1.2.   Instalaciones, Organigrama y Plantilla

Como se ha comentado anteriormente, la empresa asume la gestión de 2 plantas en Norte América: la planta de Bridgewater (New Jersey), construida en 1957 por la empresa JOHNSON & JOHNSON, en la que se desarrolla la

página 9

P00057

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                    Contexto Empresarial

VISCOFAN COLLAGEN USA INC.

Fase de Producción y Preparación del Gel de Colágeno y la Fase de Línea Continua, descritas en la patente US 10,485,241 B2 (cuya propiedad en origen correspondió a NITTA CASINGS INC.) y la planta de Ontario (Canadá), en la que se desarrolla la Fase de Acabado, también descrita en la patente.

En la planta de Bridgewater, además, se procesa gel de colágeno como producto de base para la fabricación de instrumental médico y distintas aplicaciones en investigación biomédica.

En la imagen anterior, obtenida del informe pericial del DEMANDANTE, se muestra la distribución en planta (layout) del edificio principal de las instalaciones de VISCOFAN COLLAGEN USA INC. en Bridgewater (New Jersey); así como la ubicación concreta de la Línea S (dentro del contorno de la línea roja), que acabará conviviendo con otras líneas de producción de envoltura mediante extrusión de gel de colágeno que operaban anteriormente.

Tal como refiere VISCOFAN COLLAGEN USA INC. a petición del perito, la estructura organizativa de NITTA CASINGS INC. en el momento de formalizarse el Contrato era la que se muestra en el gráfico.



– Estructura Orgánica de NITTA CASINGS INC. en agosto de 2015 (facilitada por VISCOFAN COLLAGEN USA INC.) –

VISCOFAN COLLAGEN USA INC. no ha facilitado información sobre los perfiles profesionales de sus integrantes, ni tampoco de otros empleados que trabajaban en ese momento en la empresa, y que aparecen citados en algunos de los correos electrónicos cruzados con SAYER TECHNOLOGIES S.L. (es el caso de Gary Wysocki, Gari Seibel, Michael Plocic y Henry Huang, por ejemplo).

página 10


Informe Pericial JPI2-PAM-PO-2021-1327

Contexto Empresarial

VISCOFAN COLLAGEN USA INC.

### 4.1.3.   Sistemas de Gestión de Calidad, Patentes y Otros

VISCOFAN COLLAGEN USA INC. refiere que no tiene constancia de que NITTA CASINGS INC. dispusiera en agosto de 2015 de alguna certificación en alguno los Sistemas de Gestión de Calidad.

En el caso de NITTA CASINGS INC., la identificación de las patentes de su propiedad que guardaran relación con el objeto de estudio se ha resuelto a través de una consulta en la base de datos Patent Public Search, aplicando el filtro "(DEVRO.AS. OR NITTA.AS.) AND collagen", que devuelve como resultado las patentes que incluyen la palabra "collagen" en alguna parte del texto, y cuyo nombre de cesionario (assignee) incluya las palabras "NITTA".o "DEVRO".

El número de patentes obtenidas es de 69, solicitadas entre los años 1973 y 2020 por las empresas DEVRO INC., NITTA GELATIN Co. Ltd., DEVRO Limited, DEVRO PLC, DEVRO-TEEPAK INC., DEVRO (Scotland) Limited y NITTA CASINGS INC.; y referidas a los ámbitos sanitario y alimentario, principalmente.

Entre las patentes que se refieren al ámbito alimentario, hay invenciones destinadas a su aplicación en todas y cada una de las Fases del proceso de Producción de Envoltura mediante Extrusión de Gel de Colágeno descrito en el apartado 5.1, algunas de naturaleza puramente mecánica, orientadas a resolver los procesos de extrusión, aplicación de sabores, plisado, anudado, etc.

Por último, en el Acuerdo de Cooperación Tecnológica y Comercial que firman SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. en junio de 2015, las empresas se reconocen mutuamente especialistas en su ámbito de actividad, y en el caso particular de NITTA CASINGS INC., como "empresa dedica a la producción de colágeno para la industria alimentaria".

### 4.2.  SAYER TECHNOLOGIES S.L.

Según consta en los Fundamentos de Derecho del Auto 161/2016 del Procedimiento de Apelación de Autos de Instrucción n.º 309/2016 de la Sección Primera de la Audiencia Provincial de Navarra, de 20 de mayo, varios trabajadores de la que fuera Cooperativa BILDU LAN abandonaron la empresa y constituyeron SAYER TECHNOLOGIES S.L., con similar objeto social.

Según consta en los Fundamentos de Derecho de la Sentencia 40/2019, de 7 de marzo, del Procedimiento Ordinario 444/2016 del Juzgado de lo Mercantil N.º 1 de Pamplona, entre los miembros fundadores de SAYER TECHNOLOGIES S.L. se encuentran el que fuera Director Gerente de BILDU LAN, y su Adjunto Gerente.

Según consta en la consulta realizada en el Registro Mercantil de Navarra, con n.º de solicitud N99FZ20, la empresa SAYER TECHNOLOGIES S.L. comienza a operar, el 5 de agosto de 2011, identificando su ámbito de



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Contexto Empresarial

SAYER TECHNOLOGIES S.L.

actividad con el código 2.849 (fabricación de otras máquinas herramienta) de la Clasificación Nacional de Actividades Económicas (C.N.A.E.), y estableciendo como su objeto social "la innovación, comercialización y fabricación de maquinaria especial y automatización de procesos".

Según indica en su página web (http://www.sayer.es/), "la empresa se dedica a la automatización de procesos industriales para la mejora de la producción, el incremento de la calidad y fiabilidad de los productos así como la reducción de los costes de desarrollo. Se trata de una empresa de ingeniería mecatrónica con profesionales de dilatada experiencia en las áreas de diseño mecánico y eléctrico, programación, así como en el montaje y puesta a punto de maquinaria especial y líneas de montaje automatizadas. Desarrolla soluciones a medida para sus clientes con total compromiso y dedicación en cada proyecto, buscando ser el aliado tecnológico de sus clientes en innovación industrial. Trabaja para diferentes sectores como el de automoción, alimentación, línea blanca-electrodomésticos, electrónica, etc, pudiendo automatizar cualquier proceso industrial que implique manipulación de producto, ensamblaje, mecanizado, etiquetados, soldadura, pintura, marcado, control, empaquetado, etc."

Aunque el domicilio social de la empresa se establece en el Valle de Aranguren (Navarra), las instalaciones en las que desarrolla su actividad se encuentran en Orkoien (Navarra).



- Vista aérea de la planta de SAYER TECHNOLOGIES S.L. en Orkoien (Navarra) -

P00


*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

### 4.2.1.   Objeto Social

SAYER TECHNOLOGIES S.L. se constituye en agosto de 2011 con el mismo objeto social ("innovación, comercialización y fabricación de maquinaria especial y automatización de procesos") que la entonces Cooperativa BILDU LAN, de la que proceden sus miembros fundadores, que venían de ocupar los puestos de Director Gerente y Adjunto Gerente, además de integrar en su plantilla a varios empleados también provenientes de aquella.

### 4.2.2.   Instalaciones, Organigrama y Plantilla

SAYER TECHNOLOGIES S.L. lleva a cabo su actividad empresarial en unas instalaciones ubicadas en la nave 33-35 del Polígono Industrial Ipertegui II de Orkoien (Navarra).

Se trata de una nave industrial de alrededor de 1.000 m², distribuida en dos niveles: la planta baja y una entreplanta que sólo se desarrolla parcialmente, a lo largo de la fachada principal.

Las oficinas de dirección, técnica y administrativa se encuentran distribuidas en ambos niveles (planta baja y entreplanta), mientras que la zona de producción (fabricación, montaje y ensayos), se ubica sólo en planta baja, en el espacio diáfano que queda a continuación de la zona de oficinas.

Tal como refiere la empresa, la estructura organizativa en el momento de formalizarse el Contrato estaba formada por 6 Áreas (Comercial y Gerencia / Financiera y Organización / Técnica, Programación y Automatismos / Compras y Metrología - Sistemas / Puesta a Punto y Montaje Mecánico).

Además, para el caso que nos ocupa, cabe citar que SAYER TECHNOLOGIES S.L. contrató los servicios de la empresa AG Global, que estableció el contacto inicial con NITTA CASINGS INC. y actuó como enlace comercial.

La plantilla de la empresa está compuesta por alrededor de 20 personas con perfiles técnicos adecuados a sus funciones y responsabilidades, tanto por su formación como por su grado de experiencia profesional, contando con varios titulados competentes para la firma de proyectos técnicos industriales de toda índole y envergadura.

### 4.2.3.   Sistemas de Gestión de Calidad, Patentes y Otros

SAYER TECHNOLOGIES S.L. no se certifica en la norma ISO 9001 hasta septiembre de 2017, momento en el que se reconoce su Sistema de Gestión de Calidad para el "diseño, fabricación e instalación de máquinas y líneas automatizadas".

Sin embargo, BILDU LAN disponía desde marzo de 2003 del certificado de calidad ISO 9001, que reconoce su

P00061



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Contexto Empresarial

SAYER TECHNOLOGIES S.L.

Sistema de Gestión de la Calidad; además, desde septiembre de 2005 disponía del certificado ISO 14001, que reconoce su Sistema de Gestión Medioambiental; y trabajaba en base al modelo de gestión EFQM desde 2004, viendo reconocida la excelencia en su gestión con un galardón recibido ese mismo año, en el apartado de empresas de entre 200 y 400 púntos.

El 4 de agosto de 2015, pocas semanas antes de la firma del Contrato, SAYER TECHNOLOGIES S.L. presenta la invención de una "máquina automática de sticks" en la Oficina Española de Patentes y Marcas (OEPM), que le asigna el número de solicitud Internacional PCT/ES2015/070609.

La OEPM concede finalmente la patente, que se publica en febrero de 2017, y cuyo objeto se enmarca dentro del campo técnico de las máquinas industriales empleadas en la industria alimentaria, y más concretamente, en su uso durante la Fase de Acabado por parte de fabricantes de colágeno, celulosa y plástico.

Según consta en los Fundamentos de Derecho del Auto 161/2016 del Procedimiento de Apelación de Autos de Instrucción n.º 309/2016 de la Sección Primera de la Audiencia Provincial de Navarra, de 20 de mayo de 2016, la empresa recibe varios encargos de VISCOFAN S.A. sujetos al correspondiente acuerdo de confidencialidad, que firmaron el 10 de diciembre de 2012. A este respecto, la empresa refiere haber realizado para VISCOFAN S.A. trabajos de diseño, fabricación y montaje de maquinaria, fabricación de componentes y equipos, así como trabajos de mantenimiento y repuestos; y aunque no se llegó al punto de recibir el encargo de fabricar una línea de transporte de tripa de colágeno, varios de los técnicos de la plantilla sí que habían intervenido con anterioridad en el diseño, fabricación y montaje de este tipo de máquinas (de colágeno comestible y no comestible, celulosa, fibrosa y plástico) para VISCOFAN S.A.

Por otra parte, en el Acuerdo de Cooperación Tecnológica y Comercial que firman SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. en junio de 2015, las empresas se reconocen mutuamente especialistas en su ámbito de actividad, y en el caso particular de SAYER TECHNOLOGIES S.L., como "empresa dedica a la fabricación de maquinaria especial y hecha a medida, así como a la automatización de procesos industriales, implicada en el desarrollo tecnológico de distintos sectores (automoción, alimentación, electrónica y electrodomésticos)".

P00062

 Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 5. FUNDAMENTOS TÉCNICOS

En este apartado se exponen los fundamentos técnicos esenciales para la comprensión general de la problemática planteada en la DEMANDA; en particular, los que se refieren al proceso de producción de envoltura mediante extrusión de gel de colágeno para el que se diseñó la Línea S.

### 5.1. Producción de Envoltura mediante Extrusión de Gel de Colágeno

Los contenidos que se desarrollan en este apartado se basan en la información que aparece en dos versiones de una misma patente, que tienen por objeto la aplicación de sabores en las envolturas de gel de colágeno: la patente US 10,485,241 B2, publicada por la United States Patent and Trademark Office (USPTO) a solicitud de NITTA CASINGS INC y la patente ES 2 803 249 T3, publicada por la Oficina Española de Patentes y Marcas (OEPM) a solicitud de VISCOFAN COLLAGEN USA INC. Según los planteamientos de estas patentes, el proceso de producción de envolturas mediante extrusión de gel de colágeno se puede estructurar en cuatro Fases:

1. La Fase de Procesamiento del Material (Material Processing).

2. La Fase de Preparación para la Extrusión (Extrusion Preparation).

3. La Fase de Línea Continua (Continuous Lines).

4. La Fase de Acabado (Finishing).

Cada una de las Fases anteriores estaría compuesta, a su vez, de una serie de Etapas, de manera que:

⇨ Las Etapas correspondientes a las dos primeras Fases se dedican fundamentalmente a la obtención del gel de colágeno (presente en el proceso a partir de la Etapa 20, de Mezcla) que se almacena en determinadas condiciones de temperatura (Etapa 25, de Almacenamiento) antes de ser bombeado y filtrado para su extrusión (Etapa 28, de Extruido).

⇨ La Fase de Línea Continua comienza en el momento de la extrusión del gel de colágeno (Etapa 28, de Extruido) y finaliza con el empaquetado de la envoltura en forma de rollos o bobinas (Etapa 33, de Enrollado). Esta Fase se caracteriza principalmente porque se desarrolla a velocidad constante, sin solución de continuidad.

⇨ En la Fase de Acabado se hace un último tratamiento para proporcionar a la envoltura de gel de colágeno el grado de humedad deseado, se plisa (formato en el que se entrega finalmente al cliente), se empaqueta y se etiqueta, pendiente únicamente de su envío al cliente.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327        Fundamentos Técnicos

Producción de Envoltura mediante Extrusión de Gel de Colágeno



- Esquema General del Proceso de Producción de Envoltura por Extrusión de Gel de Colágeno (fuente: US 10,485,241 B2) -

página 16

P00064

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*                    Fundamentos Técnicos

Informe Pericial JPI2-PAM-PO-2021-1327

Producción de Envoltura mediante Extrusión de Gel de Colágeno

ES 2 803 249 T3



FIG. 1

- Esquema General del Proceso de Producción de Envoltura por Extrusión de Gel de Colágeno (fuente: ES 2 803 249 T3) -



Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Fundamentos Técnicos

Fases de Procesamiento del Material y Preparación para la Extrusión

## 5.2. Fases de Procesamiento del Material y Preparación para la Extrusión

Estas Fases tienen por objeto la producción de gel de colágeno para su almacenamiento temporal, previo a la Fase de Línea Continua.

Para la producción del gel de colágeno se recurre al colágeno presente en la piel descarnada de los animales recién sacrificados (generalmente de bovino o porcino). El colágeno es una proteína altamente resistente que se encuentra en el tejido conjuntivo (conectivo) y que tiene por objeto, precisamente, ligar y contribuir al soporte estructural del conjunto del organismo vivo. Se presenta en forma fibrosa y distintas composiciones, según la zona del organismo en la que se produce.

Exponer en detalle los aspectos técnicos concretos que caracterizan cada una de las distintas Etapas que componen esta Fase excede el objeto de estudio del presente Informe y tampoco contribuye a una mejor comprensión del mismo, así que, *grosso modo*, bastaría con referir que la obtención de gel de colágeno se consigue mediante su desnaturalización por ebullición, y su posterior enfriamiento en solución acuosa.

## 5.3. Fase de Línea Continua

Siguiendo con los planteamientos de las patentes citadas en el apartado 5.1, la Fase de Línea Continua se inicia con el bombeo y filtrado del gel de colágeno almacenado en la Etapa 25, de Almacenamiento, y continúa con la dosificación previa a la Etapa 28, de Extruido o Extrusión, que se resuelve por medio de una máquina extrusora, (cuyo funcionamiento puede asimilarse, salvando las distancias, al de una manga pastelera) cuyo cabezal (boquilla, siguiendo con el símil) está diseñado para darle al gel de colágeno forma tubular, con un calibre (diámetro) y un espesor (grosor) determinados; es decir, la forma de envoltura característica con la que se recubren y comercializan los productos cárnicos embutidos.

En el cabezal de extrusión se practican una serie de orificios cuya función sería inyectar en el interior de la envoltura un agente gaseoso a una presión ligeramente superior a la del ambiente, para evitar que colapse, ayudando a que conserve su forma tubular a lo largo de las Etapas siguientes, y al mismo tiempo, activando el proceso de coagulación del gel de colágeno.

En la patente ES 2 396 807 B1, publicada por la Oficina Española de Patentes y Marcas a solicitud de VISCOFAN S.A., se muestran cuatro representaciones distintas de un cabezal de extrusión (3) que tiene la particularidad de presentar una ranura de salida (1) no circular.

En la figura 3 se muestra la salida del material extruido a través del cabezal de extrusión (1), y su circulación por la Línea, apoyada sobre unos rodillos que la transportarán a lo largo de las distintas Etapas de tratamiento



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Fundamentos Técnicos

Fase de Línea Continua

previas al bobinado final de la envoltura de gel de colágeno.

En la figura 6 se pueden apreciar los orificios que presenta el cabezal de extrusión (1) para facilitar la inyección del agente gaseoso con el que se presuriza el interior de la envoltura de gel de colágeno.



FIG. 2

FIG. 3

FIG. 4

FIG. 6

- Representación de un Cabezal de Extrusión de Gel de Colágeno (fuente: ES 2 396 807 B1) -

Siguiendo con el proceso descrito en las patentes, la envoltura de gel de colágeno extruido atraviesa una serie de Etapas sucesivas en las que se la somete a diferentes tratamientos físicos y químicos que tienen por objeto dotarle de las propiedades que el fabricante considera adecuadas.

página 19

P00067



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327

Fundamentos Técnicos

Fase de Línea Continua

Los tratamientos en cuestión se denominan Neutralización[4] (Etapa 29), Lavado (Etapa 30), Plastificado (Etapa 31) y Secado (Etapa 32), y consisten básicamente en la aplicación de las dosis[5] adecuadas de amoníaco, agua, glicerina, aire caliente y seco, y aire húmedo, respectivamente, sobre la envoltura de gel de colágeno extruido.



– Esquema[6] correspondiente a la Fase de Línea Continua descrita en la patente US 10,485,241 B2 –

Por último, la envoltura se colapsa y se enrolla lisa en forma de bobina o carrete en la Etapa 33, de Enrollado.

Los parámetros de gestión que habría que considerar en la Etapa de Extrusión serían: el calibre y el espesor de la envoltura, la concentración de la mezcla gaseosa, su presión y su temperatura, entre otros.

Los parámetros de gestión que habría que considerar en la Etapa de Neutralización serían: la duración del tratamiento y el caudal de aire del sistema de extracción, entre otros.

Los parámetros de gestión que habría que considerar en la Etapa de Lavado serían: la duración del tratamiento, y el caudal y la temperatura del agua, entre otros.

Los parámetros de gestión que habría que considerar en la Etapa de Plastificado serían: la duración del tratamiento, y el caudal y la temperatura de la glicerina, entre otros.

Los parámetros de gestión que habría que considerar en la Etapa de Secado serían: la duración del tratamiento, y el caudal, la temperatura y la humedad relativa del aire, entre otros.

## 5.4. Fase de Acabado

La Fase de Acabado comienza con la Etapa 34, de Humectación, en la que se aporta de nuevo humedad al producto antes de su plisado y posterior envasado al vacío. A continuación, se guarda en unas cajas aprobadas por la autoridad alimentaria estadounidense (United States Food and Drug Administration – FDA) que se etiquetan, se codifican con un código de barras y se escanean en el sistema de control de la empresa con fines de trazabilidad.

---

4    También denominada Etapa de Coagulación.

5    La dosificación del tratamiento se regula actuando simultáneamente sobre la concentración del agente y el tiempo de exposición.

6    En el caso de la Línea S, el esquema de aplicación de todos los tratamientos coincide con el de la Etapa de Secado (Drying).

*página 20*

P00068

 Informe Pericial IPI2-PAM-PO-2021-1327                    Contratación de la Línea S

Cristina Fuentes Sánchez                    Contratación de la Línea S
Nº T/I Jurada: 3380
19 de junio de 2023

## 6. CONTRATACIÓN DE LA LÍNEA S

A continuación se exponen los acontecimientos más significativos relacionados con el proceso de contratación de la máquina, ordenados de forma cronológica, con la finalidad de contextualizar el objeto de estudio e interpretar adecuadamente las relaciones que se producen entre las empresas implicadas:

1. En febrero de 2015, SAYER TECHNOLOGIES S.L. facilita a NITTA CASINGS INC. un Dosier Técnico (Technical Dossier) con las especificaciones técnicas de una Línea de Colágeno denominada LSC-60-4C (este documento se incluye como anexo al informe pericial que se presenta con la DEMANDA).

2. El 23 de junio de 2015 se produce la firma de un Acuerdo de Cooperación Tecnológica y Comercial (Technology and Trade Cooperation Agreement) entre SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC., orientado al desarrollo de varios proyectos entre los que se incluye una Máquina de Colágeno (Collagen Machine), y cuyo período de vigencia previsto inicialmente es de un año.

3. El 28 de agosto de 2015 se produce la firma del Contrato (Contract Agreement) entre SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC., documento que también se adjunta como anexo a la DEMANDA, y cuyo objeto principal es la adquisición de la Línea de Colágeno de SAYER (Sayer Collagen Line Machine) denominada Línea S.

   En el Contrato se establece la fecha del 18 de abril de 2016 como límite para la entrega de la Línea S en las instalaciones de NITTA CASINGS INC. bajo la modalidad EXW (Ex-Works). Además, se hace referencia a una serie de eventos que obligan al cliente a satisfacer unas cantidades económicas concretas, referenciadas como porcentajes del importe total, y establece un período de garantía de 24 meses cuya fecha de inicio queda referida a la realización de una Prueba (Test) y a la Puesta en Marcha de la máquina, que se realizaría en colaboración con los ingenieros del cliente.

   Al Contrato se anexa un Presupuesto (Attachment A – Quotation), codificado como 059-2015, en el que se recogen las especificaciones técnicas de la Línea S.

4. El 19 de diciembre de 2019, la Comisión Nacional del Mercado de Valores publica una nota del GRUPO VISCOFAN, en la que hace público el acuerdo alcanzado con el grupo japonés NITTA GELATIN INC. para hacerse con su división de envolturas de colágeno (NITTA CASINGS INC. en USA y en CANADA).

   El 3 de noviembre de 2019, con anterioridad a la adquisición formal de ambas empresas, el GRUPO VISCOFAN encarga a la firma legal Baker Mckenzie la elaboración de un informe de auditoría (Due Diligence) que incluye algunas referencias a la Línea S.

P00069



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Contratación de la Línea S

Contratación de la Línea S

5. El 29 de enero de 2020, VISCOFAN COLLAGEN USA INC. traslada a SAYER TECHNOLOGIES S.L. una reclamación formal por daños y perjuicios como consecuencia del incumplimiento de varios contratos, uno de los cuales resulta ser el Contrato objeto del presente informe.

6. El 23 de marzo de 2020, SAYER TECHNOLOGIES S.L. da contestación al GRUPO VISCOFAN rechazando las acusaciones de la que es objeto y reclamando el pago de otros servicios prestados a NITTA CASINGS INC.

7. El 2 de abril de 2020, VISCOFAN COLLAGEN USA INC. responde a SAYER TECHNOLOGIES S.L. reafirmándose en sus acusaciones y rechazando, también, la reclamación de la deuda antes citada.

8. El 23 de diciembre de 2021, el Juzgado de Primera Instancia N.º 2 de Pamplona admite a trámite la DEMANDA presenta por VISCOFAN COLLAGEN USA INC. contra SAYER TECHNOLOGIES S.L., estableciendo que el proceso se sustancie por las reglas del Procedimiento Ordinario.

## 6.1. Dosier Técnico

Este documento se incorpora a la DEMANDA presentada por VISCOFAN COLLAGEN USA INC. como el primero de los anexos de su informe pericial. En sus páginas no aparece ninguna referencia que permita ubicarlo temporalmente, pero SAYER TECHNOLOGIES S.L. indica que se le facilitó a NITTA CASINGS INC. en febrero de 2015, con ocasión de sus primeros encuentros en Estados Unidos, y que se les envió por correo electrónico el 28 de abril de ese mismo año, acusando su recibo por la misma vía dos días después.

El Dosier Técnico (Technical Dossier) es un documento de 25 páginas, elaborado por SAYER TECHNOLOGIES S.L., en el que se exponen de forma sinóptica las características y especificaciones técnicas generales de un modelo de una línea de colágeno a la que se denominada LSC-60-4C (según indica SAYER, se trata de una codificación con la que se refieren a una Línea SAYER de Colágeno de 4 Canales que puede alcanzar velocidades de hasta 60 metros por minuto).

Las páginas 2 y 3 del Dosier Técnico (Introducción y Observaciones) se dedican a realizar una serie de:

⇨ Consideraciones generales sobre las características técnicas de la máquina, entre las que cabe citar la longitud total de la línea, de 115 metros, y el rango de velocidades disponible (de 40 a 60 metros por minuto).

⇨ Advertencias sobre el ámbito de especialización técnica del fabricante (excluyendo expresamente el gel de colágeno) y la posibilidad de adaptar las dimensiones de la línea a los requerimientos concretos del cliente, que deberá especificar los tiempos de procesamiento que requiere su producto (gel de

*página 22*

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Contratación de la Línea S

Dosier Técnico

colágeno).

⇨ Indicaciones sobre los elementos que quedan excluidos de la propuesta y sobre aquellos sobre los que sería preciso hacer un estudio específico (como en el caso del amoníaco, por ejemplo).

A partir de la página 4 comienza la descripción técnica de la LSC-60-4C, que se divide en 6 apartados:

1. Sección de Gel (apartado sin contenido, por quedar excluida de la propuesta).

2. Sección Húmeda, en la que se realizan de forma consecutiva los tratamientos de Neutralización, Lavado y Plastificado (descritos en las patentes a las que se hizo referencia en el apartado 5.1), mediante la aplicación de las correspondientes dosis de amoníaco, agua y glicerina.

   En este apartado se definen principalmente las características de la estructura portante y de la zona de extrusión del gel de colágeno, los dispositivos de control de calibre, el sistema de transporte de la envoltura de gel de colágeno y el sistema de recogida de líquidos de tratamiento (agua y glicerina).

3. Sección de Secado, en la que se realiza el tratamiento de Secado (descrito en las patentes a las que se hizo referencia en el apartado 5.1) mediante la aplicación de aire caliente y seco.

   En este apartado se definen las características de la estructura portante y de aislamiento térmico del proceso, así como del sistema de transporte de la envoltura de gel de colágeno.

4. Láser, para el control del calibre (diámetro) de la envoltura de gel de colágeno.

   En este apartado se proponen dos zonas de control: la primera, al principio del proceso, e inmediatamente después de la extrusión del gel de colágeno; la segunda, al final del proceso, e inmediatamente antes del enrollado de la envoltura. También se propone la incorporación de sensores de infrarrojos para el control de la temperatura del gel de colágeno a la salida de los cabezales de extrusión.

5. Humectador, en el que se proporciona a la envoltura el grado de humedad adecuado antes de su enrollado (bobinado).

   En este apartado se describe un sistema de humectación distinto del que se contrata posteriormente.

6. Bobinadora doble, en la que se enrolla la envoltura de gel de colágeno antes de su entrada en la Fase de Acabado (descrita en las patentes a las que se hizo referencia en el apartado 5.1).

   Al final de este apartado, probablemente por error, se incluyen los componentes de la instalación eléctrica de la línea de colágeno.

página 23



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327      Contratación de la Línea S

Acuerdo de Cooperación Tecnológica y Comercial

## 6.2. Acuerdo de Cooperación Tecnológica y Comercial[7]

El autor de este informe tiene acceso al documento a través de VISCOFAN COLLAGEN USA INC., que se lo facilita el 2 de mayo de 2021, junto a otros con los que dan respuesta a una serie de cuestiones que se le plantean a través de distintos formularios.

El Acuerdo de Cooperación Tecnológica y Comercial (Technical and Trade Cooperation Agreement) es un documento de 4 páginas y 8 cláusulas, firmado el 23 de junio de 2015 por SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. con el objeto de articular los mecanismos de cooperación tecnológica y comercial entre ambas empresas por un periodo inicial de un año. En el documento se plantea la posibilidad de que ambas partes, por acuerdo mutuo, extiendan el periodo de vigencia del acuerdo más allá del previsto inicialmente pero, según refieren, este hecho no se produce.

Los aspectos más relevantes de este Acuerdo, en el caso que nos ocupa, serían:

1. El reconocimiento mutuo y expreso del ámbito tecnológico en el que está especializada cada una de las dos empresas:

   ⇨ NITTA CASINGS INC., en la producción de colágeno para el sector alimentario.

   ⇨ SAYER TECHNOLOGIES S.L., en el desarrollo de maquinaria especial a medida y automatización de procesos.

2. La identificación de los roles que asumen cada una de las partes en el desarrollo de una serie de proyectos, de los que se citan algunos ejemplos:

   ⇨ NITTA CASINGS INC., encargando los proyectos.

   ⇨ SAYER TECHNOLOGIES S.L., coordinando y responsabilizándose de la ejecución de los proyectos encargados, garantizando que se desarrollan de acuerdo con las especificaciones técnicas del producto.

3. La mención expresa a una máquina de colágeno, como ejemplo de uno de los proyectos en los que podrían colaborar.

4. La consideración de secreto industrial que tendrá la información técnica proporcionada por NITTA CASINGS INC.

5. El reconocimiento de la propiedad industrial adquirida por SAYER TECHNOLOGIES S.L. como consecuencia del desarrollo de estos proyectos.

---

7   Se corrige la traducción al castellano que se adjunta al documento original.

 Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

### 6.3. Contrato y Presupuesto

El Contrato (Contract Agreement) es un documento de 3 páginas y 12 cláusulas, firmado el 28 de agosto de 2015 por SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. con el objeto de formalizar el encargo del proyecto de diseño, fabricación, transporte, instalación y puesta en marcha de una línea de procesamiento de envolturas de gel de colágeno en la planta de New Jersey, cuyas especificaciones técnicas recoge su Anexo A (Attachment A) o Presupuesto (Quotation); documento que se trata con más detalle en el siguiente apartado.

La línea a la que se refiere el Contrato se denomina Máquina Línea de Colágeno Sayer (Sayer Collagen Line Machine) o Línea S (Line S), que es la fórmula que se empleará generalmente en este informe.

⇨ En la primera cláusula del Contrato se establecen sus Condiciones Generales (Terms), que especifican, entre otras cuestiones, el objeto (la adquisición de la Línea S, de acuerdo con las especificaciones técnicas establecidas en el Presupuesto o Anexo A), el precio (3,235,260 €), el plazo de entrega previsto (18 de abril de 2016) y la modalidad escogida para ello (EXW).

Cabe advertir que en el punto 1.3 se incluye una cláusula que recuerda los términos del Acuerdo de Cooperación Tecnológica y Comercial firmado con anterioridad entre ambas empresas, otorgando también a SAYER TECHNOLOGIES S.L. el papel de coordinador responsable de la ejecución del proyecto de acuerdo con las especificaciones técnicas del producto (gel de colágeno) de NITTA CASINGS INC.

Lo mismo ocurre con el punto 1.5, en el que se prevé la participación de los ingenieros de NITTA CASINGS INC. en el proceso de puesta en marcha (start-up), aportando, precisamente, su conocimiento técnico sobre el producto (gel de colágeno).

⇨ La cláusula 2 del Contrato establece un plazo de 60 días desde su firma para que NITTA CASINGS INC. pueda plantear modificaciones en las especificaciones técnicas previstas en el Presupuesto, aunque según refieren las partes, no consta que se recurriera a esta opción.

⇨ En la cláusula 4 del Contrato se le reconoce a NITTA CASINGS INC. el derecho a inspeccionar los materiales enviados por SAYER TECHNOLOGIES S.L. a sus instalaciones de New Jersey durante un período de 30 días, contados a partir del momento de la entrega, y antes de su aceptación definitiva, debiendo formalizarse cualquier reclamación por escrito (correo electrónico o correo certificado) y con acuse de recibo. Según refieren las partes, tampoco consta que se recurriera a esta opción.

⇨ La cláusula 5 del Contrato recoge la fórmula prevista para el abono del importe de la Línea S, estableciendo la obligación de satisfacer de forma sucesiva una serie de cantidades, referidas como porcentajes del importe total, a medida que se vayan cumpliendo ciertos hitos, y según el siguiente

 Informe Pericial JPI2-PAM-PO-2021-1327

Contratación de la Línea S

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Contrato y Presupuesto

esquema:

✓ 35% con la Confirmación del Pedido (Order Confirmation).

✓ 15% con la Aceptación del Diseño (Design Acceptance).

✓ 15% con la Fabricación (Manufacturing).

✓ 10% con el Ensamblaje en las instalaciones de SAYER (Assembly at SAYER).

✓ 15% con la Aceptación en las instalaciones de SAYER (Acceptance at SAYER).

✓ 10% con la Aceptación en las instalaciones de NITTA (Acceptance at NITTA).

Como se verá más adelante, todos estos abonos se irán produciendo tal como se había previsto, con alguna salvedad que no tiene especial trascendencia.



- Distribución porcentual del Abono de Importes previsto en el Contrato -

⇨ En la cláusula 6 del Contrato se establece un período de Garantía de 24 meses, que se contabilizaría a partir de la realización de un Test de Prueba en las instalaciones de NITTA CASINGS INC. y la correspondiente Puesta en Marcha.

El mecanismo de Garantía previsto en el Contrato permite a SAYER TECHNOLOGIES S.L. optar por la reposición de los materiales defectuosos, su reparación, o el reembolso del precio de compra de la Línea S, aunque según refieren las partes, hasta la fecha no se ha invocado esta opción.

El resto de las cláusulas del Contrato no aportan información relevante al objeto de estudio del presente

P00074

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Contratación de la Línea S

Contrato y Presupuesto

informe, si bien es cierto que el reconocimiento en exclusiva de la jurisdicción para resolver los conflictos derivados de su aplicación a los Juzgados de Pamplona, recogido en la cláusula 8, no deja de resultar llamativo, siendo NITTA CASINGS INC. el cliente, New Jersey el lugar en el que se instala y opera la máquina, y el inglés el idioma en el que se formalizan las relaciones entre las dos empresas.

El Presupuesto (Quotation) es el documento de 10 páginas que se anexa al Contrato bajo la denominación de Anexo A (Attachment A) donde se detallan las especificaciones técnicas de la Línea S y se hace una valoración económica general (no desglosada), recurriendo para ello a una estructura documental muy similar a la empleada en el Dosier Técnico (Technical Dossier).

Este documento se incorpora a la DEMANDA presentada por VISCOFAN junto al Contrato, como el primero de sus anexos, y también en el informe pericial que la soporta, en el segundo de sus anexos, como documento independiente. Aparece codificado como "059-2015" y fechado, también, el 28 de agosto de 2015.

En la primera página se establecen las especificaciones técnicas generales de la Línea S (ver Generalidades) y se muestra un esquema en planta en el que se puede observar la configuración de 4 tramos que adopta el diseño de la Línea S para encajar en el espacio habilitado por NITTA CASINGS INC.

En la segunda página se muestran dos imágenes más en perspectiva de la Línea S.

A partir de la página 3 del Presupuesto se incluyen los 11 puntos en los que se desarrollan las especificaciones técnicas de las áreas de tratamiento (las zonas a las que se refiere el Dosier Técnico), el instrumental láser para el control del calibre y las bobinadoras, se indican los elementos excluidos, el precio, las condiciones de pago, el plazo de entrega, el período de garantía y otras referencias que se citan en las cláusulas del Contrato.

Con respecto a la exclusión de elementos prevista en el punto 6, básicamente se hace referencia a todos aquellos que NO guardan relación directa con el mero transporte de la envoltura de gel de colágeno extruido a lo largo de las distintas zonas de tratamiento.

## 6.4. Especificaciones Técnicas

El Dosier Técnico facilitado por SAYER TECHNOLOGIES S.L. a NITTA CASINGS INC. el 30 de abril de 2015 puede considerarse la primera referencia que comparten ambas empresas de cara a la definición de las especificaciones técnicas concretas de la Línea S, así como de su particular diseño (en forma de "L" invertida).

De hecho, como ya se ha hecho notar anteriormente, el Presupuesto que se incluye en el Contrato consiste básicamente en la adaptación del diseño general de la LSC-60-4C a los requerimientos planteados por NITTA CASINGS INC., que era el cliente, considerando especialmente los condicionamientos de espacio y los tiempos de

Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nª T/I Jurada: 3380*
*19 de junio de 2023*

Contratación de la Línea S

Especificaciones Técnicas

tratamiento requeridos por su producto (gel de colágeno).

Por otra parte, entre el momento de la firma del Contrato y el momento en el que se produce el abono del importe correspondiente a la Aceptación del Diseño de la Línea S (Design Acceptance), SAYER TECHNOLOGIES S.L. dispone de un período de más de 4 meses para desarrollar y concretar los detalles específicos del diseño de la máquina. En el caso concreto que nos ocupa, no ha sido posible disponer de un documento que integre y exponga de forma ordenada toda la información técnica asociada al proceso de diseño de la Línea S (en el formato previsto para los proyectos visados, por ejemplo, en los que se incluye una memoria descriptiva, un apartado de cálculos, otro de planos, un presupuesto y tantos anexos como resulte oportuno); no obstante, SAYER TECHNOLOGIES S.L. ha proporcionado al perito autor de este Informe información técnica abundante relacionada con el diseño original de la máquina.

### 6.4.1. Generalidades

Las dos primeras páginas del Presupuesto que se anexa al Contrato se dedican a mostrar la configuración geométrica de la Línea S y a establecer las siguientes especificaciones técnicas de carácter general sobre:

A. Su capacidad de producción potencial, estableciendo una velocidad máxima de transporte de 46 metros (150 pies) por minuto, y dos configuraciones posibles:

⇨ 2 líneas de 4 canales para calibres de 13 a 24 mm.

⇨ 1 línea (derecha) de 4 canales para calibres de 13 a 24 mm y 1 línea (izquierda) de 3 canales para calibres de 25 a 42 mm.

Se sobreentiende que la especificación de un valor máximo para la velocidad de transporte de la Línea S supone asumir para este parámetro un rango de valores que van del reposo absoluto (0 metros por minuto) al valor máximo especificado (46 metros por minuto).

B. Sus dimensiones generales y su configuración característica (en forma de "L" invertida), que cambian con respecto a la propuesta del Dosier Técnico (Technical Dossier) para poder emplazarla en el espacio habilitado por NITTA CASINGS INC., de manera que resulta:

⇨ 20 centímetros más estrecha (2,80 metros, frente a los 3 metros del modelo del Dosier Técnico).

⇨ 1 metro más baja (5 metros, frente a los 6 metros del modelo del Dosier Técnico).

⇨ 5 metros más corta (110 metros, frente a los 115 metros del modelo del Dosier Técnico).

⇨ Fraccionada en 4 tramos (Wet Area 1 / Wet Area 2 / Additives / Dry Area).

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial JPI2-PAM-PO-2021-1327

Contratación de la Línea 5

Especificaciones Técnicas

Estas medidas resultan de adaptar el diseño general de la línea LSC-60-4C a las características geométricas del espacio disponible en la planta de Bridgewater y a los tiempos de tratamiento previstos en cada una de las Etapas para el producto (gel de colágeno).

C. Los rangos de temperatura (entre 80 y 120 ºC) para los que se ha diseñado la estructura[a] de la Zona de Secado, indicativos de las temperaturas a las que se introduce el aire de tratamiento.

D. Los rangos de humedad relativa del producto (envoltura de gel de colágeno) a la salida del Humectador (19 a 20%) y de la Zona de Secado (9 a 11%), cuya medición se obtiene realizando ensayos sobre distintas muestras del producto al margen de la línea de procesamiento.

## 6.4.2.   Área Húmeda

En las páginas 3 y 4 se incluyen las especificaciones técnicas propias del Área Húmeda, distribuida en 2 Zonas (Wet Area 1 / Wet Area 2), en las que se emplea amoníaco, agua y glicerina para los procesos de neutralización, lavado y plastificado, respectivamente. Estas Zonas se encuentran desalineadas, formando un ángulo de 90 grados entre sí.

La Zona 1 del Área Húmeda mide 38 metros de largo, 5 metros de alto (2 niveles de acceso) y 2,80 metros de ancho (0,8 metros de ancho de pasillo).

En el nivel superior se encuentra la zona de extrusión y la zona de neutralización (evaporador).

El tiempo de tratamiento para el proceso de neutralización (evaporador) se establece en 1,82 minutos (1 minuto y 49 segundos), reservando para ello un espacio de 28 metros y 3 pases (un total de 84 metros).

En el nivel inferior se encuentra la zona de lavado (que continuará en el Área Húmeda 2).

El tiempo de tratamiento para la primera etapa del proceso de lavado se establece en 4,43 minutos (4 minutos y 25 segundos), reservando para ello un espacio de 34 metros y 6 pases (un total de 204 metros).

De acuerdo con estas especificaciones, los tiempos de tratamiento indicados se corresponden con una velocidad de transporte en la línea de 46 metros (150 pies) por minuto.

La Zona 2 del Área Húmeda mide 24 metros de largo, 5 metros de alto (2 niveles de acceso) y 2,80 metros de ancho (0,8 metros de ancho de pasillo).

En el nivel superior continúa la zona de lavado (que comenzaba en el Área Húmeda 1).

---

8   El perito autor de este Informe interpreta que la inclusión del término *"structurally"* añade un matiz que delimita la aplicación de las especificaciones técnicas de temperatura al ámbito concreto de los elementos estructurales de la Zona de Secado, ya que no haberlo incluido habría bastado para extender su aplicación a todos y cada uno de los elementos que operan en dicha Zona.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

 Informe Pericial JPI2-PAM-PO-2021-1327

Contratación de la Línea S

Especificaciones Técnicas

El tiempo de tratamiento para la segunda etapa del proceso de lavado se establece en 1,30 minutos (1 minuto y 18 segundos), reservando para ello un espacio de 20 metros y 3 pases (un total de 60 metros).

En el nivel inferior se encuentra la zona de plastificado.

El tiempo de tratamiento para el proceso de plastificado se establece en 2,60 minutos (2 minutos y 36 segundos), reservando para ello un espacio de 20 metros y 6 pases (un total de 120 metros).

De acuerdo con estas especificaciones, los tiempos de tratamiento indicados se corresponden con una velocidad de transporte en la línea de 46 metros (150 pies) por minuto.

### 6.4.3.    Área de Aditivos y Área de Secado

En las páginas 6 y 7 se incluyen las especificaciones técnicas propias de las Áreas de Aditivos y de Secado.

El Área de Aditivos está destinada a la aplicación de diversos aditivos sobre la envoltura, mide 6 metros de largo y conecta el Área Húmeda 2 con el Área de Secado, siendo perpendicular a ambas.

El Área de Secado está destinada a la aplicación de temperatura y humedad sobre la envoltura, mide 36 metros de largo, 5 metros de alto (2 niveles de acceso) y 2,80 metros de ancho (0,8 metros de ancho de pasillo).

El tiempo de tratamiento para el proceso de secado se establece en 3,78 minutos (3 minutos y 46 segundos), reservando para ello un espacio de 29 metros y 6 pases (un total de 174 metros).

El tiempo de tratamiento para el proceso de humectación se establece en 1,90 minutos (1 minuto y 54 segundos), reservando para ello un espacio de 29 metros y 3 pases (un total de 87 metros).

De acuerdo con estas especificaciones, los tiempos de tratamiento indicados se corresponden con una velocidad de transporte en la línea de 46 metros (150 pies) por minuto.

### 6.4.4.    Control de Calibre, Enrollado y Elementos No Incluidos

En las páginas 8 y 9 se incluyen las especificaciones técnicas relativas al control de calibre y al enrollado final de la envoltura; y al final de esta última se citan los elementos NO INCLUIDOS en el Presupuesto.

página 30

P00078



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327

Ejecución del Contrato

Ejecución del Contrato

## 7. EJECUCIÓN DEL CONTRATO

La ejecución del Contrato es un proceso que comienza en el mismo momento de su firma, el 28 de agosto de 2015, y finaliza con el agotamiento del período de Garantía de 24 meses previsto en él.

En el siguiente esquema se muestras las fases o etapas que compondrían este proceso.



*- Etapas del Proceso de Ejecución del Contrato -*

### 7.1. Proceso de Diseño

El diseño definitivo de la Línea S se concreta a lo largo de los meses siguientes a la firma del Contrato, en base a las especificaciones técnicas establecidas en el Presupuesto, y el cliente formaliza su conformidad con el mismo el 15 de enero de 2016, mediante el abono del importe previsto a estos efectos (15% at the design acceptance). El apartado 8 se dedica en exclusiva a la descripción del diseño original de la Línea S.

### 7.2. Abono de Importes

En el Contrato para la adquisición de la Línea S se establece una hoja de ruta en la que se identifican claramente una serie de 6 hitos que se deben producir de forma sucesiva, y que se corresponden con la "Confirmación del Pedido" (35%), la "Aceptación del Diseño" (15%), la "Fabricación" (15%), el "Ensamblaje" (10%), la "Aceptación en las instalaciones de SAYER" (15%) y la "Aceptación en las instalaciones de NITTA" (10%); eventos relevantes en el desarrollo del proyecto vinculados al abono de un porcentaje concreto del precio total establecido en el documento (de 3.235.249,00 €), y que NITTA CASINGS INC. resuelve de acuerdo con el siguiente esquema:

⇨ El 1 de septiembre de 2015 se produce el abono correspondiente a la Confirmación del Pedido mediante una transferencia bancaria en cuyo concepto aparece la expresión "35% at order confirmation".

Según refieren las partes, este hito se formaliza documentalmente mediante la firma del Contrato.

página 31

P00079



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Ejecución del Contrato

Abono de Importes

⇨ El 15 de enero de 2016 se produce el abono correspondiente a la Aceptación del Diseño mediante una transferencia bancaria en cuyo concepto aparece la expresión "15. DESIGN ACCEPTANCE".

Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente que incluya toda la información asociada al proyecto, algo particularmente llamativo a la vista de su envergadura.

SAYER TECHNOLOGIES S.L. refiere que varios representantes de la empresa (Ernesto Garrido, Alejandro Gutiérrez, Óscar García, Carlos Múgica, Alfonso Rey y José Miguel Idoate) se desplazaron a las instalaciones de NITTA CASINGS INC. en Bridgewater (New Jersey) entre los días 6 y 11 de diciembre de 2015 para hacer la presentación del diseño definitivo; y que fue durante esos días cuando se produjo su aprobación formal.

Esta versión es consistente con la información expuesta en los justificantes de los pasajes de avión presentados por SAYER TECHNOLOGIES S.L., y con el contenido de un correo enviado el 16 de noviembre de 2015 por el entonces Gerente de Ingeniería (Engineering Manager) de NITTA CASINGS INC., Mr. Gary Wysocki (no aparece en el organigrama facilitado por VISCOFAN COLLAGEN USA INC.), en el que hace referencia a este viaje y solicita que lleven consigo todos los planos fin de obra ("as-built") de la Línea S para su revisión, recalcando la importancia que tiene para ellos conocer las dimensiones exactas de la Línea S, de cara a las actuaciones que deban ejecutar en la planta para su acondicionamiento.

⇨ El 20 de junio de 2016 se produce el abono correspondiente a la Fabricación mediante una transferencia bancaria en cuyo concepto aparece la expresión "15. AT MANUFACTURING".

Según refieren las partes, este hito tampoco se formaliza documentalmente por medio de un acta o algún documento equivalente.

⇨ El 27 de abril de 2016 se produce el abono correspondiente al Ensamblaje (se rompe la "lógica cronológica") mediante una transferencia bancaria en cuyo concepto aparece la expresión "10. ASSEMBLAGE".

Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

⇨ El 11 de agosto de 2016 se produce el abono correspondiente a la Aceptación en SAYER (se recupera la "lógica cronológica") mediante una transferencia bancaria en cuyo concepto aparece la expresión "12.5.ACCEPTANCE AT SAYER".

página 32

P00080



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Ejecución del Contrato

Abono de Importes

Según refiere SAYER TECHNOLOGIES S.L., en ese momento no se produce el abono del 15% pactado por "conveniencia financiera" de NITTA CASINGS INC. Según refieren las partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

⇨ Los días 1 de febrero, 2 de marzo y 24 de abril de 2017 se produce el abono correspondiente a la Aceptación en NITTA de forma fraccionada (completando también el abono pendiente correspondiente al hito anterior) mediante sendas transferencias bancarias, incluyendo las dos primeras en su concepto la expresión "PARTIAL OF 12.5 AT ACCEPTANCE AT NCI (USA)", mientras que la última se refiere a la factura 160139, emitida por SAYER TECHNOLOGIES S.L. el 30 de diciembre de 2016 (el importe de la transferencia no coincide con el de factura).

Según refieren ambas partes, este hito no se formaliza documentalmente por medio de un acta o algún documento equivalente.

Aunque el esquema expuesto no se ajusta por completo a los criterios establecidos en el Contrato, no constan reclamaciones por parte de SAYER TECHNOLOGIES S.L. en relación con esta cuestión.

## 7.3. Envío de Materiales y Facturación

El envío de los materiales a las instalaciones de NITTA CASINGS INC. se efectúa a través de la empresa SCHENKER LOGISTICS S.A.U., que emite 7 Documentos Únicos Administrativos (D.U.A.) para los días:

⇨ 15 de abril de 2016, envío por barco de 20.645 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

⇨ 22 de abril de 2016, envío por barco de 21.630 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

⇨ 29 de abril de 2016, envío por barco de 13.382 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

⇨ 6 de mayo de 2016, envío por barco de 14.630 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

⇨ 27 de mayo de 2016, envío por barco de 16.623 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

⇨ 12 de agosto de 2016, envío por barco de 13.922 kg de "PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MAQUINA PARA EL SECTOR ALIMENTARIO".

P00081

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial IPI2-PAM-PO-2021-1327

Ejecución del Contrato

Envío de Materiales y Facturación

⇨ 10 de enero de 2017, envío por avión de 241 kg de "PARTES DE PIEZAS METÁLICAS DE ACERO INOXIDABLE PARA EL MONTAJE DE UNA MÁQUINA PARA EL SECTOR ALIMENTARIO".

SAYER TECHNOLOGIES S.L. asume los costes de envío desde sus instalaciones (EXW), tal como establece el Contrato, lanzando la primera remesa pocos días antes del 18 de abril de 2016, fecha tope establecida en el Contrato para el envío/entrega de la máquina.

No constan reclamaciones por parte de NITTA CASINGS INC. en relación con las fechas de envío, y sí una comunicación por correo electrónico, fechada el 29 de agosto de 2016, en la que Francisco Sousa (Chief Operating Officer - COO) le indica a Ernesto Garrido (Gerente) que han recibido el sexto contenedor (enviado el 12 de agosto de 2016) y que Gary Wysocki (Engineering Manager) "tiene todo bajo control".

Por otra parte, para la facturación de los trabajos establecidos en el Contrato, SAYER TECHNOLOGIES S.L. procede de acuerdo con el siguiente esquema de 7 facturas:

⇨ El 13 de abril de 2016 emite la factura 160030 en concepto de 01 – S LINE/PARTS H – ZONE 1, por un importe de 540.000 €.

⇨ El 21 de abril de 2016 emite la factura 160040 en concepto de 02 – S LINE/PARTS H – ZONE 2, por un importe de 930.000 €.

⇨ El 27 de abril de 2016 emite la factura 160043 en concepto de 03 – S LINE/PARTS D – ZONE1, por un importe de 400.000 €.

⇨ El 4 de mayo de 2016 emite la factura 160049 en concepto de 04 – S LINE/PARTS D – ZONE2, por un importe de 300.000 €.

⇨ El 24 de mayo de 2016 emite la factura 160058 en concepto de 01 – S LINE/PARTS C – ZONE 1, por un importe de 500.000 €.

⇨ El 8 de agosto de 2016 emite la factura 160088 en concepto de 01 – S LINE PARTS C – ZONE 2, por un importe de 530.000 €.

⇨ El 30 de diciembre de 2016 emite la factura 160139 en concepto de 01 – S LINE PARTS C – ZONE 3, por un importe de 35.249 €.

Al contrario que ocurre con el esquema de abono de los importes expuesto en el apartado anterior, en el esquema de facturación que emplea SAYER TECHNOLOGIES S.L. los importes y los conceptos de las facturas no están relacionados con los hitos previstos en el Contrato, sino con el envío de los materiales a las instalaciones de NITTA CASINGS INC. en New Jersey, como se expone en el siguiente apartado.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Ejecución del Contrato

Envío de Materiales y Facturación

En cualquier caso, no constan reclamaciones por parte de NITTA CASINGS INC. en relación con esta cuestión.



- Evolución Relativa del Abono de Importes ($), la Emisión de Facturas (€) y el Envío de Materiales -

## 7.4. Test de Prueba y Puesta en Marcha

Según refieren las partes, no consta que se formalizaran documentalmente por medio de un acta, o algún documento equivalente, ni la realización de un Test de Prueba ni de un proceso de Puesta en Marcha, de manera que no es posible recurrir a ellos para rescatar los detalles que pudieron rodear su ejecución (fechas de inicio y de finalización, objetivos planteados, pruebas efectuadas, resultados obtenidos, mecanismos de validación empleados, registro de la evolución del proceso, registro de incidencias, etc.).

De la misma manera, tampoco hay constancia de que ninguna de las dos empresas hubiera reclamado la formalización de estos trámites o procesos en algún momento, a pesar de su trascendencia.

## 7.5. Garantía

La cláusula 6 del Contrato aborda de forma muy escueta las cuestiones que regulan la garantía que ofrece SAYER TECHNOLOGIES S.L. con la venta de su producto, limitándose a establecer un período de garantía de 24 meses en los que la empresa puede optar por la reposición de los materiales defectuosos, su reparación o la devolución del precio de compra.

Hasta el momento de la adquisición de NITTA CASINGS INC. por parte del GRUPO VISCOFAN no se activó la cláusula 6 del Contrato, en la que se establecen las coberturas previstas en caso de reclamación del cliente.

## 7.6. Cronograma de Eventos

A continuación se representa de forma gráfica, y por años completos, la sucesión de eventos más relevantes a lo largo del proceso de contratación y posterior ejecución del Contrato (de los que se tiene alguna certeza), dándolo por concluido en 2017, con la formalización del abono por parte de NITTA CASINGS INC. del último concepto previsto (que fragmenta en 3 pagos), la realización del Test de Prueba, el inicio del proceso de Puesta en Marcha y el comienzo del período de Garantía de la Línea S (estos 3 últimos eventos no aparecen referidos temporalmente en el gráfico debido a la ausencia de referencias claras).

página 35

P00083

Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Ejecución del Contrato

Cronograma de Eventos



2015

ene
feb
mar
abr
may

30 de abril de 2015
Dosier Técnico

jun

23 de junio de 2015
Acuerdo de Cooperación Tecnológica y Comercial

jul

28 de agosto de 2015
Contrato y Presupuesto

ago

1 de septiembre de 2015
1ª Order Confirmation 35%

sep
oct
nov
dic

2016

– Cronograma de eventos relevantes en 2015 –

página 36

P00084



Informe Pericial IPI2-PAM-PO-2021-1327

Ejecución del Contrato
Cronograma de Eventos

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*



– Cronograma de eventos relevantes en 2016 –



Informe Pericial JPI2-PAM-PO-2021-1327

Ejecución del Contrato

Cronograma de Eventos

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*



- Cronograma de eventos relevantes en 2017 -

P00086

 Informe Pericial JPI2-PAM-PO-2021-1327            Diseño de la Línea S

Diseño de la Línea S

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 8. DISEÑO DE LA LÍNEA S

En los apartados anteriores se han expuesto los detalles que rodearon el proceso de contratación de la Línea S, y su posterior ejecución, que comienza a partir del momento de la firma del Contrato celebrado el 28 de agosto de 2015, y cuya primera fase consiste en el desarrollo del diseño de la máquina a partir de las especificaciones técnicas recogidas en el Presupuesto. En ese sentido, NITTA CASINGS INC. procede al abono del 15% del importe previsto en el Contrato en concepto de *"Design Acceptance"* el 15 de enero de 2016, dando por concluido el proceso de diseño desde un punto de vista formal.

Los apartados siguientes se dedican a la descripción de dicho diseño, el original de la Línea S, con el objetivo de proporcionar las referencias técnicas necesarias para acometer con suficiente criterio el análisis de las reclamaciones que presenta VISCOFAN COLLAGEN USA INC. en su DEMANDA.

Al mismo tiempo, se aprovecha la ocasión para proponer una terminología específica con la que referirse a las distintas partes, sistemas y equipos que integran la máquina, evitando en la medida de lo posible que puedan producirse referencias equívocas a partir del momento de la emisión de este informe.

### 8.1. Descripción General

La Línea S es una máquina que se integra en la Fase de Línea Continua (descrita en el apartado 5.3) del proceso de producción de envoltura mediante extrusión de gel de colágeno; y su función principal consiste en facilitar el tránsito de las envolturas de gel de colágeno producidas en los cabezales de extrusión, a lo largo de una serie de etapas de tratamiento, para su posterior bobinado o enrollado.

La Línea S dispone de una capacidad de producción de hasta 8 canales (4 canales a cada uno de los lados del pasillo central que divide la máquina en dos partes simétricas), mientras que los esquemas de proceso que se muestran representan el proceso de producción de cada uno de ellos por separado.

Según se ha visto en el apartado de Especificaciones Técnicas, los tiempos de tratamiento previstos para la envoltura de gel de colágeno suman un total de 15,83 minutos (15 minutos y 49 segundos), de forma que, circulando a la velocidad máxima de funcionamiento prevista para la máquina (46 metros por minuto), el producto debe recorrer un total de 735 metros de distancia para completar todos los tratamientos (incluyendo el recorrido por el Área de Aditivos). La solución adoptada por SAYER TECHNOLOGIES S.L. para "contener" esta circulación en el espacio disponible en la planta de NITTA CASINGS INC. consistió en:

a) Dividir la Línea S en 4 tramos (Zonas 1 y 2 del Área Húmeda, Área de Aditivos y Área de Secado)





*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Diseño de la Línea S

Descripción General

distribuidos en forma de "L" invertida, para adaptarse al espacio disponible en planta.

b) Efectuar hasta 9 recorridos de ida y vuelta (pases) en cada tramo (exceptuando el Área de Aditivos), para proporcionar a la envoltura los tiempos de tratamiento previstos.

c) Emplear cintas transportadoras y poleas para resolver la circulación del producto.

Tal como se representa en el Esquema de la Línea S, la circulación del producto en cada uno de los tramos (exceptuando el Área de Aditivos) comienza en la parte superior, con un pase en el sentido general del proceso, y va descendiendo de forma progresiva recorriendo los 8 niveles siguientes (a favor de la gravedad), cambiando de sentido en cada extremo al girar alrededor de una polea para caer sobre la cinta de transporte inmediatamente inferior, de manera que, al llegar a la última cinta de transporte, circula de nuevo en el sentido general del proceso.

La conexión del proceso entre los distintos tramos se resuelve en las esquinas o "curvas" de la Línea S (esta cuestión se desarrolla con más detalle en el apartado 8.6) mediante un sistema de poleas que recibe el producto procedente del nivel inferior del tramo anterior, lo eleva hacia el nivel superior (en contra de la gravedad), y lo reorienta hacia el tramo siguiente (la transición entre el Área de Aditivos y el Área de Secado no precisa resolver el cambio de nivel, ya que en el Área anterior sólo se produce un pase).

| | etapa | tiempo (min) | tiempo (min:s) | pases (n) | longitud (m) | espacio (m) |
|---|---|---|---|---|---|---|
| Húmeda 1 | Neutralización | 1,82 | 01:49 | 3 | 28 | 84 |
| | Lavado 1 | 4,43 | 04:25 | 6 | 34 | 204 |
| Húmeda 2 | Lavado 2 | 1,3 | 01:18 | 3 | 20 | 60 |
| | Plastificado | 2,6 | 02:36 | 6 | 20 | 120 |
| Aditivos | Aditivos | - | - | 1 | 6 | 6 |
| Secado | Secado | 3,78 | 03:46 | 6 | 29 | 174 |
| | Humectación | 1,9 | 01:54 | 3 | 29 | 87 |
| | Total | 15,83 | 15:49 | 28 | | 735 |

- Tabla resumen con los tiempos de tratamiento establecidos en el Presupuesto -

página 40

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S

Descripción General



~ Vista General de la Línea S ~

página 41

P00089

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S

Descripción General



- Esquema de Proceso de la Línea S -

P00090

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

 Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S
Área Húmeda

## 8.2. Área Húmeda

En este Área, que se divide en 2 Zonas, se produce la extrusión de la envoltura de gel de colágeno y los tratamientos de Neutralización (Evaporador), Lavado y Plastificado, en ese orden, para los que se dedican 3, 9 y 6 pases, respectivamente (ver Vista General y Esquema de Proceso de la Línea S).

La Zona 1 del Área Húmeda se corresponde con el primer tramo de la Línea S, que comprende todos los elementos ubicados entre la Zona de Extrusión y la primera curva. En esta Zona se produce la extrusión de la envoltura, se realizan los 3 pases de 28 metros de la Etapa de Neutralización (Evaporador) y los primeros 6 pases de 34 metros de la Etapa de Lavado.

La Zona 2 del Área Húmeda se corresponde con el segundo tramo de la Línea S, que comprende todos los elementos ubicados entre la primera y la segunda curva. En esta Zona se completa finalmente la Etapa de Lavado, con 3 pases de 20 metros, y se efectúa la Etapa de Plastificado, con 6 pases de 20 metros.

Aunque en el Contrato para la adquisición de la Línea S no se contemplaba la instalación de los cabezales de extrusión, sí se previó habilitar una Zona de Extrusión en la que alojar estas máquinas, así como los dispositivos láser de control de calibre, las placas de control de amoniaco y otros elementos.

En la Etapa de Neutralización se produce la reacción del amoniaco con la envoltura de gel de colágeno, provocando su coagulación. El amoniaco en condiciones ambientales normales es un gas tóxico y corrosivo, motivo por el que se evacúa del proceso a través de un sistema de extracción (Evaporador) que no estaba incluido en el Contrato.

En la Etapa de Lavado se utiliza un sistema de dosificación de agua sobre la envoltura de gel de colágeno que tiene por objeto retirar las sales que se depositan sobre su superficie. El agua empleada en el lavado se recoge en la bandeja situada en la parte inferior del último pase (una en la Zona 1 y otra en la Zona 2), para su posterior tratamiento. El sistema de drenaje y tratamiento del agua de lavado, y su suministro, no estaban incluidos en el Contrato.

En la Etapa de Plastificado se aplica glicerina a la envoltura para dotarle de las propiedades elásticas requeridas. El sistema de dosificación y drenaje de la glicerina es similar al que se emplea en la Etapa de Lavado, y tampoco estaba incluido en el Contrato.

## 8.3. Área de Aditivos

El Área de Aditivos se corresponde con el tercer tramo de la Línea S, que comprende todos los elementos ubicados entre la segunda y la tercera curva. Esta zona está destinada a la aplicación de aditivos sobre la

P00091

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S
Área de Aditivos

envoltura con diferentes propósitos, y de acuerdo con el criterio técnico exclusivo de NITTA CASINGS INC.

Como se ha comentado anteriormente, en este Área sólo se produce un pase del producto (6 metros).

## 8.4. Área de Secado

El Área de Secado se corresponde con el cuarto tramo de la Línea S, que comprende todos los elementos ubicados entre la tercera curva y la zona de Enrollado, y en ella se desarrolla la Etapa de Secado, que se resuelve en dos Fases: la Fase de Secado y la Fase de Humectación.

En la Fase de Secado se somete a la envoltura de gel de colágeno a una atmósfera de aire caliente y seco a lo largo de 6 pases de 29 metros de longitud, con el objeto de rebajar su porcentaje de humedad a valores comprendidos entre el 9 y el 11 % (según se indica en el Presupuesto).

En la Fase de Humectación se somete a la envoltura a una atmósfera húmeda a lo largo de 3 pases de 29 metros de longitud, con el objeto de proporcionar a la envoltura de gel de colágeno un porcentaje de humedad de entre el 19 y el 20 % (según se indica en el Presupuesto).

Toda la estructura de este Área está diseñada para soportar temperaturas de trabajo de 80 a 120 ºC, y está revestida de un aislante térmico para reducir las pérdidas de calor.

El sistema de aportación de aire caliente y seco de la Fase de Secado y el sistema de aportación de agua de la Fase de Humectación no estaban incluidos en el Contrato.

## 8.5. Sistema de Transporte

El transporte de la envoltura de gel de colágeno extruido a lo largo de las Etapas de tratamiento de la Línea S se resuelve mediante un sistema de 28 cintas transportadoras distribuidas de la siguiente manera:

⇨ 9 cintas transportadoras en la Zona 1 del Área Húmeda: 3 para el proceso de Neutralización y 6 para la primera parte del proceso de Lavado.

⇨ 9 cintas transportadoras en la Zona 2 del Área Húmeda: 3 para la segunda parte del proceso de Lavado y 3 para el proceso de Plastificado.

⇨ 1 cinta transportadora para el Área de Aditivos.

⇨ 9 cintas transportadoras en el Área de Secado: 6 para el proceso de Secado y 3 para el proceso de Humectación.

Para los tratamientos de Neutralización (evaporador), Secado y Humectación se recurre a unas bandas de

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S

Sistema de Transporte

color verde que sirven de soporte a unos "peines" o "cunas" sobre los que se apoya la envoltura de gel de colágeno.

Para los tratamientos de Lavado y Plastificado, se recurre a unas bandas de color blanco en las que hay dispuestos cuatro canales sobre los que se apoya la envoltura de gel de colágeno.

Cada cinta transportadora tiene su propio sistema motriz, compuesto fundamentalmente por un variador de frecuencia y un motor eléctrico, de manera que las maniobras de arranque, parada y regulación de la velocidad son independientes. Para facilitar la operación del conjunto de la máquina, SAYER TECHNOLOGIES S.L. implementó un sistema de gestión integrada que permitía realizar las maniobras de arranque, parada y regulación de la velocidad de la línea de forma conjunta, y cuyos detalles técnicos vienen descritos en la Sección 3 (Manual de Ajustes) del Manual de Instrucciones de la Línea S (se adjunta al informe). La precisión con la que se puede fijar la velocidad de las cintas transportadoras es de una centésima de pie por minuto (0,01 pie por minuto).



– Bandas Blancas –



– Bandas Verdes –

P00093



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                          Diseño de la Línea S

Curvas

## 8.6. Curvas

Las curvas, o esquinas, son las zonas que conectan los distintos tramos de la Línea S. Como se ha comentado anteriormente, la existencia de estos elementos se justifica por la limitación de espacios disponibles en la planta de NITTA CASINGS INC. en New Jersey.

La primera curva (Curva 1) conecta la Zona 1 del Área Húmeda con la Zona 2 del Área Húmeda.

La segunda curva (Curva 2) conecta la Zona 2 del Área Húmeda con la Zona de Aditivos.

La tercera curva (Curva 3) conecta la Zona de Aditivos con la Zona de Secado.

En las dos primeras curvas, el producto se recibe desde el nivel inferior del tramo anterior y se redirige al nivel superior del siguiente tramo, salvando la diferencia de cotas, en contra de la gravedad, mediante el sistema de poleas que se muestra en la imagen de la izquierda.

En la tercera curva, el producto se recibe del tramo anterior y se redirige al nivel superior del siguiente tramo mediante el sistema de poleas que se muestra en la imagen de la derecha.





- Sistema de poleas empleado en las Curvas 1 y 2 -          - Sistema de poleas empleado en las Curva 3 -

P00094

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

## 8.7. Control de Calibre

El calibre de la envoltura de gel de colágeno es el único parámetro del producto que se mide en tiempo real y de forma continua mientras se desarrolla el proceso de producción. Cualquier otra característica o propiedad de la envoltura de gel de colágeno se evalúa mediante ensayos sobre el producto ya terminado.

El sistema de control de calibre implementado en la Línea S utiliza equipos láser de precisión micrométrica y alta frecuencia de muestreo de las series LS-5000 y LS-7000 de la empresa KEYENCE CORPORATION OF AMERICA. Según se establece en el Contrato, NITTA CASINGS INC. se encargaría de la adquisición de los equipos y SAYER TECHNOLOGIES S.L. se encargaría de su instalación, proporcionando los soportes mecánicos (bases y pórticos), el sistema eléctrico, la programación del sistema y las pantallas de control. Según refiere SAYER TECHNOLOGIES S.L., finalmente se montaron un total de 20 equipos distribuidos en 4 zonas, tal como se indica a continuación:

⇨ 8 equipos a la salida de la zona de extrusión; 1 equipo por cabezal de extrusión o canal.

⇨ 4 equipos al final de la Zona 1 del Área Húmeda; 1 equipo cada 2 canales.

⇨ 4 equipos al final de la Zona 2 del Área Húmeda; 1 equipo cada 2 canales.

⇨ 4 equipos a la salida del Área de Secado, antes de la Zona de Enrollado; 1 equipo cada 2 canales.



- Micrómetros digitales KEYENCE de la serie LS-7000 -

La configuración del sistema de control de calibre prevista en el diseño original de la Línea S tiene como principal objeto permitir el ajuste de los parámetros de funcionamiento de los cabezales de extrusión, pero también evaluar las variaciones del calibre de la envoltura de gel de colágeno extruido a medida que va siendo sometida a los distintos tratamientos. En este sentido, se habrían establecido 4 sectores de control de la evolución del calibre de la envoltura de gel de colágeno tras su extrusión:

⇨ El primer sector de control tendría por objeto medir el calibre a la salida de los cabezales de extrusión.

P00095



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S

Control de Calibre

⇨ El segundo sector de control permitiría evaluar los efectos sobre el calibre debidos a los tratamientos de Neutralización y Lavabo que se efectúan en la Zona 1 del Área Húmeda.

⇨ El tercer sector de control permitiría evaluar los efectos sobre el calibre debidos a los tratamientos de Lavabo y Plastificado que se efectúan en la Zona 2 del Área Húmeda.

⇨ El cuarto sector de control permitiría evaluar los efectos sobre el calibre debidos a los tratamientos de Secado y Humectación que se efectúan en el Área de Secado, amén de la aplicación de aditivos que se realice en cada caso.

Esta sectorización del control del calibre habría facilitado en cierta medida los ajustes propios del proceso de Puesta en Marcha de la Línea S, así como los propios de la fase de producción.

## 8.8. Enrollado

La Fase de Línea Continua finaliza con el proceso de enrollado de la envoltura de gel de colágeno (lisa), que es el formato en el que se envía el producto a la planta de NITTA CASINGS INC. en Ontario (Canadá), donde se realiza la Fase de Acabado (se recuerda que el cliente final recibe la envoltura de gel de colágeno plisada).





- Envoltura enrollada en bobina -

- Envoltura plisada en barra o "stick" -

En la Zona de Enrollado se recibe la envoltura de gel de colágeno tras finalizar su recorrido por la Zona de Secado, y se enrolla en tambores. Se instalaron 2 tambores de enrollado para cada uno de los canales de producción (un total de 16), de manera que uno estuviera activo mientras el otro quedaba en reserva.

No se profundiza más en la descripción de esta parte de la máquina porque no hay reclamaciones sobre su diseño en la DEMANDA, y porque tras la adquisición de las instalaciones de NITTA CASINGS INC. por parte de VISCOFAN COLLAGEN USA INC. ha sido sustituida por otro sistema de enrollado.

P00096

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Diseño de la Línea S

Enrollado



- Vista de la Zona de Enrollado de una de las 2 líneas de producción previstas en el Diseño original de la Línea S –

P00097



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Análisis y Conclusiones
Análisis y Conclusiones

## 9. ANÁLISIS Y CONCLUSIONES

Este apartado aborda el análisis de las reclamaciones que se plantean en el dictamen pericial que se incorpora a la DEMANDA, al objeto de extraer las conclusiones pertinentes; aunque también se analizan otros aspectos no citados de forma expresa sobre las que se ha considerado oportuno pronunciarse, porque facilitan la interpretación del contexto en el que se desarrolla el conflicto.

### 9.1. Sobre el Objeto del Contrato

Para distinguir con claridad los ámbitos de responsabilidad de los actores implicados en el proceso de contratación de la Línea S, así como de su ejecución posterior, resulta esencial identificar con cierta precisión el objeto del Contrato, que no es otro que aquel delimitado por sus cláusulas.

Mediante la firma del Contrato, SAYER TECHNOLOGIES S.L. se comprometió al diseño, fabricación y montaje, en las instalaciones del cliente, de una máquina cuyas prestaciones, *grosso modo*, consistían en:

a) Recibir la envoltura de gel de colágeno producida en los cabezales de extrusión.

   El Contrato no contemplaba el compromiso de incluir estos dispositivos (los cabezales de extrusión), de manera que su adquisición, montaje, puesta a punto y operación no eran responsabilidad de SAYER TECHNOLOGIES S.L.

b) Facilitar la circulación de la envoltura de gel de colágeno extruido a una velocidad constante[9], de hasta 46 metros (150 pies) por minuto, a lo largo de un circuito que recorre distintas etapas que tienen por objeto proporcionar al producto una serie de tratamientos de forma secuencial (neutralización, lavado, plastificado, secado y humectación).

   El Contrato no contemplaba el compromiso de incluir los sistemas de aportación y/o extracción de fluidos para dichos tratamientos (amoniaco, agua, glicerina, aditivos, aire caliente y seco, y aire húmedo, respectivamente), de manera que su adquisición, montaje, puesta a punto y operación no eran responsabilidad de SAYER TECHNOLOGIES S.L.

c) Adecuar el diseño y los materiales empleados en la máquina al espacio disponible y a las condiciones de trabajo previstas en cada una de las etapas de tratamiento (corrosión, humedad, temperatura, aislamiento térmico, etc.).

---

9   Esta cuestión se aborda en profundidad en el apartado Sobre las Capacidades Motrices de la Línea S.

d)  Recibir la envoltura de gel de colágeno a la salida de la última etapa de tratamiento (humectación) y darle formato de rollo o bobina (envoltura lisa), teniendo presente que el formato en el que se entrega el producto al cliente final requiere someter a la envoltura a un proceso adicional, de plisado, que tiene lugar en la planta que la empresa tiene en Ontario (Canadá).

e)  Proporcionar un sistema para el control del calibre de la envoltura, con 4 puntos de control distribuidos a lo largo del recorrido de la Línea S. Aunque el Contrato no contemplaba el compromiso de incluir estos dispositivos, SAYER TECHNOLOGIES S.L. se hizo cargo de su montaje y puesta a punto.

En definitiva, el Contrato suscrito entre ambas empresas tenía por objeto la adquisición de una máquina destinada a integrarse en un proceso de producción de envoltura de gel de colágeno extruido, capaz de: transportar la envoltura de gel de colágeno extruido a lo largo de las distintas etapas que componían el proceso de producción de forma adecuada[10], garantizar los tiempos de tratamiento del producto especificados para cada una de esas etapas, adaptarse al espacio disponible en la planta de Bridgewater (New Jersey), equipar un sistema de control de calibre, y subsidiariamente, prever la integración de aquellos sistemas esenciales para el proceso no previstos en el Contrato.

Además de las consideraciones anteriores, eminentemente técnicas, el Contrato tenía por objeto otros propósitos, destinados a proporcionar los mecanismos legales adecuados para proteger y garantizar los intereses de las partes firmantes.

## 9.2. Sobre las Especificaciones Técnicas de la Línea S

Poco más de un mes antes de la firma del Contrato, SAYER TECHNOLOGIES S.L. y NITTA CASINGS INC. habían firmado un Acuerdo de Cooperación Tecnológica y Comercial con el objeto de abordar una serie de proyectos que incluían, entre otros, una línea de procesamiento de envoltura de gel de colágeno.

Con anterioridad a la firma de este acuerdo, SAYER TECHNOLOGIES S.L. ya había facilitado a NITTA CASINGS INC. diversos documentos en los que se describían las características técnicas de algunos de sus productos; y en el caso concreto del Dosier Técnico, se anticipaban las referencias que se emplearon posteriormente para definir las especificaciones técnicas de la Línea S.

El Dosier Técnico presentaba una solución para el proceso de producción de envoltura de gel de colágeno extruido que difería sustancialmente del proceso productivo que NITTA CASINGS INC. venía operando hasta la fecha en sus líneas (Unit 1, 2, 3 y 4), y que afectaba de forma radical a la aplicación de los tratamientos de

---

10  Esta cuestión se trata con mayor detalle en el apartado Sobre la Adecuación para el Transporte de la Línea S.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Análisis y Conclusiones

Sobre las Especificaciones Técnicas de la Línea S

neutralización, lavado y plastificado; de manera que, aceptando estas premisas, NITTA CASINGS INC. asumía de forma implícita el carácter experimental del proyecto, y en consecuencia, el riesgo asociado.

Por otra parte, el Dosier Técnico incluía una serie de advertencias ( *"remarks"*) en sus primeras páginas para aclarar que SAYER TECHNOLOGIES S.L. estaba especializada en fabricación y automatización de líneas, pero no en gel (de colágeno, se entiende), descargando así en el cliente la responsabilidad de anticipar la idoneidad de su producto (el gel de colágeno) a las prestaciones contratadas. Estas advertencias se referían también a la definición de los tiempos de procesamiento que requería el producto del cliente (gel de colágeno), que servirían para definir las dimensiones de la máquina, así como otras cuestiones relativas a los elementos o sistemas que no se incluían en la propuesta (cabezales de extrusión, sistemas de aportación de aire, etc.).

El documento que recogía las especificaciones técnicas definidas para la Línea S era el Presupuesto (Quotation) que se adjuntó al Contrato, y el responsable último de la definición y aceptación de dichas especificaciones era NITTA CASINGS INC., en calidad de cliente y como empresa especializada en la producción de gel de colágeno y en su procesamiento para la producción de envoltura.

Por su parte, SAYER TECHNOLOGIES S.L., en calidad de vendedor y como empresa especializada en maquinaria industrial y automatización de procesos, estaba en condiciones de asesorar a NITTA CASINGS INC. en la definición de aquellas especificaciones técnicas propias de su ámbito de competencias.

La configuración propuesta (en forma de "L" invertida) obedecía en exclusiva a la necesidad del cliente de acondicionar la máquina al espacio disponible en la planta de Bridgewater (New Jersey), y obligaba a la fragmentación del recorrido, una circunstancia que imponía serias restricciones al diseño de la Línea S, motivando, entre otras cosas, la implementación del sistema de poleas en las curvas.

De la misma manera, el dimensionamiento de la longitud de cada uno de los tramos de la Línea S, así como el número de pases previstos para cada uno de ellos, obedecía en exclusiva a la previsión del cliente sobre los tiempos de tratamiento que requería su producto (que es donde residía en última instancia la clave del proceso productivo). En este sentido, conviene subrayar que los tratamientos de neutralización, lavado y plastificado aceptados por NITTA CASINGS INC. en este proyecto difieren sustancialmente de los que venía operando hasta la fecha en sus líneas de procesamiento de envoltura mediante extrusión de gel de colágeno y que, por tanto, no disponía de referencias previas propias para su definición (de nuevo se incide en el carácter experimental asociado a esta circunstancia).

Por otra parte, dotar a la máquina de una velocidad máxima de transporte alrededor de un 50% superior a la velocidad a la que estaban funcionando hasta el momento sus líneas de procesamiento de envoltura de gel de

P00100

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Análisis y Conclusiones

 Informe Pericial IPI2-PAM-PQ-2021-1327

Sobre las Especificaciones Técnicas de la Línea S

colágeno, que operaban en el entorno de los 30 metros (100 pies) por minuto, obedecía en exclusiva al interés del cliente por incrementar de forma sensible su capacidad de producción.

En relación con los contenidos que se incluyen finalmente en el Presupuesto, cabe afirmar que SAYER TECHNOLOGIES S.L. estaba en condiciones de asumir y satisfacer el cumplimiento de todas las especificaciones técnicas que se definieron porque formaban parte de su ámbito de especialización industrial y porque dependían en exclusiva de su capacidad técnica, con la excepción de aquellas que hacían referencia a los objetivos de humedad del producto a la salida de las etapas de secado y humectación, cuya inclusión resulta inexplicable para el perito autor de este Informe, ya que su consecución dependía también de factores ajenos a su solvencia técnica, entre los que estaría la gestión que hiciera NITTA CASINGS INC. de sus sistemas de aportación de aire caliente y seco (para el secado del producto), y de aire húmedo (para su humectación) en el Área de Secado, amén de la gestión que hiciera de los sistemas que afectaban a los tratamientos previos, que son los que determinan las propiedades del producto a su entrada. A este respecto, se ha solicitado a las partes que manifiesten en qué sentido interpretan la inclusión de estas referencias en el Presupuesto, de manera que:

⇨ SAYER TECHNOLOGIES S.L. declara que los objetivos de humedad del producto fueron algunos de los datos que los técnicos de NITTA CASINGS INC. plantearon en las reuniones previas a la firma del Contrato, y que se incluyeron en el Presupuesto para hacerlo más completo a las solicitudes del cliente.

⇨ VISCOFAN COLLAGEN USA INC. considera que la inclusión de dichos objetivos de humedad responde al previo estudio que SAYER TECHNOLOGIES S.L. tuvo que haber realizado sobre el proceso de producción de las envolturas en la fábrica de NITTA CASINGS INC., antes de proceder al diseño de la Línea S.

Según el criterio del perito autor de este Informe, la inclusión en el Presupuesto de las especificaciones técnicas que se refieren a la humedad del producto es inconveniente e inapropiada, y propone obviarlas ya que, en el momento de la firma del Contrato, SAYER TECHNOLOGIES S.L. no estaba en condiciones de asumir esos compromisos por sí sola, y NITTA CASINGS INC. no podía ignorar este hecho, puesto que ambas empresas eran bien conscientes de sus respectivos ámbitos de especialización.

## 9.3. Sobre el Proceso de Ejecución del Contrato

En el Contrato (cláusula 5) se establecían una serie de hitos a lo largo del proceso de diseño, fabricación y montaje, que obligaban a NITTA CASINGS INC. al abono de ciertos porcentajes del importe total de la máquina,

así como la realización de un Test de Prueba y un proceso de Puesta en Marcha vinculados al comienzo del período de Garantía, cuya duración se fijaba en 24 meses (cláusula 6). Sin embargo, y a pesar de su trascendencia, ambas partes refieren no disponer de actas, o documentos equivalentes, con los que poder ubicar temporalmente estos eventos, conocer su alcance o las circunstancias en las que se produjeron, de manera que la reconstrucción de los hechos sólo puede hacerse de forma parcial e indirecta a partir de otras referencias, como los justificantes de envío de materiales, los justificantes de abono de los importes previstos en el Contrato, el material audiovisual aportado o la correspondencia que mantuvieron en su momento los técnicos y los directivos de ambas empresas.

Esta aparente falta de formalidad en la documentación y registro de cuestiones fundamentales para la ejecución del Contrato se extiende también al ámbito de la documentación del diseño de la máquina (proyecto), entre otros, condicionando de forma sustancial el objeto de este informe.

### 9.3.1. Sobre el Test de Prueba y el Proceso de Puesta en Marcha

Tanto el Test de Prueba como el proceso de Puesta en Marcha son instrumentos que se incorporaron al Contrato con el propósito, entre otros, de validar el cumplimiento de las especificaciones técnicas establecidas para la Línea S y de servir como referencia para fechar al comienzo del período de Garantía, cuestiones fundamentales para resolver adecuadamente sobre la DEMANDA presentada por VISCOFAN COLLAGEN USA INC.; y aunque no se formalizasen ni se registrasen como habría sido deseable desde la perspectiva de quienes pretendemos su análisis *a posteriori*, de alguna manera se produjeron, y en consecuencia, conviene disponer de criterios suficientes para referirse a ellos, que es a lo que se dedican los siguientes párrafos, con los que se trata de compensar su ausencia.

En primer lugar, resulta esencial entender y asumir que el Test de Prueba y el proceso de Puesta en Marcha serían dos actividades bien diferenciadas, pudiendo considerarse, *grosso modo*, que:

⇨ El Test de Prueba (test performance) de la Línea S sería un trámite consistente en la realización de una serie de comprobaciones de carácter técnico sobre la máquina, o sobre ciertos componentes o sistemas de la misma, tras su montaje y puesta a punto [11], con el objeto de verificar que su funcionamiento es conforme con las especificaciones técnicas establecidas en el Contrato.

Por razones obvias, la iniciativa sobre la resolución de este trámite (diseño, ejecución, registro, validación, formalización, etc.) le correspondería principalmente a SAYER TECHNOLOGIES S.L., mientras

---

11   La puesta a punto de un equipo o sistema sería el proceso de ajuste de sus componentes, generalmente posterior a su montaje, que tiene por objeto hacerlo plenamente funcional desde el punto de vista de sus especificaciones técnicas.

que NITTA CASINGS INC. adoptaría en este caso un rol eminentemente fiscalizador.

Para la adecuada realización del Test de Prueba de la Línea S, tal como se ha definido aquí, sería preciso disponer al menos de suministro eléctrico para alimentar los sistemas de tracción, regulación y control, de manera que pudiera verificarse que se alcanzaban los objetivos de velocidad, entre otros.

En cambio, no sería preciso haber resuelto en esta fase la integración de todos aquellos sistemas y componentes excluidos del Contrato (los cabezales de extrusión, el sistema de extracción de amoniaco, de dosificación de agua, de glicerina, de aditivos, de aire caliente y seco, de agua pulverizada, etc.), y por lo tanto, no procedería la realización de pruebas con gel de colágeno.

Por último, también conviene aclarar que todas aquellas comprobaciones que pudieran resolverse mediante la consulta y el estudio de la documentación de las especificaciones técnicas de los materiales y componentes instalados en la máquina (data sheet) relativos a la resistencia a la humedad, a la corrosión, a la temperatura, a los esfuerzos mecánicos previstos, y demás características prescritas en la fase de diseño, no serían objeto del Test de Prueba.

⇨ El proceso de Puesta en Marcha de la Línea S comenzaría tras la superación del Test de Prueba (al menos desde un punto de vista formal), y consistiría en la secuencia de actuaciones de carácter técnico sobre la máquina, y sobre los componentes o sistemas de la misma, orientadas a procurar su puesta en servicio definitiva (producción orientada a la comercialización).

En este caso, la iniciativa sobre la resolución de esta fase (diseño, ejecución, registro, validación, formalización, etc.) le correspondería principalmente a NITTA CASINGS INC., que contaría con el asesoramiento de SAYER TECHNOLOGIES S.L. durante todo el proceso, procurándole los mecanismos que le permitieran asumir la operación y el mantenimiento de la Línea S de forma autónoma (documentación, formación, etc.).

Para la adecuada resolución de esta fase habría que disponer de suministro eléctrico, obviamente, pero también habría que resolver la integración de todos y cada uno de los sistemas y componentes esenciales para la producción de envoltura de gel de colágeno no previstos en el Contrato, ya que es en esta fase cuando procede la realización de pruebas con gel de colágeno, al objeto de establecer los parámetros de funcionamiento de la máquina más adecuados para el cliente, de acuerdo con las características específicas de su producto.

Este planteamiento es consistente con la primera mención que se hace en el Contrato al respecto del proceso de Puesta en Marcha (cláusula 1.5), donde se indica que deberá realizarse integrando al

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*



Análisis y Conclusiones

Sobre el Proceso de Ejecución del Contrato

equipo de ingenieros de NITTA CASINGS INC., conocedores del producto (gel de colágeno). También lo es con el contenido del texto que desarrolla la cláusula 6, que menciona estos acontecimientos en el orden propuesto (*"test performed and start-up"*).

A la vista de los criterios propuestos, se pueden establecer las siguientes premisas, de cara a la determinación de las fechas en las que se pudieron realizar estas dos actividades (Test de Prueba y Puesta en Marcha):

1.  La realización del Test de Prueba exigía el montaje completo de los materiales enviados por SAYER TECHNOLOGIES S.L. y el suministro eléctrico de los motores y sistemas de regulación y control de la Línea S.

2.  El proceso de Puesta en Marcha comenzaría tras la realización del Test de Prueba, con la integración en la Línea S de todos los sistemas excluidos del Contrato que eran esenciales para la producción de envolturas de gel de colágeno, y la realización de las primeras pruebas con dicho producto, supervisadas por los ingenieros de NITTA CASINGS INC.

En el momento de redactarse este informe, ya se dispone de diversa documentación que incluye referencias temporales válidas para determinar con un grado de aproximación suficiente el momento en el que tuvieron lugar estos sucesos (fechas de envío de los materiales a la planta de NITTA CASINGS INC., fechas de abono correspondientes al hito de Aceptación en NITTA, fechas de registro de material audiovisual aportado por las partes en el que se observan las primeras pruebas con gel de colágeno circulando por uno de los canales de la Línea S, fechas de los correos electrónicos enviados por los técnicos de NITTA CASINGS INC. a los técnicos de SAYER TECHNOLOGIES S.L. compartiendo aspectos relacionados con las características físicas que se iban obteniendo en la envoltura de gel de colágeno, y la referencia que se incluye en el séptimo apartado del dictamen pericial que se incorpora a la DEMANDA, fechando las primeras pruebas de producción en mayo de 2017, compatible con todas las anteriores).

### 9.3.2. Sobre la Garantía

Con respecto al comienzo del período de garantía, el criterio de las partes no coincide:

⇨ SAYER TECHNOLOGIES S.L. hace referencia al momento en el que se produce el primero de los 3 abonos con los que se formaliza el último hito previsto en el Contrato (Aceptación en NITTA), situando el inicio del período de garantía el 1 de febrero de 2017.

⇨ VISCOFAN COLLAGEN USA INC. sitúa el inicio del período de garantía el 31 de enero de 2018 (11 meses más tarde que SAYER TECHNOLOGIES S.L.), basándose en el contenido de un informe de

Informe Pericial JPI2-PAM-PO-2021-1327

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Análisis y Conclusiones
Sobre el Proceso de Ejecución del Contrato

auditoría (Due Diligence) elaborado por la firma legal Baker Mckenzie durante el proceso previo a la adquisición de NITTA CASINGS INC. en EE.UU. y de NITTA CASINGS (Canada) INC.

Lo cierto es que la redacción del texto incluido en el Contrato no es especialmente clara ( *"Seller warrants the Line S for 24 months from the test performed and start-up at NITTA facilities (USA)…"*), y puede ser interpretado de formas diversas según los intereses de unos y de otros, por no hablar de los matices que pueden surgir al traducirlo.

A este respecto, y basándose en las premisas propuestas en el apartado anterior, el perito que redacta este informe considera que el comienzo del período de Garantía se debería establecer a partir del momento en el que se hubiera superado con éxito el Test de Prueba (*test performed*), ya que ése sería el momento en el que SAYER TECHNOLOGIES S.L. habría satisfecho todos los compromisos relacionados con su solvencia técnica, y sólo le restaría hacer frente a la Garantía ofrecida en el Contrato, proporcionar formación a NITTA CASINGS INC. para la operación y el mantenimiento de la Línea S, y asesoramiento durante el proceso de Puesta en Marcha.

Por último, quedaría pendiente considerar los efectos que puedan tener sobre la Garantía inicialmente prevista las modificaciones posteriores realizadas sobre el diseño original de la Línea S, una cuestión sobre la que no procede pronunciarse en este informe.

## 9.4. Sobre las Capacidades Motrices de la Línea S

El Presupuesto que se adjunta al Contrato recoge cuatro referencias explícitas a la capacidad motriz que debe proporcionar la Línea S. Son las siguientes:

⇨ La Línea S debe disponer de 2 líneas de producción, una a la derecha y otra a la izquierda del pasillo central que recorre los distintos tramos de la maquina.

⇨ Cada línea de producción (derecha e izquierda) debe disponer de 4 canales.

⇨ Los canales deben dimensionarse para trabajar con calibres de 13 a 24 milímetros. Además, la línea de producción de la izquierda debe dimensionarse para trabajar también con 3 canales, con calibres de 25 y 42 milímetros.

⇨ La velocidad máxima de la Línea S se fija en 150 pies (46 metros) por minuto.

No consta reclamación alguna por parte de VISCOFAN COLLAGEN USA INC. sobre las tres primeras especificaciones, pero sí sobre la cuarta, que se analiza con más detalle en el siguiente apartado.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327

Análisis y Conclusiones

Sobre las Capacidades Motrices de la Línea S

### 9.4.1. Sobre la Velocidad Máxima de la Línea S

El proceso de diseño de las cintas transportadoras de la Línea S se detalla en un documento que se adjunta al informe. El esquema general empleado para el diseño de sus componentes sería el siguiente:

a) Estimación de cargas y esfuerzos en base a las especificaciones técnicas y a la experiencia (que incrementa la previsión de cargas y esfuerzos previstos inicialmente).

b) Dimensionamiento y determinación de bandas (cintas) y poleas, en base a los criterios técnicos del fabricante (la selección conservadora de las opciones ofrecidas por el fabricante revierte en el incremento de las prestaciones mecánicas del diseño).

c) Dimensionamiento y determinación de motores eléctricos y variadores de frecuencia, en base a las especificaciones de velocidad máxima, al cálculo de cargas y esfuerzos, a la previsión de ampliación de las capacidades del sistema y a la gama de equipos disponibles.

A la vista de la documentación facilitada por SAYER TECHNOLOGIES S.L., revisada y analizada por el perito autor de este informe, se concluye que:

⇨ Los cálculos facilitados por la empresa para el dimensionamiento de los componentes mecánicos y eléctricos de las cintas de transporte de la Línea S prevén su funcionamiento en el entorno de los 200 pies (60 metros) por minuto (un 33% superior a la especificación técnica recogida en el Contrato), aunque en primera instancia se limita (vía software) a 150 pies (46 metros) por minuto, tal como se había establecido en el Contrato.

⇨ Las prestaciones de los equipos y sistemas empleados en la Línea S, cuyo objeto sería proporcionarle la capacidad de transporte prevista en el Contrato, se adaptan a los parámetros obtenidos durante el proceso de cálculo citado en el párrafo anterior, de manera que acaban dimensionándose para ofrecer mayores prestaciones de las contratadas (sobredimensionados).

En definitiva, se desestima la reclamación que se presenta en la DEMANDA en la que se cuestiona el cumplimiento de la especificación técnica sobre la velocidad máxima de la Línea S, porque se diseñó y dimensionó para desarrollar todo el rango de velocidades contratadas, incluida la máxima, que podría superar suprimiendo la limitación que se implementó en su sistema de regulación y control.

Cabe indicar que el argumento que se presenta en la DEMANDA no cuestiona en realidad este hecho, sino la incapacidad de producir envoltura de gel de colágeno comercializable más allá de los 105 pies (32 metros) por minuto (una cuestión que no depende únicamente de las prestaciones del sistema motriz de la

*página 58*

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*

Informe Pericial JPI2-PAM-PO-2021-1327    *19 de junio de 2023*    Análisis y Conclusiones

Sobre las Capacidades Motrices de la Línea S

Línea S, como ya se ha aclarado en diversas ocasiones), recurriendo para ello al uso reiterado de un concepto artificioso ("velocidad prometida") que induce a interpretar de forma equívoca los verdaderos compromisos adquiridos por SAYER TECHNOLOGIES S.L. en relación con las capacidades de la Línea S.

### 9.4.2.  Sobre la Adecuación para el Transporte de la Línea S

Con la firma del Contrato, SAYER TECHNOLOGIES S.L. asume de forma explícita el compromiso de satisfacer el cumplimiento de las especificaciones técnicas previstas para la Línea S, incluidas aquellas relacionadas con sus capacidades motrices; pero al mismo tiempo, y de forma implícita, asume también el compromiso de diseñar una máquina adecuada para el transporte de la envoltura de gel de colágeno extruido dentro de los rangos de velocidad de trabajo establecidos.

La falta de consistencia (o estabilidad mecánica) de la envoltura de gel de colágeno extruido y su variabilidad a lo largo de las distintas etapas de procesamiento son aspectos que hay que considerar especialmente a la hora de diseñar el sistema motriz, que podrá considerarse adecuado en la medida en que permita el tránsito del producto sin afectar significativamente a su estabilidad mecánica, que podría verse comprometida por la combinación de los siguientes efectos:

⇨ Rozamiento del producto con elementos mecánicos.

⇨ Transiciones del producto entre cintas de transporte consecutivas.

⇨ Efectos gravitatorios (peso propio).

⇨ Presión de la mezcla de gases que se inyecta en su interior.

⇨ Alteración de las propiedades del producto debidas a los tratamientos aplicados.

SAYER TECHNOLOGIES S.L. estaba en disposición de intervenir en el diseño de la máquina para amortiguar los efectos debidos al rozamiento recurriendo al empleo de materiales, componentes y estrategias de diseño orientados a minimizar los coeficientes de fricción (recubrimientos, revestimientos, rodamientos, lubricantes, secciones de apoyo, radios de giro, etc.).

SAYER TECHNOLOGIES S.L. también estaba en disposición de intervenir en el diseño de la máquina para amortiguar los posibles estiramientos (o colapsos) de la envoltura durante las transiciones que se producen entre una cinta de transporte y la siguiente; desde un punto de vista pasivo, mediante el diseño de recorridos poco traumáticos entre cintas de transporte (empleando materiales de baja fricción); y desde un punto de vista activo, mediante la implementación de un sistema de regulación de la velocidad de la Línea S que permitiera un

P00107

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IP|2-PAM-PO-2021-1327 · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · Análisis y Conclusiones

Sobre las Capacidades Motrices de la Línea S

ajuste suficientemente preciso de las velocidades de cada una de las cintas de transporte instaladas en la máquina de manera pudieran controlarse los estiramientos asociados a la diferencia de velocidad entre cintas de transporte consecutivas (aunque la gestión de este sistema fuera responsabilidad exclusiva de NITTA CASINGS INC. a partir del momento en que se iniciase el proceso de Puesta en Marcha). A este respecto, cabe recordar que la precisión con la que se puede establecer la velocidad de cada una de las cintas de transporte es de una centésima de pie por minuto (0,01 pies por minuto), de manera que el estiramiento asociado en exclusiva a este mecanismo se puede mantener acotado en el entorno del 0,01% en todos los casos[12] (si se consideran los datos aportados en el dictamen pericial que se incorpora a la DEMANDA, los valores porcentuales que se obtienen superan este valor en dos órdenes de magnitud).



- Pantalla de control de la velocidad de la Línea S -

Con respecto a los efectos asociados al peso propio, lo cierto es que ambas empresas estaban en disposición de contribuir a su amortiguamiento; en el caso de NITTA CASINGS INC., como productora del gel de colágeno y responsable de su extrusión, mediante la gestión de las propiedades físicas del producto (espesor, calibre, densidad, resistencia, elasticidad, humedad, etc.), incluyendo su densidad lineal; y en el caso de SAYER TECHNOLOGIES S.L., mediante la consideración de las propiedades del gel de colágeno extruido en el diseño del sistema motriz (para determinar, por ejemplo, la distancia entre cunas en las bandas verdes, los metros de descuelgue de la envoltura en los tramos de curva, etc.).

---

12  Asumiendo una hipótesis muy conservadora con recorridos de 100 pies y tiempos de circulación de 1 minuto.

P00108



NITTA CASINGS INC., por su parte, era responsable en exclusiva de la gestión del sistema de inyección de la mezcla de gases en el interior de la envoltura de gel de colágeno extruido, a través de los orificios de los cabezales de extrusión, y por lo tanto, de la regulación de su presión.

Y por último, NITTA CASINGS INC. establecía los valores de velocidad de cada una de las cintas de transporte y las dosis de los distintos tratamientos que se aplicaban a lo largo del proceso productivo, siendo como era la responsable de la gestión del conjunto de la línea de procesamiento.

Pero al margen de las consideraciones anteriores, el hecho es que SAYER TECHNOLOGIES S.L. no dispuso de información suficiente (así se le hecho saber al perito tras su consulta a las partes) sobre las propiedades mecánicas del producto de NITTA CASINGS INC. para evaluar convenientemente la idoneidad de algunas de las soluciones incluidas en el diseño original de la Línea S (es el caso de los sistemas de poleas empleados en las curvas), entre otras cosas porque NITTA CASINGS INC. no disponía de referencias previas para anticipar el comportamiento de su producto en las etapas de neutralización, lavado y plastificado de la Línea S, ya que resultaban inéditas para ellos, de manera que esta información sólo empezó a estar disponible a partir del momento en el que comienza el proceso de Puesta en Marcha (no obstante, SAYER TECHNOLOGIES S.L. refiere la realización de un ensayo a partir de una muestra obtenida de una de las líneas de procesamiento de envoltura mediante extrusión de gel de colágeno que operaban previamente en la planta de New Jersey, que sirvió para evaluar la adecuación del diseño del sistema de poleas empleado en las curvas).

Así pues, en relación con la adecuación del sistema motriz de la Línea S, y a la vista de la información referida en los párrafos anteriores, se concluye que:

a) NITTA CASINGS INC. debió proporcionar a SAYER TECHNOLOGIES S.L. información suficiente y necesaria sobre las características mecánicas de su producto para facilitar la validación de las soluciones mecánicas propuestas en el diseño de la Línea S; pero no lo hizo.

b) SAYER TECHNOLOGIES S.L. debió emplear la información sobre las características mecánicas del producto de NITTA CASINGS INC. para validar la adecuación de las soluciones mecánicas propuestas en el diseño de la Línea S; pero no dispuso de ella.

c) NITTA CASINGS INC. debió proporcionar a SAYER TECHNOLOGIES S.L. muestras de producto que le sirvieran para ensayar las soluciones mecánicas que se estaba planteando en la fase de diseño; y si lo hizo, no pudo garantizar que sus propiedades fueran similares a las que se observarían una vez comenzase el proceso de Puesta en Marcha de la Línea S, ya que los tratamientos de neutralización, lavado y plastificado previstos para esta máquina cambiaban sustancialmente con respecto a los que NITTA CASINGS INC. venía operando en otras líneas de procesamiento de su planta de New Jersey.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JP12-PAM-PO-2021-1327                    Análisis y Conclusiones

Sobre las Capacidades Motrices de la Línea S

d) Al no disponer de los mecanismos de validación referidos en los puntos anteriores, SAYER TECHNOLOGIES S.L. pudo recurrir a la realización de ensayos para evaluar la adecuación del diseño del sistema de poleas que se implementarían posteriormente en las curvas de la máquina, pero empleando para ello producto procesado en una línea de envoltura mediante extrusión de gel de colágeno de NITTA CASINGS INC. que aplicaba los tratamientos de neutralización, lavado y plastificado con técnicas distintas a las previstas para la Línea S.

e) Y aunque el diseño del sistema motriz de la Línea S pudiera ser adecuado a las características del producto de NITTA CASINGS INC., no sería garantía suficiente de que no se viera sometido a esfuerzos mecánicos excesivos, ya que éstos dependan también de la gestión que hiciera NITTA CASINGS INC. de los sistemas de regulación de la velocidad de la Línea S y de los sistemas de dosificación de los tratamientos de neutralización, lavado, plastificado, secado y humectación.

f) En cualquier caso, y a tenor de los cambios radicales a los que se ha sometido el diseño original de la Línea S, resulta inviable obtener conclusiones válidas sobre el desempeño de la máquina original a partir del funcionamiento de la que opera actualmente.

En definitiva, no hay indicios ni pruebas concluyentes de que los supuestos estiramientos que sufría la envoltura de gel de colágeno extruido que denuncia VISCOFAN COLLAGEN USA INC. en la DEMANDA, pudieran deberse a la mejor o peor adecuación del sistema de tracción diseñado para la Línea S por SAYER TECHNOLOGIES S.L.

## 9.5. Sobre el Dimensionamiento de la Línea S

Las reclamaciones que hace VISCOFAN COLLAGEN USA INC. a este respecto se refieren a la falta de capacidad de la Zona de Secado (se entiende excluida la Zona de Humectación), que identifica como la causa principal que limita el aumento de la velocidad de procesamiento de la línea por encima de los 105 pies (32 metros) por minuto, y al tamaño excesivo del Área Húmeda (tanto de la Zona 1 como de la Zona 2).

Por su parte, SAYER TECHNOLOGIES S.L. refiere que se limitó a dimensionar la Línea S atendiendo a las especificaciones técnicas recogidas en el Presupuesto, que establecían la longitud de los pases y su número, en cada una de las zonas de la máquina, de acuerdo con los tiempos de tratamiento que NITTA CASINGS INC. consideró adecuados.

Centrados en primera instancia en el dimensionamiento de la Zona de Secado, y recurriendo a la información que proporciona VISCOFAN COLLAGEN USA INC. en su DEMANDA, parece que NITTA CASINGS INC. no conseguía

P00110

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327                    Análisis y Conclusiones

Sobre el Dimensionamiento de la Línea S

los valores de humedad que había especificado en el Presupuesto[13] para su producto a la salida de esta etapa (entre el 9 y el 11%) cuando la línea superaba valores de velocidad de 30 metros (100 pies) ó 32 metros (105 pies) por minuto; aún siendo notablemente inferiores a la máxima contratada (en casi un 50%).

Las razones por las que no se alcanzaron estos objetivos de humedad pudieron ser varias, e incluso pudieron confluir, siendo las más verosímiles las siguientes:

⇨ Falta de capacidad del sistema de aportación de aire caliente y seco.

⇨ Problemas de aislamiento térmico del cerramiento instalado en la Zona de Secado.

⇨ Condiciones de la envoltura de gel de colágeno a la entrada de la Zona de Secado.

⇨ Dimensionamiento insuficiente de la Zona de Secado como consecuencia de una definición equivocada del tiempo de tratamiento mínimo necesario.

Con respecto a la primera causa, hay que hacer notar que el proceso de secado no puede alcanzar sus objetivos si las características del aire (temperatura y humedad relativa) no son las adecuadas. O dicho de otro modo, de nada sirve prolongar los tiempos de permanencia de la envoltura de gel de colágeno en la Zona de Secado si el ambiente en el que lo hace no es propicio para alcanzar los objetivos de humedad establecidos. A este respecto, VISCOFAN COLLAGEN USA INC. no considera en ningún momento la posibilidad de que ésta pudiera ser la causa que impedía que se alcanzaran los objetivos de humedad propuestos para la envoltura a la salida de la Zona de Secado, de hecho, no hace mención alguna de las características técnicas del sistema de aportación de aire en el dictamen pericial que incorpora a la DEMANDA, y sin embargo, refiere temperaturas de trabajo en la Zona de Secado de 82 a 87 °C, y una humedad relativa promedio del 35%, muy superior a la que debía alcanzar el producto al final de esta etapa (de entre el 9 y el 11%).

En relación con la posibilidad de que pudiera haber problemas de aislamiento térmico con el cerramiento empleado en la Zona de Secado, desde luego no habrían impedido la regulación de las condiciones de temperatura y humedad relativa requeridas, o al menos no hay referencias en la DEMANDA a este respecto.

Por último, en referencia a las dos últimas causas que se plantean, hay que advertir de nuevo que las especificaciones proporcionadas por NITTA CASINGS INC. se basaban en su experiencia operando líneas de procesamiento cuyos tratamientos de neutralización, lavado y plastificado diferían notablemente de los que se proponían en el diseño de la Línea S, pudiendo ocurrir que se anticiparan condiciones del producto a la entrada de la Zona de Secado que no se ajustaran a las que finalmente se obtuvieron (carácter experimental del Contrato). Resulta llamativo que los valores de humedad del producto empiecen a ser conformes cuando los

---

13  Revisar la disquisición que se hace en el apartado 9.2 sobre la inclusión de estas referencias en el Presupuesto.

*Cristina Fuentes Sánchez*
*Nº T/I Jurnda: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327                    Análisis y Conclusiones
                                                Sobre el Dimensionamiento de la Línea S

tiempos de tratamiento en la Zona de Secado superan en casi un 50% los valores definidos inicialmente en el Presupuesto (la relación entre la velocidad de procesamiento y la duración de los tratamientos en la línea es de proporcionalidad inversa).

Si abordamos el análisis de las consideraciones que hace VISCOFAN COLLAGEN USA INC. en su DEMANDA con respecto al dimensionamiento excesivo de las Zonas Húmedas (1 y 2), comprobaremos que siguen el mismo patrón argumental empleado para cuestionar el dimensionamiento de la Zona de Secado, justificando en este caso que se deben al anterior; es decir: VISCOFAN COLLAGEN USA INC. considera que el dimensionamiento de las Zonas Húmedas 1 y 2 es excesivo porque asume una limitación en la velocidad de procesamiento de la línea cuya causa principal es la supuesta falta de capacidad de la Zona de Secado para alcanzar los objetivos de humedad previstos inicialmente; aunque también cabría hacer la lectura contraria, interpretando que, tras su paso por un Área Húmeda excesivamente larga (o mal gestionada desde el punto de vista de la dosificación), el producto llegase a la Zona de Secado en unas condiciones de humedad inasumibles para ella.

Sea como fuere, todas estas cuestiones, con la excepción del aislamiento térmico, dependían en exclusiva del criterio técnico de NITTA CASINGS INC., cliente y especialista en la producción, extrusión y procesamiento de gel de colágeno.

En definitiva, SAYER TECHNOLOGIES S.L. diseña, fabrica, instala, pone a punto y ensaya una máquina dimensionada de acuerdo con las especificaciones técnicas establecidas en el Presupuesto que se adjunta al Contrato, basadas principalmente en la definición de unos tiempos de tratamiento que sólo NITTA CASINGS INC. estaba en condiciones de proporcionar, dada su condición de cliente y especialista en la producción, extrusión y procesamiento de su producto (gel de colágeno).

NITTA CASINGS INC. no se limita a firmar el Contrato dando por buenas sus especificaciones técnicas, sino que acepta formalmente el diseño final de la máquina, procediendo al abono correspondiente al 15% de su valor total (Design Acceptance).

Por otra parte, las causas que pueden explicar en mayor medida la incapacidad de la línea para alcanzar los objetivos de humedad establecidos a la salida de la Zona de Secado dependían exclusivamente del criterio técnico de NITTA CASINGS INC., ya fuera con la definición de los tiempos de tratamiento, con la implementación y gestión del sistema de aportación de aire caliente y seco, o con la gestión de los tratamientos previos al secado de la envoltura (neutralización, lavado y plastificado).

La reclamación relativa a las Zonas Húmedas 1 y 2 se apoya en las mismas tesis que la reclamación sobre la Zona de Secado, siendo de aplicación las mismas conclusiones.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial IPI2-PAM-PO-2021-1327

Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

## 9.6. Sobre el Empleo de Materiales Inadecuados en la Línea S

Además de las reclamaciones que ya se han tratado en apartados anteriores, VISCOFAN COLLAGEN USA INC. añade a su DEMANDA varias reclamaciones relativas al empleo de una serie de elementos o materiales en el montaje de la Línea S, considerando que no eran adecuados para desempeñar su función correctamente.

### 9.6.1. Sobre las Bandas (o Correas) Verdes

En el apartado 8.5 se describe el mecanismo de transporte previsto en el diseño de la Línea S, y se menciona el empleo de dos modelos de bandas (o correas) diferentes según la zona de tratamiento en la que se instalen, refiriéndose a ellas por su color (blancas y verdes) para facilitar su asociación con las referencias empleadas en el dictamen pericial que se incorpora a la DEMANDA.

No obstante, y de cara al estudio concreto que se desarrolla en este apartado, las referencias que se hagan al respecto de estos elementos se basarán en la denominación que aparece en las hojas de especificaciones técnicas que ha facilitado SAYER TECHNOLOGIES S.L. (se adjuntan al informe), de forma que:

⇨ Las bandas (o correas) blancas se corresponderían con el modelo FAB-12E de la empresa <u>HABASIT</u>.

⇨ Las bandas (o correas) verdes se corresponderían con el modelo T20-S de la empresa <u>HABASIT</u>.

Como no hay reclamación alguna con respecto al funcionamiento o idoneidad del modelo FAB-12E, nos centramos directamente en el análisis del modelo T20-S, montado en las Zonas de Neutralización, Secado y Humectación, advirtiendo previamente que VISCOFAN COLLAGEN USA INC., a requerimiento del perito autor de este informe, ha facilitado las hojas de especificaciones técnicas a las que se estaría aludiendo en algún momento de la videoconferencia que se adjunta al dictamen pericial (en su Anexo 09, en el que se recoge el cuarto fragmento de la entrevista), resultando ser de un fabricante distinto (<u>BRECO</u>) que emplea una referencia muy parecida para su producto (T20).

Según refiere el dictamen pericial, la causa que explicaría el supuestamente elevado número de roturas del modelo T20-S sería su falta de adecuación a las condiciones de trabajo de las zonas en las que se implementó[14], y en particular, la falta de protección suficiente frente a la temperatura y la humedad, lo que habría provocado la corrosión temprana de los elementos metálicos embutidos en las bandas (moldeadas con poliuretano termoplástico, o TPU), favoreciendo su fallo mecánico.

La acusación anterior se sostiene aportando tres fotografías realizadas sobre algunos ejemplares aparentemente afectados por la corrosión, y mediante un análisis de la evolución temporal de las roturas de

---

14  No aparecen referencias a posibles errores en el dimensionamiento mecánico de las bandas.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                    Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

estos elementos basado en la información registrada en una hoja de cálculo que se adjunta como Anexo 11 al dictamen pericial bajo la denominación "Fichero Excel del Histórico de roturas de correas (verdes) en Zona Húmeda 2" (cuando la Zona Húmeda 2 es la única que no dispone de estos elementos), y en la que se cita a la empresa HABASIT en todos los casos, y no a BRECO.

El perito autor de este informe considera que no puede asumir ninguna de estas referencias para su propio análisis, entre otras razones porque no permiten establecer una relación de causa-efecto con suficientes garantías, y opta por la estrategia del contraste entre los datos disponibles relativos a las condiciones de trabajo en las zonas de neutralización, secado y humectación, y las especificaciones técnicas del modelo T20-S,

CONDICIONES de TRABAJO /

Aunque esta cuestión ya ha sido expuesta anteriormente, conviene recordar de nuevo en este punto que la responsabilidad última sobre la definición, gestión y supervisión de las condiciones de trabajo en las que opera la línea de procesamiento de envoltura mediante extrusión de gel de colágeno le corresponde a NITTA CASINGS INC. a partir del momento en el que la Línea S supera el Test de Prueba.

Así pues, y según refiere VISCOFAN COLLAGEN USA INC. las condiciones de trabajo habituales para la línea de procesamiento de envoltura mediante extrusión de gel de colágeno serían: funcionamiento ininterrumpido (24/7) y velocidad constante en régimen permanente no superior a los 46 metros (150 pies) por minuto.

En lo relativo al empleo del modelo T20-S de HABASIT en las Zonas de Neutralización, Secado y Humectación, conviene recordar que no se produce contacto directo con el producto alimentario (que se apoya en unos peines o cunas), de forma que no está sujeto al cumplimiento de los requisitos de conformidad alimentaria a los que sí está sometido el modelo FAB-12E, empleado en las Zonas de Lavado y Plastificado.

Desde un punto de vista ambiental, en cada una de las zonas en las que opera el modelo T20-S tendríamos las siguientes referencias, proporcionadas también por VISCOFAN COLLAGEN USA INC. en el dictamen pericial que incorpora a su DEMANDA:

⇨ En la Zona de Neutralización: la temperatura se mantendría de forma aproximada alrededor de los 25 ºC, no constan valores estimados para la humedad relativa, y tampoco para la acidez o alcalinidad del ambiente, aunque en el proceso se emiten vapores de amoniaco potencialmente corrosivos.

⇨ En la Zona de Secado: la temperatura se mantendría en el rango de los 82 a los 87 ºC, no constan valores estimados para la humedad relativa y tampoco para la acidez o alcalinidad del ambiente, dado que el producto ha sido sometido previamente a los tratamientos de lavado y plastificado.

página 66

P00114

*Cristina Puentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327                    Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

⇨ En la Zona de Humectación: la temperatura se mantendría alrededor de los 50 °C, la humedad relativa
se mantendría alrededor del 35% y no se contempla considerar la acidez o alcalinidad del ambiente
como un aspecto relevante, dado que el producto ha sido sometido previamente a los tratamientos de
lavado, plastificado y secado.

| | T (°C) | HR (%) | (pH) |
|---|---|---|---|
| Neutralización | ~25 | - | ? |
| Secado | 82-87 | ? | - |
| Humectación | ~50 | ~35 | - |

## ESPECIFICACIONES TÉCNICAS /

Desde un punto de vista meramente contractual, las especificaciones técnicas que se establecen en el
Presupuesto en este ámbito se limitarían a plantear la hipótesis de un ambiente de trabajo en el Área de Secado
cuyo rango de temperaturas se movería entre los 80 y los 120 °C, a los únicos efectos de tomarla en
consideración en la selección de sus elementos estructurales. Además de lo anterior, las consideraciones que se
refieren a la humedad relativa del producto (rangos de 9 al 11% y del 19 al 20%), también recogidas en el
Presupuesto, no pueden extrapolarse al ambiente de trabajo del modelo T20-S, ya que no hay contacto físico
entre la banda y el producto, que es transportado mediante unas cunas (o peines) sujetas a dicho elemento.

Así pues, de la consulta de las especificaciones técnicas que ha facilitado SAYER TECHNOLOGIES S.L. sobre el
modelo T20-S de HABASIT, moldeado en TPU 10, se concluye que el fabricante prescribe su uso para trabajar
en ambientes cuyas temperaturas se muevan en el rango de los 0 a los 110 °C.

Por contra, no se indican los rangos de humedad relativa para los que estaría recomendado su uso, pero sí
consta una mención al final del documento que sirve para establecer un criterio sobre lo que podrían
considerarse condiciones climáticas estándar, fijando la referencia para este parámetro en el 50% (muy por
encima del valor del 35% referido por VISCOFAN COLLAGEN USA INC.).

Por último, tampoco aparecen referencias sobre los valores de pH ambiental que puede tolerar este modelo de
forma continuada, ni a los tiempos de vida promedio, que dependerán del conjunto de las condiciones de
trabajo a las que se vean expuestas. En cualquier caso, HABASIT dispone de una aplicación web que permite
hacer ciertas comprobaciones y simulaciones en el siguiente enlace: https://rims.habasit.com/.

P00115



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                    Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

En definitiva, las especificaciones técnicas del modelo de banda T20-S de HABASIT moldeado en TPU 10, elegido por SAYER TECHNOLOGIES S.L. para las Zonas de Neutralización, Secado y Humectación, satisfacen los requerimientos de las condiciones ambientales de trabajo referidas por VISCOFAN COLLAGEN USA INC., que son aproximadas (~) e incompletas (?), tal como se puede observar en la tabla.

La verificación de lo anterior sería explícita en el caso de la temperatura (esta afirmación también es válida en el caso de considerar las especificaciones técnicas del modelo de banda T20 de BRECO que ha facilitado VISCOFAN COLLAGEN USA INC, siempre y cuando el material empleado para su moldeo fuera el TPUWB1), e implícita en el caso de la humedad relativa, al establecerse la referencia de las condiciones ambientales estándar en el entorno del 50%.

### 9.6.2.   Sobre los Cerramientos del Área de Secado

En la Zona de Secado de la Línea S se produce un aporte constante de aire caliente y seco que tiene por objeto reducir los niveles de humedad del producto proveniente del Área Húmeda (y de Aditivos) a valores de entre el 9 y el 11% antes de su procesamiento en la Zona de Humectación.

Según refiere VISCOFAN COLLAGEN USA INC., responsable de la gestión del sistema de aportación de aire, las temperaturas en la Zona de Secado se mantienen entre los 82 y los 87 ºC y la humedad relativa en torno al 35% (este último dato, orientativo, se empleó en otro apartado del dictamen pericial que se incorpora a la DEMANDA para referirse a la humedad relativa de la Zona de Humectación).

El aislamiento térmico que se dispuso en la Zona de Secado de la Línea S tenía el doble objetivo de reducir las pérdidas de calor (eficiencia energética) y facilitar la regulación de la temperatura en el interior (limitando variaciones bruscas). A tal efecto, SAYER TECHNOLOGIES S.L. refiere el empleo de un cerramiento de tablero de partículas para uso de interiores en ambiente seco, revestido de un laminado de 8 mm de la marca Fundermax (aporta una factura fechada el 30 de abril de 2016).

La reclamación que hace VISCOFAN COLLAGEN USA INC. en este caso no se refiere a las consecuencias de un mal aislamiento térmico (exceso de consumo energético y/o dificultades en la regulación de la temperatura), sino al deterioro que parecen haber sufrido los revestimientos interiores de las compuertas del cerramiento que se encuentran en la zona del pasillo, que se debe, según su criterio, a su falta de adecuación para resistir temperaturas y humedades relativas elevadas[15] ("ambiente extremo"); una cuestión que afectaría a su vez al deterioro progresivo del aislante térmico revestido, por exposición directa a las condiciones ambientales de la

---

15  Se recuerda de nuevo que una humedad relativa del 35% se asocia generalmente con un ambiente seco.

*Cristina Fuentes Sánchez*
*N° T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327 — Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

Zona de Secado.

Los elementos probatorios que presenta VISCOFAN COLLAGEN USA INC. se limitan a la exhibición de una compuerta (de las muchas que hay montadas en esa zona de la línea) cuyo revestimiento interior aparece parcialmente rasgado y despegado, así como a la inclusión de una serie de facturas, fechadas en febrero de 2021, en las que aparecen conceptos que podrían estar relacionados con la reciente reposición de estos elementos; de manera que el perito autor de este informe opta, de nuevo, por el contraste entre las condiciones de trabajo del revestimiento, facilitadas por VISCOFAN COLLAGEN USA INC., y sus especificaciones técnicas, proporcionadas por SAYER TECHNOLOGIES S.L., resultando en este caso que la documentación facilitada se corresponde con el producto MAX COMPACT Estándar FH de Fundermax, cuyo empleo se justifica también con la presentación de una factura fechada en abril de 2016, y cuyas propiedades térmicas serían las siguientes:

| Propiedades | Norma | Unidad de medida | Valor mínimo según Norma | Valor obtenido |
|---|---|---|---|---|
| Estabilidad dimensional a 20 °C | EN 438-2 punto 18 | l %  / t % | 0,3 / 0,6 | 0,05 / 0,06 |
| Estabilidad dimensional a elevada temperatura | EN 438-2 punto 17 | l %  / t % | 0,3 / 0,6 | 0,05 / 0,15 |
| Resistencia al agua hirviendo | EN 438-2 punto 12 | % | ≤ 2 | 0,3 |
| Coeficiente de expansión térmica | DIN 52328 | 1/K | – | 20x10⁻⁶ |
| Conductividad térmica | | W/ mK | – | 0,3 |
| Resistencia a la penetración del vapor | | μ | – | 17.200 |
| Resistencia superficial | DIN 53482 | Ohm | – | 10⁹ – 10¹¹ |
| Resistencia a la quemadura de cigarro | EN 438-2 punto 30 | grado | ≥ 3 | 5 – Sin cambios visibles |
| Resistencia sartén caliente | EN 438-2 punto 16 | grado | ≥ 4 | 5 – Sin cambios visibles |
| Valor calentamiento | | MJ/kg | | 18-20 |

– Especificaciones técnicas de las propiedades térmicas del producto MAX COMPACT Estándar FH de Fundermax –

La norma UNE-EN 438-2:2016+A1:2019 (que se cita en la tabla) especifica los métodos de ensayo para la determinación de las propiedades de los laminados decorativos de alta presión. El perito autor de este informe no ha encontrado correspondencia entre las referencias que aparecen en la tabla (quemadura de cigarro o sartén caliente) y las que recoge la norma para las condiciones de trabajo que más se asimilan a las de la Zona de Secado (resistencia al calor seco o al calor húmedo); y aunque los valores obtenidos en esos ensayos resultan óptimos, no procede apoyarse en ellos para justificar su comportamiento en condiciones de ensayo diferentes, incluso cuando se trata de evaluar sus propiedades térmicas (esta misma consideración es aplicable a las propiedades del material en su comportamiento frente al fuego).

P00117



Por otra parte, la indicación que hace el fabricante en el apartado general de propiedades, refiriendo de forma muy vaga que el producto es "resistente a la humedad y al vapor", tampoco puede servir para validar su aptitud para emplearse en la Zona de Secado.

La reclamación sobre el revestimiento de las compuertas de la Zona de Secado se refiere a un aspecto poco relevante desde el punto de vista del funcionamiento de la máquina y de su rendimiento.

Los elementos probatorios (facturas) que presentan ambas partes para justificar la instalación y posterior sustitución de estos elementos quedan fuera del ámbito de análisis de este informe; y la exhibición de la compuerta que aparece deteriorada tampoco tiene la entidad probatoria suficiente y necesaria.

Tampoco hay garantías plenas con respecto a las condiciones de humedad relativa y temperatura a la que hayan podido verse sometidas las compuertas desde el momento de su instalación, y sólo se conoce con certeza que su régimen de funcionamiento previsto es continuo (24/7).

Las especificaciones técnicas facilitadas por SAYER TECHNOLOGIES S.L. tampoco permite pronunciarse con rotundidad sobre la aptitud del material para resistir las condiciones ambientales de la Zona de Secado, aunque los valores de las propiedades térmicas que aparecen referenciadas resultan muy favorables.

En definitiva, el perito autor de este informe no dispone de elementos de juicio suficientes para determinar que la causa de los desperfectos que presenta la compuerta que se exhibe en el dictamen pericial que se adjunta a la DEMANDA sea su falta de adecuación para soportar las condiciones ambientales que refiere VISCOFAN COLLAGEN USA INC.

### 9.6.3.    Sobre los Suelos de Acero en Rejilla (TRAMEX)

El acero en rejilla, conocido popularmente como TRAMEX, es un producto industrial cuya solución estructural consiste en el entramado rectangular de pletinas metálicas electro-soldadas (en la imagen). Su uso está muy extendido en el montaje de suelos, falsos techos, peldaños, pasarelas, etc. debido a múltiples factores (manejabilidad, ligereza, resistencia y modularidad, entre otros) que no procede analizar en este informe, salvo para indicar que ninguno de ellos lo hace incompatible *a priori* con la industria alimentaria.

La reclamación que hace VISCOFAN COLLAGEN USA INC. en este caso tiene que ver con el empleo de esta solución en el pasillo del nivel superior de la máquina, destinado principalmente al tránsito del personal que opera y mantiene la línea de procesamiento, entendiendo que existe el riesgo de caída de partículas provenientes de ese nivel sobre el producto que circula por debajo del nivel del pasillo o sobre las bandejas por las que circulan los fluidos de tratamiento.

A este respecto, el análisis propuesto consiste en determinar, en primer lugar, si el riesgo al que se alude existe para, a continuación, identificar al responsable de su gestión.

- Vista inferior de una escalera en rejilla (tramex) -

- Sección transversal de la Zona 1 del Área Húmeda -

En relación con la primera cuestión, se recurre a la sección transversal de la Zona 1 del Área Húmeda de la Línea S, obtenida a partir del modelo que ha facilitado SAYER TECHNOLOGIES S.L. al perito autor de este informe (distinta de la que se muestra en el Dosier Técnico), para confirmar la existencia del riesgo.

El piso sobre el que transita el operario, sombreado con la señal de advertencia (amarillo y negro), se solapa en la vertical con los elementos por los que circulan el producto y los fluidos para su tratamiento; pero es que incluso si este solape no se produjera, el perito autor de este informe entiende que la solución propuesta no evitaría este riesgo por completo.

SAYER TECHNOLOGIES S.L. apunta que NITTA CASINGS INC. descartó incluir en el Contrato una propuesta que se ofrecía en el Dosier Técnico (detallada en las páginas 8 y 9), que incluía la colocación de una bandeja corrida a lo largo del pasillo, colocada justo debajo del suelo de TRAMEX y ligeramente inclinada con respecto a él, cuya función consistiría precisamente en impedir el tránsito de partículas del nivel superior al nivel inferior, y facilitar la recogida de estos residuos, canalizándolos al exterior de la máquina como vertidos durante las labores de limpieza.

Case 3:23-cv-02257-MAS-TJB    Document 28-4    Filed 10/21/24    Page 171 of 187
PageID: 818

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial IPI2-PAM-PO-2021-1327    Análisis y Conclusiones

Sobre el Empleo de Materiales Inadecuados en la Línea S

Sea como fuera, el hecho es que NITTA CASINGS INC. era la responsable de establecer las condiciones en las que estaba dispuesta a iniciar la Puesta en Marcha de su línea de procesamiento de envoltura de gel de colágeno extruido, incluidas aquellas relacionadas con su seguridad e higiene; y que, consciente de no haber contratado la solución propuesta por SAYER TECHNOLOGIES S.L., dio por bueno su diseño definitivo y no implementó ninguna solución alternativa para corregir esta deficiencia.

En definitiva, el perito coincide con el criterio de la DEMANDA al considerar que la colocación de un suelo de TRAMEX en los pasillos de los distintos tramos de la Línea S, en las circunstancias en las que se hace, y particularmente en el Área Húmeda, no es aceptable desde el punto de vista de la higiene en el ámbito industrial en el que se produce este hecho (sector alimentario).

Sin embargo, la consideración anterior no puede servir de ninguna manera para trasladar a SAYER TECHNOLOGIES S.L. la responsabilidad sobre las condiciones en materia de seguridad e higiene en las que se decidió iniciar el proceso de Puesta en Marcha de la línea de procesamiento de envoltura de gel de colágeno extruido, máxime cuando ella misma estaba en disposición de procurar una solución adecuada.

## 9.7. Sobre el Proceso de Producción de Envoltura

El proceso de producción de envoltura mediante extrusión de gel de colágeno comprende el conjunto de Fases y Etapas descritas en el apartado 5 del informe, dedicado a los Fundamentos Técnicos, y en consecuencia, la calidad final de su producto (la envoltura) depende de todas y cada una de ellas, que se suceden unas a otras de forma secuencial.

La composición y las propiedades del gel de colágeno dependen, en primera instancia, de la materia prima que se introduce en el proceso, y en segunda instancia, de la gestión que haga su productor de las Etapas que componen las Fases de Procesamiento del Material (Material Processing) y de Preparación para la Extrusión (Extrusion Preparation).

Con respecto a las características de la envoltura de gel de colágeno que le llega al cliente final ocurre algo parecido: dependerán, en primera instancia, de las características del gel de colágeno empleado (volvemos al párrafo anterior), y en segunda instancia, de la gestión que haga su productor de las Etapas que componen la Fase de Línea Continua (Continuous Lines) y la Fase de Acabado (Finishing).

Aunque el proceso de producción de gel a partir del colágeno está sobradamente documentado desde el punto de vista técnico, no ocurre lo mismo en el ámbito industrial, donde cada productor lo modifica y adapta según su conveniencia, de manera que la formulación concreta del proceso es única para cada productor y producto, y

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Análisis y Conclusiones

Sobre el Proceso de Producción de Envoltura

por lo tanto, un valor intangible que se protege con celo (secreto industrial). Lo anterior es igualmente válido si lo referimos a la dosificación concreta que recibe la envoltura que se produce a partir del gel de colágeno en cada uno de los tratamientos que se le aplican.

Por último, y antes de abordar las reclamaciones concretas que se incluyen en el dictamen pericial al respecto del proceso productivo en el que se integra la Línea S, se cita[16] la referencia que hace la firma legal Baker Mckenzie en su Due Diligence, indicando que, *"por causas diversas, y de acuerdo con la información proporcionada por NITTA CASINGS INC., el rendimiento de la máquina de envoltura de colágeno no ha logrado alcanzar el punto de funcionamiento óptimo previsto"*.

En definitiva, NITTA CASINGS INC, era el productor del gel de colágeno que se extrudía en la línea, y de la envoltura que se obtenía a partir de él; en consecuencia, era el responsable de la gestión de todos los aspectos que concernían al desarrollo de ambos procesos, y por lo tanto, también de sus resultados.

Que la Línea S no acabase operando a pleno rendimiento tras el proceso de Puesta en Marcha no debería resultar sorprendente, dado el carácter experimental que tenía el proyecto, que enfrentaba a los técnicos de NITTA CASINGS INC. a un proceso de producción novedoso sobre el que no tenían referencias previas.

### 9.7.1. Sobre la Estabilidad del Calibre

En el dictamen pericial que se adjunta a la DEMANDA se incluye una reclamación sobre el comportamiento de la envoltura a su paso por la línea, argumentando que dificultaría el control de su calibre durante el proceso de producción. En principio, y como viene de exponerse anteriormente, el comportamiento de la envoltura de gel de colágeno, una vez extruido y puesto en circulación sobre la línea, es una cuestión sobre la que SAYER TECHNOLOGIES S.L. poco tiene que decir una vez satisfechos sus compromisos contractuales.

En cualquier caso, VISCOFAN COLLAGEN USA INC. presenta un esquema de proceso sobre el que se muestran una serie de valores que se corresponderían con registros del valor del calibre de la envoltura medidos en distintos puntos de la línea para, a continuación, establecer una relación de causa-efecto entre la variación del calibre y el estiramiento de la envoltura manifestando que *"dicha variabilidad demuestra que la envoltura sufría fuertes estiramientos durante el proceso de producción, lo que hacía muy complicado el control de calibre"*.

En primer lugar, el esquema de proceso que se presenta NO se corresponde con la configuración original de la Línea S (aparecen 4 pases de lavado y 2 de plastificado), y por lo tanto, los resultados que puedan haber sido obtenidos mediante pruebas en esas condiciones no pueden extrapolarse al planteamiento original.

16   *"According to information provided by the Seller via Q&A, the collagen casing machine's performance has not meet optimum performance standards for a variety of reasons."*



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

En según lugar, los registros que se muestran no tienen validez probatoria (no se aporta ningún documento que acredite en qué condiciones se obtienen estas lecturas), además de que representan una cantidad de elementos de control enorme (21) en comparación con las que se dispusieron inicialmente en la Línea S (4) para controlar el calibre del producto.

En tercer lugar, incluso en el caso de que se pudieran tomar en consideración estos datos, lo único que demostrarían es que se produce una variabilidad en el calibre de la envoltura a lo largo del proceso, pero no que esta implique necesariamente la existencia de estiramientos excesivos. De hecho, la diferencia de lecturas sólo en el primer tramo, antes de que se produzca ningún giro, ya supondría una variación del calibre del 24% (de 12,7 a 15,8 mm).

En cuarto lugar, hay varias causas que permiten explicar la variación del calibre de la envoltura distintas de los estiramientos (variaciones de presión del gas inyectado en el interior, cambios de composición durante la coagulación y la plastificación, cambios de temperatura y humedad, etc.).

A continuación, VISCOFAN COLLAGEN USA INC. enumera un par de medidas que se habrían adoptado con el objetivo supuesto de mejorar el control del calibre en la línea. La primera consistiría en la introducción de *"amoniaco externo en la extrusión"*, una decisión que encajaría dentro de la lógica del esquema de responsabilidades que le corresponde adoptar como productor del gel de colágeno y de la envoltura que se produce tras su extrusión; y la segunda en la supresión de los niveles inferiores del Área Húmeda, una decisión que se atribuía en otra parte del dictamen pericial a la falta de capacidad del Área de Secado (asunto que se ha tratado anteriormente en el apartado 9.5, Sobre el Dimensionamiento de la Línea S).

Por último, la atención del autor del dictamen pericial que se incorpora a la DEMANDA se centra en el diseño de la Curva 3 (parece ser la única que no se había desmantelado en el momento de la adquisición de NITTA CASINGS INC. por parte de VISCOFAN COLLAGEN USA INC.), a la que hace responsable también de supuestos estiramientos excesivos y roturas de bandas del modelo T20-S, aunque no argumenta su tesis, ni la justifica.

### 9.7.2.    Sobre la Devolución de Producto Terminado

En este punto vuelven a servir las conclusiones que se han plasmado anteriormente, según las cuales NITTA CASINGS INC. sería el responsable último del resultado del procesamiento mediante extrusión de la envoltura de gel de colágeno, así como del procesamiento del propio gel. Sirven también las advertencias sobre la condición experimental del proyecto que se pone en marcha con la adquisición de la Línea S.

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                    Análisis y Conclusiones
                                          Sobre el Proceso de Producción de Envoltura

Si la devolución de producto terminado[17] a la que se refiere el dictamen pericial se debiera a su falta de conformidad, lo primero que debería quedar en evidencia sería el sistema de control de calidad implantado por NITTA CASINGS INC., responsable de la gestión del proceso de producción. Sea como fuere, si el producto devuelto no cumplía los estándares de calidad establecidos, nunca debió haberse comercializado.

Por otra parte, el hecho de que el sistema de trazabilidad (del que no se ofrecen detalles) apuntase a la nueva línea de producción como el origen de estas devoluciones (tampoco se ofrecen detalles) no debería resultar una sorpresa en ningún caso, dadas las circunstancias, teniendo en cuenta, además, que las otras líneas que operaba NITTA CASINGS INC. llevaban años en funcionamiento y sus parámetros de producción estarían, en principio, bajo control.

## 9.8. Sobre el Estado Actual de la Línea S

Desde el momento de su Puesta en Marcha, la Línea S se ha visto sometida a diversas modificaciones.

VISCOFAN COLLAGEN USA INC. refiere que, en el momento de su adquisición, ya se había anulado el funcionamiento de las plantas inferiores de las Zonas Húmedas, de manera que se habían suprimido también los mecanismos de giro de la envoltura de gel de colágeno previstos para las curvas (ver apartado 8.6), y se habían modificado los tiempos de tratamiento originales de los procesos de neutralización, lavado y/o plastificado.

Además de lo anterior, tras la adquisición de la línea por parte de VISCOFAN COLLAGEN USA INC. se procede a la sustitución del sistema de Enrollado y de Humectación de la envoltura de gel de colágeno, y se efectúan otras modificaciones de menor calado que tienen por objeto, según refieren, mejorar su rendimiento.

Sea como fuere, el hecho cierto es que, en el momento de proponerse la redacción de este informe, resulta inviable evaluar el desempeño del conjunto de la máquina que se diseñó en origen, a partir de la que opera actualmente; no así de ciertos elementos o sistemas aislados.

## 9.9. Sobre el Contenido de la Videoconferencia

En este apartado se hace referencia a una serie de 5 videos que se incorporan como anexos al dictamen pericial que se adjunta a la DEMANDA, y que tendrán por objeto dar soporte a sus contenidos, mostrando el estado actual de la línea de procesamiento de envoltura mediante extrusión de gel de colágeno a través de una videoconferencia celebrada el 16 de junio de 2021, conducida por el perito autor del dictamen, desde las oficinas de su empresa en Madrid, y guiada por D. Guillermo Díez García, Director de Operaciones de VISCOFAN

---

17  La expedición del producto terminado se realiza en la planta de Ontario (Canadá), donde tiene lugar la Fase de Acabado.



*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Análisis y Conclusiones

Sobre el Contenido de la Videoconferencia

COLLAGEN USA INC. y VISCOFAN COLLAGEN CANADA INC. desde febrero de 2020, según reza en su perfil de LinkedIn, que atiende al perito desde la planta de la empresa en New Jersey.

El motivo por el que se recurre a este formato se justifica por las restricciones de movilidad impuestas como consecuencia de la declaración de una situación de pandemia mundial (COVID-19).



**Fernando Prieto Moran**
Partner; European Patent Attorney en ABG
Intellectual Property

ABG Intellectual Property · ICAI, Madrid
Madrid, Comunidad de Madrid, España

Más de 600 contactos

Experiencia

ABG Intellectual Property
18 años

- Partner; European Patent Attorney
sept. 2018 - actualidad · 4 años 2 meses
Madrid, Barcelona, Bilbao.

  New stage as ABG Intellectual Property.
  ... Ver más

- Partner; European Patent Attorney
nov. 2004 - actualidad · 18 años
Madrid Area, Spain

  I am a qualified European Patent Attorney
  (EQE) and Partner at ABG Patentes,... ver más



**Guillermo Diez García**
Director of Operations at Viscofan Collagen USA
Inc. & Viscofan Collagen Canada Inc.

VISCOFAN S.A. · Universidad de Valladolid
Bridgewater, Nueva Jersey, Estados Unidos

Más de 600 contactos

Experiencia

VISCOFAN S.A.
10 años 7 meses

- Director of Operations at Viscofan
Collagen USA Inc & Viscofan Collagen
Canada
Jornada completa
feb. 2020 - actualidad · 2 años 9 meses
New Jersey, USA

- Corporate Project & Process Engineer
abr. 2012 - feb. 2020 · 7 años 11 meses
Weinheim, Baden-Württemberg, Germany

  Within the Corporate Process Engineering
  Division of the company, main tasks... ver más

- Fuente: LinkedIn -

La primera parte de la videoconferencia comienza con la presentación del perito, no así de su interlocutor, que lleva mascarilla durante toda la sesión, y que será presentado posteriormente en el dictamen pericial. A continuación se muestra un diagrama de proceso que NO se corresponde con el diseño original de la Línea S que, ha sido sometida a modificaciones profundas desde que fuera instalada por primera vez, como ya se ha indicado en varias ocasiones a lo largo de este informe. También se muestra un esquema de distribución en planta, en el que se observa su característica forma de "L" invertida y donde NO aparecen referencias a la Zona de Aditivos.

La segunda parte de la videoconferencia transcurre en la cabecera de la línea, donde se ubican los cabezales

*página 76*

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial IPI2-PAM-PO-2021-1327

Análisis y Conclusiones

Sobre el Contenido de la Videoconferencia

de extrusión (excluidos del Contrato), y en una oficina cercana a la que se acerca el Director de Operaciones a recoger el plano de distribución en planta que se mostraba en la primera parte.

El perito alude a la velocidad máxima a la que opera, supuestamente, otra línea que existía con anterioridad en la planta (a la que denomina "Línea NITTA"), dedicada también a la producción de envoltura de gel de colágeno, y que parece alcanzar los 30 metros por minutos; una información que confirma el Director de Operaciones, sin aclarar si se refiere a las prestaciones máximas del sistema de transporte, o a la máxima velocidad a la que puede operar la línea produciendo producto "conforme".

El perito solicita entonces conocer a qué velocidad opera en ese momento la máquina, y el Director de Operaciones muestra una pantalla (panel o display) en la que aparece un menú de navegación y varios campos de información, centrando la imagen en el que muestra la velocidad de la línea (Speed Line: 105,00), aclarando que la medida se muestra en pies por minuto, y que la lectura mostrada equivaldría a unos 30 metros por minuto. Según refiere el Director de Operaciones, hay otra pantalla al final de la línea (en la zona de Enrollado) en la que también puede leerse esta información.

A continuación, el perito menciona los valores de velocidad que aparecen en el Dosier Técnico (40/60 metros por minuto) y en el Presupuesto que se adjunta al Contrato (46 metros por minuto), para preguntarle al Director de Operaciones si se está alcanzando, al menos, la menor de ellas (40 metros por minuto), a lo que éste responde, literalmente, "...no llegamos...". El perito hace una primera mención al concepto de "...velocidad prometida..." (al que también aludirá su interlocutor más adelante) para consultar sobre los motivos que explican que no se esté trabajando a velocidades superiores a los 30 metros por minuto. El Director de Operaciones refiere que el "...principal problema..." por el que no se puede llegar a esa "...velocidad prometida..." de procesamiento "...ahora mismo..." se encuentra en la Zona de Secadero, incapaz de proporcionar las propiedades deseadas al producto si la velocidad de procesamiento supera ese valor.

Por último, el perito le pregunta al Director de Operaciones si, en base al escenario anteriormente expuesto, considera que la inversión que se hizo merecía la pena, a lo que éste responde que "...claramente no...".

La tercera parte de la videoconferencia permite visualizar el estado actual de la línea, desde su cabecera, donde se ubican los cabezales de extrusión, hasta la Curva 3.

El Director de Operaciones confirma verbalmente la supresión del nivel inferior de los dos tramos del Área Húmeda (tanto en la Zona 1 como en la Zona 2), reduciéndose de forma significativa el número de pases del proceso. Como consecuencia de lo anterior, desaparecen los sistemas de poleas instalados originalmente en las Curvas 1 y 2, que son sustituidos por un sistema de carriles guiados.

página 77

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de Junio de 2023*

Informe Pericial JPI2-PAM-PO-2021-1327                                    Análisis y Conclusiones

Sobre el Contenido de la Videoconferencia

Se atraviesa el primer tramo de la línea sin detenerse para referir nada relevante sobre él. El único proceso que tiene lugar en esta zona en la actualidad, además de la extrusión, es la neutralización (se han anulado los 6 pases del tratamiento de lavado que se habían previsto en él, motivo por el que los video-conferenciantes no emplean la denominación de Zona Húmeda hasta llegar al segundo tramo de la línea).

Al llegar a la Curva 1, el Director de Operaciones muestra el pasillo que recorre la que ahora denominan "Zona Húmeda" (que se corresponde parcialmente con la Zona 2 del Área Húmeda de la Línea S original, ya que en este tramo también se ha anulado el nivel inferior). En este punto, el perito se interesa por las razones que han llevado a considerar excesivo el dimensionamiento del Área Húmeda original. El Director de Operaciones opina que, efectivamente, era *"...innecesariamente larga, muy larga..., ...para la velocidad real a la que la máquina puede ir...",* aunque entiende que hubiera sido del tamaño correcto si se hubieran podido alcanzar las velocidades de referencia iniciales (el perito menciona en este caso una velocidad de 60 metros por minuto).

Surge también en este punto la controversia sobre la idoneidad de las bandas (o correas) empleadas en las cintas transportadoras de la Línea S, que parecen haber dado problemas de corrosión, y aunque el perito ubica inicialmente estos elementos en la "Zona Húmeda", el Director de Operaciones corrige esta información, apuntando que las bandas que estarían dando estos problemas se encontrarían en el Área de Secado. El Director de Operaciones confirma que dispone de las hojas de especificaciones.técnicas (data sheet) de dichas bandas y el perito solicita disponer de ellas, de cara a la redacción de su dictamen, aunque luego no se incorporan al mismo. Por último, también en este punto, se anticipa la problemática asociada al supuesto empleo de materiales no apropiados en las compuertas del Área de Secado, sin entrar en mayores detalles.

A continuación, el Director de Operaciones atraviesa el pasillo de la "Zona Húmeda" sin detenerse para referir nada relevante sobre él, como ya hiciera con el primer tramo de la línea, para acabar deteniéndose en el Área de Aditivos, donde se encuentra con un trabajador sin calzas.

El Director de Operaciones achaca los problemas en la estabilidad del calibre de la envoltura de gel de colágeno al diseño de la Curva. Las soluciones que parecen haber resuelto esta problemática han consistido en suprimir los niveles inferiores del Área Húmeda, e incorporar una pequeña modificación a la entrada de la Curva 3, que parece proporcionar cierto efecto amortiguador en ese tramo. Según refiere el propio Director de Operaciones, disponen de registros que permitirían validar esta hipótesis.

La cuarta parte de la videoconferencia transcurre casi por completo alrededor de la Curva 3, frente al Área de Secado, a la que se accede casi al final del vídeo para mostrar el estado de una de las compuertas objeto de reclamación.

El perito consulta al Director de Operaciones si considera que *"...la capacidad del secadero es insuficiente...",*

página 78

P00126

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

Informe Pericial IPI2-PAM-PO-2021-1327                                    Análisis y Conclusiones

Sobre el Contenido de la Videoconferencia

a lo que éste responde *"…así es, correcto…"*. El perito abunda sobre esta cuestión, planteando que se trataría de *"… un cuello de botella…"* en el proceso, a lo que el Director de Operaciones responde *"…así es…, …el secadero no tiene la capacidad necesaria…, …no podemos llegar a secar el producto…,"*.

Según parece, la velocidad de 30 metros por minuto parece ser la máxima a la que pueden procesar la envoltura de gel de colágeno obteniendo los parámetros de humedad adecuados (en el caso concreto del Área de Secado, sí se han mantenido los 6 pases ya previstos en el diseño original).

A continuación, el perito pregunta por los *"…aspectos más relevantes respecto al diseño incorrecto de esa zona de la Línea S…"*, y el Director de Operaciones refiere como elemento *"…principal, el material que se utiliza en la construcción de las puertas del secadero…, que no soporta las temperaturas ni la humedad que hay en la zona…,"*, apuntando que las han tenido que cambiar, aunque algunas están todavía instaladas.

Se retoma la disertación sobre el diseño de la Curva 3, previa a la entrada al Área de Secado, y los estiramientos que supuestamente producía debido a que su diseño original, según comenta el Director de Operaciones, era *"más agresivo"* con la tripa que la solución implantada posteriormente por VISCOFAN COLLAGEN USA INC. También se retoma la problemática asociada a la rotura de bandas (o correas) en el Área de Secado, que provocaba la parada de la línea de procesamiento, cuyo régimen de funcionamiento es continuo (24/7). En este caso, el Director de Operaciones achaca estas roturas a la falta de adecuación de los materiales empleados para trabajar en régimen permanente en un ambiente de temperatura y humedad elevada.

La sesión finaliza con el acceso del Director de Operaciones al Área de Secado, mostrando el deterioro de la lámina de revestimiento del interior de una de las compuertas que forman parte del cerramiento, que aparece rasgada. Insiste de nuevo en que se han cambiado muchas de estas compuertas, pero que algunas siguen aún instaladas. Todas las compuertas que aparecen en el tramo recorrido presentan el mismo aspecto exterior.

La quinta y última parte de la videoconferencia se desarrolla en el nivel inferior de la línea, entre el Área de Enrollado y el Área de Secado. La calidad en este fragmento de la videoconferencia es particularmente baja.

Como se anticipó previamente, se observa el desmantelamiento de la línea en los dos tramos (Zona 1 y 2) del Área Húmeda, siendo parcial en el primero (se conservan las bandejas y los murales que las soportan) y total en el segundo (sólo se conservan los elementos estructurales que soportan el nivel superior).

Se aborda la problemática derivada del empleo de suelos de acero de rejilla (TRAMEX) en la zona de tránsito, mostrando zonas del pasillo ubicadas en la vertical de las bandejas por las que circula la envolvente de gel de colágeno (producto destinado al consumo humano). El Director de Operaciones menciona concretamente que *"…deja caer la suciedad de la gente que pisa en el piso superior…"*, y el perito que conduce la sesión apunta

P00127

*Cristina Fuentes Sánchez*
*Nº T/I Jurada: 3380*
*19 de junio de 2023*

 Informe Pericial IPI2-PAM-PO-2021-1327

Análisis y Conclusiones

Sobre el Contenido de la Videoconferencia

que se trata, por tanto, de una cuestión de salubridad (higiene).

Al final de la sesión se muestra la información de la pantalla (panel o display) que se encuentra al final de la línea, junto a la Zona de Enrollado, en la que se puede leer, de nuevo, un valor de "Speed Line" de 105 pies por minuto.

En definitiva, la videoconferencia sería el medio empleado por la actora para exponer y anticipar las reclamaciones que se relacionan posteriormente en el dictamen pericial que se incorpora a la DEMANDA, mostrando las localizaciones y los elementos sobre los que versan algunas de ellas. A este respecto, su valor probatorio queda a expensas de la acreditación documental de los argumentos u opiniones que en él se vierten. Por último, cabe reseñar que la calidad del documento (audio y vídeo) dificulta su interpretación en algunos momentos, y que la exhibición parcial y no exhaustiva que se hace de la máquina permite, no obstante, detectar diferencias notables con respecto al diseño original de la Línea S.

P00128

**EXHIBIT L**



*New Jersey Department of State* AUF **FILED** 213 Rev. 7/92
*Division of Commercial Recording*
*Application for Certificate of Authority*        JUL 1 5 1996
(For Use by Foreign Profit and Nonprofit Corporations)        *1103280*

LONNA R. HOOKS
SECRETARY OF STATE

**Check Appropriate Statute:**

☒  **NJSA 14A:13-4**    **New Jersey Profit Corporation Act (File in Duplicate)**

☐  **NJSA 15A:13-4**    **New Jersey Nonprofit Corporation Act (File in Triplicate)**

Pursuant to the provisions of the appropriate Statute, checked above, of the New Jersey Statutes,
the undersigned corporation hereby applies for the Authority to conduct business/activities in
New Jersey and for that purpose certifies to the following:

1.  Name of Corporation:        Nitta Casings Inc.
2.  Incorporated under the laws of:   the State of Delaware
3.  Date of Foreign Incorporation:   July 9, 1996
4.  The address of its main office or headquarters is:
    (Street and postal designation)

        201 West Passaic Street

    (City)  Rochelle Park        (State)  New Jersey        (Zip)  07662

5.  The name and address of its Registered Agent in New Jersey is:
    (Agent's Name)        THE CORPORATION TRUST COMPANY

    (Street and postal designation)   820 Bear Tavern Road

    (City) West Trenton        (State)   New Jersey        (Zip)   08628

    Said Registered Agent is an agent of the corporation upon whom process against the corporation
    may be served.

6.  The period of its duration is:    Perpetual
7.  The business/activities which the corporation is authorized to conduct in New Jersey, and which
    it is also authorized to conduct in its home jurisdiction are:  the manufacture and sale of collagen
    casings for meat and other products and all related and incidental activities

    Note:  Attach a **Good Standing Certificate** from the home state dated no more than
    **30 days** prior to filing in New Jersey.

Signature: _____

Title: _____  Date: _July 11, 1996_
        Executive Vice President
    (Must be Chairperson of the Board, President, or Vice President)

(N. J. - 2010 - 6/17/94)        0100672756



C-113A Rev. 3/2013    **New Jersey Division of Revenue & Enterprise Services**
**APPLICATION FOR AMENDED CERTIFICATE OF AUTHORITY**
(For Use by Foreign Profit and Non-profit Corporations)

Check Appropriate Statute:
- ☑ N.J.S.A. 14A:13-6    New Jersey Profit Corporation Act
- ☐ N.J.S.A. 15A:13-6    New Jersey Nonprofit Corporation

Pursuant to the provisions of the appropriate Statute, checked above, of the New Jersey Statutes, the undersigned corporation hereby applies for an Amended Certificate of Authority, and for this purpose certifies to the following:

1. Original corporate name: Nitta Casings Inc.

2. NJ 10 digit ID Number: _____

3. New name of corporation (if applicable):
   Viscofan Collagen USA Inc.

4. Incorporated under the laws of: Delaware
   The date of foreign incorporation: 07/09/1996

5. The duration of the corporation is: Perpetual

6. The address of its main office or headquarters is:
   (Street and postal designation) 141 Southside Ave.
   (City) Bridgewater    (State) NJ    (Zip) 08807

7. The name and address of its Registered agent in New Jersey is:
   (Agent's Name) Cogency Global Inc.
   (Street and postal designation) 14 Scenic Drive
   (City) Dayton    (State) NJ    (Zip) 08810

   Said Registered Agent is an agent of the corporation upon whom process against the corporation may be served.

8. The business/activities which the corporation is authorized to conduct in New Jersey, and which it is also authorized to conduct in its home jurisdiction are:
   Develop, manufacture and sell casings and collagen primarily for the meat industry

NOTE: Attach a Good Standing Certificate from the home state dated no more than 30 days prior to filing in New Jersey.

Signature: _____

Title: José Antonio Canales Garcia, Vice Chairman of the Board    Date: December 19, 2019
(Must be Chairperson of the Board, President, or Vice President)



*State of Delaware*    PAGE   1

## *Office of the Secretary of State*

---

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY "NITTA CASINGS INC." IS DULY

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN

GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE

RECORDS OF THIS OFFICE SHOW, AS OF THE NINTH DAY OF JULY, A.D.

1996.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES

HAVE NOT BEEN ASSESSED TO DATE.





*Edward J. Freel, Secretary of State*

AUTHENTICATION:        8019458

DATE:

2641576   8300                            07-09-96

960199962

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "VISCOFAN COLLAGEN USA INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE NINETEENTH DAY OF DECEMBER, A.D. 2019.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "VISCOFAN COLLAGEN USA INC." WAS INCORPORATED ON THE NINTH DAY OF JULY, A.D. 1996.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

2641576  8300

SR# 20198772902

Authentication: 204265866

Date: 12-19-19

You may verify this certificate online at corp.delaware.gov/authver.shtml

CAO
FILED
JAN 2 3 2020
STATE TREASURER
0100672736

C-104G Rev: 7/1/02

## New Jersey Division of Revenue

### CERTIFICATE of CHANGE of REGISTERED OFFICE &/or REGISTERED AGENT

*(For Use by Domestic and Foreign, Profit and Non-profit Corporations)*

Corp ID#: 0100672736

CORPORATION NAME:   Viscofan Collagen USA Inc

STATE OF ORIGINAL INCORPORATION:   Delaware

**IMPORTANT - INCLUDE INFORMATION ON BOTH THE PRIOR AND NEW AGENT**

| PRIOR AGENT NAME: | | | NEW AGENT NAME: | | |
|---|---|---|---|---|---|
| Cogency Global Inc. | | | Corporation Service Company | | |

| PRIOR AGENT STREET ADDRESS | | | NEW AGENT STREET ADDRESS | | |
|---|---|---|---|---|---|
| 14 Scenic Drive | | | Princeton South Corporate Ctr, Ste 160 100 Charles Ewing Blvd | | |

| CITY | STATE | ZIP | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| Dayton | NJ | 08810 | Ewing | NJ | 08628 |

The corporation states that the address of its new registered office and the address of its new registered agent are identical. Further, the changes designated on this form were authorized by resolution duly adopted by its board of directors or members.

By _____
(Signature of Officer)

Title   José Antonio Canales Garcia, Vice Chairman of the Board
(Type)

Date:  01/17/2020

**NOTE -** This form must be executed by the chairman of the board, the president, or the vice president of the corporation.

FEES: Change of Agent Name-$25.00
        Change of Agent Address-$25.00
        Change of Both-$25.00

MAIL TO: NJ Division of Revenue
        PO Box 308
        Trenton, NJ 08646

Make checks payable to:  TREASURER, STATE of NEW JERSEY  (NO CASH PLEASE)

**STATE OF NEW JERSEY**
**DEPARTMENT OF THE TREASURY**
**DIVISION OF REVENUE AND ENTERPRISE SERVICES**
**CERTIFICATE OF PENDING WITHDRAWAL**

*Foreign Profit Corporate Title N.J.S.A 14A:13-8*

**VISCOFAN COLLAGEN USA INC.**
*0100672736*



*IN TESTIMONY WHEREOF, I have*
*hereunto set my hand and affixed*
*my Official Seal, this*
*5th day of July, 2022*

*Certificate Number : 2646262253*
*Verify this certificate online at*
*https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp*

*Elizabeth Maher Muoio*
*State Treasurer*

### STATE OF NEW JERSEY
### DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES
### CERTIFICATE OF PENDING WITHDRAWAL

*Foreign Profit Corporate Title N.J.S.A 14A:13-8*

### VISCOFAN COLLAGEN USA INC.
*0100672736*

I, the Treasurer of the State of New Jersey, do hereby certify that the above-name New Jersey Foreign For-Profit Corporation did on the 5th of July, 2022, file and record in this department a Certificate Relative to Cancellation in the home state, hereby terminating existence.

1. **Name:** VISCOFAN COLLAGEN USA INC.

2. **Incorporated under the laws of:** DE

3. The corporation is not transacting business activities in New Jersey.

4. The corporation hereby surrenders its authority to transact business activities in New Jersey.

5. The address to which the Treasurer, State of New Jersey may mail a copy of any process against the corporation that may be served is:

   GUILLERMO EQUIDAZU CHAPA, PRESIDENT
   141 SOUTHSIDE AVENUE
   BRIDGEWATER, NJ 08807

6. **Date of Adoption:** 06/27/2022

The undersigned represent(s) that the filing complies with State laws detailed in Title 14A:13-8 and that they are authorized to sign this form on behalf of the Foreign Profit Corporation.

**Signature and Title**
GUILLERMO EGUIDAZU CHAPA, PRESIDENT